Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


FELICIA SUZETTE HENDRICKS,

    Plaintiff,

vs.          CASE NO. 2:05-CV-714-F

WARREN McDONNELL, et al.,

    Defendants.


\* \* \* \* \* \* \* \* \* \*

DEPOSITION OF FELICIA SUZETTE HENDRICKS,
taken pursuant to stipulation and agreement
before Dee Coker, Registered Professional
Reporter and Commissioner for the State of
Alabama at Large, in the Legal Offices of the
Department of Corrections, 301 South Ripley
Street, Criminal Justice Building, Montgomery,
Alabama, on Wednesday, April 26, 2006, commencing
at approximately 1:21 p.m.

\* \* \* \* \* \* \* \* \* \* \*


DEFENDANT'S
EXHIBIT
A

April 26, 2006

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

2 (Pages 2 to 5)

Page 2

1          APPEARANCES
2    FOR THE PLAINTIFF:
3    Mr. Amardo Wesley Pitters
     Attorney at Law
4    1145 South Perry Street
     Montgomery, Alabama 36104
5
     FOR THE DEFENDANTS:
6
     Mr. Greg Biggs
7    Assistant Attorney General
     ALABAMA DEPARTMENT OF CORRECTIONS
8    Legal Division
     301 South Ripley Street
9    Montgomery, Alabama 36104
10
11       * * * * * * * * * *
12       EXAMINATION INDEX
13   FELICIA SUZETTE HENDRICKS
     BY MR. BIGGS           5
14   BY MR. PITTERS         157
     BY MR. BIGGS           174
15
         EXHIBIT INDEX
16
     DEFENDANTS'S EXHIBIT NO.:
17
      1 Notice to Take Deposition    12,44
18
      2 Complaint for Violation of   48,63,69
19     Civil Rights, Equal Protection 74,83
       of the Law, and Dismissal from
20     Employment Without Just Cause
21    3 Motion to Amend Complaint for  96,97
       Violation of Equal Protection
22     of the Law, Violation of Civil
       Rights and Due Process of Law
23

Page 3

1    (DEFENDANT'S EXHIBITS continuing:)
2     4 ADOC Standards of Conduct    75,77,80,82
3     5 ADOC Positive (Progressive)  153,154,158
       Employee Discipline
4
      6 2/18/05 memo to F.Hendricks  147,148,166
5      from T.McDonnell
6     7 3/2/05 memo to D.Campbell    148,150
       from T.McDonnell
7
      8 Predismissal Conference Memo 149,150
8      to D.Campbell from T.McDonnell
9     9 Statement of F.Hendricks     98-100,112
                                     113,126
10
     10 3/4/05 letter to F.Hendricks 150,151,153
11     from D.Campbell               156,158,164
                                     174
12
     12 ADOC Oath of Office signed   125,126
13     by F.Hendricks
14   14 Statement by F.Hendricks     16
15   15 Memo of understandings by    21,43,44,48
       F.Hendricks
16
17       * * * * * * * * * *
18        STIPULATIONS
19       It is hereby stipulated and agreed by
20   and between counsel representing the parties that
21   the deposition of FELICIA S. HENDRICKS is taken
22   pursuant to the Federal Rules of Civil Procedure
23   and that said deposition may be taken before Dee

Page 4

1    Coker, Registered Professional Reporter and
2    Commissioner for the State of Alabama at Large,
3    without the formality of a commission; that
4    objections to questions other than objections as
5    to the form of the questions need not be made at
6    this time but may be reserved for a ruling at
7    such time as the deposition may be offered in
8    evidence or used for any other purpose as
9    provided for by the Federal Rules of Civil
10   Procedure.
11       It is further stipulated and agreed by
12   and between counsel representing the parties in
13   this case that said deposition may be introduced
14   at the trial of this case or used in any manner
15   by either party hereto provided for by the
16   Federal Rules of Civil Procedure.
17
18       * * * * * * * * * * *
19       MR. PITTERS: We'll waive.
20
21
22
23

Page 5

1         FELICIA SUZETTE HENDRICKS
2       The witness, having first been duly
3    sworn to speak the truth, the whole truth and
4    nothing but the truth, testified as follows:
5             EXAMINATION
6    BY MR. BIGGS:
7    Q. Good afternoon.
8    A. Good afternoon.
9    Q. My name is Greg Biggs. I'm with the
10      Department of Corrections, legal counsel
11      office. I think I have met you in court
12      before, before you had an attorney. It's
13      good to see you again.
14          This is your deposition. And you're
15      here with Mr. Pitters who represents you
16      today. Have you ever been deposed before?
17   A. No, sir.
18   Q. Okay. This is not a marathon. And during
19      the course of this, if you ever get tired and
20      want to take a break for any reason, you let
21      me know or let your lawyer know and we'll
22      take a break, okay? The only thing I ask you
23      is when I ask you a question, if there's a

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

April 26, 2006

3 (Pages 6 to 9)

Page 6

1  pending question -- that is, if I ask you a
2  question, you can't break until you answer
3  the question.
4      The other rule is that this is Dee, and
5  she's a court reporter; and she's a great
6  court reporter, and she takes down everything
7  that is said. But that behooves you, when I
8  ask a question, to answer verbally,
9  articulate an answer either yes or no or
10 state your answer. You can't nod your head
11 or you can't go uh-huh or unh-unh because
12 it's real hard for her to type that down.
13     If I ask a question and you don't
14 understand it, you ask me to ask it again,
15 because -- and I will ask bad questions and
16 sometimes, they don't make sense. If you
17 have any hesitation at all about what I'm
18 asking, ask me to clarify it, because I don't
19 want you to answer a question and you're
20 assuming what I'm asking. So you make sure
21 what I ask first, okay?
22 A. (Nodding head.)
23 Q. You have to say yes.

Page 7

1  A. Yes, sir.
2  Q. I want you to get used to doing that because
3     this is a very awkward thing. I will be
4     asking you a series questions, and you have
5     to answer those questions.
6  A. Yes, sir.
7  Q. And you're under oath. You understand that?
8  A. Yes, sir.
9  Q. The first thing I want you to do is state
10    your full name for the record.
11 A. Felicia Suzette Hendricks.
12 Q. Would you spell that, please?
13 A. Felicia, F-E-L-I-C-I-A, Suzette,
14    S-U-Z-E-T-T-E, Hendricks, H-E-N-D-R-I-C-K-S.
15 Q. Okay. And what's your date of birth?
16 A. May the 19th, 1971.
17 Q. Okay. And where do you live?
18 A. I live -- presently I'm living now at 734
19    St. Martins Drive, Pike Road, Alabama 36064.
20 Q. And how long have you lived there?
21 A. I just moved there the end of December of
22    2005.
23 Q. Okay. And before you moved out to that

Page 8

1  address, where did you live?
2  A. I was living at 5113 Loblolly Pine Drive,
3     Montgomery, Alabama.
4  Q. All right. Do you also have a P.O. box?
5  A. Yes, sir.
6  Q. And what's your P.O. Box?
7  A. Post Office Box 251554, Montgomery, Alabama,
8     36125.
9  Q. How long have you had that P.O. box?
10 A. It's been years.
11 Q. Okay. Are you employed presently?
12 A. Yes, sir, I am.
13 Q. Where are you employed now?
14 A. At T&WA of Montgomery.
15 Q. And how long have you been employed there?
16 A. April the 1st of this year was a year.
17 Q. Okay. So you've been working for that
18    company since April of '05?
19 A. Yes, sir.
20 Q. Okay. And prior to that, where did you work?
21 A. I was working at Kilby Correctional Facility.
22 Q. Okay. You worked for the Department of
23    Corrections?

Page 9

1  A. Department of Corrections, yes, sir.
2  Q. When did you start working for the Department
3     of Corrections?
4  A. It was April 2000.
5  Q. Okay. And what was your position with the
6     Alabama Department of Corrections?
7  A. Correction Officer I.
8  Q. Okay. And how did it come about you getting
9     a job with the Alabama Department of
10    Corrections?
11 A. I applied with the State at Jim Folsom
12    Building downtown. And I received a letter
13    saying that I was a qualified candidate, and
14    I pursued on from there with the steps.
15 Q. Okay. Did you have any prior law enforcement
16    experience to that day?
17 A. No, sir.
18 Q. Okay. After you were hired in 2000 --
19 A. Yes, sir.
20 Q. -- did you attend an academy?
21 A. Yes, sir. In Selma, Alabama.
22 Q. Okay. When was that?
23 A. In April -- in April, 2000.

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

April 26, 2006

4 (Pages 10 to 13)

Page 10

1  Q. Okay. How long was the academy?
2  A. I think it was like eight, nine weeks.
3  Q. Okay.
4  A. If I'm not mistaken.
5  Q. Okay. And as part of your training, did you
6     receive instruction on the administrative
7     regulations with the Alabama Department of
8     Corrections?
9  A. Yes, sir.
10 Q. All right. And you also were instructed as a
11    corrections officer you have responsibility
12    to review and -- well, strike that.
13       As part of your responsibilities as a
14    corrections officer, you also learned that
15    you were to keep up to date on the
16    administrative regulations of the Alabama
17    Department of Corrections?
18 A. Yes, sir.
19 Q. Okay. When you graduated the academy, what
20    was your first assignment? What was your
21    first place that you worked?
22 A. At Kilby.
23 Q. Okay. Is it safe to say that you were a

Page 11

1     corrections officer with the Alabama
2     Department of Corrections at Kilby Prison
3     only?
4  A. Yes, sir. Because that was my first choice,
5     and I was approved for my first choice.
6  Q. Okay. So your entire employment with the
7     Department of Corrections would be at that
8     facility?
9  A. Yes, sir.
10 Q. Kilby facility. In the position of
11    Corrections Officer I?
12 A. Yes, sir.
13 Q. Okay. All right. Ultimately, you were
14    dismissed as a corrections officer, correct?
15 A. Yes, sir.
16 Q. Do you remember the exact day that you were
17    dismissed?
18 A. February the 11th, 2005.
19 Q. And how did you receive notice that you were
20    dismissed?
21 A. It was first a pre-dismissal; then dismissal
22    from Terrance -- Warden Terrance McDonnell.
23 Q. Did you receive a letter from the

Page 12

1     Commissioner -- then Commissioner Campbell?
2  A. Yes, sir.
3  Q. Okay. It's like he -- the letter -- and
4     we'll go over it in a minute. But the letter
5     basically says, in sum, that he approves the
6     recommendation of the Warden McDonnell of
7     your dismissal?
8  A. Yes, sir.
9  Q. And you got that letter?
10 A. Yes, sir.
11 Q. Okay. I show what's marked as Defendant's
12    Exhibit #1. That is a notice of this
13    deposition. Do you see that?
14 A. Yes, sir.
15 Q. Okay. Do you remember getting a copy of that
16    notice?
17 A. Yes, sir.
18 Q. Okay. Did you read it?
19 A. Yes, sir.
20 Q. Okay. In that notice of taking deposition,
21    it says that your deposition will be today at
22    one o'clock, does it not?
23 A. Yes, sir, it does.

Page 13

1  Q. It also asks you to bring things with you.
2     Did you bring any of the things that are
3     outlined in that notice of deposition with
4     you?
5        Well, maybe we ought to do it this way.
6     Let me go through it one by one with you.
7     Look at number one. Do you have any written
8     or tape recorded notes, memorandum or other
9     documents in your possession or subject to
10    your control which supports the claims made
11    the basis of your lawsuit in this case?
12 A. Yes.
13 Q. What do you have?
14 A. Just some little notes that I jotted down on
15    my own.
16 Q. Some notes?
17 A. Uh-huh.
18 Q. Do you have them with you?
19 A. Yes.
20 Q. Okay. Could you bring them out and let us
21    take a look at them?
22    MR. PITTERS: You can't do that.
23    Objection to --

DEPOSITION OF FELICIA S. HENDRICKS                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

---

Page 14

1    MR. BIGGS: Why are you objecting?
2    MR. PITTERS: Attorney/client
3       privilege. These are documents
4       that bear not only her
5       handwriting, but if you see --
6    MR. BIGGS: I don't see. I won't --
7    MR. PITTERS: I don't want you to read
8       them, but the handwriting are
9       different.
10   MR. BIGGS: Are you representing to me
11      that those notes that are in front
12      of you are notes of conversations
13      between you and your client?
14   MR. PITTERS: That's correct.
15 Q. All right. Anything that you communicate
16   with your lawyer with, conversations or -- is
17   not discoverable. That is privileged.
18   Okay. So if we get into questions about have
19   you had conversations with this person,
20   always remember anything that you've
21   discussed with your lawyer is privileged,
22   okay?
23 A. All right.

---

Page 15

1  Q. Do you have any -- other than the notes that
2     are represented to me as attorney/client
3     privilege, do you have any other notes or
4     documents, memorandum or anything that
5     supports the basis of this lawsuit?
6  A. Yes, sir.
7  Q. What do you have? Just tell me what you
8     have.
9  A. I have a statement from -- which I had of an
10    incident that happened on February the 27,
11    2004.
12 Q. Could I see it? Okay. What I'd like to do
13    is make a -- mark this and make a copy of
14    it. And so I'm going to let you have it
15    back, but I think for the record, I need to
16    get this identified. Maybe mark it --
17   MR. BIGGS: Do you have a copy?
18   MR. PITTERS: That's what I was going
19      to say. Let me see. Make sure
20      it's the same thing. Yes, you
21      don't have to copy it. Just mark
22      that if you want to mark it.
23   MR. BIGGS: Dee, I've already got some

---

Page 16

1       pre-marked exhibits. I think I'm
2       going to start with --
3    MR. PITTERS: And I think, you know,
4       you had -- most of what she has
5       here are documents that I
6       submitted with the disclosures.
7       But, I mean --
8    MR. BIGGS: If that's the case, we'll
9       go through it one by one. But if
10      it's already something that I have
11      or you filed with the court or we
12      have, then we won't have to make
13      copies of her exhibits. I just --
14      you just need to tell me. But
15      this is something I haven't seen.
16      I'm going to mark this as
17      Defendant's Exhibit #14.
18 Q. I show you what's marked as Defendant's
19   Exhibit #14. This is the document that you
20   have brought with you. And it says
21   statement. Is this your statement?
22 A. Yes, sir.
23 Q. Okay. And this is a statement where you say

---

Page 17

1    that you briefly observed Sergeant White pull
2    a pocket knife from his pocket and attempt to
3    cut an inmate. Is that true?
4  A. Cut an inmate down from his cell, which he
5     was hanging himself.
6  Q. Okay. Do you have anything else?
7  A. No, sir. The same thing that I have is the
8     same thing that you have.
9  Q. Okay. Just verbally tell me what you have.
10    And I probably won't mark it, but just tell
11    me what you brought with you to make sure the
12    record is clear what you have.
13 A. I have a memorandum from Warden Terrance
14    McDonnell to CO-I Hendricks, notice of a
15    pre-dismissal conference.
16 Q. That's dated when?
17 A. February the 18th, 2005.
18 Q. Okay.
19 A. I have -- and I have to Donal Campbell,
20    Commissioner from Terrance McDonnell, Warden,
21    subject, CO-I Hendricks, pre-dismissal
22    conference memorandum as to the grievances
23    and the --

DEPOSITION OF FELICIA S. HENDRICKS
April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

6 (Pages 18 to 21)

Page 18

1  Q. Is that the dismissal letter signed by Donal
2     Campbell?
3  A. Yes, sir, the dismissal letter from
4     Mr. Campbell.
5  Q. Okay.
6  A. And I have another grievance form.
7  Q. It's your handwritten statement that you've
8     written?
9  A. And then I have some handwritten statements,
10    and I have a petition that was signed by some
11    officers and former employers -- employees,
12    excuse me. And I have another -- I have a
13    complaint form.
14 Q. Okay. What else do you have?
15 A. And this is the same thing that you have that
16    I have, which is the motion to amend for the
17    complaint of violation of equal protection of
18    the law.
19 Q. Okay. I see it.
20 A. I have that. And --
21 Q. Is that your personnel file that you have, a
22    copy of your personnel file? Is that the
23    complaint? I'm sorry. You're looking at the

Page 19

1     actual -- the original complaint, right?
2  A. Yes.
3  Q. All right. I see that.
4  A. And I have the first original complaint.
5  Q. Okay.
6  A. And I have one of my employee's performance
7     appraisals that I brought with me.
8  Q. Okay. What date is on that performance
9     appraisal?
10 A. It was period covered from 11/01/2003 to
11    11/01/2004 and your raise effective for -- it
12    was January of 2005.
13 Q. Okay. Anything else you have?
14 A. No, sir. No more than I have Administration
15    Regulations Rule 208.
16 Q. What's the date of 208 there?
17 A. It was date of July 26, 2000.
18 Q. Okay.
19 A. And Administration Regulation 207. But
20    that's a -- it was dated like in '94. That's
21    the last one that I had received since I was
22    there. And Administration Regulation 220.
23    It's dated July 26, 2000.

Page 20

1  Q. Okay. Anything else?
2  A. No, sir. That is it.
3  Q. Okay. What are you looking at? What are the
4     documents you're looking at right now? What
5     are those?
6  A. Those are the ones that I received from -- in
7     the United States District Court for the
8     Middle District of Alabama, Northern
9     Division.
10 Q. Is it documents or pleadings of this case
11    that was filed or orders by Judge Coody in
12    the case?
13 A. Yes, sir.
14 Q. Is that what those are?
15 A. From Judge Coody.
16 Q. Okay. What is that -- what is that one right
17    there? What's that?
18 A. And I have a -- it's a memoranda of
19    understanding the involvement of other
20    employees at DOC.
21 Q. Okay. Could I see that, please? Okay. I
22    won't mark this one. When Stephanie gets
23    here, I'll ask her to make a copy of it. But

Page 21

1     what I'll do if you don't mind, I'll put a
2     little sticky on it. This will be marked
3     Defendant's Exhibit #15. And we'll refer to
4     it as that. Or I can take a break and we'll
5     make a copy of it real quick.
6        MR. PITTERS: Okay.
7        MR. BIGGS: Let me do that so I can go
8        ahead and mark it. We're off the
9        record for just a second.
10       (Off-the-record discussion)
11 Q. Ms. Hendricks, I show you what I have marked
12    as Defendant's Exhibit #15. And this is one
13    of the documents, other than the pleadings
14    and such you brought here today that you say
15    support your case. And it says, the first
16    paragraph, A memorandum of understandings
17    involving my employment at DOC, parenthesis,
18    see enclosures one through eleven for further
19    information. All DOC employees still remain
20    with DOC with no discrepancy. Who prepared
21    this?
22 A. I did.
23 Q. Okay. And why did you prepare this?

April 26, 2006

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

7 (Pages 22 to 25)

Page 22

1  A. Because it's incidents that happened
2     similarities to mine, but it wasn't any
3     actions taken as of for to where I received
4     the maximum action.
5  Q. Okay. When did you prepare this?
6  A. This was prepared during the -- when I --
7     when I had first went to court -- to the
8     hearing with Judge Coody and he told me that
9     I had -- he explained some of the laws to me,
10    and for me to get information that was
11    pertaining to my case, is that it was a
12    similarity to it. And that's when I dug and
13    found information as of to where I have known
14    of situations this had happened while I was
15    there and some that had happened before I
16    were -- became an officer.
17 Q. How did you -- when you say dug, how did you
18    do this? How did you prepare this -- gather
19    this information?
20 A. Well, it was some incident that I had already
21    knew and others that I -- I asked about.
22 Q. Okay. Which ones -- and these are numbered
23    one through eleven. Which ones did you

Page 23

1     already know about?
2        MR. PITTERS: Object to the form.
3        MR. BIGGS: What's the basis of your
4          objection?
5        MR. PITTERS: When you say already knew
6          about, I'm not sure exactly what
7          are you talking about. When you
8          say already knew about --
9        MR. BIGGS: Well, her testimony was
10         just now that some of these events
11         she knew about. The others she
12         had to gather and ask people. I
13         want to know which ones that she
14         knew about and not have to ask
15         people about.
16       MR. PITTERS: Which she knew about at
17         the time that she went to court
18         with Judge Coody or she knew about
19         it at the time she prepared the
20         document.
21       MR. BIGGS: At the time she prepared
22         the document.
23       MR. PITTERS: Okay.

Page 24

1  A. Eight.
2  Q. Okay. It's your testimony that eight of the
3     eleven --
4  A. Eight of the eleven that I already knew
5     about.
6  Q. Which ones of the eight? Just tell me which
7     numbers.
8  A. Number one, number four, number five, number
9     seven, eight, nine, ten, and eleven.
10 Q. Okay. All right. Let's go to number one.
11    And in this statement, it says: Lieutenant
12    Eddie Browning was arrested and charged with
13    stalking and sexual harassments in an event
14    that was highly televised. He was
15    immediately transferred to Staton
16    Correctional Facility. When was that?
17 A. I can't exactly remember the date, sir.
18 Q. Okay. Where was he arrested?
19 A. That, I really don't know where of that -- of
20    where he was arrested. I know that for
21    stalking and sexual harassment, and it was
22    televised on television.
23 Q. Where was the stalking or sexual harassment

Page 25

1     performed by Lieutenant Eddie Browning?
2  A. It was at an apartment complex here in
3     Montgomery, Alabama.
4  Q. Okay. Was there any weapons involved?
5  A. That, I -- I have no knowledge of.
6  Q. Okay. Is Lieutenant Browning, is he a --
7     what's his race?
8  A. His race? He's black.
9  Q. All right. Number four, Sergeant William
10    Miller was involved in a relationship with
11    CO-I Kenneth McMann's wife while both were
12    employed at the same institution which
13    eventually led to a dispute and a transfer.
14    What kind of dispute was that?
15 A. With Sergeant Miller and Officer Kenny McMann
16    had -- I think they had some words. And that
17    Officer McMann wife had worked up front. And
18    it was a little confrontation about that.
19    And --
20 Q. Well, tell me about that confrontation.
21 A. I really don't know the confrontation from
22    words for words.
23 Q. Were just words passed?

DEPOSITION OF FELICIA S. HENDRICKS                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

8 (Pages 26 to 29)

Page 26

1  A. Sir?
2  Q. Were words just passed, to your knowledge?
3  A. Yes.
4  Q. Okay. Was there any physical altercation
5     between the two individuals that you refer to
6     here?
7  A. That, I don't know for sure.
8  Q. Was there a weapon involved?
9  A. I can't say that I'm for sure about that
10    either.
11 Q. Okay. Number five, Sergeant Patricia Davis
12    and Johnnie Dumas were both involved in a
13    physical altercation that involved a weapon
14    at the Montgomery Work Center. Both Davis
15    and Dumas were involved in a love affair with
16    Warden Jeffery Williams. Both officers were
17    transferred to different institutions.
18       Let me go back to four -- I apologize to
19    you -- about Sergeant Miller. Where did that
20    occur?
21 A. It was while -- it was at Kilby Correctional
22    Facility.
23 Q. Okay. Kilby. Okay. And then go back to

Page 27

1     five. And, again, I apologize. How do you
2     know of this?
3  A. Because CO-I Johnnie Dumas was transferred to
4     Kilby Correctional Facility.
5  Q. Did you talk to Johnnie Dumas?
6  A. I've had some words with Ms. Johnnie Dumas.
7     And she really didn't get involved of the
8     incident because she said it would cause too
9     much chaos. But as of words of what I heard.
10 Q. Okay. So your summary of this, is it based
11    upon statements you received from Johnnie
12    Dumas or other sources?
13 A. Both.
14 Q. Okay. What are the other sources besides
15    Johnnie Dumas?
16 A. Other employees.
17 Q. Okay. What did they say?
18 A. I can't say word for word, but all I know was
19    a physical altercation over at the Montgomery
20    Work Center with Sergeant Davis and CO-I
21    Dumas in front of inmates at the Montgomery
22    Work Center.
23 Q. Okay. And who told you this?

Page 28

1  A. Other employees.
2  Q. Who are they?
3  A. Right now, I can't recall.
4  Q. Okay. And when did this happen?
5  A. I'm not sure of the date, sir.
6  Q. Is Patricia Davis a female?
7  A. Yes, sir.
8  Q. Is Johnnie Dumas a female?
9  A. Yes, sir.
10 Q. All right. And based on your conversations
11    with folks and Ms. Dumas, there was a
12    purported physical altercation. What
13    actually happened?
14 A. It was a physical altercation. They was
15    fighting.
16 Q. Okay. Well, what happened?
17 A. I don't know all the full details, sir.
18 Q. Okay. It says involved a radio as a weapon?
19 A. Yes, sir.
20 Q. How did that happen?
21 A. I heard the word that Mrs. Davis -- Sergeant
22    Davis had the radio.
23 Q. And she did what with it?

Page 29

1  A. I assume she had hit Ms. Johnnie Dumas.
2  Q. Okay. You assume that, but you don't know?
3  A. I assume she did. They was fighting.
4  Q. Okay. But other than summaries of what
5     you've talked to other folks about, what they
6     think happened, you have no personal
7     knowledge of what happened on this occasion?
8  A. No, sir, because it happened at the
9     Montgomery Work Center, sir.
10 Q. Okay. And you don't know where at Montgomery
11    Work Center this allegedly happened, do you?
12 A. No, sir, no more than I think it happened in
13    the office.
14 Q. Okay. Why do you say that?
15 A. Because that's where -- that's what I was
16    told.
17 Q. Okay. Someone told you it happened in the
18    office?
19 A. Yes.
20 Q. Okay. But this didn't happen at Kilby
21    Correctional Facility?
22 A. No, sir.
23 Q. Okay. Have you ever been to Montgomery Work

DEPOSITION OF FELICIA S. HENDRICKS                                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

9 (Pages 30 to 33)

Page 30

1     Center?
2  A. Yes, sir.
3  Q. Okay. And what level of facility is
4     Montgomery Work Center; do you know?
5  A. I know, but I don't want to get it confused.
6  Q. Well, what do you know?
7  A. It's a work release -- work release.
8  Q. Work release center?
9  A. Uh-huh.
10 Q. What level of facility is Kilby?
11 A. Level four.
12 Q. Okay. Is that high or low?
13 A. Exceeding to the highest is -- number five is
14    the highest. It's in between.
15 Q. Okay. It's almost to the highest?
16 A. To the highest.
17 Q. Okay. Would it be a maximum?
18 A. Medium.
19 Q. Medium facility. But Kilby is not a work
20    release center, is it?
21 A. No, sir, it is not.
22 Q. All right. Anything else you know about
23    number five that you haven't told me?

Page 31

1  A. No, sir.
2  Q. Okay. What is the race of Sergeant Davis?
3  A. Black.
4  Q. What is the race of Johnnie Dumas?
5  A. Black.
6  Q. All right. Let's go to number seven. It
7     says CO-I Jerry Redic and CO-I William Scott
8     were involved in a physical, verbal
9     altercation in the seg unit at Kilby
10    Correctional Facility. Is that what that's
11    supposed to say?
12 A. Yes, sir.
13 Q. How do you know about that?
14 A. At the present time I was there at Kilby.
15 Q. Did you see it?
16 A. Yes. I was in West Dorm.
17 Q. Okay. And when did this happen?
18 A. I cannot recall the date, sir, when it
19    happened.
20 Q. What year? Do you know?
21 A. No, sir.
22 Q. Okay. Would it have been within the past
23    five years?

Page 32

1  A. Within the five years, yes, sir, in my
2     presence at Kilby.
3  Q. And what are the facts -- purported facts
4     surrounding this alleged physical/verbal
5     altercation?
6  A. It started about a fan between officer Redic
7     and CO-I William Scott. And they had words
8     about the fan. If I'm not mistaken -- I'm
9     not going to really say which one, but I know
10    one of them was assigned to segregation and
11    one of them was assigned to mental health.
12    And I think that Officer William Scott had
13    came to get the fan for mental health because
14    it was hot at that present time. And I think
15    the air had went out or something like that.
16    And Officer Redic -- Scott said that he
17    needed the fan down there because the
18    segregation unit -- it houses 25 on A block,
19    25 on B and 25 on C and 25 on D, which is a a
20    total of a hundred inmates, plus it was no
21    air circulating for the officers which was in
22    the office. And then they had words --
23    verbal words about who was going to get the

Page 33

1     fan and who wasn't. Then, from that forth,
2     it turned to a little tussle with him and
3     Officer Redic.
4  Q. What do you mean by a tussle?
5  A. To where they just locked up, and then they
6     was broken up.
7  Q. All right. Did you see this?
8  A. Yes, sir.
9  Q. Who else was present?
10 A. I can't recall no officer's names at this
11    present time, because I can't really remember
12    back that far of my surroundings.
13 Q. Was there a weapon involved?
14 A. No, sir.
15 Q. What's the race of Jerry Redic?
16 A. Black.
17 Q. What's the race of William Scott?
18 A. White.
19 Q. Number eight, CO-I Mary Holmes and CO-I Debra
20    Caldwell were involved in an altercation at
21    Montgomery Work Center. CO-I Holmes was
22    transferred to another institution after
23    CO-I Caldwell threatened to assault CO-I

DEPOSITION OF FELICIA S. HENDRICKS                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

10 (Pages 34 to 37)

Page 34

1    Holmes with a weapon, a hand-held radio.
2        Okay.  How do you know about this?
3  A. From former -- other employees.
4  Q. Do you know what the purported altercation
5      was about?
6  A. No, sir, I don't.
7  Q. Okay.  And you allege that CO-I Holmes was
8      transferred to another institution.
9  A. Yes.
10 Q. Is that what you heard?
11 A. Yes, sir, that's what I had heard.  But I'm
12     not for sure which one.
13 Q. Okay.  And you also heard an allegation that
14     CO-I Caldwell had threatened to assault CO-I
15     Holmes with a hand-held radio.
16 A. Yes.  From my understanding from words that
17     was said, that she hit Ms. Holmes up side the
18     head, and Ms. Holmes was out for a few
19     minutes.
20 Q. Okay.  Was this in the Montgomery Work Center
21     or outside or where?
22 A. I can't actually say, sir.
23 Q. Okay.  And what's the race of Ms. Holmes?

Page 35

1  A. Black.
2  Q. What's the race of Debra Caldwell?
3  A. Black.
4  Q. Number nine, CO-I William -- Willie Lawrence
5      was involved in a physical altercation with
6      his wife after his wife had an involvement
7      with a fellow employee at the sheriff's
8      department.  The incident led to CO Lawrence
9      getting a domestic violence charge.
10        Where did this happen at, the physical
11     altercation?
12 A. Okay.  On number nine, I strike that one,
13     because I'm not for sure that happened while
14     I was at Kilby -- during my present time at
15     Kilby.
16 Q. Okay.  So you don't know if it happened on a
17     Department of Corrections facility, do you?
18 A. No, sir.
19 Q. Let's go to 10.  CO-I Charles Caldwell
20     received a domestic violence charge after
21     assaulting his wife because of an affair that
22     CO-I Caldwell was having with Nurse Katie
23     Bailey, a former employee at DOC.

Page 36

1        Okay.  Where did the domestic violence
2      charge occur?
3  A. I don't know, sir.
4  Q. Okay.  Did you have information that that
5      occurred on or about a Department of
6      Corrections facility?
7  A. No, sir, I don't.
8  Q. Look at 11.  CO-I Bernard McClain was
9      involved in an altercation with his
10     girlfriend, which led up to his arrest and
11     charged with domestic violence.  You don't
12     know where that occurred, do you?
13 A. No, sir.  Because CO-I Bernard McClain and
14     CO-I Charles Caldwell work first shift, and I
15     worked -- at that present time, I worked
16     second shift.  So I don't know.
17 Q. But you don't know if the purported events of
18     10 and 11 occurred at Kilby or any other
19     Department of Corrections?
20 A. No, sir.
21 Q. All right.  Let's go to two.  Now, two,
22     three, and six are the ones that you had
23     people tell you about, correct?

Page 37

1  A. Yes, sir.
2  Q. Okay.  Number two, purportedly, Lieutenant
3      Victor Napier had problems with his wife
4      where his wife came to the facility and
5      picked him up.  Lieutenant Napier abandoned
6      his post.  And he was the only one
7      supervising that day and left the facility
8      unsupervised.  Who told you about this one?
9  A. It was an employee, sir.
10 Q. Well, who was it?
11 A. It was just former employees.  I mean, I
12     don't really like to call no name, because I
13     don't want to put no one else's job in
14     jeopardy, sir.
15 Q. Well, unfortunately, this is a deposition and
16     you're under oath.  And I ask questions; you
17     have to answer the questions unless your
18     attorney directs you not to answer those
19     questions.
20 A. Officer Thomas Parks.
21 Q. Thomas Harts?
22 A. Junior.  P-A-R-K-S.
23 Q. And where does he work?

April 26, 2006

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

11 (Pages 38 to 41)

Page 38

1   A. Kilby Correctional Facility.
2   Q. And when did you talk to him?
3   A. It's been a while.
4   Q. Past three months?
5   A. Yeah, a little over three months.
6   Q. Okay. And how did it come about that you
7      spoke with Officer Parks?
8   A. I asked him what incidents that happened.
9   Q. And was this over the phone or in person?
10  A. Over the phone.
11  Q. Did you call him or did he call you?
12  A. I called him.
13  Q. And what did you tell him?
14  A. I asked him about some incidents that he knew
15     of that happened at Kilby.
16  Q. Was this before or after you were dismissed?
17  A. Way after.
18  Q. And did you call him at home?
19  A. Yes.
20  Q. Did you tell him that you were filing a
21     lawsuit?
22  A. Yes.
23  Q. Did you tell him you needed information?

Page 39

1   A. Yes, sir.
2   Q. Okay. What did he say?
3   A. He just only said that he only knew of a
4      couple of incidents, but it wasn't really
5      word for word of what happened and what --
6      how it went about.
7   Q. How long have you known Mr. Parks?
8   A. During the present time I was at Kilby.
9   Q. What shift does he work?
10  A. He was on second shift. Then he went to
11     first shift.
12  Q. Okay. And how would you describe your
13     relationship with Officer Parks?
14  A. It's not like a friendly, friendly basis. We
15     talk. It just -- it just a relationship. I
16     mean, it just a friendly relationship.
17  Q. How often do you talk to him?
18  A. I don't.
19  Q. Okay. Does he call you on occasion?
20  A. No, sir.
21  Q. Do you call him?
22  A. No, sir.
23  Q. Does he know about your dismissal?

Page 40

1   A. Yes, sir.
2   Q. Does he know about the facts surrounding your
3      dismissal?
4   A. As of facts of to --
5   Q. Well, did you tell him why you were
6      dismissed?
7   A. Yes, sir.
8   Q. You told him about the events in the parking
9      lot at Kilby?
10  A. Yes, sir.
11  Q. What did he tell you?
12  A. No more than he asked me what happened, and I
13     told him. And the only thing he said is it
14     just wasn't right. I received a maximum
15     disciplinary.
16  Q. You told Officer Parks about the events that
17     led to your dismissal, and he told you it's
18     not right?
19  A. Yes, sir.
20  Q. Is that your testimony?
21  A. Yes, sir.
22  Q. All right. So after talking to Officer
23     Parks, he informed you of the fact -- the

Page 41

1      purported facts that are outlined in number
2      two, correct?
3   A. Yes, sir.
4   Q. There was no physical altercation alleged in
5      number two, was there?
6   A. Not to my knowledge, sir. I don't know.
7   Q. There was no weapon used in number two,
8      correct?
9   A. Not to my knowledge.
10  Q. Okay. Basically, the purported allegations
11     are just Lieutenant Napier just left his
12     post, correct?
13  A. Yes, sir.
14  Q. All right. Let's go to number three. Did
15     you find out that information from Officer
16     Parks as well?
17  A. Yes, sir.
18  Q. Okay. And it says purportedly, Sergeant John
19     Crow assaulted his wife about a relationship
20     with an inmate. Nothing was done.
21        This is another event that was told to
22     you purportedly by Officer Parks, correct?
23  A. Yes, sir.

April 26, 2006

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

12 (Pages 42 to 45)

Page 42

1  Q. And he's telling you that Sergeant Crow
2     assaulted his wife, allegedly, correct?
3  A. Yes, sir.
4  Q. Okay. Did he tell you where that assault
5     occurred?
6  A. No, sir.
7  Q. You've got no reason to believe that that
8     occurred at Kilby, do you?
9  A. I have no knowledge, sir, where it occurred.
10 Q. And you have no knowledge as to whether or
11    not a weapon was used, do you?
12 A. No, sir, I don't.
13 Q. Okay. And it says a relationship with an
14    inmate. Was this Sergeant Crow's
15    relationship with an inmate or a purported
16    relationship that Crow's wife had with an
17    inmate?
18 A. His wife.
19 Q. Okay. And number six, is that another
20    purported event that was told to you by
21    Officer Parks?
22 A. Yes, sir.
23 Q. And in number six, purportedly CO-I Jimmy

Page 43

1     Glenn and CO-I Potterfield were involved in a
2     physical altercation where a knife was used
3     in the receiving unit at Kilby. The only
4     basis that you have for this allegation is
5     statements from Officer Parks, correct?
6  A. Yes, sir.
7  Q. The last page of Exhibit #15 is this a
8     narrative statement of yours?
9  A. Yes, sir.
10 Q. Okay. And it says what it says. But looking
11    at the second paragraph, it says, The
12    incident involving my dismissal, in my
13    opinion, was prejudiced and unfavorable due
14    to two of my fellow officers and an unknown
15    female later recognized as Selena Davis
16    approaching you -- approaching me -- in an
17    unfriendly manner which caused me to reach in
18    the door of my car where I was standing and
19    pick up a small pocket knife and made it
20    visible to them to distract or detour them
21    from approaching any further.
22       Is that your statement?
23 A. Yes, sir.

Page 44

1  Q. Is that an accurate statement?
2  A. Yes, sir.
3  Q. Why did you put together this last page?
4  A. Because I just summed up of all the other
5     things that happened to my situation to where
6     I -- I said I was treated unfavorable because
7     of the calls that happened to where in my
8     discretion to where I was approached by an
9     aggressive officer and I -- I just -- I just
10    received the maximum disciplinary. And I
11    don't think that was right.
12 Q. All right. So you put this together in
13    response to someone other than your lawyer
14    directing you to do this or you did this on
15    your own?
16 A. I did this on my own.
17 Q. All right. We'll come back -- put this in --
18    Defendant's Exhibit #15 over here. We'll
19    come back to it. Go back to Defendant's
20    Exhibit #1. We're on number two now. Before
21    we get to number two, those are all the
22    documents that you've brought with you today
23    in response to number one of the notice to

Page 45

1     take deposition, correct?
2  A. Yes, sir.
3  Q. Okay. Number two says all documents which
4     the plaintiff utilized to prepare for the
5     deposition testimony or to refresh your
6     recollection. Other than what you've
7     testified to already, are there any other
8     documents that falls in the category of
9     number two that you know about?
10 A. No, sir.
11 Q. Okay. Do you have copies of any medical
12    records that you intend on using in this
13    lawsuit?
14 A. No, sir.
15 Q. You've made no claim for any type of mental
16    anguish or any type of emotional distress in
17    this case, have you?
18 A. No, sir.
19 Q. Okay. Do you have any tape recordings of any
20    person, witness, that you intend on using in
21    this case?
22 A. No, sir.
23 Q. Okay. Number five, is there any paperwork

DEPOSITION OF FELICIA S. HENDRICKS                                        April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

13 (Pages 46 to 49)

Page 46

1    associated with any complaints or grievances
2    or any other documents that you have in
3    support of your claims of a denial of equal
4    protection or denial of due process?
5         MR. PITTERS: Object to the form.
6    Q. You can answer, if you can.
7    A. No more than what I have present in front of
8    me, sir.
9    Q. Okay. Your claims under Title 7 have been
10   dismissed. Do you understand that?
11   A. No, sir. Could you refresh my memory of the
12   Title 7?
13   Q. Do you recall Judge Coody, before you had
14   your attorney, entering an order dismissing
15   any claims under Title 7 because you failed
16   to file an EEOC complaint that is timely?
17   Do you recall that?
18   A. Yes, sir.
19   Q. Okay. Since that dismissal, have you
20   attempted to file any EEOC complaints or
21   notices of EEOC as a claim under Title 7?
22   A. No, sir.
23   Q. Okay. Number 7 asks for any type of notes,

Page 47

1    calendars or writings used to -- to relate to
2    any claims. And other than the documents
3    you've brought here and some documents that
4    are represented to me as attorney/client
5    privilege. Are there any other documents
6    that fall under that category that you are
7    aware of?
8    A. As of no more than my own personal?
9    Q. Did you make notes?
10   A. Yes, sir.
11   Q. Okay. Other than what you have today, are
12   there any notes anywhere?
13   A. No, sir.
14   Q. Okay. Other than the notes that Mr. Pitters
15   represents are protected by attorney/client
16   privilege, are there any other notes that you
17   have in your possession or control that are
18   not covered by attorney/client privilege that
19   you have here today?
20   A. No, sir.
21   Q. Okay. Do you have any witnesses' statements
22   that you've collected in this case?
23   A. No, sir, no more than the ones that I have

Page 48

1    already present.
2    Q. Okay. Other than the statements made to you
3    by Officer Thomas Parks, are there any other
4    witnesses you intend on calling?
5    A. As of what? Today?
6    Q. At the trial of your case that you're aware
7    of.
8    A. Not none that I have at this present time,
9    sir.
10   Q. All right. Are there any other witnesses
11   that you're aware of other than some of the
12   names listed here in this document,
13   Defendant's Exhibit #15, Officer Parks or any
14   of the defendants, that you know today that
15   you're going to call as a witness in this
16   case?
17   A. I don't really know at this present time.
18   Q. Okay. That's fair. All right. Let's go to
19   Defendant's Exhibit #2, which I represent is
20   the complaint -- the original complaint filed
21   in this case. Do you see that?
22   A. Yes, sir.
23   Q. Is that your original complaint written by

Page 49

1    you and filed in this case?
2    A. Yes, sir.
3    Q. Okay. The first nine pages are a collection
4    of hand-printed pages that purports to be the
5    complaint itself; is that correct?
6    A. Yes, sir.
7    Q. Okay. Is this in your own handwriting?
8    A. Yes, sir.
9    Q. Okay. Attached to that handwritten complaint
10   are a number of documents that I believe you
11   attached as supporting purported documents to
12   your original complaint; is that correct?
13   A. Yes, sir.
14   Q. Okay. And I want to ask you about some of
15   those. The first thing I want to do is ask
16   you about on page 8 of your complaint, it has
17   your name, Felicia S. Hendricks, correct?
18   A. Yes, sir.
19   Q. And that's your signature?
20   A. Yes, sir.
21   Q. And you signed your name in front of a notary
22   on July 11th, 2005, correct?
23   A. Yes, sir.

DEPOSITION OF FELICIA S. HENDRICKS                                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

14 (Pages 50 to 53)

Page 50

1   Q. And page 7 it's hand-printed that as part of
2      this complaint, the words, I hereby declare
3      that the contents of my complaint are true
4      and correct to the best of my knowledge of
5      the facts as they are known to me. And then
6      there's a place underneath, sworn to and
7      subscribed before me on this the blank day of
8      blank, 2005. Did you write all of that out?
9   A. Yes, sir.
10  Q. Okay. You didn't sign that?
11  A. No, sir, due to the -- at the time -- present
12     the time when I took this down to the United
13     States District Court --
14  Q. Yes, sir.
15  A. -- Mrs. Karen Mosely, she said I didn't need
16     that part. And that's where that came in at.
17  Q. Oh, okay. Well, I ask you today, the
18     information that you expressed in this
19     original complaint, is it true and correct to
20     the best of your knowledge?
21  A. Yes, sir.
22  Q. Okay. On page 2 -- well, this was filed --
23  A. 8/1.

Page 51

1   Q. August 1, 2005 --
2   A. Yes, sir.
3   Q. -- you filed that, correct?
4   A. Yes, sir.
5   Q. On August 1st, 2005, in your section that's
6      entitled -- or subtitled, Argument, on page
7      2, you claim that following a confrontation
8      with two fellow female correction officers in
9      the parking lot area of Kilby Corrections
10     Facility located in Mt. Meigs, Alabama, and
11     upon the issue of a pocket knife belonging to
12     the plaintiff being displayed in defense of
13     bodily harm and injury from two fellow female
14     corrections officers, she was fired from her
15     job as a correctional -- at Kilby
16     Correctional Facility in violation of her
17     civil rights, equal protection of the law and
18     her due process of law. That's your
19     statement?
20  A. Yes, sir.
21  Q. Okay. What do you mean the phrase "Upon the
22     issue of a pocket knife"? What does that
23     mean?

Page 52

1   A. Upon the issue is the matter of which a
2      pocket knife was present at the time.
3   Q. Okay. Are you saying that -- in this
4      particular section of your complaint, you're
5      alleging that a pocket knife was present and
6      there was an issue made of it? Is that what
7      you're saying?
8   A. Yes, sir.
9   Q. Okay. Look at page 3. On page 3, the second
10     full paragraph, your allegation is that you
11     were denied equal protection of the law and
12     due process because, quote: Plaintiff shows
13     that most, if not all, male officers carry
14     some kind of pen or small knives in their
15     possession while inside the institution to
16     cut strings down used by inmates to hang
17     their laundry or a privacy type cloth on
18     their bunks. And then further on down, it
19     says: Plaintiff, a female, kept such a small
20     pocket knife in her possession, was not found
21     as permissive as male officers.
22        Ms. Hendricks, were you claiming that
23     you were denied equal protection of the law

Page 53

1      and due process because male officers are
2      allowed to carry knives, and female officers
3      are not allowed to carry knives?
4         MR. PITTERS: Object to the form.
5   Q. You can answer, if you can.
6   A. What I'm saying was that some male officers
7      do have knives in their possession. But at
8      my present time, my knife was not in my
9      possession; it was in my car.
10  Q. Okay. But are you claiming that there are
11     differences being made between the male
12     officers and the female officers regarding
13     possession of knives?
14  A. Employees, sir.
15  Q. There was a difference in employees?
16  A. Yes, as --
17  Q. What do you mean by that?
18  A. As in to what I'm saying, it's males -- it's
19     male officers that do have knives in their
20     possession. As of a female, I only, as of
21     myself, had a knife in my possession as of in
22     my car. But it's male officers that have
23     knives inside the institution.

DEPOSITION OF FELICIA S. HENDRICKS                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

Page 54

1  Q. Okay. Which male officers can you tell me
2     have knives in the institution?
3  A. From what I personally seen was Sergeant Gus
4     White was one, Officer Darnel Moore, Officer
5     Jesse Williams, Officer Clarence Hall,
6     Officer Patrick Moss. And those are the ones
7     that I know for sure as of myself.
8  Q. Okay.
9  A. And it might be others, but --
10 Q. You don't have any information or personal
11    knowledge of how these officers were allowed
12    to possess knives in the facility, now, do
13    you?
14 A. Excuse me, sir. Could you re --
15 Q. Isn't it true that small knives like pen
16    knives and such are allowed to be possessed
17    by any corrections officer as long as they
18    are approved by the warden or some other
19    administrator of the Department of
20    Corrections?
21 A. As approved by the warden, I only thought it
22    was like the captain.
23 Q. Okay.

Page 55

1  A. I mean, as far as other officers, not to my
2     knowledge.
3  Q. But there's nothing wrong with these officers
4     being able to possess a knife as long as it's
5     been approved by the warden, correct?
6     MR. PITTERS: Object to the form. I
7        mean, do you know that? If she
8        don't know that, then -- she can
9        answer that if she knows that. I
10       think you have to lay her some
11       predicate that she has the
12       requisite knowledge to base it
13       on --
14    MR. BIGGS: Mr. Pitters, I'm sorry,
15       sir. I'm going to object to you
16       coaching your witness. I
17       mean, she either knows it or
18       doesn't know it. You can object
19       to the form. She can answer it if
20       she can.
21    MR. PITTERS: Well, I just don't
22       want -- I'm not going to sit here
23       and let her give answers to

Page 56

1     questions that she don't know or
2     facts that you're presenting in
3     evidence that she doesn't know to
4     be factual.
5  Q. If you don't know an answer, okay, your
6     answer is I don't know. But you've alleged
7     in your complaint in your own handwriting
8     regarding knives being in possession of male
9     officers and females possessing or not
10    possessing knives, and that's part of the
11    claim of your lawsuit. What I'm trying to
12    ask you is, is how you had personal knowledge
13    which would allow you to write a federal
14    lawsuit which you filed yourself claiming
15    that all -- wait a minute. Quote: Most, if
16    not all male officers carry some kind of pen
17    or small knives in their possession inside
18    the institution. And I'm asking you now if
19    you have personal knowledge of whether or not
20    it is acceptable at Kilby Correctional
21    Facility for male officers to carry or
22    possess knives as long it's been approved by
23    the warden? Do you know that?

Page 57

1  A. I don't know, sir.
2  Q. Okay. Do you know of any female officers
3     that possess knives?
4  A. No, sir, not to my knowledge, I don't know,
5     sir.
6  Q. You would agree with me that the fact that
7     you had a knife in your car is not the same
8     as some of these officers possessing a knife
9     in the facility. You'd agree with me that
10    that's different, right?
11 A. Yes, sir.
12 Q. You would agree with me that the facts of
13    your case involve you in a physical
14    altercation in the parking lot of Kilby
15    Correctional Facility where you actually took
16    possession of your knife, opened the knife
17    and attempted to use that knife, that that is
18    completely different from these few officers
19    just possessing a pen knife at the facility?
20 A. No, sir, I don't agree with that.
21 Q. Okay. Are you saying that if an officer
22    carries a knife in the facility with
23    permission of a warden, that that is the same

April 26, 2006

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

16 (Pages 58 to 61)

**Page 58**

1    thing as you going to your car, getting a
2    knife, opening a knife and attempting to use
3    it to assault another corrections officer in
4    the parking lot?
5        MR. PITTERS: Object to the form.
6  Q. Is that the same thing?
7        MR. PITTERS: Same objection.
8  Q. Answer if you can.
9  A. Okay. Can you ask the question again, sir?
10  Q. Did you get your answer from Mr. Pitters?
11  A. No, I didn't get my answer from Mr. Pitters.
12    I mean, it just -- how you asked the
13    question, it -- you throwing something in
14    there --
15  Q. All right. Well, what I'm getting at is you
16    filed this lawsuit, and you claim denial of
17    equal protection and due process. And on
18    page 3, you alleged that there's -- in your
19    argument for denial of equal protection and
20    due process, that male officers carry some
21    kind of pen or small knife and you, a female
22    kept a small pocket knife, which you're
23    telling me is in the car -- that somehow

**Page 59**

1    that's a denial of equal protection or due
2    process?
3        MR. PITTERS: Objection before she
4    answers that. Counsel, I will not
5    have you cut her off. She was
6    about to answer your question.
7    Before she answers what you just
8    represented on the record, I want
9    her to answer what she was
10    previously going to say before you
11    cut her off.
12        MR. BIGGS: Well, Mr. Pitters, that's
13    fine. I'll try to do better. But
14    I would ask you when I have a
15    question on the table, that that's
16    not the time to tell your
17    witness -- she's got to answer.
18    And if you want to take a break
19    and talk to her, you can. But if
20    there's a pending question, you
21    can't advise your client what to
22    say.
23        MR. PITTERS: I'm -- I don't want to

**Page 60**

1    take a break. I want her to tell
2    you what the -- what her answer
3    is.
4        MR. BIGGS: Okay.
5  Q. Do you have an answer? I didn't mean to cut
6    you off.
7  A. Yes, sir, I do. At that present time, sir, I
8    did have a pocket knife which was in my
9    possession as in my car, which was in the
10    parking lot. But as with other officers,
11    they have their knives in their possession
12    inside the institution. Yes, that is
13    different.
14        But the other thing is that I did have a
15    pocket knife and I pulled the pocket knife,
16    but I did not open the pocket knife.
17  Q. Okay. I'm going back to your complaint that
18    you filed in August of 2005. Was that the
19    basis then for your claims that you were
20    treated unfairly and were denied due process?
21        MR. PITTERS: Object to the form.
22        MR. BIGGS: What's your objection?
23        MR. PITTERS: I'm not sure what you

**Page 61**

1    mean by what was the basis -- or
2    was that the basis. What are you
3    referring to?
4        MR. BIGGS: I'm referring to the
5    lawsuit that she wrote herself and
6    she acted as her own attorney.
7        MR. PITTERS: What are you referring to
8    when you say was that the basis?
9    Was what the basis?
10  Q. Well, let me ask you this. In August of
11    2005, what was your argument that you were
12    denied equal protection and denied due
13    process?
14  A. Due to the fact that as of -- I just said
15    that the knife was in my car, due to the fact
16    of male officers have knives in their
17    possession inside the institution. At that
18    present the time when the knife was in my
19    car, that was for my protection outside in
20    the street wise, because I'm only a single
21    parent. It was not for me to have as -- I
22    came to work that day and forgot it was in my
23    car because I don't usually come to work with

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

April 26, 2006

Page 62

1      a knife in my car.  As of that day, it was --
2      just happened to be in my car.  But it was
3      not pulled to immediately as of to harm
4      somebody, but it's to ward off people from
5      coming to me as aggressive.  And that was for
6      my defense.
7   Q. Okay.  And are you saying that was why you
8      filed this lawsuit for denial of equal
9      protection?
10  A. Yes.  Because I feel like I shouldn't have
11     lost my job for that.
12  Q. How were you denied due process?
13  A. As of to the grievances that I had filed --
14     two grievances that I -- a complaint and a
15     grievance that I had filed, it was not
16     answered.
17  Q. Are those grievances attached to your
18     complaint here?
19  A. Yes, sir, it is.
20  Q. All right.  We'll get to those in a minute.
21     And you were denied due process because
22     someone didn't answer those grievances?
23  A. Yes, sir.

Page 63

1   Q. Who did you expect to answer those
2      grievances?
3   A. As of in the regulation that say you have to
4      file certain steps.  And my first one was
5      filed to my supervisor.  Then the next one I
6      filed to Warden McDonnell.
7   Q. Okay.  What are you referring to?  Is it in
8      State's -- Defendant's Exhibit #2 that you're
9      referring to?  Let's go to the grievances.
10  A. On the very last page.
11  Q. Okay.
12  A. It was the complaint.
13  Q. All right.  And what I'm looking at, it says
14     grievance, but it's G-R-I-V-A-N-C-E, slash,
15     complaint form.  And it's got your signature
16     on it and it's got February 17th of '05.
17     Have I got the right document?
18  A. Yes, sir.
19  Q. Okay.  When did you fill this out?
20  A. On February 17th, 2005.
21  Q. Okay.  And why did you fill this out?
22  A. Because as of to that day when I was -- went
23     on mandatory leave, when I came into work

Page 64

1      that next day, I was pulled -- stopped up
2      front and I was told that the warden had
3      wanted to see me.  And Officer Nelson and
4      Officer Colbert was at work and presently
5      working at the time while I was in a
6      conference with the warden on mandatory
7      leave -- to be placed on mandatory leave.
8   Q. Okay.  This was at a meeting that you had
9      with Warden McDonnell?
10  A. Yes, sir, after the meeting I had with Warden
11     McDonnell.
12  Q. Okay.  And you were placed on mandatory leave
13     after that day?
14  A. Yes, sir.
15  Q. And then, thereafter, you were placed on
16     mandatory leave, you felt that you needed to
17     file this grievance or complaint form?
18  A. Yes, sir.
19  Q. Okay.  Did anyone direct you to do that?
20  A. I got the complaint form that I had got
21     from -- I had already had one and I had a
22     copy made of this same one from Kilby -- I
23     had a copy of one, and then I had a copy made

Page 65

1      from this one that I had already received
2      from Kilby of a complaints form.
3   Q. Okay.  And tell us how you were denied due
4      process as a result of you filing this
5      particular grievance form and any results
6      thereafter.
7   A. Because I didn't receive any -- any response
8      from which it was filed to from Tchernavia
9      Blackmon, my lieutenant, and Kenneth Cash was
10     my sergeant.  I didn't receive any response
11     from them.
12  Q. Did you expect a response after you had
13     already been placed on mandatory leave?
14  A. Well, yes.
15  Q. Okay.  What kind of response did you expect
16     to receive?
17  A. Whatever they had -- I mean, had to say as of
18     dealing with the complaint I filed.
19  Q. Was this before or after the pre-dismissal
20     conference, this complaint?  Well, I'll tell
21     you.  I see a notice of pre-dismissal
22     conference from Warden McDonnell to you dated
23     February 18th, 2005.  Do you recall that?

Page 66

1   A. Of the notice of intent to recommend
2      dismissal?
3   Q. No, ma'am. It's the notice of pre-dismissal
4      conference.
5   A. Pre-dismissal conference. Yes, sir.
6   Q. Okay. That was dated February 18th, 2005,
7      correct?
8   A. Yes, sir.
9   Q. Was that the day after you purportedly filed
10     this grievance form?
11  A. Yes, sir.
12  Q. And you actually signed that on February
13     18th, 2005, did you not?
14  A. Yes, sir.
15  Q. Okay. And in that memorandum from Warden
16     McDonnell, he outlines the facts as he saw it
17     and was the result of the I & I investigation
18     as to what happened in the parking lot on
19     February 10th, 2005, correct?
20  A. Yes, sir.
21  Q. It outlines some specific parts of
22     Administrative Reg 207 and Administrative Reg
23     208, correct?

Page 67

1   A. Yes, sir.
2   Q. Okay. So you were well aware on February
3      18th, 2005, that there was going to be a
4      pre-dismissal conference, correct?
5   A. Yes, sir.
6   Q. Okay. Tell us how you were denied due
7      process when you are aware there is going to
8      be a pre-dismissal conference on February
9      18th as a result of you filing this grievance
10     form dated February 17th, 2005.
11  A. Ask that again, now.
12  Q. Okay.
13  A. Ask the question again.
14  Q. As I understand, your testimony is that your
15     claims for denial of due process is because
16     someone didn't respond to your grievance
17     dated February 17th, 2005; is that correct?
18  A. Uh-huh.
19  Q. You have to answer yes or no.
20  A. Yes, sir.
21  Q. Okay. But the next day, the warden sent you
22     a memo indicating that as a result of the
23     events of February 10th, 2005, there was

Page 68

1      going to be a pre-dismissal conference; is
2      that correct?
3   A. Yes, sir.
4   Q. I'm trying to understand what more process do
5      you say that you were due as a result of you
6      filing the grievance form of February 17th,
7      2005?
8   A. From when I had filed it on the 17th. And
9      then I got a letter from him on the 18th of a
10     notice of a pre-dismissal conference.
11  Q. What more process do you think you were due
12     as a result of you filing this thing on
13     February 17th, 2005?
14  A. I don't know. I don't know.
15  Q. Do you have any other basis for your claims
16     of denial of due process?
17  A. No, sir.
18  Q. All right.
19     MR. PITTERS: Greg, I'm sort of
20        confused. I don't know if you
21        want me to stay on the record or
22        what. But which one were you --
23        which grievance were you referring

Page 69

1      to when -- with regard to this --
2      that line of questioning? Because
3      I don't see --
4   MR. BIGGS: She's on Defendant's
5      Exhibit #2, which is the complaint
6      that she filed, the handwritten
7      complaint. As part of some of the
8      documents she attached when she
9      represented herself pro se, the
10     last page on Defendant's Exhibit
11     #2 is a grievance filed by her on
12     February 17th, 2005. Do we have
13     Defendant's Exhibit #2?
14  MR. PITTERS: Okay. Because mine was
15     missing that page. Okay.
16  MR. BIGGS: Her testimony was, in
17     regards to the claim of denial of
18     due process is that no one
19     responded to her grievance of
20     February 17th, 2005. And I was
21     simply asking her what more
22     process was due in her mind when
23     she filed the complaint on August

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

Page 70

1    of 2005 when the warden responded
2    the next day that she was going to
3    be fired or -- or her
4    pre-dismissal conference.
5  A.  As of the next day, it wasn't for me to be
6    fired.  It was just a notice of a
7    pre-dismissal.
8  Q.  I understand that.  Okay.  What I'm asking
9    you is when you filed your complaint, what
10    more process did you -- do you suggest was
11    due to you as a result of you filing that on
12    February 17th, 2005?
13  A.  I was taking the correct actions of filing it
14    in the steps as they say you file it with the
15    your immediate supervisor and then from there
16    on.  That's what I did.
17  Q.  But you expected somebody to respond to that
18    other than the warden responding the next day
19    with a notice of pre-dismissal conference?
20  A.  Well, it's supposed to have been filed in the
21    correct order and as I filed it with the
22    lieutenant and the sergeant.  I didn't
23    receive no action.  Next I received action

Page 71

1    from the warden.
2  Q.  Okay.  You expected someone other than the
3    warden to file a response to your grievance
4    form of February 17th, 2005?
5  A.  No.  Like I said, I was going by the steps
6    that you follow.
7  Q.  Okay.  What steps are you talking about?
8  A.  I don't really have exactly any with me.
9    It's steps that you follow when you filed a
10    grievance.  You have to file it with your
11    immediate supervisor.  From there as of to
12    the captain get with them.  Then from there
13    it goes to -- on up to the warden.
14  Q.  Okay.  So you're saying there's more that
15    needed to be done prior to the warden issuing
16    the letter of February 18th -- or memo of
17    February 18th, 2005?
18  A.  Yes, sir, it should have been more
19    investigation of the incident.
20  Q.  Okay.  Are you saying that the investigation
21    that was conducted in your case was
22    deficient?
23  A.  Yes, sir.

Page 72

1    MR. PITTERS:  Can we take a break real
2    quick?
3    MR. BIGGS:  Sure.  Take a break.
4    (Brief recess)
5  Q.  We're back from a break.  Ms. Hendricks, we
6    were talking about due process and your
7    claims of your lawsuit that you filed in
8    August of 2005.  Who do you say denied you
9    due process and denied you equal protection?
10    MR. PITTERS:  Object to the form.
11  A.  Can you repeat the question again?  Who
12    denied me or --
13  Q.  Yeah.  In your lawsuit and in your amendment
14    to the lawsuit, the only defendants I see are
15    Mr. McDonnell and the Alabama Department of
16    Corrections; is that correct?
17  A.  Yes, sir.
18  Q.  Okay.  Are there any other defendants that
19    you claim in your lawsuit violated your equal
20    protection rights or your due process right?
21  A.  No more than who I filed it to was Lieutenant
22    Blackmon and CO-I -- I mean, Sergeant Cash.
23  Q.  Okay.  But you didn't name them in the

Page 73

1    lawsuit?
2  A.  No, sir.  So it was Warden McDonnell.
3  Q.  Okay.  Can you tell me how Warden McDonnell
4    denied you equal protection and/or denied you
5    due process?
6  A.  Well, at the time of when I filed it, it was
7    on the 17th of February, 2005.  Then, on the
8    18th of February, 2005, I received a notice
9    of a pre-dismissal conference.  And at that
10    time, me not knowing I was having a
11    pre-dismissal conference, but I filed my
12    complaint form.
13  Q.  Are you talking about your lawsuit or your
14    grievance that you filed on February 17th?
15  A.  My grievances that I filed.
16  Q.  Okay.  If you can, articulate how Warden
17    McDonnell wronged you in any way.
18  A.  Because I wasn't -- I wasn't treated fairly
19    as the other employees of situations that had
20    happened.
21  Q.  Okay.  And that's the basis for your denial
22    of equal protection?
23  A.  Yes.

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

April 26, 2006

20 (Pages 74 to 77)

Page 74

1  Q. Okay. How did Warden McDonnell deny you due
2     process?
3  A. Because at the time when I filed it on the
4     17th, me not knowing that I was going to
5     receive a letter on the 18th of a
6     pre-dismissal conference.
7  Q. Okay. Are you saying that Warden McDonnell
8     should have done something differently?
9  A. Yes, sir. He should have gave me a chance to
10    explain the side of my story of what had
11    happened and the situation. Instead of me
12    explaining it at the time of my dismissal
13    hearing, I should have explained it before
14    the dismissal hearing.
15 Q. I want to go back to Defendant's Exhibit #2,
16    your -- your original lawsuit. Turn to page
17    5 of that. Are you at page 5?
18 A. Yes, sir.
19 Q. Okay. That's a continuation of something you
20    started on page 4, but it appears that you've
21    attempted to, in your complaint, cite an
22    Administrative Reg 207; is that correct?
23 A. There where you're talking about, at the top

Page 75

1     of the page?
2  Q. Yes, ma'am. You said this section states no
3     employee shall carry any firearms, tear
4     gas --
5  A. Yes, sir.
6  Q. That refers to something that you talked
7     about on the page before. You talk about
8     Administrative Reg 207; is that correct?
9  A. Yes, sir.
10 Q. Let me show you what's been marked as
11    Defendant's Exhibit #4.
12    MR. BIGGS: And I have you a copy,
13       Mr. Pitters.
14 Q. That is Administrative Reg 207 dated May
15    11th, 2004, is it not?
16 A. Yes, sir.
17 Q. Are you familiar with this reg?
18 A. Yes, sir.
19 Q. Okay. Were you familiar with this reg back
20    in August of 2005?
21 A. Yes, sir.
22 Q. Okay. Look on page 4 of this reg, number
23    eleven. Do you see that?

Page 76

1  A. Yes, sir.
2  Q. Okay. It says carry any weapon, any tear
3     gas, ammunition, blackjack into the
4     institution or on the grounds of any ADOC
5     state property except as authorized by
6     warden/division director, do you see that?
7  A. Yes, sir.
8  Q. Did you know that administrative reg back in
9     August of 2005?
10 A. Yes, sir.
11 Q. Okay. I'm trying to understand because I
12    look and you say the Administrative Reg
13    section 3-C-9, which is different than the
14    reg I see. Where did you get your
15    Administrative Reg at?
16 A. I looked in a -- it was from an old book --
17    from the 207 -- from the 207 in which we had
18    an old book of our regs.
19 Q. What was the date of that old reg?
20 A. November the 2nd, 1994.
21 Q. Okay. All right. So your citation of that
22    reg was accurate -- you just had the wrong
23    reg?

Page 77

1  A. Yes, sir.
2  Q. Or wrong date of the reg?
3  A. Just had the wrong date of the reg.
4  Q. Okay. But you would agree with me that
5     Defendant's Exhibit #4 was an administrative
6     reg that was in existence at the time of the
7     events of your lawsuit?
8  A. State -- repeat that again, sir.
9  Q. Okay. Defendant's Exhibit #4 is
10    Administrative Reg 207. It's dated May 11th,
11    2004, correct?
12 A. Yes, sir.
13 Q. This Administrative Reg was in existence in
14    2005, correct?
15 A. Yes, sir.
16 Q. Okay. This is dated later than the reg that
17    you have?
18 A. Okay. Yes, sir.
19 Q. Okay. And this reg suggests that employees
20    shall not carry any weapon, tear gas,
21    ammunition or blackjack into the institution
22    or on the grounds of any ADOC state property
23    except as authorized by the warden,

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

Page 78

1  commissioner, director. Would you agree with
2  me that that's what that says, and that was
3  in existence at the time that you filed this
4  lawsuit?
5  A. Was it in existence at the time that I filed
6  the lawsuit?
7  Q. Yes, ma'am.
8  A. Yes, sir.
9  Q. And it was in existence at the time of your
10  altercation in the parking lot at Kilby,
11  correct?
12  A. Yes, sir.
13  Q. Okay. At the time that you had your knife in
14  the possession -- strike that. At the time
15  your knife was in your car on February 10th,
16  2005, you did not have any authorization from
17  the warden or division director to have that
18  knife in your car, correct?
19  A. Correct.
20  Q. Okay. On February 10th, 2005, you would
21  agree with me that the parking lot at Kilby
22  Correctional Facility is the grounds of the
23  ADOC?

Page 79

1  A. Correct.
2  Q. Okay. You would agree with me that a knife
3  is a weapon?
4  A. Correct.
5  Q. You would agree with me that as part of your
6  job as a Corrections Officer I is to know the
7  regs that are in effect at the time that
8  you're working?
9  A. Yes, sir. At the time that I working. But
10  at the present time, I did not have this reg
11  as of the new 207 from which this reg that I
12  had been had ever since I was at Kilby of
13  this old reg, which was in '94. I did not
14  have the new 207.
15  Q. Are you saying to me you didn't have access
16  to Administrative Reg 207 that was published
17  May 11th, 2004?
18  A. No, sir, I didn't. Only as of -- it was in
19  the lieutenant's office, but I did not have
20  it on my possession of when I had this same
21  reg.
22  Q. Would you agree with me part of your job as a
23  corrections officer is to go to the

Page 80

1  lieutenant's office and review the
2  Administrative Regs, correct?
3  A. Correct.
4  Q. And a copy of this was in the lieutenant's
5  office?
6  A. Correct.
7  Q. So a copy of Defendant's Exhibit #4 was in
8  the lieutenant's office. You just didn't go
9  review it?
10  A. No, sir, I didn't. Because at that time, I
11  was barred from the grounds.
12  Q. Well, I'm asking you on February 10th, 2005,
13  or any time prior to that, you had an
14  opportunity to go to the lieutenant's office
15  and review Defendant's Exhibit #4, did you
16  not?
17  A. Yes.
18  Q. And that's part of your job as a corrections
19  officer to do that?
20      MR. PITTERS: Object to the form. Is
21      that part of your job?
22      THE WITNESS: Not only to read the regs
23      but only if the book is in the

Page 81

1  office. But at the present time,
2  the book wasn't always in the
3  office.
4  Q. Why do you say that?
5  A. Because it's been times when other officers
6  had asked for the book with the regulations
7  in it. Lieutenant Blackmon would have the
8  book.
9  Q. How many times did you go to the lieutenant's
10  office prior to February 10th, 2005, and
11  after May 11th, 2004, to review the
12  administrative regulations?
13  A. I can't recall.
14  Q. Well, once, twice, ten? Give me your best
15  guess.
16  A. It probably was like a couple of times,
17  because I was taking the -- I was going to
18  take the sergeant's test.
19  Q. Okay. So at least a couple of times you went
20  to the lieutenant's office to review the
21  administrative regs, correct?
22  A. Yes, sir.
23  Q. And that occurred after May 11th, 2004?

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

22 (Pages 82 to 85)

Page 82

1  A. Yes, sir.
2  Q. And are you saying that the copy of
3     Defendant's Exhibit #4 was not there?
4  A. No, it wasn't, because Officer Staples had
5     the book and Lieutenant Blackmon had the book
6     a couple of times. And another officer had
7     the book, because we took the test. We was
8     taking the test at the same time.
9  Q. So your purpose in reviewing the regs on
10    those occasions was in preparation to take
11    a sergeant's test?
12 A. Sergeant test.
13 Q. Okay. But you agree with me that regardless
14    of whether or not you were going to take the
15    sergeant test or not, part of your job as a
16    Corrections Officer I is to know the
17    administrative regs, correct?
18 A. Correct.
19 Q. And you failed to do that, didn't you?
20 A. Yes.
21 Q. Okay. And other than the couple of times
22    that you wanted to study for the sergeant's
23    exam, you could have gone to the lieutenant's

Page 83

1     office and reviewed the regs but you didn't?
2  A. Yes. And number one, when they tell us they
3     are updated.
4  Q. But it's up to you to do that, correct?
5  A. I don't know about that. If it's up to me or
6     not. All we know is we have the rules and
7     regulations.
8  Q. Okay. If, in fact, this was the
9     Administrative Reg on February 10th, 2005,
10    you brought an unauthorized weapon into your
11    car on State property of the Alabama
12    Department of Corrections without
13    authorization, correct?
14 A. Correct.
15 Q. Okay. How many times did you bring that
16    knife to Kilby Correctional Facility in your
17    car prior to February 10th, 2005?
18 A. That was my first time, because as I said, I
19    don't never bring -- I don't never bring a
20    knife to work --
21 Q. Okay. Turn to page -- it's the first page
22    after page 9 of your lawsuit on Defendant's
23    Exhibit #2. And it says it's dated March

Page 84

1     17th, 2005.
2  A. Yes.
3  Q. Okay. Did you fill this out?
4  A. Yes, sir.
5  Q. And that's your signature and it's dated
6     March 17th, 2005, correct?
7  A. Yes, sir.
8  Q. And these are your words that you formed on
9     that date in March, correct?
10 A. Yes, sir.
11 Q. Okay. Go to the next page. It says
12    continuation of remedy sought. Are these --
13    is this your handwriting on this page?
14 A. Yes, sir.
15 Q. And this was dated or written on March 17th,
16    2005 as well, correct?
17 A. Yes, sir.
18 Q. The next page is another statement of yours,
19    but I'm assuming it was written on the same
20    day of March 17th, 2005?
21 A. Yes, sir.
22 Q. Go to the next page. It says Grievance Form
23    for Step 3. Is this in your handwriting?

Page 85

1  A. Yes, sir.
2  Q. Okay. When did you fill this out?
3  A. March the 1st, 2005.
4  Q. And why did you fill this out?
5  A. Because I took the next step to where I
6     didn't receive one from -- a response from
7     the first one -- the complaint that I first
8     filed with Lieutenant Blackmon and Sergeant
9     Cash. This was my second one.
10 Q. Okay.
11 A. And my third one was filed with Warden
12    Terrance McDonnell again on 3/17/05.
13 Q. Okay. So this particular page that's
14    attached to your complaint, you said you
15    filled this out on March 1st, 2005. And it
16    came after the February 17th grievance,
17    correct?
18 A. Yes.
19 Q. Okay. Can you tell me why you filled this
20    out when you've already received a memo from
21    Warden McDonnell giving you notice of a
22    pre-dismissal conference?
23 A. Because I felt like I was treated unfairly.

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

April 26, 2006

23 (Pages 86 to 89)

---

**Page 86**

1   Q. Okay. Is it a form that you filled out in
2       hopes of countering the notice that you were
3       going to -- given a pre-dismissal conference?
4           MR. PITTERS: Object to the form.
5   Q. That's probably a good objection. I guess
6       what I'm trying to ask you is you already
7       have notice there's going to be a
8       pre-dismissal conference. I'm just trying to
9       understand why you would continually -- or
10      file a second grievance knowing that you've
11      already given notice that there's going to be
12      a pre-dismissal conference set up.
13  A. Well, at the time when I filed the first one,
14      I did not know it was going to be a
15      pre-dismissal. And this is the day -- this
16      was filed the day before the dismissal.
17  Q. I understand. But on February 18th, 2005,
18      you had a memo from the warden saying there's
19      a notice of pre-dismissal conference. You
20      didn't receive any response from the February
21      17th grievance. And then you filed this on
22      March 1st. I'm trying to understand why you
23      would do that.

---

**Page 87**

1   A. I just filed the next step.
2   Q. Okay. The next step that you thought that
3       you ought to file regardless of whether or
4       not you received a memorandum from the warden
5       of a pre-dismissal conference?
6   A. Not regardless whether I received it. It
7       just that I didn't think I was going to be
8       dismissed for -- as of I had a
9       pre-dismissal. Then next I turned around and
10      I had a dismissal. Like I said, this was
11      filed the day before a dismissal.
12  Q. Are you telling me that on March 1st, 2005,
13      when you filed this, you had no idea you were
14      going to be dismissed?
15  A. No, sir, I didn't. A pre-dismissal. I had a
16      pre-dismissal -- recommended for a
17      pre-dismissal. But the next thing I know, I
18      was dismissed.
19  Q. Okay. Looking down at the remedy, it says,
20      For my actions, I deserve some form of
21      discipline guidance, but not dismissal. Are
22      those your words?
23  A. Correct.

---

**Page 88**

1   Q. So you were aware that there was a
2       possibility you were going to be dismissed,
3       correct?
4   A. Well, what I told, it wasn't that I was going
5       to be dismissed from -- when I first went
6       back, I wasn't going to be dismissed. It was
7       just -- this is just a step that we go
8       through as a pre-dismissal of all that.
9   Q. Tell me what you mean by, For my actions, I
10      deserve some form of discipline.
11  A. Some form of discipline means I should have
12      got reprimanded or suspended for some days or
13      something due to other employees that have
14      the same similarities as of my situation.
15      They did not receive a dismissal at all, but
16      I did.
17  Q. Okay. So you agree with me that you did
18      something wrong on February 10th, 2005,
19      whereby you deserve some sort of discipline?
20          MR. PITTERS: Object to the form.
21  A. Can you repeat the question again, sir?
22  Q. Okay. I'm just using your words. You're
23      saying, For my actions, I deserve some form

---

**Page 89**

1       of discipline. What actions are you talking
2       about whereby you deserve discipline?
3   A. To where I should have been punished but not
4       should have been -- for a dismissal.
5   Q. Would you agree with me that if you think on
6       March 1st, 2005 you need to be punished,
7       there is a reason why you should be punished?
8   A. There is a reason?
9   Q. Yes, ma'am.
10  A. I don't know.
11  Q. You don't know?
12  A. Unh-unh. I don't know.
13  Q. Are you saying that you should be punished
14      and you did nothing wrong?
15  A. No. I'm not saying I didn't do anything
16      wrong. I mean, I know what I did was wrong,
17      but to my discretion of what I did, it was
18      for my self defense.
19  Q. What did you do wrong?
20          MR. PITTERS: Object to the form.
21              Counsel, with all due respect,
22          could you let her finish answering
23          the question. I'm not sure.

April 26, 2006

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

24 (Pages 90 to 93)

Page 90

1  Q. I'm sorry. Were you finished?
2  A. No, sir, I wasn't.
3  Q. Keep going. I'm sorry. I apologize. And
4     I'll ask you what you did wrong in a minute.
5  A. No. What I said was I know that what I did,
6     it was wrong. But two other employees, they
7     have done the similarity of things that they
8     have done, but no action wasn't taken or no
9     dismissal was not taken for those employees.
10    And, I mean, I -- I know -- like I said, I
11    know what I did was wrong, but -- I did pull
12    the pocket knife, but I didn't open the
13    pocket knife. But I used it as out of my
14    defense just to ward them off as just holding
15    it in my hand due to the aggressive one which
16    was Mrs. Colbert.
17 Q. Are you finished?
18 A. Uh-huh.
19    MR. PITTERS: Is that a yes?
20 A. Yes.
21 Q. What did you do wrong?
22    MR. PITTERS: I can put on the
23      record --

Page 91

1     MR. BIGGS: Counsel, there's a question
2       on the table.
3     MR. PITTERS: I can put on the
4       record -- I understand.
5     MR. BIGGS: And I would wish you would
6       respond to my question before you
7       take a break. If you want to take
8       a break, you can.
9     MR. PITTERS: I don't want to take a
10      break, Counselor. But she just --
11      immediately the record will
12      reflect once again to the
13      answer -- to the question that you
14      put to the witness. The witness
15      response was uh-huh. And I'm
16      trying to get the witness to
17      remember that she needs verbal
18      responses for clarity of the court
19      reporter's record. Uh-huh,
20      unh-unh is what we use in
21      colloquial. This is a formal
22      proceeding, and I want her to
23      remember to say yes or no so for

Page 92

1     clarity of the record.
2     MR. BIGGS: Thank you.
3     MR. PITTERS: Go ahead.
4  Q. There's a question on the table.
5  A. Okay. Repeat the question, sir.
6  Q. What did you do wrong?
7  A. I did pull a pocket knife, but I did not open
8     the pocket knife.
9  Q. Okay. Why is pulling the pocket knife wrong?
10 A. Why is it wrong?
11 Q. Yes, ma'am.
12 A. I'm kind of stuck right there, sir.
13 Q. Why are you stuck?
14 A. Because you -- you asking me why is it
15    wrong. I mean, as of to my defense, I don't
16    see it's wrong.
17 Q. Okay. Well, I'm getting -- to be frank with
18    you, you just testified a few seconds ago "I
19    know what I did was wrong." Now you're
20    saying it's not wrong?
21 A. Because I was on State property. It was
22    wrong for me to be on State property.
23 Q. With a knife?

Page 93

1  A. Yes. But me not knowing that at the time,
2     like I said, I don't usually carry no knife
3     on State property with me. At that present
4     time, it was just in my car.
5  Q. Okay. Are those the only actions of yours
6     whereby you say you deserve some form of
7     discipline or guidance?
8  A. My action was for what I did, I pulled -- I
9     did pull a pocket knife, but I did not open
10    it. And my discipline was for me to
11    receive -- not knowing that I was going to
12    receive a dismissal.
13 Q. Would you agree with me that you need to be
14    punished because you pulled a knife but
15    didn't open it?
16 A. Yes, because I was on State property, if
17    that's what you're saying.
18 Q. No, it's -- it's what you're saying, ma'am.
19    I'm trying to understand what you're saying.
20    You testified that what you did was wrong.
21    Now, I'm trying to understand in your mind
22    why you think what you did was wrong.
23 A. Because I pulled the pocket knife.

April 26, 2006

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

25 (Pages 94 to 97)

Page 94

1  Q. Okay. So on that occasion on February 10th,
2    2005, you pulled a pocket knife and it was
3    wrong?
4  A. Yes.
5  Q. Why did you say in the second line for the
6    remedy sought, quote: I am willing to attend
7    and complete anger management?
8  A. Because I was told by some employees that if
9    I take an anger management class, it would
10   help me. But I don't see I need no anger
11   management class.
12 Q. Who told you you needed anger management?
13 A. Other former employees, because of the
14   situation of how it happened and how it
15   escalated.
16 Q. Who were those former employees?
17 A. I can't remember at this present time.
18   Because I mean, I talked to so many people at
19   that present time.
20 Q. Are you saying you don't have an anger
21   management problem?
22 A. No, sir.
23 Q. Okay. But you did put that down on this form

Page 95

1    that you were willing to do that?
2  A. But, yes, sir, I was willing to do that, yes,
3    sir.
4  Q. Even if you don't need it?
5  A. Even if I don't need it. I mean, that was
6    just to help, you know, protect myself for my
7    job.
8  Q. Okay. The next pages are several handwritten
9    pages. And it's signed Felicia Hendricks.
10   Is that your handwritten statement?
11 A. Yes, sir.
12 Q. Okay. Was this particular collection of
13   papers in your handwriting attached to the
14   grievance form that you filed on March 1st,
15   2005?
16 A. No, sir. This is what I wrote, because at
17   that present time, I was not asked to write a
18   statement at all.
19 Q. Okay. When you say at that present time,
20   what do you mean? What time are you talking
21   about you were not asked to write?
22 A. I was not asked at no time.
23 Q. To write a statement?

Page 96

1  A. No, sir. This was my own statement I wrote
2    and put it in with my grievance way after.
3  Q. Oh, okay. Okay. You put that with your
4    grievance?
5  A. It wasn't with – I filed my grievance,
6    but this is with my grievance that I have
7    that's now as of to all the other grievance
8    and to --
9  Q. When did you write all that -- this
10   handwritten -- when did you write it?
11 A. This was written way after like the middle of
12   March.
13 Q. All right. And it's followed up by the
14   petition and some other statements that were
15   attached to your complaint, correct?
16 A. Yes, sir.
17 Q. Okay. I'm showing you what's Defendant's
18   Exhibit #3. Is that your amendment to your
19   original complaint?
20 A. Yes, sir.
21 Q. Okay. Are all your allegations in this
22   lawsuit contained in the original complaint
23   and in that amendment, Defendant's Exhibit

Page 97

1    #3?
2  A. Yes, sir.
3  Q. Okay. I don't want to ask you any questions
4    about that. You testified a little while ago
5    that, number one, you felt like there wasn't
6    an adequate investigation done, correct –
7  A. Yes.
8  Q. -- in this case. You also testified that you
9    never were allowed to give a written
10   statement, correct?
11 A. Yes.
12 Q. Okay. To your knowledge, there was an
13   investigation done by the I & I Division of
14   the Alabama Department of Corrections; is
15   that not correct?
16 A. Correct.
17 Q. Okay. Do you remember an investigator by the
18   name of Errick Demus?
19 A. Yes.
20 Q. Okay. Did he interview you?
21 A. Yes.
22 Q. And he interviewed you on -- well, shortly
23   after February 10th, 2005, correct?

DEPOSITION OF FELICIA S. HENDRICKS                          April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

26 (Pages 98 to 101)

Page 98

1  A. Yes.
2  Q. Okay. And he interviewed you where?
3  A. At Kilby.
4  Q. Okay. And when was that statement taken by
5     Investigator Deramus?
6  A. I can't recall his exact date.
7  Q. Was it before your meeting with Warden
8     McDonnell?
9  A. I can't recall. I mean, I can't recall
10    exactly.
11 Q. Okay. Defendant's Exhibit #9.
12    MR. PITTERS: Help the court reporter
13       out. Is it Deramus or Demus?
14       Because --
15    MR. BIGGS: I don't know.
16    THE WITNESS: Demus.
17    MR. BIGGS: Is it Demus?
18    THE WITNESS: Demus.
19    MR: BIGGS: I apologize.
20    THE COURT REPORTER: How do you spell
21       it?
22    MR. BIGGS: I don't know. I've been
23       with Corrections for year. I

Page 99

1        don't know everybody.
2     THE WITNESS: I think it's D-E-M-U-S.
3     MR. BIGGS: I apologize.
4     THE WITNESS: If I'm not mistaken.
5     MR. BIGGS: Demus. I'm sorry. I can't
6        read my own writing.
7        (Off-the-record discussion)
8  Q. Do you see Defendant's Exhibit #9?
9  A. Yes, sir.
10 Q. Okay. I represent to you that this is a
11    transcription of your oral statement given to
12    that investigator. Would you like a few
13    moments to take a look at it?
14 A. Yes, sir.
15    MR. BIGGS: All right. Take a look at
16       it. Go ahead. Off the record.
17       (Off-the-record discussion)
18       (Brief recess)
19 Q. Have you reviewed Defendant's Exhibit #9?
20 A. Yes, sir.
21 Q. You don't need any more time to review that?
22 A. No, sir.
23 Q. Are these your words that you gave the

Page 100

1     investigator on that day?
2  A. Some words.
3  Q. Ma'am?
4  A. Yes, sir, some words.
5  Q. What do you mean by some words?
6  A. Just what I said. I mean, some words. I
7     mean, I can't exactly recall everything that
8     is exactly happening.
9  Q. Do you see anything in there that just you
10    know is an incorrect statement?
11 A. Yes. As to when they said I admitted to --
12    which I opened the knife. But I don't
13    remember saying that.
14 Q. Okay. We'll get to that in a minute. In
15    looking at Defendant's Exhibit #9, it has an
16    acronym to the left, ED and FH. On the side
17    of the words in capital, ED, and then capital
18    FH. And it's that way on the left-hand
19    column of this Defendant's Exhibit #9; is
20    that not correct?
21    MR. PITTERS: Object to the form.
22    MR. BIGGS: Sir?
23    MR. PITTERS: That's not correct, sir.

Page 101

1     MR. BIGGS: I'm sorry. There's not --
2     MR. PITTERS: Let me just cut to the
3        chase.
4     MR. BIGGS: Yeah, cut to the chase.
5     MR. PITTERS: I hope my hearing is not
6        playing tricks on me. But I
7        thought you said that it has
8        acronyms to the sides. And it has
9        acronyms on the left side.
10    MR. BIGGS: To the side. Side.
11    MR. PITTERS: Okay. All right. The
12       left side.
13    MR. BIGGS: I had a deposition in North
14       Carolina late last night, and I
15       flew in early this morning, and
16       I'm getting a little weary. And I
17       apologize to you, Ms. Hendricks.
18 Q. When it refers to FH, that is your
19    statements, correct?
20 A. Yes.
21 Q. Those are your statements? Okay. Looking at
22    the top, it says the first line, on February,
23    the February the 10th, 2005, at approximately

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN McDONNELL, ET AL.

Page 102

1    ten p.m., when I received my car from the
2    front lobby, I went out to my car. I crunk
3    my car up and sat there, and I waited on
4    Ms. Latoya Nelson to come out. All right.
5        What time did you work that day on
6    February 10th, 2005?
7    A. What time do I work?
8    Q. Yes, ma'am.
9    A. From two until we are relieved from our post.
10   Q. Okay. So at ten o'clock is your normal
11   quitting time, correct? Ten p.m.?
12   A. Yes, sir, supposed to be.
13   Q. Okay. So you had just gotten off work at
14   ten p.m., correct?
15   A. Yes.
16   Q. And you went out to your car from the front
17   lobby at Kilby Correctional Facility?
18   A. Yes, sir. That's supposed to have been I
19   received my card. Because he have to turn in
20   ID cards.
21   Q. Okay. I received my card from the front
22   lobby, and I went out to my car. And I crunk
23   my car up. Is that crunk or crank your car

Page 103

1    up?
2    A. I crunk.
3    Q. Okay. And you waited on Ms. Latoya Nelson.
4    How long did you know Ms. Latoya Nelson?
5    A. For a while, while I was at Kilby. Because I
6    had found out she was from Troy from where my
7    mother lived.
8    Q. Are y'all friends or were you friends at the
9    time?
10   A. Yes, sir.
11   Q. Okay. And had you went out with her on
12   occasion prior to February 10th, 2005?
13   A. Yes, sir.
14   Q. And what would y'all do when you would go out
15   on occasion?
16   A. We went to the casino.
17   Q. Okay.
18   A. We been out to eat.
19   Q. When you say casino, what are you talking
20   about?
21   A. The casino on Dozier Road, out to eat, me and
22   her and Ms. Flowers. We been to McDonald's
23   with our kids.

Page 104

1    Q. The casino on Dozier Road, what is that
2    place?
3    A. A gambling place, entertainment center.
4    Q. Okay. Is it in Montgomery County?
5        MR. PITTERS: Where is Dozier Road?
6    A. It's right up from Kilby right by the golf
7    course.
8    Q. Is it run by a legal entertainment
9    establishment?
10   A. Well, it -- it says legal it's here. I mean,
11   I don't --
12   Q. Is it open to the public is what I'm trying
13   to say?
14   A. Yes, sir, it's open to the public.
15   Q. Is it kind of like the dog track out there at
16   Macon County where everybody goes out and
17   gambles --
18   A. Yes, sir, but they don't run dogs. They just
19   have machines.
20   Q. Like the video machines?
21   A. Yes, sir.
22   Q. Is it something like the place in Wetumpka up
23   here where you can go and you can play video

Page 105

1    machines and video poker and such?
2    A. Yes, sir. Only on the machines. It's just
3    machines.
4    Q. But it's a legitimate place, correct?
5    A. Yes.
6    Q. Okay. And y'all would go there together,
7    correct?
8    A. We met there. We would go there, yes, sir.
9    Q. Okay. Is it not true that the reason why you
10   waited on Ms. Latoya Nelson to come out that
11   evening was that there were rumors being
12   spread about you?
13   A. I waited on her because it was rumors
14   spreaded about me, yes, sir.
15   Q. All right. What were the rumors being spread
16   about you that caused you to want to wait in
17   the parking lot that night?
18   A. To -- well, I had been hearing the rumors for
19   over like two weeks, but I never said nothing
20   about it. It was just -- I heard it from
21   other employees of -- nurse -- people from
22   the nursing staff and even some inmates had
23   came and asked me what's the problem with you

April 26, 2006

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

28 (Pages 106 to 109)

Page 106

1   and Ms. Nelson. Why you and Ms. Nelson don't
2   talk. And I'm like, well -- they saying
3   Ms. Nelson saying that you stole some money
4   from her. And I'm like, I didn't steal no
5   money from Ms. Nelson. The whole situation
6   boiled down to a hundred dollars that she had
7   might have lost or she just misplaced.
8   Q. So you're hearing rumors in the facility from
9     co-employees and the inmates that someone was
10    spreading rumors about you being a thief?
11  A. Yes, sir.
12  Q. And supposedly a hundred bucks that
13    Ms. Nelson either lost or she alleges that
14    you stole from her, correct?
15  A. Yes, sir.
16  Q. Okay. And the purpose of you waiting that
17    evening was to confront her about it?
18  A. To ask her about what was going on, yes, sir.
19  Q. Okay. When did you decide to do that, that
20    you were actually going to talk to her about
21    that?
22  A. Well, that night, because I had -- like I
23    said, people had been coming to me. This

Page 107

1   had been going on for like two whole weeks.
2   And then she was saying that I would -- I
3   wouldn't speak to her, I wouldn't talk to
4   her. I mean, what is it for me to say when
5   you go around saying -- spreading rumors
6   about me.
7   Q. And during that two weeks prior to ten p.m.
8     on February 10th, 2005, did you ever talk to
9     her prior to then?
10  A. No. We spoke that day. But it -- I think
11    that day we was working different posts. And
12    I didn't get to see her. So that's the night
13    I waited on her and I asked her about it.
14  Q. How did it make you feel, these rumors being
15    spread about you in the facility?
16  A. It don't make me -- it don't make me feel
17    good because I don't like nobody be telling
18    no lies on me.
19  Q. Did it make you mad?
20  A. Well, I was upset. But it's not nothing to
21    be just angry toward that. Because, I mean,
22    rumors are rumors. I mean, people going to
23    talk regardless. But, I mean, inside the

Page 108

1   institution, as of the rules say of DOC,
2   there's no personal or whatever should be
3   brought inside the institution.
4   Q. Did you have Ms. Latoya Nelson's phone
5     number?
6   A. Not -- I -- my phone that I had, it was in my
7     other phone, but I had just got a new phone.
8   Q. Did you try any other way to contact
9     Ms. Latoya Nelson during the two weeks before
10    February 10th, 2005, to discuss these
11    allegations that you were a thief?
12  A. No, sir, I didn't. Like I said, we had spoke
13    to each other that day, and as of that night
14    I had asked -- waited to ask her about this.
15  Q. Why didn't you ask her about it during the
16    day?
17  A. Because we was -- went in. It was almost
18    right at two. About 1:50, 1:55 then. And
19    when you sign in, you have to go straight to
20    your post.
21  Q. Okay. You didn't think you ought to try to
22    call her at home and talk to her about this?
23  A. Well, I -- at that particular time, I

Page 109

1   didn't -- I didn't think.
2   Q. Okay. You could have asked her for her phone
3     number and said are you going to be home this
4     evening, can I call you about a matter,
5     couldn't you?
6   A. I could have.
7   Q. Okay. I'm trying to understand why you chose
8     to wait in the parking lot with your knife in
9     your car to talk to Ms. Latoya Nelson?
10       MR. PITTERS: Object to the form.
11       MR. BIGGS: What's the problem with
12         that?
13  A. Because it's -- it's not like that I was
14    just --
15       MR. PITTERS: Ms. -- Ms. Hendricks.
16       MR. BIGGS: The question was to your
17         lawyer. What was the wrong with
18         the form of the question?
19       MR. PITTERS: It -- implicit within the
20         question is to answer that -- or
21         evidence that she had the knife in
22         the car waiting on Ms. Nelson,
23         when the evidence, the

Case 2:05-cv-00714-WKW-CSC    Document 35-2    Filed 05/22/2006    Page 29 of 135

DEPOSITION OF FELICIA S. HENDRICKS                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

29 (Pages 110 to 113)

Page 110

1    documentation and her statements
2    suggest that it was an act of
3    impromptu as opposed to an act of
4    deliberation.
5        MR. BIGGS: Well, the evidence is, is
6        her testimony is that she never,
7        ever carries the knife. This was
8        the first time she's ever brought
9        the knife to Kilby facility. The
10       fact is she admits that she had
11       the knife in the car with her, and
12       this was the night she chose to
13       talk to Ms. Nelson.
14           There is nothing wrong with
15       the form of my question. It's
16       based on her testimony that she
17       just has given here today.
18       MR. PITTERS: Okay. That's fair
19       enough. Go ahead.
20   A. Well, on that particular day, that was the
21       day that I had the knife. But, like I said,
22       I don't usually carry the knife, because I
23       had a problem with my radio and I had gotten

Page 111

1    the knife out of my house; and someone was
2    fixing on my car. So I just dropped the
3    knife in my door at that present time, and I
4    had forgot all about the knife.
5    Q. What kind of knife is it or was it?
6    A. It was a small little pocket knife.
7    Q. Was it a buck knife?
8    A. I don't exactly know the name of the knife.
9        All I know, it was a small little pocket
10       knife.
11   Q. How long was the knife when the blade was
12       closed?
13   A. I can't say that. It wasn't no bigger
14       than -- ain't no bigger than this.
15       MR. PITTERS: Let the record reflect
16       that the witness is demonstrating
17       the length of the knife with her
18       fingers specifically and her thumb
19       and the index finger on her right
20       hand.
21       MR. BIGGS: Would you say it's two and
22       a half to three inches that she's
23       trying to demonstrate? Would you

Page 112

1        agree with that?
2    A. About three.
3    Q. About three inches? And that's with the
4        blade closed?
5    A. Yes.
6    Q. All right. Go back to Exhibit #9. And she
7        came out, and as she came to her car, Officer
8        Hendricks had asked Officer Nelson did you
9        have anything you wanted to say to me. And
10       she said a little smirk, did you use the word
11       a little smirk?
12   A. Well, how she said, it was a smirk.
13   Q. Okay. You're saying at the time that you're
14       out in the car at that time, you made a
15       question to her, and she came back and
16       responded no but had a smirk on her face?
17   A. Yes.
18   Q. How did that make you feel for her to have a
19       smirk on her face?
20   A. It didn't made me feel nothing. I just knew
21       she was lying.
22   Q. Okay. It upset you, didn't it?
23   A. No, not really. I mean, she just --

Page 113

1    Q. Okay. This woman whose supposedly spreading
2        rumors that you're a thief and you come out
3        and ask her about it and she's got a smirk on
4        her face, that didn't upset you?
5    A. No, because of at the time when I asked her,
6        I was not upset or nothing like that.
7    Q. All right. And you said -- this is
8        Defendant's Exhibit #9 -- and I said, Are you
9        sure? And she said, Yeah, I'm sure. And I
10       said, Why are you going around telling people
11       I stole your money? She said, You did steel
12       my money.
13           So she accused you of a thief, didn't
14       she -- of being a thief, didn't she?
15   A. Yes, sir.
16   Q. How did that make you feel when she came out,
17       had a smirk on her face and accused you of
18       being a thief?
19   A. I mean, it didn't really bother me then.
20   Q. Are you saying on the record that that didn't
21       bother you?
22   A. No, not when she had said with the little
23       smirk, no.

April 26, 2006

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

30 (Pages 114 to 117)

Page 114

1  Q. Okay. And you said in your statement, I
2     said, Ms. Nelson, I did not steal your
3     money. I said, I helped you that night,
4     tried to backtrack on what you did with your
5     money; and you sat there and you said that
6     you was going to call the bank and check the
7     bank and you was going to find out what
8     happened to your money and therefore.
9     Anyway, when you got home, you supposed to
10    had called me, but Ms. Nelson didn't call
11    me. So from then, when I had left, then come
12    back the next day, it was more confrontation
13    about that. What do you mean it was more
14    confrontation about that? What does that
15    mean?
16 A. I don't know about that.
17 Q. Okay. Are you saying you didn't make those
18    words, it was more confrontation about that?
19 A. No, it wasn't no more confrontation about
20    that.
21 Q. All right. Continue on. It says, okay.
22    When I had asked her about the money again
23    and she said that I said you had my money --

Page 115

1     period. Okay. And I told her I don't have
2     her money. Period. I told her that if
3     anything she want from me, she could ask me,
4     much as I have helped her.
5     Then the investigator says, Okay. Let's
6     get to about what happened last night on the
7     10th. Would you agree with me that the
8     investigator referred to the night before in
9     this statement that this statement you gave
10    was on February 11th, 2005?
11 A. Do I agree with you that this is the
12    statement that was given on the 11th?
13 Q. Yes, ma'am.
14 A. Yes.
15 Q. Okay. This is a statement -- your statement
16    that you gave the day after the events of
17    February 10th, 2005, correct?
18 A. Yes.
19 Q. All right. Then it goes into what you say.
20    It says, okay, period. On the 10th of what
21    happened, I was waiting on my car, waiting at
22    my car for Ms. Nelson came. When Officer
23    Nelson came to her car, I asked about the

Page 116

1     money and she said that I had her money and I
2     told her, No, I didn't. Okay. From then on,
3     as we was talking, things got to escalating.
4     What happened from then on to cause
5     things to escalate?
6  A. She started getting loud and I got loud, and
7     it just started escalating from there. She
8     started getting loud. I started getting
9     loud, and we was both hollering at each other
10    and we was crying.
11 Q. Okay. Were you in the car or out in the
12    parking lot?
13 A. Standing out beside my car and her car.
14 Q. Okay. Now, the parking lot is how far from
15    the fence of the prison?
16 A. I can't say the exact distance, because I
17    don't really know. It's a distance.
18 Q. Would you say within 10 or 20 yards?
19 A. Yes, sir.
20 Q. And on the other side of the fence is the
21    dorms where the inmates are, correct?
22 A. Yes, sir.
23 Q. Are they asleep at ten o'clock at night or

Page 117

1     are they still up?
2  A. Ten o'clock, we be leaving. Some inmates be
3     asleep, some be up or -- at that particular
4     time, we're -- we're -- we're off from
5     there. We was parked out towards the grass
6     way.
7  Q. Okay. When y'all were escalating and yelling
8     at each other, were there inmates in the yard
9     between the dorms and the fence?
10 A. No, sir, because the yard closes before dark.
11 Q. Were you yelling -- were you escalating
12    things and yelling so that you were able to
13    be heard by the inmates inside the prison?
14 A. No, sir.
15 Q. Okay. Were y'all calling each other names?
16 A. No, sir.
17 Q. She didn't call you a bitch or a whore or
18    anything like that at that time and you
19    didn't call her anything?
20 A. No, sir.
21 Q. Well, what were y'all saying in a loud
22    manner? What were y'all saying to each
23    other?

April 26, 2006

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

31 (Pages 118 to 121)

Page 118

1  A. No. She was just saying if I had her money
2     to give her her money and I told her,
3     Ms. Nelson, I don't have your money. I said,
4     If I had your money, I would give you your
5     money. I said, Why do I have to steal from
6     you all the times I had helped you? I done
7     gave you gas money to get back and forth to
8     work.
9  Q. Were you mad at each other?
10 A. No. At that time we were just -- we were
11    just talking loudly and we both were just
12    crying. We were just --
13 Q. Upset about the whole event?
14 A. Yes, sir.
15 Q. Well, tell me what this means. This is in
16    the same paragraph: We both was crying at
17    each other and we both was hollering. I
18    guess this is "hollin." The next sentence --
19    last sentence. I had stepped to Ms. Nelson
20    and I pushed her with my chest. No hand
21    contact whatsoever.
22       What does it mean, I pushed her with my
23    chest?

Page 119

1  A. As of to what that phrase, that's what
2     Officer Demus asked me did we bump chest to
3     chest. And I told him, she bumped me and
4     then I bumped her back.
5  Q. Okay. But on February 11th, 2005, your
6     statement was, quote: I had stepped to
7     Ms. Nelson, and I pushed her with my chest.
8     No hand contact whatsoever. Those are the
9     words used on February 11th, 2005, correct?
10 A. Yes, sir.
11 Q. You didn't say anything about her approaching
12    you and bumping you, now, did you?
13 A. No, I didn't.
14 Q. The fact is, is that you did the initial
15    bumping with your chest; is that not correct?
16 A. Well, we both bumped chest to chest. But I
17    did not say that. I was told that -- when he
18    asked me the question to put that in my
19    statement, and that's what I did.
20 Q. Okay. But your words is that you stepped to
21    Ms. Nelson. She didn't step to you?
22 A. That's what it says in writing.
23 Q. All right. Well, if this is an accurate

Page 120

1     transcription of your words, that's what you
2     said on February 11th, 2005, correct?
3  A. That's what I said.
4  Q. You don't see any words in there about
5     Ms. Nelson stepping to you, now, do you?
6  A. No, I don't see no -- in there -- in that
7     situation, no, I don't.
8  Q. But you never stated that to the
9     investigator, did you, that she stepped to
10    you first, now, did you?
11 A. No, sir, I didn't.
12 Q. Okay. So you're the one that initiated
13    physical contact with Ms. Nelson, correct?
14 A. Yes.
15 Q. The second page, you kind of go into that,
16    now, don't you? He asked you so you're
17    saying you stepped up to her and put your
18    chest to her chest. And your answer was,
19    yes, sir, I did. Is that correct?
20 A. That's correct. That's what I said.
21 Q. Kind of bumped her in her chest, and you said
22    it again, yes, sir, I did, correct?
23 A. Yes. He asked.

Page 121

1  Q. Okay. And he asked did she have -- did she
2     go backwards? And your answer was, Yes,
3     sir. And then she stepped back forward to
4     me. Those are your words, correct?
5  A. Yes, sir.
6  Q. You didn't say anything about her doing
7     anything to you first other than hollering
8     before you initiated you bumping her chest --
9     to her chest, correct?
10 A. Yes, sir.
11 Q. Then he asked what happened after that. And
12    let me stop right there. Would you agree
13    with me that you're in violation of
14    Administrative Reg 207 when you initiated
15    bumping your chest to her chest in the
16    parking lot of Kilby Correctional Facility on
17    February 10th, 2005?
18       MR. PITTERS: Object to the form.
19         Which one? 207 or you said 208?
20       MR. BIGGS: 207.
21       MR. PITTERS: Counsel, that's in
22         accordance with my objection.
23         That document is a five-page

DEPOSITION OF FELICIA S. HENDRICKS                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

32 (Pages 122 to 125)

**Page 122**

1    document. With all due respect
2    and courtesy to the witness, if
3    there's some specific violation
4    that -- or provision of the
5    regulation that you are
6    representing to the witness that
7    she violated, you know, it would
8    be -- I would request that you
9    point it out to her so that she
10   can concur or refute your
11   representation that she was in
12   violation.
13        MR. BIGGS: Okay.
14 Q. Would you agree with me that by you bumping
15   your chest on the parking lot that evening,
16   that you obeyed rule Roman Numeral V(a)(7),
17   observing all laws, rules, and regulations?
18 A. Let me find something just a minute.
19 Q. Let me withdraw that question and I'll ask
20   you another one. Would you agree with me
21   that when you bumped her chest in the parking
22   lot on the February 10th, 2005, that you
23   assaulted Ms. Nelson?

**Page 123**

1        MR. PITTERS: Object to the form. And
2        I'm going to instruct the witness
3        not to answer that.
4        MR. BIGGS: What's your grounds?
5        MR. PITTERS: Assault is a criminal
6        offense, and you're asking her to
7        admit a criminal offense.
8        MR. BIGGS: Are you invoking the Fifth
9        Amendment?
10       MR. PITTERS: Hold on a second. Let
11       me --
12       MR. BIGGS: I understand.
13       MR. PITTERS: Oh, you can advise her.
14       I mean --
15       MR. BIGGS: Well, I just want to
16       understand. And I'll understand
17       that.
18       MR. PITTERS: That's fair enough.
19 Q. You understand what assault is, don't you?
20 A. Yes, sir, I do.
21 Q. Okay. You went to the academy, and you know
22   about assault being a criminal violation,
23   correct?

**Page 124**

1 A. Yes.
2 Q. When a person bumps another person with their
3   chest, that is an assault, correct?
4        MR. PITTERS: Object to the form.
5        Calls for a legal conclusion on
6        the part of the witness.
7        MR. BIGGS: She's a trained law
8        enforcement officer.
9        MR. PITTERS: I don't think you have
10       laid the necessary predicate that
11       she's a lawyer. That's such that
12       she has the requisite ability and
13       knowledge to -- with respect to
14       the law of assault and battery.
15 Q. Was it wrong for you to bump Ms. Nelson with
16   your chest?
17       MR. PITTERS: Object to the form. At
18       this time, I'm going to -- I'm
19       going to instruct the witness not
20       to answer this line of
21       questioning. And as her counsel,
22       I'm going to advise her on the
23       record that this line of

**Page 125**

1    questioning pursues a criminal
2    offense of assault and battery;
3    that she has the right under the
4    United States Constitution, the
5    Fifth Amendment right, to invoke
6    her right to remain silent, not to
7    say anything that will be
8    incriminating.
9        And to that extent, I'll
10   advise her as her lawyer to invoke
11   her Fifth Amendment right. And,
12   along with that, in accordance
13   with that objection, I'm going to
14   advise her not to answer the
15   question.
16       MR. BIGGS: Mark that part of the
17       deposition.
18 Q. I show you what's marked as Defendant's
19   Exhibit #12. Do you see Defendant's Exhibit
20   #12, Ms. Hendricks?
21 A. Yes.
22 Q. Is that your signature on Defendant's Exhibit
23   #12?

April 26, 2006

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

33 (Pages 126 to 129)

Page 126

1   A. Yes.
2   Q. Is this the oath of office that you signed on
3       April 25th, 2000?
4   A. Yes.
5   Q. And in that oath of office, did you swear to
6       support the Constitution of the United States
7       of America and the constitution of the State
8       of Alabama?
9   A. Yes.
10  Q. Did you also say that you would observe all
11      the rules and regulations prescribed for the
12      government of convicts?
13  A. Yes.
14  Q. Okay. All right. Let's go back to
15      Defendant's Exhibit #9. The investigator
16      asked you, following your statement, Yes,
17      sir, and then she stepped back forward to
18      me. And he asked, Okay. What happened after
19      that? And then you say, After that, by that
20      time, then that's when everybody came out.
21      The officers had started coming. They was
22      pulling me and Ms. Nelson apart, and me and
23      Ms. Nelson both were still crying, say, you

Page 127

1       know, still talking about the money and all
2       this here. Then she told them to just leave
3       her alone, that she wanted to talk to me. So
4       me and her got in the car, and we was
5       talking.
6           So at this time, you and Ms. Nelson are
7       in her car, correct?
8   A. Yes.
9   Q. Are there folks standing outside of your car,
10      those officers you had talked about?
11  A. Yes.
12  Q. Who was outside your car; do you recall? Or
13      her car. I apologize.
14  A. Officer Penn, Officer Pettaway, Officer
15      Craig. Officer Armstrong was sitting in his
16      car. I can't -- I can't remember nobody else
17      that was exactly around. I can't, you
18      know --
19  Q. There were several people outside the car at
20      this point?
21  A. Yes.
22  Q. And what were you and Ms. Nelson doing in the
23      car at this time?

Page 128

1   A. Well, we was talking about the issue about
2       the money. And she said that she -- well,
3       inside the car, she apologized to me; said
4       that she was sorry for accusing me of
5       stealing her money. And I told her I didn't
6       have to steal from her, all the time that I
7       had gave her money. And she said that she
8       was upset because I hadn't spoke to her or
9       said nothing to her in the last past couple
10      of weeks.
11  Q. Did you have any type of physical contact
12      with her in the car?
13  A. No, sir, we had no physical contact in the
14      car.
15  Q. All right. And you agree with me that both
16      you and her were upset when you were in the
17      car still?
18  A. Well, we had done calmed down. We was
19      talking then.
20  Q. Okay. Then you say in your statement, When
21      we got in her car and was talking, then
22      Officer Colbert had pulled up and had came to
23      Ms. Nelson's side of her window; and she

Page 129

1       knocked on the window and she asked
2       Ms. Nelson are you all right. Who is Officer
3       Colbert?
4   A. Officer Lilkenya Colbert.
5   Q. How long have you known her?
6   A. No more than from the time when she had came
7       to Kilby.
8   Q. Okay. Did you ever go out gambling with her?
9   A. No, sir.
10  Q. How would you describe your relationship with
11      her prior to February 10th, 2005?
12  A. Just a regular employee.
13  Q. Okay. Friends?
14  A. As of coworkers. I mean, we wasn't friends.
15  Q. Just a coworker?
16  A. Yes, sir.
17  Q. All right. So she asked Ms. Nelson are you
18      all right. And you told Ms. Colbert that
19      Ms. Nelson is fine. Why did you feel it was
20      necessary for you to tell Ms. Colbert that
21      she was fine -- that Ms. Nelson was fine?
22  A. Because I wasn't fixing to do nothing to
23      Ms. Nelson. We was sitting in the car

DEPOSITION OF FELICIA S. HENDRICKS                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

34 (Pages 130 to 133)

---

**Page 130**

1    talking. I just told her she's fine.
2  Q. Which Ms. Nelson told her, she said, Yeah,
3    I'm all right. She said, Just leave me
4    alone. I want to talk to Officer Hendricks.
5    So me and her were -- was talking. Officer
6    Colbert opened the door back up again and
7    said, Well, I'm not leaving. I'm not going
8    anywhere. You my friend.
9        I guess she's indicating that Ms. Nelson
10   was her friend, correct?
11 A. Yes.
12 Q. And Ms. Nelson told her again, she said, I'm
13   all right. And I said, Ms. Colbert, I said,
14   Ms. Nelson all right. I said, We was
15   talking. Then Ms. Colbert wanted to tell me
16   about, Bitch, we don't like you, anyway.
17 A. That's talking.
18 Q. Okay. Where was Ms. Colbert when she made
19   this statement to you, Bitch, we don't like
20   you anyway?
21 A. Standing on the driver's side of Ms. Nelson
22   where Ms. Colbert was.
23 Q. Okay. And where were you?

---

**Page 131**

1  A. Still sitting in the car in the passenger's
2    side.
3  Q. And was Ms. Nelson's door shut or open at
4    that time?
5  A. Open.
6  Q. Okay. What did you say in response to
7    Ms. Colbert when she says, Bitch, we don't
8    like you, anyway?
9  A. I told her I didn't care whether she liked me
10   or not. I told her I didn't like her either.
11 Q. Is that what you meant when you said, And,
12   you know, things started escalating with me
13   and Officer Colbert?
14 A. No, because at that time she started talking
15   about calling me as a -- Bitch, we don't like
16   you anyway because you ain't nothing. And it
17   just started escalating from there.
18 Q. Okay.
19 A. And I told her she didn't know me.
20 Q. You said Ms. Colbert, at the time she's
21   standing outside the driver's window of
22   Ms. Nelson's car, she's calling you a bitch?
23 A. Yes.

---

**Page 132**

1  Q. She called you a whore?
2  A. Yeah. She called me all kind of names.
3  Q. And what did you say to her?
4  A. I called her another bitch back.
5  Q. Okay. And you're still sitting in the car,
6    correct?
7  A. Yes, sir.
8  Q. Okay. Are y'all yelling at each other with
9    you sitting in the passenger side of the car
10   and her on the other side of the car?
11 A. Yes.
12 Q. Okay.
13 A. And by that time, I had told Ms. Nelson, I
14   said, well, Ms. Nelson, I'm fixing to go. I
15   got out the car and I walked around the back
16   from Ms. Nelson's car, which was parked right
17   beside my car. And I got in my -- I opened
18   up my driver door and I stood right there at
19   the side of my driver door.
20 Q. Okay. Where was your car parked in relation
21   to Ms. Nelson's car?
22 A. Right to the left side of Ms. Nelson's car.
23 Q. Okay. Did you get out and go to your

---

**Page 133**

1    driver's door?
2  A. I opened my door and stood in between my door
3    and the car.
4  Q. All right. And you opened your car -- your
5    driver's door, and naturally, you got in your
6    car to leave, correct?
7  A. Well, I stood there because me and Officer
8    Penn were talking at the time.
9  Q. Okay. Are you saying that at that time you
10   chose to talk to Officer Penn after
11   Ms. Colbert called you a bitch and a whore?
12 A. Because he was telling me to get in the car.
13   And she had went to her car. I walked
14   around. When I got out of Ms. Nelson's
15   side, I came around to my car. I stood at
16   my door. Officer Penn said, Okay,
17   Ms. Hendricks. He said, Just leave, just
18   leave it alone, like that.
19 Q. Okay. Well, wait. Let me ask you this. Why
20   didn't you just leave it alone? Why didn't
21   you just get in your car and leave?
22 A. Because I wasn't talking to Ms. -- this
23   situation didn't have nothing to do with

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

April 26, 2006

35 (Pages 134 to 137)

Page 134

1    Ms. Colbert, period.
2  Q. But you didn't leave, now, did you?
3  A. No, I didn't. Because, like I said, I was
4    standing there talking to Officer Penn.
5  Q. Would you agree with me that you could have
6    gotten in your car, shut the door and left?
7  A. I could have.
8  Q. But instead, you chose to go and get your
9    knife, correct?
10  A. No, sir, not at that point in time, no, sir.
11  Q. Okay. Well, when in point in time did you
12    decide that you were going to reach in your
13    door and pull out your knife?
14  A. At that point in time when Ms. Colbert walked
15    to her car and she pulled her jacket off.
16    Then she came back, then she walked back to
17    her car again, she pulled her shirt out. And
18    then, at that time, that's when the female
19    that was in the car with her got out.
20  Q. Okay. With all this going on, her taking her
21    clothes off and the other girl getting out of
22    the car, you would agree with me that you
23    could have got in your car, shut the door and

Page 135

1    left the State property of the Alabama
2    Department of Corrections, now, couldn't you?
3  A. Yes, sir, I could have.
4  Q. You chose not to do that, but instead, you
5    got your knife; is that not correct?
6  A. That's not correct. At that present time, I
7    didn't.
8  Q. How much time elapsed between the time --
9    strike that. How much time did it take for
10    Ms. Colbert to disrobe herself in the parking
11    lot of Kilby Correctional Facility?
12  A. To disrobe her?
13  Q. Yeah. Take her clothes off?
14  A. By the time it was -- at that time, it was
15    kind of cool. She went to her car, she took
16    her jacket off. Then she said a few words,
17    and she walked back to her car and pulled her
18    shirt out. And she bent down. Now, what she
19    did after that, I don't know when she bent
20    down.
21  Q. You would agree with me, that at the time
22    that Officer Penn is telling you to leave it
23    alone, leave it alone, and Officer Colbert

Page 136

1    taking her clothes off, that you had more
2    than enough time to get in your car and
3    leave?
4  A. Okay. At that present time, if I had got in
5    my car and left, then I would have hit her
6    car because she was parked right in front of
7    me and Ms. Nelson.
8  Q. But you could have got in your car, shut the
9    door, locked the door, correct?
10  A. Yes.
11  Q. But you made a decision not to do that, but
12    instead, get your knife, correct?
13  A. No.
14  Q. Okay. When did -- but you ultimately got
15    your knife, did you not?
16  A. Yes.
17  Q. Okay. What was going through your head at
18    the time you got your knife?
19  A. Well, at the present time when I got my
20    knife, I felt like I was being -- fixing to
21    be attacked by her and the female that was
22    with her.
23  Q. Okay. If you had gotten in your car, as

Page 137

1    Officer Penn had told you to get in your car,
2    and not stayed outside your car, then you
3    would not have had an opportunity to be
4    allegedly attacked by these other folks, now,
5    would you?
6  A. No, sir, I wouldn't have. Because when she
7    left the State property, she came back. So
8    allegedly, she was looking for trouble.
9  Q. Okay. Is that what you were thinking at the
10    time that you decided not to leave and stay
11    there so you could pull your knife, that she
12    was looking for trouble?
13  A. No, sir. Because when she left, she came --
14    she got a phone call from another officer. I
15    don't know who the officer was. And then,
16    when she came back, then that's when all the
17    confusion started. So she left State
18    property and came back.
19  Q. Okay. Does that make what you did correct?
20  A. No.
21  Q. Okay. The fact of the matter is that you
22    were mad at her because she called you a
23    bitch and a whore, and she was getting her

DEPOSITION OF FELICIA S. HENDRICKS                April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

36 (Pages 138 to 141)

Page 138

1     business into your business; is that not
2     correct?
3         MR. PITTERS: Objection.
4             Argumentative.
5  Q. Okay. Were you upset with her because she
6     called you a bitch and a whore?
7  A. No, sir. I've been called all kind of names,
8     but it doesn't bother me.
9  Q. Are you saying on the record you were not
10    upset --
11        MR. PITTERS: Objection.
12 Q. -- and mad that evening that -- when
13    Ms. Colbert called you a bitch and a whore?
14        MR. PITTERS: Objection. Asked and
15            answered.
16 Q. No?
17 A. No, I wasn't upset then.
18 Q. Okay. When did you finally get upset at
19    Ms. Colbert?
20 A. When she went to her car and pulled her
21    jacket off.
22 Q. Okay.
23 A. I mean, even though we had words, I mean,

Page 139

1     it's not like I was fixing to attack her,
2     because she was the aggressive one towards
3     me. She came towards me.
4  Q. Did she have a weapon?
5  A. I don't know what she had.
6  Q. Did you see a weapon?
7  A. No, I didn't.
8  Q. Did she give you any indication that she had
9     a weapon?
10 A. Well, when she went and bent down at her car
11    where she was, I don't know what she had.
12 Q. Okay.
13 A. I assumed she did.
14 Q. Okay. So you're assuming that she might have
15    had a weapon?
16 A. Yes.
17 Q. So would you agree with me that instead of
18    leaving and getting in your car, you decided
19    that you were going to go after your weapon
20    which you knew about to confront her with her
21    supposed weapon?
22 A. No. Because like I said, if I had pulled off
23    and left, then I would have hit her car.

Page 140

1  Q. Would you agree with me that the only weapon
2     that evening that you are aware of was your
3     knife?
4  A. That I know of was mine, yes, sir.
5  Q. Okay. Would you agree with me that when you
6     decided not to leave at the direction of
7     Officer Penn, stay and pull your knife, that
8     you did not uphold with integrity the
9     public's trust in your position as a
10    Corrections Officer I?
11 A. Repeat that again, now.
12 Q. All right. I'm referring to Administrative
13    Reg 207, number 9. Are you aware of that?
14 A. Yes.
15 Q. Okay. Would you agree with me that you --
16    when you decided you were going to go after
17    your knife and confront Ms. Colbert, that you
18    did not uphold with integrity the public's
19    trust --
20        MR. PITTERS: Object to the form.
21        MR. BIGGS: I haven't finished with my
22            question yet.
23 Q. -- the public's trust involved in your

Page 141

1     position as a Corrections Officer I?
2         MR. PITTERS: Object to the form.
3  A. As to what? Where I -- I don't understand.
4     I'm confused now.
5  Q. Did you uphold the integrity of your position
6     by staying out there confronting Ms. Colbert
7     with a knife?
8         MR. PITTERS: Object to the form.
9  Q. Can you answer that?
10 A. Well, you want me to answer that. You're
11    asking me can I answer that. But, I mean, it
12    all falls up under her category, too, when
13    she left State property and came back.
14 Q. I ain't asking about her. I'm asking about
15    you, ma'am.
16 A. I don't know.
17 Q. You don't know that -- I'll withdraw that.
18    On February 10th, 2005, were you a sworn
19    and certified law enforcement officer for the
20    State of Alabama?
21 A. Yes.
22 Q. Did you tote a badge on February 10th, 2005?
23 A. Yes.

DEPOSITION OF FELICIA S. HENDRICKS                         April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

37 (Pages 142 to 145)

Page 142

1  Q. Did you swear an oath to uphold the laws and
2     the constitution of the State of Alabama
3     prior to February 10th, 2005?
4  A. Yes.
5  Q. Would you agree with me that your actions on
6     February 10th, 2005 in confronting
7     Ms. Colbert with a knife violated your
8     position as a law enforcement officer?
9        MR. PITTERS: I'm going to object to
10       that and instruct the witness not
11       to answer that question.
12       MR. BIGGS: What's your grounds for
13       instructing her not to answer?
14       MR. PITTERS: You're asking the witness
15       to incriminate herself in these
16       proceedings. And she has a right
17       under the Fifth Amendment of the
18       United States Constitution not to
19       incriminate -- render any
20       statements that would be
21       incriminating.
22       MR. BIGGS: That question has nothing
23       to do with crimes. That's got to

Page 143

1        do with her sworn oath as a law
2        enforcement officer for the State
3        of Alabama. And I beg to differ
4        with you.
5        MR. PITTERS: I stand on my objection,
6        Counselor.
7        MR. BIGGS: Mark that.
8  Q. Your prior testimony today was, on several
9     occasions, that you never opened the knife;
10    is that correct?
11 A. Yes.
12 Q. But reading the words of your statement which
13    was done the day after the events of February
14    10th, 2005, the words are, quote: By that
15    time, I had rushed to my left side of my
16    door, comma, door panel, and I had a knife,
17    comma, which I opened the knife; and when she
18    said, ah, bitch, comma, I'm going to get you
19    or whatever.
20       Were those your words on February 11th,
21    2005, that you opened the knife?
22 A. I don't remember saying that.
23 Q. Okay. If those are your words on February

Page 144

1     11th, 2005, is that what really happened?
2  A. No, sir, because I didn't open the knife.
3  Q. Okay. But if those are your words, you made
4     that statement on February 11th, 2005,
5     correct?
6  A. That's what it says, but I don't remember
7     opening the knife.
8  Q. Well, let's make it correct, now. Your
9     statement now is you don't remember opening
10    the knife?
11·A. I don't remember opening no knife. Because
12    if I had opened the knife, then I would have
13    cut Officer Penn.
14 Q. Is your testimony now that you don't remember
15    opening the knife or that you didn't open the
16    knife?
17 A. I didn't open the knife.
18 Q. Okay. So that is an affirmative statement
19    that you did not open the knife?
20 A. I didn't open the knife.
21 Q. Continue on. And after that, then Officer
22    Penn had grabbed my right hand, which the
23    knife was in my right hand. He got the

Page 145

1     knife, and what he did with the knife, I
2     don't know. And then, after that, me, I got
3     back into my car when Officer Penn had tried
4     to push me back in the car twice. Why did it
5     take Officer Penn twice to push you back in
6     your car?
7  A. Because I pushed him and I told him just
8     leave me alone. And then he pushed me
9     again. So that's twice.
10 Q. So after two times Officer Penn tried to push
11    you are in the car, you finally got back in
12    the car, correct?
13 A. Yes.
14 Q. Then you said I finally got back in my car.
15    Then me and Ms. Nelson pulled out. I pulled
16    out first, then Officer Nelson pulled out
17    behind me and we left, correct?
18 A. Yes.
19 Q. You didn't give any indication you had any
20    problems leaving then, now, did you?
21 A. No.
22 Q. Okay. You didn't have any problems pulling
23    out after you got -- finally got in the car,

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

April 26, 2006

38 (Pages 146 to 149)

---

Page 146

1    now, did you?
2    A. By that time, Ms. Colbert had done moved
3       then.
4    Q. Oh, okay. You didn't say that in your
5       statement, did you?
6    A. No, it's not in my statement. But by that
7       time, she had done moved. Because she went
8       over to see, because Lieutenant Blackmon had
9       fell in the parking lot.
10   Q. Then you say you met up with Latoya Nelson
11      down at Pike Road Post Office, correct?
12   A. Yes.
13   Q. Now, this happened on -- the statement you
14      gave was on February 11th, 2005. What did
15      you do on February 12th, 2005 in regards to
16      this situation?
17   A. On what I -- what you mean, what I did?
18   Q. Did you file any report or go to the warden,
19      say, look, I messed up last night. I pulled
20      a knife. Here it is. Did you do anything in
21      regards to this situation on February 12th,
22      2005?
23   A. No, sir.

---

Page 147

1    Q. Why not?
2    A. Because on February the 11th, I was barred
3       from Kilby Correctional Facility.
4          MR. PITTERS: Apparently counsel, you
5             have finished your examination as
6             far as that statement is
7             concerned?
8          MR. BIGGS: I may go back to it, but I
9             think I'm finished right now.
10         MR. PITTERS: Okay. I think that's
11            good little stopping place to go
12            to the break room back here.
13         MR. BIGGS: Okay. Sure. Go ahead.
14            Sure.
15            (Brief recess)
16   Q. Ms. Hendricks, I show you what's marked as
17      Defendant's Exhibit #6, which is dated
18      February 18th, 2005. It's a memorandum from
19      Terrance McDonnell to you, notice of
20      pre-dismissal conference. Do you recognize
21      Defendant's Exhibit #6?
22   A. Yes, sir.
23   Q. And on the second page of that exhibit, you

---

Page 148

1    received a copy of this and that's your
2    signature dated February 18th, 2005, correct?
3    A. Yes, sir.
4    Q. Okay.
5          MR. PITTERS: That's Defendant's
6             Exhibit what?
7          MR. BIGGS: #6.
8    Q. I show you what's marked as Defendant's
9       Exhibit #7. This is dated March 2nd, 2005.
10      It's a memorandum from Terrance McDonnell to
11      Commissioner Donal Campbell through Dora
12      Jackson. Did you receive a copy of this
13      particular memorandum?
14         MR. PITTERS: And what's the date of
15            that?
16         MR. BIGGS: March 2nd, 2005.
17   A. I think I did, but I don't have it with me.
18   Q. Okay. That's fine.
19         MR. PITTERS: That's going to be
20            Defendant's Exhibit what?
21         MR. BIGGS: #7.
22   Q. But you do recognize that particular exhibit,
23      you just don't have it with you?

---

Page 149

1    A. Yes, sir.
2    Q. Okay. Defendant's Exhibit #8 is a collection
3       of documents that's entitled Kilby
4       Correctional Facility pre-dismissal
5       conference memorandum. And there's a
6       collection of documents following that. Do
7       you recognize that document and the documents
8       attached?
9    A. Yes, sir.
10   Q. Okay. The first page of that has your
11      signature as the employee dated March 2nd of
12      '05, correct?
13   A. Yes.
14   Q. So you received a copy of the first page; is
15      that not correct?
16   A. Yes.
17   Q. Okay. The other documents attached to that
18      Defendant's Exhibit #8 are some of the same
19      documents that are attached to the original
20      complaint in this case, correct, we've
21      already talked about?
22   A. Yes.
23   Q. Okay.

DEPOSITION OF FELICIA S. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

April 26, 2006

39 (Pages 150 to 153)

Page 150

1    MR. PITTERS: That's exhibit number?
2    MR. BIGGS: #8.
3    MR. PITTERS: #8.
4    MR. BIGGS: Yes, sir.
5    MR. PITTERS: That's the one dated
6        which one? That's the --
7    MR. BIGGS: This is dated March 2nd,
8        2005.
9    MR. PITTERS: Okay. Wait a minute.
10       Didn't we mark the same Exhibit
11       #7? Oh, no. They just have the
12       same dates.
13   MR. BIGGS: Yes. Same date. This is
14       March --
15 Q. And on page 1, it says: In addition to a
16   response, the employee submitted the
17   following documents. And it lists the
18   documents that are attached to this exhibit,
19   but those are the same documents you used as
20   attachments to the original complaint. Does
21   that make sense to you?
22 A. Yes, sir.
23 Q. Okay. Then lastly, Defendant's Exhibit #10

Page 151

1    is dated March 2nd, 2005. And this is a
2    letter to you from Donal Campbell. And did
3    you receive a copy of this letter?
4  A. Yes, sir.
5  Q. Did you understand it, all the allegations in
6    there as to why you were being dismissed by
7    Commissioner Campbell?
8  A. Somewhat I do, and some that I don't.
9  Q. Okay. Which ones do you not understand? You
10   want to look at it? Oh, you've got a copy of
11   it?
12 A. Yeah, I have a copy of it.
13 Q. Which ones do you not understand?
14       MR. PITTERS: And that is dated -- that
15       is Exhibit #10?
16       MR. BIGGS: Yes, sir.
17 A. On the second page to where it says a review
18   of your overall work record reveals no active
19   or previous disciplinary actions.
20 Q. You didn't understand that?
21 A. I understand it. But as of to where my
22   dismissal, no, I don't.
23 Q. Okay. Would you agree with me that prior to

Page 152

1    these events on February 10th, 2005, you
2    hadn't been disciplined by the Department of
3    Corrections as an employee?
4  A. I hadn't been disciplined?
5  Q. Yeah. You didn't have anything in your
6    personnel file where you had been disciplined
7    for anything?
8  A. I mean, for some being tardy a couple of
9    times or late or something. But that's not
10   no -- this says a review of your overall
11   record reveals no action or previous
12   disciplinary action.
13 Q. Okay. Other than a couple of tardies, you
14   hadn't been disciplined as an employee prior
15   to this particular event of the parking lot,
16   correct?
17 A. No, sir.
18 Q. And that's what that suggests to you, does it
19   not, that -- that Commissioner Campbell
20   reviewed your overall work record, and you
21   revealed nothing active or any type of
22   previous disciplinary action that meant
23   anything to him, correct?

Page 153

1  A. Yes.
2  Q. I mean, you didn't have any other prior
3    assaults or anything --
4  A. No, sir.
5  Q. -- where you were charged with some type of
6    violation of rules other than being tardy a
7    couple of times; is that correct?
8  A. No, sir.
9  Q. Is there anything else you don't understand
10   about Defendant's Exhibit #10?
11 A. That's all.
12 Q. Okay. Did you say no, sir?
13 A. I said that's all.
14 Q. I show you what's been marked as Defendant's
15   Exhibit #5, once I get a copy to your
16   attorney. That's Administrative Reg 208
17   dated July 26th, 2000; is that correct?
18 A. Yes, sir.
19 Q. And this was the Administrative Reg 208 that
20   was in effect on or before March 4th, 2005,
21   and after July 26th, 2000, correct?
22 A. Yes, sir.
23 Q. Okay. In Defendant's Exhibit #10 -- which

DEPOSITION OF FELICIA S. HENDRICKS                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

40 (Pages 154 to 157)

---

Page 154

1    you have a copy of dated March 4th, 2005 --
2    one of the things that Commissioner Campbell
3    considered was, one, fighting, assault,
4    physical violence and disruptive behavior,
5    correct?
6  A. Yes.
7  Q. And that's Paragraph A3b(4)(a); is that not
8    correct? Look on page 6 of Defendant's
9    Exhibit #5 -- correct? Down here, Number A.
10 A. Yes, sir.
11 Q. Okay. Would you agree with me that when you
12   bumped your chest on the chest of Officer
13   Nelson prior to Officer Colbert getting
14   there, that you violated rule -- or
15   Administrative Regulation 208, Section 3,
16   Group 3 offense, Paragraph A3b(4)(a)?
17 A. Are you --
18 Q. I'm asking you did you engage in the
19   fighting, assault, physical violence and
20   disruptive behavior when you bumped the chest
21   of Officer Nelson?
22 A. Did I? Did I?
23 Q. Yes, ma'am.

---

Page 155

1      MR. PITTERS: Object to the form.
2  Q. You can answer, if you can.
3  A. Well --
4      (Brief pause)
5  A. No, sir.
6  Q. All right. So you're disagreeing with
7    Commissioner Campbell's assessment -- well,
8    I'll strike that. Following you bumping your
9    chest to the chest of Officer Nelson and then
10   your encounter with Officer Colbert and the
11   knife in your car, would you agree with me
12   that looking at all of that, you violated
13   that particular offense of fighting, assault,
14   physical violence, and disruptive behavior?
15 A. No, sir, because it wasn't job-related. Yes,
16   sir? Wait a minute. I'm confused.
17     MR. BIGGS: Which answer do you want
18       her to say, Mr. Pitters?
19 A. No. I'm saying you say something --
20     MR. PITTERS: He didn't ask you why.
21       He just ask you yes or no, and you
22       said no.
23     MR. BIGGS: Is that for the record,

---

Page 156

1      Mr. Pitters, arguing with the
2      client?
3  Q. All right. So your answer is no?
4  A. Yes.
5  Q. Okay. Do you also disagree -- would y'all
6    like a moment?
7      MR. PITTERS: Yes, please.
8      MR. BIGGS: Okay. Let's take a break
9        for a minute.
10       (Brief recess)
11 Q. Just a couple more, Ms. Hendricks, and then
12   we'll stop. Back to Defendant's Exhibit
13   #10. Commissioner Campbell outlines in
14   paragraphs 2, 3, and 4, other violations of
15   Administrative Regulation 208. Do you see
16   those?
17 A. Yes.
18 Q. Okay. Do you agree with any of those
19   assessments by Commissioner Campbell that you
20   had violated that -- those parts of
21   Administrative Reg 208?
22 A. No.
23 Q. Okay. So what I hear from you is that based

---

Page 157

1    on your actions of February 10th, 2005, in
2    your opinion, you violated neither
3    Administrative Reg 207 nor 208 in any way; is
4    that correct?
5  A. Yes.
6      MR. BIGGS: That's all my questions.
7        But a little housecleaning.
8        I offered several exhibits.
9        I did not offer a Defendant's
10       Exhibit #13 or Defendant's
11       Exhibit #11. Other than that, everything
12       else that I've offered is in and
13       nothing is out of place, I don't
14       think.
15       EXAMINATION
16 BY MR. PITTERS:
17 Q. All right. Ms. Hendricks, let me start with
18   the line of questioning that counsel ended
19   his examination on. Specifically, regs --
20   Department of Correction Regulation --
21   Administrative Regulation number 208. And
22   the representations set forth in the March
23   24th -- I mean, March 4, 2005 correspondence

DEPOSITION OF FELICIA S. HENDRICKS                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

Page 158

1    to you from Commissioner Campbell. The --
2    that would be Defendant's Exhibit #5 and
3    Defendant's Exhibit #10.
4        Okay. Now, you deny -- and your
5    representations a short while ago was that
6    you did not violate the regulations set forth
7    therein by the commissioner; is that correct?
8  A. Yes.
9  Q. Now, the actions or the course of events that
10   transpired on February 10th, 2005 occurred
11   after your hours of employment with the
12   Department of Corrections -- the Alabama
13   Department of Corrections had concluded; is
14   that correct?
15 A. Yes.
16 Q. Had you clocked out from your daily
17   employment with the Alabama Department of
18   Corrections when this -- the occurrence --
19   whatever happened out there with you and
20   Colbert and Nelson on October -- on February
21   10th, 2005?
22 A. Yes.
23 Q. Okay. Do you know if Colbert had clocked

Page 159

1    out?
2  A. Yes.
3  Q. What about Nelson and Krammer Penn and all of
4    the folks that were there? Do you know if
5    everyone had -- their shift had ended and
6    y'all had terminated your employment that day
7    and were off the clock?
8  A. Yes.
9  Q. Okay. So what transpired on February 10th,
10   2005, that forms the basis of Mr. McDonnell's
11   recommendation to the Commissioner that you
12   be terminated and the Commissioner's
13   subsequent or -- subsequent action on
14   Mr. McDonnell's recommendation all occurred
15   after you -- well, let me back up.
16       Did not occur within the line and scope
17   of your employment with the Alabama
18   Department of Corrections; is that correct?
19       MR. BIGGS: Object to the form. She's
20           not qualified and it's leading
21           your witness. There's no
22           predicate, and invades the mental
23           operations of folks that's not

Page 160

1        her. That's my objection.
2  Q. Go ahead. Let me redo the question.
3    Apparently you don't recall it.
4        Were y'all off the clock, not working,
5    had concluded your shift and were on your way
6    home when all this happened?
7  A. Yes.
8  Q. And to that extent, did not occur within the
9    line and scope of your employment, correct?
10       MR. BIGGS: Object to the form. Not
11           qualified to give that answer.
12 Q. Is that correct?
13 A. Yes.
14 Q. Okay. Now, you did not fight, assault, or
15   engage in physical violence or disruptive
16   behavior during the hours of your employment
17   with the Alabama Department of Corrections on
18   February 10th, 2005, did you?
19       MR. BIGGS: Object to the form.
20 A. No.
21 Q. You did not possess or use a firearm,
22   weapons, explosives or other dangerous items
23   during the hours of your employment with the

Page 161

1    Alabama Department of Corrections on February
2    10th, 2005, did you?
3  A. No.
4  Q. Now, number two on page 2 of the
5    commissioner's correspondence of May 4, 2005,
6    addressed conduct that is disgraceful on or
7    off the job that doesn't adversely affect
8    employees' effectiveness on the job. Did you
9    engage in any disgraceful conduct that
10   affected your effectiveness during the hours
11   of two to ten p.m. on February 10th, 2005?
12       MR. BIGGS: Object to the form.
13 A. No.
14 Q. How would you -- how would you describe your
15   effectiveness on the job with the Department
16   of Corrections on February 10, 2005 when you
17   worked for the Department of Corrections on
18   that day, between -- did you say you worked
19   between two to ten p.m. that day?
20 A. Yes, sir.
21 Q. How would you describe your effectiveness on
22   the job during those hours? Did anything
23   occur disgraceful or --

DEPOSITION OF FELICIA S. HENDRICKS                          April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

42 (Pages 162 to 165)

---

Page 162

1  MR. BIGGS: Which question you want her
2      to answer first? You've asked
3      numbers of questions.
4  MR. PITTERS: Strike all of that,
5      Ms. Court reporter.
6  Q. During the hours of two to ten p.m. on
7      October -- no, February 10, 2005, did you
8      engage in any disgraceful conduct that
9      adversely affected your -- or adversely
10     affected your performance on the job between
11     two to ten p.m. on February 10, 2005?
12     MR. BIGGS: Object to the form.
13 A. No.
14 Q. Were you written up during the hours of two
15     to ten p.m. on February 10, 2005?
16 A. No.
17 Q. Has Mr. McDonnell ever complained to you that
18     you engaged in any conduct between the hours
19     of two to ten p.m. on February 10, 2005
20     adversely reflecting your ability to perform
21     your job with the Department of Corrections?
22 A. No.
23 Q. All right. Now, Counsel asked you --

---

Page 163

1      opposing counsel asked you earlier about your
2      engaging in premeditation with respect to the
3      pocket knife that you had in your car in your
4      confrontation -- the confrontation you had
5      with -- is it Officer Colbert? Did you
6      previously had made up your mind before
7      February 10th of 2005 with respect to what
8      occurred in that parking lot, did you engage
9      in mental deliberations to use -- to get that
10     knife from your car and assaulted or engage
11     in any fight with Officer Colbert?
12     MR. BIGGS: Object to the form.
13 A. No.
14 Q. Now, Counsel asked you about the defendants
15     that you have named in this lawsuit. And he
16     asked you about warden -- now, Warden
17     McDonnell and the Department of Corrections,
18     are those -- that's who you named in your
19     original complaint; is that correct?
20 A. Yes.
21 Q. Okay. Now, when you named the Department of
22     Corrections, were you filing suit against the
23     Alabama -- the State of Alabama, Department

---

Page 164

1      of Corrections?
2  A. Yes.
3  Q. And indeed, in your complaint, you see where
4      you -- you have made reference to the Alabama
5      Department of Corrections, correct?
6  A. Yes.
7  Q. Okay. Now, who fired you?
8      MR. BIGGS: Objection to form.
9      MR. PITTERS: I'll rephrase the
10         question.
11 Q. Did you get a notice from the -- the
12     Defendant's Exhibit I think it's #10. Yeah.
13     Did you understand from that correspondence,
14     Defendant's Exhibit #10, March 4th, 2005, who
15     was that -- first of all, who was that
16     correspondence from?
17 A. Donal Campbell.
18 Q. Did you understand -- and what was that --
19     what did that -- what did you understand from
20     that correspondence from Commissioner
21     Campbell?
22 A. That I was going to be terminated, dismissed.
23 Q. Okay. And Donal Campbell -- I mentioned

---

Page 165

1      commissioner. You understood at the time
2      when you got this correspondence, that he was
3      the commissioner of the State of Alabama
4      Department of Corrections, correct?
5      COURT REPORTER:
6  A. Yes.
7  Q. Okay. And before this letter of termination,
8      you were placed on mandatory leave effective
9      February 11th, 2005; is that correct?
10 A. Yes.
11 Q. Let me show you -- okay. You're looking at
12     it. Tell me what's that document you're
13     looking at right now.
14 A. It's a memorandum to Felicia Hendricks,
15     correctional officer, from Donal Campbell,
16     Commissioner, subject: Mandatory leave
17     placement effective February 11th, 2005.
18 Q. Okay. Now, is that -- that document you just
19     read from, is that what you're referring to
20     when you told opposing counsel that --
21     MR. BIGGS: Objection to form. I'm
22         sorry. You're leading the
23         witness. Go ahead. I'm sorry. I

DEPOSITION OF FELICIA S. HENDRICKS                April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

43 (Pages 166 to 169)

Page 166

1           apologize.  I cut you off.  I
2       apologize Mr. Pitters.  I should
3       have waited.
4  Q. On February 12th, you told him that you could
5     not go back on the property because -- is
6     that the document you're referring to when
7     you told him you couldn't go back on the
8     property on February 12?
9  A. Yes, I had one, yes, sir, that was given to
10    me.
11 Q. All right.  So -- all right.  And before you
12    received -- before you received -- strike
13    that.  On February -- on February 18th, 2005,
14    after you received that notice putting you on
15    mandatory leave with pay for duration of ten
16    working days effective February 11th, did you
17    receive a memo from Terrance McDonnell dated
18    February 18th, 2005?
19 A. Yes.
20 Q. And that document -- that is Defendant's
21    Exhibit #6 to your deposition, correct?
22 A. Yes.
23 Q. Okay.  And that document from Mr. McDonnell

Page 167

1     tells you about a notice of a pre-dismissal
2     conference, correct?
3  A. Yes.
4  Q. And did you understand that Mr. McDonnell was
5     recommending to the commissioner -- that is
6     Commissioner Campbell -- that you be
7     terminated from your employment with the
8     Alabama Department of Corrections?
9           MR. BIGGS:  Object to the form.
10 A. Yes.
11 Q. Okay.  Now, back to my question regarding
12    what counsel was asking as to who you are
13    suing.  You named -- he indicated that you
14    named Warden McDonnell, and the Alabama
15    Department of corrections.  By naming the
16    Alabama Department of Corrections, is it your
17    contention or do you -- are you suing also
18    the commissioner in his official capacity as
19    representative of the state of Alabama or the
20    Department of Corrections regarding your
21    termination?
22          MR. BIGGS:  Object to the form.
23 A. Yes.

Page 168

1  Q. To that extent, do you contend that those two
2     individuals violated your rights as you have
3     alleged in this lawsuit?
4           MR. BIGGS:  Object to the form.
5  A. Yes.
6  Q. Okay.  Now, do you know who Captain Billups
7     is?
8  A. Yes.
9  Q. Okay.  And who is she?
10 A. She's the captain at Kilby Correctional
11    Facility.
12 Q. Pardon?
13 A. The captain at Kilby.
14 Q. Is that the facility where you were working
15    at?
16 A. Yes, she was.
17 Q. Was she the captain at Kilby while you were
18    employed there?
19 A. Yes.
20 Q. Up until you got terminated?
21 A. Yes.
22 Q. Okay.  Do you have any knowledge of capital
23    Billups doing a shakedown of officers coming

Page 169

1     to the institution and her having found
2     employees with weapons?
3           MR. BIGGS:  Object to the form.
4  A. Yes.
5  Q. Okay.  To your knowledge, were any adverse or
6     disciplinary actions taken against those
7     employees?
8           MR. BIGGS:  Object to the form.
9  A. No, sir.
10 Q. Is that part of the basis of your contentions
11    of unequal treatment or disparate treatment
12    in this lawsuit?
13          MR. BIGGS:  Object to the form.
14 A. Is it?
15 Q. Is that part of the basis of your claiming to
16    having been subject to unequal treatment
17    under the law in this lawsuit?
18          MR. BIGGS:  Object to the form.
19 A. Yes.
20 Q. When you were talking about testifying
21    earlier about what happened with your --
22    Ms. Colbert, did I understand you to say that
23    Ms. Colbert had left the premises of the ADOC

DEPOSITION OF FELICIA S. HENDRICKS                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

44 (Pages 170 to 173)

Page 170

1    after y'all had gotten off work and came back
2    to where you and Ms. Nelson were?
3        MR. BIGGS: Object to the form.
4  A. Yes.
5  Q. And when counsel asked you about why didn't
6    you get in the car and drive off, tell the
7    court where was the vehicle that Ms. Colbert
8    was riding in? Where was it parked in
9    proximity to where your vehicle was, where
10   Officer Nelson's vehicle was. Tell the court
11   where Ms. Colbert had parked her truck?
12 A. She had parked diagonally in front of me and
13   Ms. Nelson's car.
14 Q. Okay. Could you have got in your car and
15   driven off without confronting Ms. Colbert,
16   based on where she was parked in proximity to
17   your vehicle and that of Ms. Nelson's
18   vehicle?
19       MR. BIGGS: Object to the form.
20 A. No.
21 Q. Where does Ms. Colbert work at the
22   facility -- the Kilby facility? Where does
23   she work?

Page 171

1  A. Where do she work?
2  Q. Yeah. Where does she work? Does she --
3    y'all have towers over there, correct?
4  A. Yeah. We have towers, certain man posts,
5    manned posts.
6  Q. Do you know where she worked, where was
7    her --
8  A. At that particular night?
9  Q. Yes.
10 A. Yes, sir. She was on tower five.
11 Q. Okay. Did she have to come to where you and
12   Ms. Nelson were -- did she have to come that
13   way or pass y'all in order to get off work
14   and leave and go on about her business?
15       MR. BIGGS: Object to the form.
16 A. No.
17 Q. Was she -- do you know where she -- strike
18   that.
19       This Selena Davis that you refer to, the
20   civilian who came -- what was her purpose at
21   the facility that night?
22       MR. BIGGS: Object to the form.
23 A. To pick Officer Colbert up.

Page 172

1  Q. And where was she picking up Officer Colbert
2    from?
3        MR. BIGGS: Object to the form.
4  Q. In proximity to where you and Ms. Nelson
5    was -- or were?
6        MR. BIGGS: Object to the form.
7  A. At the gate. Right at the main entrance on
8    the fence line to where she came from tower
9    five from.
10 Q. Okay. Where was that in comparison to where
11   you and Ms. Nelson were parked at as far as
12   distance-wise?
13 A. That was way off.
14 Q. Okay.
15 A. It was a good distance.
16 Q. Did she have to come to where you -- did she
17   have to pass by where you all were in order
18   for her to catch her ride and leave the
19   facility?
20       MR. BIGGS: Object to the form.
21 A. Going outside, it was the opposite side going
22   outside -- of leaving outside of the
23   institution, yes.

Page 173

1  Q. I'm not sure I understand your answer.
2    Did -- did Ms. -- when Ms. Colbert's ride
3    came to pick her up, based on where you and
4    Ms. Nelson were, did she have to drive by
5    where you all were in order for her to go
6    home?
7        MR. BIGGS: Object to the form.
8  A. No, not to come by where we were. No.
9  Q. Okay. Well, do you know why she came over --
10   or how is it that she came -- how it came
11   about for her to come from where her ride
12   came and picked her up to come over to where
13   you and Ms. Nelson were?
14       MR. BIGGS: Object to the form.
15 A. She received a phone call.
16 Q. About what?
17       MR. BIGGS: Object to the form.
18 A. Saying that me and Ms. Nelson was arguing.
19 Q. Is it your testimony that Ms. Colbert
20   specifically came over to where you and
21   Ms. Nelson were to, I guess, dabble into or
22   get involved in what you and Ms. Nelson were
23   talking about?

DEPOSITION OF FELICIA S. HENDRICKS                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

45 (Pages 174 to 177)

Page 174

1       MR. BIGGS:  Object to the form.
2  A. Yes.
3  Q. Do you know of any lawful purpose that
4     Ms. Colbert had to have come over to where
5     you and Ms. Nelson were?
6       MR. BIGGS:  Object to the form.
7  A. No.
8  Q. While you were in the presence of Ms. Nelson,
9     do you recall her calling Ms. Colbert to come
10    to her rescue or to come over and be a part
11    of your -- her discussion with you?
12      MR. BIGGS:  Object to the form.
13 A. No.
14      MR. PITTERS:  That's all I have.
15         EXAMINATION
16 BY MR. BIGGS:
17 Q. I've just got -- I mean, I'm sorry, but I've
18    got to ask this, because Mr. Pitters went
19    through painstaking -- the allegations on
20    Defendant's Exhibit #10, 1 through 4 of
21    Commissioner Campbell, asking you
22    specifically, one, did you engage in
23    fighting, assault, physical violence and

Page 175

1     disruptive behavior while within the hours
2     employed with the Department of Corrections.
3     Your answer was no.  Is that your answer?
4  A. Yes.
5  Q. Would you agree with me that while you're not
6     in the hours of employ with the Department of
7     Corrections but on DOC property, that you
8     engaged in fighting, assault, physical
9     violence and disruptive behavior?
10 A. No.
11 Q. Okay.  So you're saying that you didn't
12    engage in any physical violence, fighting,
13    assault or disruptive behavior at all on
14    February 10th, 2005?
15 A. No.
16 Q. Okay.  And your testimony was that within the
17    hours of employment, you committed no conduct
18    that is disgraceful that adversely affected
19    employees' effectiveness on the job.  Is that
20    your testimony?
21 A. From what?
22 Q. Your testimony was just a while ago that
23    within the hours of your employment from two

Page 176

1     to ten on the February 10th, 2005, you did
2     not engage in any conduct that is disgraceful
3     that adversely affected your effectiveness as
4     a corrections officer.
5  A. No.
6  Q. Okay.  If you look at that particular
7     regulation, it says conduct that is
8     disgraceful on or off the job but it does
9     adversely affect employee's effectiveness on
10    the job, does it not?
11 A. Yes.
12 Q. Okay.  Can you tell me how in God's green
13    earth you have to be on the clock and you
14    have conduct that is disgraceful on or off
15    the job?
16      MR. PITTERS:  Object to the form.
17         Argumentative of the witness.
18 Q. What I'm trying to understand is that
19    regulation requires you to conduct yourself
20    on or off the job in a way that does not
21    adversely affect your effectiveness as a
22    corrections officer, does it not?
23 A. Yes.

Page 177

1  Q. Okay.  So it makes no difference with that
2     particular Administrative Reg whether or not
3     you were on the clock or off the clock,
4     correct?
5  A. Yes.
6  Q. Would you agree with me that you in the
7     activities that you conducted on February
8     10th, 2005, may impact your effectiveness as
9     a corrections officer as it -- you deal with
10    inmates on day-to-day?
11      MR. PITTERS:  Object to the form.
12 Q. Well, let's get down to the -- let's get
13    down.  Do you agree with me that your
14    effectiveness as a corrections officer is
15    compromised when you're out fighting in the
16    parking lot, correct?
17      MR. PITTERS:  Object to the form.
18 A. No.
19 Q. It doesn't?
20 A. I wasn't fighting.
21 Q. Oh, okay.  Now, you're still saying that
22    bumping your chest and going for your knife
23    is not engaged in any type of fighting?

DEPOSITION OF FELICIA S. HENDRICKS                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

46 (Pages 178 to 181)

Page 178

1  A. No. I wasn't fighting.
2  Q. What about disruptive behavior? Would you
3     call it disruptive behavior?
4  A. No.
5  Q. He asked you that while you were on the
6     clock, you did not possess any firearm,
7     weapon, or explosive or other dangerous
8     items. You remember him asking you that, and
9     your answer was no, correct?
10 A. Uh-huh. Yes.
11 Q. But you did -- but you did possess a knife on
12    DOC property that was not authorized by the
13    warden, correct?
14 A. Excuse me. You confused me there. Did you
15    say while I was on the clock?
16 Q. Well, no. He asked you -- Mr. Pitters asked
17    you that while you were on the hours of
18    employment on February 10th, 2005, you did
19    not possess a weapon. And your answer was
20    no, correct?
21 A. Yes.
22 Q. But you did possess a weapon on February
23    10th, 2005 in the parking lot of the Alabama

Page 179

1     Department of Corrections that was not
2     authorized by the warden; is that not
3     correct?
4  A. Yes.
5  Q. Okay. Your testimony concerning Captain
6     Billups and during a shakedown of a few
7     employees, you would agree with me that the
8     purported facts of that are in no way similar
9     to what you did in the parking lot of
10    February 10th, 2005, would you not?
11       MR. PITTERS: Object to the form.
12 A. No.
13 Q. How is it similar if Captain Billups
14    purportedly found some employees possessing
15    some weapons to what you did on February
16    10th, 2005?
17 A. Because the weapons that the male officers
18    had, she instructed them to take them back to
19    their car.
20 Q. Is that how --
21 A. And it was no disciplinary actions taken
22    against them.
23 Q. Are you saying that those -- the events of

Page 180

1     those officers, if it did occur, those are
2     similar to what you did on February 10th,
3     2005?
4  A. Okay. You're saying the events. The event
5     is that there -- it was a shakedown conducted
6     and they had weapons on them, which was a
7     knife -- pocket knife.
8  Q. Other than involving purportedly a weapon
9     during a shakedown, is there any other
10    similarity to you on February 10th, 2005?
11 A. Is it a similarity with me?
12 Q. How is it the same?
13 A. Because they had a weapon on them. The
14    weapon was in they possession, which was on
15    them. Mine was in my car.
16 Q. Would you agree with me that you have no
17    information concerning the shakedown that
18    involves any of those officers bumping the
19    chest of another officer on the Alabama
20    Department of Corrections?
21 A. This was during the shakedown.
22 Q. All right. Do you have any information, any
23    personal knowledge that any of those officers

Page 181

1     during a shakedown bumped the chest of
2     another officer?
3  A. No.
4  Q. Okay. So your case is, at least on that
5     point, different from what you know about
6     what happened with Captain Billups, correct?
7  A. Yes.
8  Q. Did the events of Captain Billups involve
9     name-calling and arguing as it did with you
10    on February 10th, 2005?
11 A. I don't know. I wasn't there at that present
12    the time.
13 Q. But you have no personal knowledge of that
14    concerning Captain Billups, correct?
15 A. Yes.
16 Q. Would you agree with me that if there was no
17    arguing or cussing or name calling involving
18    the officer, Capital Billups, that that's
19    different than your situation on February
20    10th, 2005?
21 A. No.
22 Q. No, what?
23 A. I don't think it's -- I mean, I don't think

DEPOSITION OF FELICIA S. HENDRICKS                     April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

47 (Pages 182 to 185)

Page 182

1    it's different.
2    Q. You don't think it's different?
3    A. It's -- it's the same.
4        MR. PITTERS: Asked and answered.
5           Objection. Asked and answered.
6    Q. Would you agree with me -- let me ask you
7        this. Do you have any personal knowledge of
8        any of the officers during the shakedown with
9        Captain Billups had attempted to use their
10       weapons on another officer as you did on
11       February 10th, 2005?
12   A. I don't know.
13   Q. Okay. So you have no personal knowledge of
14       that?
15   A. I don't know.
16   Q. If that didn't occur during the shakedown
17       with Captain Billups -- that is, no officer
18       attempted to use a knife on another
19       officer -- if that occurred or did not occur,
20       would you agree with me that that situation
21       is different from your situation on February
22       10th, 2005?
23   A. No.

Page 183

1    Q. Is it the same?
2    A. Yes.
3    Q. How is it the same?
4    A. Because they had weapons that was on them
5        which was in they possession.
6    Q. Okay. Would you agree with me that you
7        attempted to use your weapon and you have no
8        information that they attempted to use their
9        weapon?
10   A. I don't know, because I don't know what was
11       to be justified for that day.
12   Q. But you're sitting here today. You have no
13       information that the officers during the
14       shakedown attempted to use their knife like
15       you used your knife on February 10th, 2005?
16   A. I don't know.
17   Q. If the officers during the shakedown did not
18       attempt to use their knife and you attempted
19       to use your knife on February 10th, 2005, you
20       would agree with me that the two situations
21       are different?
22   A. No.
23   Q. How are they the same?

Page 184

1    A. Because I can't say as of to what might have
2        happened inside the institution of the other
3        officers.
4    Q. But you have no information, no personal
5        knowledge that the officers attempted to use
6        their knife like you attempted to use your
7        knife on February 10th, 2005?
8    A. Repeat that again, now.
9    Q. You have no personal knowledge of any of the
10       officers during this purported shakedown a
11       tented to use their weapon like you used your
12       weapon on February 10th, 2005?
13   A. I don't know.
14   Q. So you won't agree with me that the two
15       situations are different?
16   A. Yes.
17   Q. Okay. You won't agree with that. Okay.
18       MR. BIGGS: I think that's all.
19       MR. PITTERS: Okay. That's all I've
20         got.
21         (The deposition concluded
22          at 5:50 p.m.)
23   * * * * * FURTHER DEPONENT SAITH NOT * * * * *

Page 185

1         REPORTER'S CERTIFICATE
2    STATE OF ALABAMA
3    ELMORE COUNTY
4        I, Dee Coker, Registered Professional
5    Reporter and Commissioner for the State of
6    Alabama at Large, hereby certify that on
7    Wednesday, April 26, 2006, I reported the
8    deposition of FELICIA SUZETTE HENDRICKS, who was
9    first duly sworn or affirmed to speak the truth
10   in the matter of the foregoing cause, and that
11   pages 5 through 184 contain a true and accurate
12   transcription of the examination of said witness
13   by counsel for the parties set out herein.
14       I further certify that I am neither of kin
15   nor of counsel to any of the parties to said
16   cause, nor in any manner interested in the
17   results thereof.
18       This 8th day of May, 2006.
19
20
21
         _____
22       DEE COKER, CSR, RPR
         Commissioner for the
         State of Alabama at Large
23
         MY COMMISSION EXPIRES: 1/25/2009

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FELICIA S. HENDRICKS,                    )
                                         )
        Plaintiff,                       )
                                         )
vs.                                      )        2:05-CV-714-F
                                         )
WARREN MCDONNELL, et al.,                )
                                         )
        Defendants.                      )

<u>**NOTICE TO TAKE DEPOSITION**</u>

TO:    **FELICIA S. HENDRICKS,**
       Post Office Box 251554
       Montgomery, Alabama 36125

Please take notice that on the <u>**26th day of April, 2006**</u>, the Defendants will take the

deposition of Felicia S. Hendricks beginning at <u>**1:00 p.m.**</u> at the office of the undersigned counsel

for the Alabama Department of Corrections, 301 South Ripley Street, Montgomery, Alabama, before

a notary public or any other officer duly authorized by law to administer oaths, and is to bring with

them to said deposition the following documents:

    1. Any and all written and/or tape recorded notes, memorandum, or other documents in your

possession or subject to your control which supports the claims made the basis of this lawsuit.

    2. All documents which the plaintiff utilized to prepare for deposition testimony or to refresh

Plaintiff's recollection.

    3. Copies of all medical records which are in the plaintiff's possession or control which

relate to the plaintiff's medical condition or health during the period of time germane to this lawsuit.

    4. Any and all tape recordings of any employee, or former employee, of the Department of

1



Corrections or any other person who may be called to testify in this proceeding.

5. Any paperwork associated with complaints and/or grievances made and/or filed by the Plaintiff against any employee of the Department of Corrections, or relating to any adverse working condition and/or unequal treatment existing within the Alabama Department of Corrections.

6. Any and all written and/or tape recorded notes, memorandum, or other documents submitted to any office of the Equal Employment Opportunity Commission which relate in any way to the allegations raised in the complaint.

7. Each notepad and/or notes, calendars or writings used or made by this plaintiff during his employment with the Department of Corrections and which relate to the claims asserted in his complaint.

8. Any witnesses statements that you anticipate using to support your claims in the above styled cause.

9. Any notes, letters, or other documents received by you from any person that you anticipate calling as a witness in the above styled cause.

10. Any correspondence, written documents, or other papers that relate, in any way, to any purported loss of wages by you in the claims of the above style cause.

Respectfully submitted,

Kim T. Thomas (THO115)
General Counsel
Deputy Attorney General

Greg Biggs (BIG004)
Assistant Attorney General
Assistant General Counsel

2

**ADDRESS OF COUNSEL:**

Alabama Department of Corrections
Post Office Box 301501
301 South Ripley Street
Montgomery, Al. 36130
(334) 353-3885

## CERTIFICATE OF SERVICE

I hereby certify that I have on this the 14th day of April, 2006, that I served a copy of the

foregoing document via United States Mail, postage prepaid, first class, on :

    **FELICIA S. HENDRICKS**
    **P. O. Box 251554**
    **Montgomery, Alabama 36125**

    **A.  WESLEY PITTERS, P.C.**
    **1145 South Perry Street**
    **P.O.Box 1973**
    **Montgomery, AL 36102-1973**

Greg Biggs (BIG004)
Assistant Attorney General
Assistant General Counsel

IN THE UNITED DISTRICT COURT FOR THE MIDDLE DISTRICT

OF ALABAMA

RECEIVED

~~THE~~ FELICIA B. HENDRICKS,
    PLAINTIFF

V.

WARDEN McDONNELL, AND
THE DEPARTMENT OF
CORRECTIONS,
    RESPONDENTS,

*
*
*
*
*
*
*
*
*
*
*

RECEIVED

2005 JUL 12  A 9:43

CIVIL ACTION

CASE NO # 2:05cv714-F

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, EQUAL PROTECTION

OF THE LAW, AND DISMISSAL FROM EMPLOYMENT WITHOUT

JUST CAUSE

COMES NOW THE PLAINTIFF FELICIA S. HENDRICKS, AND SHE SHOWS

THAT THE NAMED RESPONDENTS VIOLATED HER CIVIL RIGHTS, EQUAL

PROTECTION OF THE LAW AND DISMISSED HER FROM HER JOB AS A

CORRECTIONAL OFFICER FOR THE ALABAMA DEPARTMENT OF CORREC-

TIONS WITHOUT JUST CAUSE IN VIOLATION OF HER CIVIL RIGHTS

UNDER THE CIVIL RIGHTS ACT OF 1964, IN VIOLATION OF HER EQUAL

PROTECTION GURANTEES UNDER THE U.S. CONSTITUTION, AND IN

VIOLATION OF HER EQUAL PROTECTION RIGHTS UNDER ARTICLE 1,

SECTION 6, OF THE ALABAMA CONSTITUTION OF 1901.

1.



DEFENDANT'S
EXHIBIT
2

PLAINTIFF FURTHER SHOWS HER DUE PROCESS RIGHTS PURSUANT TO THE U.S. CONST. WERE, PURSUANT TO THE CONST. OF ALABAMA 1901, VIOLATED WHEN THE PLAINTIFF WAS FIRED FROM HER JOB WITHOUT JUST CAUSE BY THE RESPONDENT, AS GROUNDS IN SUPPORT OF THE COMPLAINTS OF THE PLAINTIFF, PLAINTIFF SHOWS THE FOLLOWING:

## JURISDICTION

PLAINTIFF SHOWS RECOVERY FOR DAMAGES SHE NOW SEEKS ARE COGNIZABLE UNDER 42 U.S.C. SECTION 1983, AND THIS CAUSE IS PROPERLY BEFORE THE COURT OF LAWFUL JURISDICTION RULE 3 F.R.CV.P., WHEREIN A CIVIL ACTION IS FILED WITH THE COURT WHEREIN THE ACTION COMPLAINED OF ORIGINATED, THEREFORE THIS HONORABLE COURT HAS JURISDICTION IN THIS CAUSE.

## ARGUEMENT

PLAINTIFF FELICIA S. HENDRICKS, SHOWS SHE WAS AN EMPLOYEE OF THE ALABAMA DEPARTMENT OF CORRECTIONS. FOLLOWING A CONFRONTATION WITH TWO FELLOW FEMALE CORRECTIONAL OFFICERS IN THE PARKING LOT AREA OF THE KILBY CORRECTIONS FACILITY LOCATED IN MT. MEIGS, ALABAMA, AND UPON THE ISSUE OF A POCKET KNIFE BELONGING TO THE PLAINTIFF, BEING DISPLAYED IN DEFENSE OF BODILY HARM AND INJURY FROM THE TWO FELLOW FEMALE CORRECTIONAL OFFICERS, SHE WAS FIRED FROM HER JOB AS A CORRECTIONAL AT KILBY CORRECTIONAL FACILITY. IN VIOLATION OF HER CIVIL RIGHTS, EQUAL PROTECTION OF THE LAW, AND HER DUE PROCESS OF LAW

GURANTEES OF THE U.S. CONST. AND UNDER VIOLATION OF THOSE
SAME RIGHTS UNDER ARTICLE 1, SECTION 6, OF THE ALABAMA CONST.
OF 1901

PLAINTIFF SHOWS ALL OF THE RIGHTS COMPLAINED TO HAVE
BEEN VIOLATED NOT ONLY UNDER HER CIVIL RIGHTS AND CONSTIT-
UTIONAL RIGHTS GURANTEES, BUT UNDER THE ALABAMA DEPARTMENT
OF CORRECTIONS ON PROCEDURES ESTABLISHED UNDER ADMIN.REG.
#207 IN THAT SECTION TWO (2) SUBSECTION (B) WHICH GOVERN RES-
PONSIBILITIES OF D.O.C. PERSONNEL STATES:
SUBSECTION (B) SUPERVISORS ARE RESPONSIBLE FOR PROVIDING POSITIVE
LEADERSHIP AND SETTING A GOOD EXAMPLE ADDITIONALLY THEY MUST
PROVIDE ADVICE AND ASSISTANCE TO EMPLOYEE'S AND TREAT ALL
EMPLOYEE'S IN A FAIR AND EQUITABLE MANNER

PLAINTIFF SHOWS THAT MOST IF NOT ALL MALE OFFICERS CARRY
SOME KIND OF PIN OR SMALL KNIVES IN THEIR POSSESSION WHILE IN-
SIDE THE INSTITUTION. TO CUT STRINGS DOWN USED BY INMATES TO
HANG THEIR LAUNDRY OR A PRIVACY TYPE CLOTH ON THEIR BUNKS.
MALE OFFICERS ALSO CARRY THESE SAME TYPE KNIVES FOR OPENING
BOXES OR PACKAGES OPEN WHEN THEY ARE RECEIVED INTO THE
INSTITUTION FOR PURPOSES OF SEEKING OUT CONTRABAND OR TO
SEEK OUT ANYTHING THAT WOULD CREATE A THREAT TO THE
SECURITY OF THE INSTITUTION, THE INMATES HOUSED UNDER THEIR
AUTHORITY OR TO THEMSELVES.

PLAINTIFF, A FEMALE, KEPT SUCH A SMALL POCKET KNIFE IN HER
POSSESSION WAS NOT FOUND AS PERMISSIVE AS THE MALE OFFICERS
SHE WAS FIRED FOR THIS REASON. THE PLAINTIFF SUPERVISORS,
SUPERIORS AND A.D.O.C. OFFICIALS FAILED TO TREAT HER IN

IN FAIR AND EQUITABLE MANNER IN THIS MATTER A DEEMED MANDATORY BY SECTION TWO (2), SUBSECTION (B) OF ADMIN. REG. #207 FOR THIS REASON, PLAINTIFF WAS DENIED HER DUE PROCESS RIGHTS TO HAVE FAIR AND IMPARTIAL DECISION MAKERS INVESTIGATE HER INCIDENT IN THE PARKING LOT OF THE KILBY CORRECTIONS FACILITY WHERE SHE WAS EMPLOYEED.

PLAINTIFF EXPRESSES THIS DUE TO THE FACT SHE WAS NOT TREATED FAIRLY IN THAT OFFICERS FOUND IN POSSESSION OF SUCH KNIVES ARE NOT DISCIPLINED FOR THIS FACT YET PLAINTIFF WAS FIRED.

PLAINTIFF REQUEST THAT THIS HONORABLE COURT TAKE JUDICAL NOTICE THAT SEVERAL INCIDENTS OCCUR IN FACILITIES WHERE OFFICERS ARE PLACED AS PUNISHMENT TO WORK IN TOWERS OR TRANSFERED TO ANOTHER FACILITY.

PLAINTIFF SHOWS FURTHER, THESE ACTIONS VIOLATED HER EQUAL PROTECTION RIGHTS UNDER THE STATED SECTIONS IN THAT SHE IS PART OF A PARTICULAR CLASS WHOSE CONDUCT MUST BE EVENLY AND DISPOPORTIONATELY VIEWED AND ASSESSED AS TO DISCIPLINE, AND TO PUNISH A FEMALE OFFICER FOR POSSESSION OF AN OBJECT POSSESSED BY MOST IF NOT ALL CORRECTIONAL OFFICERS WHO SUFFER NO DISCIPLINE OR PUNISHMENT, CLEARLY SHOWS A DISPARITY OR FAVORTISIM TO A PORTION OF THE CLASS SHE IS A PART OF AND AS SUCH CLEARLY VIOLATES HER PROTECTION TO BE TREATED EQUALLY AND FAIRLY THUS COMES A CLEAR DENIAL OF EQUAL PROTECTION

FURTHER, IT IS CLEARLY SHOWN BY ADMIN. REG. #207 SECTION THREE (3) (C) (9) THAT THERE ARE NO PROHIBITATIONS OF A POCKET KNIFE FROM THE POSSESSION OF A.D.O.C. EMPLOYEES.

4

THIS SECTION STATES:

NO EMPLOYEE SHALL:

CARRY ANY FIREARMS, TEAR GAS, AMMUNITION, OR BLACK JACK IN INSTITUTION EXCEPT AS MAYBE AUTHORIZED BY THE WARDEN THIS SECTION DOES NOT PROHIBIT A POCKET KNIFE AS A POCKET KNIFE IS NOT EXPRESSED IN THIS SECTION NOR DOES THE SECTION IMPLY THAT "ANY OTHER ARTICLE" OTHER THAN IS STATED REQUIRES ANY SPECIAL PERMISSON FROM THE WARDEN OR HIS DESIGNEE TO HAVE IN THE EMPLOYEE'S POSSESSION WHILE AT WORK AT HIS OR HER JOB. IT CERTAINLEY DOES NOT IMPLY THAT ANY OF THE ARTICLES LISTED IN THE SECTION ARE PROHIBITED FROM POSSESSION OF AN EMPLOYEE MALE OR FEMALE OUTSIDE THE INSTITUTION.

AS SUCH THE PLAINTIFF'S CIVIL RIGHTS WERE VIOLATED FOR BEING SIGNALED OUT AS A FEMALE IN POSSESSION OF A POCKET KNIFE ON STATE PROPERTY WHILE ALL OTHERS MALE AND FEMALE OFFICERS ARE ALLOWED TO POSSESS FIREARMS, AMMUNITION, TEAR GAS, AND BLACK JACKS IN THEIR PERSONAL POSSESSION AND INSIDE THEIR VEHICLES.

PLAINTIFF SHOWS AT BEST, HER CONDUCT FELL INTO GROUP I DISCIPLINE STATUS OF ADMIN. REG. #208 WHICH GOVERNS DISCIPLINE FOR D.O.C. PERSONNEL, PLAINTIFF SHOWS AT BEST SHE IS GUILTY OF SECTION THREE (3) (B) (3) (E) OF ADMIN. REG. #208 THAT STATES:

(E): PARTICIPATION IN UNAUTHORIZED ACTIVITY OF A MINOR NATURE AT THE WORK PLACE AND/OR IMPROPER USE OF DUTY TIME.

PLAINTIFF SHOWS HER CONDUCT DID NOT FALL WITHIN A SCOPE OF CONDUCT THAT WARRANTED A TERMINATION OF HER JOB.

5

PLAINTIFF SHOWS THAT SHE DID NOT HAVE ANY REPEAT ABUSE OF GROUP I OR GROUP II OFFENSES THAT WOULD CARRY TERMINATION FOR REPEAT GROUP I OR GROUP II CONDUCT VIOLATIONS CARRYING TERMINATION AS A LAST RESORT.

SEE SIMS V CLOVER, 84 F.SUPP.2d. 1273 U.S.C.A. CONST. AMEND 14 M.D. ALA. 1999. TO STATE CLAIM THAT EQUAL PROTECTION RIGHTS WERE VIOLATED, CLAIMANT MUST ALLEGE THAT SHE IS SIMILARLY SITUATED WITH INDIVIDUALS WHO WERE TREATED DIFFERENTLY THAN SHE AND THAT DIFFERENTIAL TREATMENT WAS DISCRIM- INATORILY BASED ON CLAIMANT'S MEMBERSHIP IN CONSTITUTIONALLY PROTECTED CLASS, SUCH AS RACE, RELIGION, OR NATIONAL ORIGIN.

PLAINTIFF SHOWS HER OVERALL CONDUCT WOULD HAVE TO BE IN GROUP IV OF ADMIN. REG. #208 FOR HER TO BE TERMINATED ON A "FIRST OFFENSE" VIOLATION AND THAT THE RESPONDENTS ABUSED THEIR AUTHORITY IN TERMINATING HER AND THUS VIOLATED HER DUE PROCESS RIGHTS BY PLACING HER IN THE IMPROPER GROUP CATEGORY FOR REPRIMAND AND DISCIPLINARY PUNISHMENT.

WHEREFORE, PREMISES CONSIDERED, PLAINTIFF DEMANDS JUDGEMENT AS FOLLOWS:

A) REINSTATEMENT OF HER JOB.

B) PAYMENT FOR ALL LOST WAGES

C) ALL RESTORATION OF SICK TIME AND HOLIDAYS.

6

STATE OF ALABAMA)
MONTGOMERY COUNTY )

I HEREBY DECLARE THAT THE CONTENTS OF MY COMPLAINT
ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE OF
THE FACTS AS THEY ARE KNOWN TO ME.

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS THE
_____ DAY OF_____ 2005.

_____          _____

NOTARY PUBLIC                                     PLAINTIFF

_____

MY COMMISSION EXPIRES

7

## Conclusion

WHEREFORE, PREMISES CONSIDERED, PLAINTIFF PRAYS THIS HONORABLE COURT TO AWARD HER THE RELIEF SOUGHT IN HER COMPLAINT.

ON THIS THE ___11___ DAY OF ___July___ 2005

SWORN TO AND SUBSCRIBED BEFORE
ME THIS THE ___11___ DAY OF ___July___ 2005

_____
NOTARY PUBLIC, AL ST. AT LARGE

MY COMMISSION EXPIRES ___3/18/07___

_Felicia S. Hendricks_
513 Loblolly Pine Dr.   P.O. Box 252554
Montgomery, AL 36116  (334)288-2429
36125  (334)540-3071
PLAINTIFF

## Certificate of Service

I HEREBY DECLARE THAT I HAVE ON THIS DATE CAUSE A COPY OF THE FOREGOING DOCUMENT TO BE SERVED UPON THE OFFICE OF THE CLERK FOR THE U.S. DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA BY PLACING COPIES OF THE SAME IN THE U.S. MAIL POSTAGE PREPAID. 1

ON THIS THE ___1st___ DAY OF ___August___ 2005

HON. THOMAS C. CAVER CLERK OF THE COURT
P.O. BOX 711
MONTGOMERY, ALABAMA 36101

_Felicia S. Hendricks_
PLAINTIFF
P.O. Box 251554
513 Loblolly Pine Rd.
Montgomery, Al 36116  36125
(334) 288-2429
834) 546-3071

8

Warden Terrance McDonnell
P.O. Box 150
Mt. Meigs, Al 36057


The Department of Corrections
P.O. Box 301
Montgomery, Al 36130

GRIEVANCE FORM

DATE: 03-17-05

NAME: Hendricks    Felicia    Suzette    CLASSIFICATION: Correctional Officer I
     Last       First      Middle

INSTITUTION: Kilby    SECTION/SHIFT: 2nd

YEARS WITH DEPARTMENT OF CORRECTIONS: 4½    YEARS IN CLASSIFICATION: 4½

SUPERVISOR'S NAME: Warden Terrance McDonnell    DATE OF ALLEGED INCIDENT OR MISAPPLICATION OF RULE OR REGULATION: 03-04-05

NATURE OF GRIEVANCE: Being singled out/dismissed for having a small pocket Knife on state property; numerous of officers at Kilby have been found to have Knives and other unauthorized items inside and on state property. Supervisors had informed the officers to take their weapons back to the cars and return to work. Names and events will be explained in person. (SEE CONTINUATION)

REMEDY SOUGHT: The same type of discipline be enforced against each officer the same way. Be advised this is the first time Officer Hendricks have had any form of discipline. See complaint form 1, 2 and 3 for further details (SEE CONTINUATION)

DECISION RECEIVED AT STEP ONE: _____

DECISION RECEIVED AT STEP TWO: _____

Felicia Hendricks    3/17/05
SIGNATURE OF GRIEVANT

DECISION AT STEP THREE: _____

SIGNATURE/TITLE/DATE

ANNEX C to Department of Corrections' Administrative Regulation 213

21

CONTINUATION OF REMEDY SOUGHT:
     Request a personal conference with
whom ever is concerned.


CONTINUATION OF GRIEVANCE DATED 03/17/05
     The subject matter addressed by Warden
Terrance McDonnell quoting abstracts from
Regulation #307 and #308 do not apply in my
situation unless it apply to certain officers.
Numerous shakedowns of cars at Kilby Prison
have found Knives, weapons and other materials
with no action taken against the other officers.
     As Officer Hendricks has stated earlier
two other female officers and an unknown
female approached Officer Hendricks in a
non-friendly manner using profanity and
aggression, in my opinion I had no other
choice but try and ward them off. At
Kilby there have been incidents where
officers have been in struggles at the
camp/parking lot with no further action
taken, officers involved in domestic violence
with their wives/girlfriends with or without
weapons with no further action taken
against them.

Officer Hendricks was called in for a Pre-Dismissal Conference as explained in the final report, without allowing Officer Hendricks to explain my situation in which is a violation of my due process. Why am I being singled out with a first time offense and dismissal without a warning or a second chance or reprimand? Officer Hendricks request a detail investigation of my so call Pre-Dismissal Conference which turned out to be a dismissal without my knowledge.

Alicia Hendricks 3/17/05

RECEIVED

GRIEVANCE FORM FOR STEP $\frac{3}{(1-3)}$

2005 JUL 12 A 9:12

DATE OF GRIEVANCE (ACT): 03/01/05
CHECK IF ADA FILING:
FILE STEP 2:
FILE STEP 3: __3__

FILED STEP 1: _____
COMPLETED STEP 1: _____
COMPLETED STEP 2: _____
COMPLETED STEP 3: _____

NAME: _Felicia Hendricks_        SSN: _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_

INSTITUTION: _Kilby Correctional Facility_     CLASSIFICATION: _CO I_

YEARS OF SERVICE W/DOC: _5_         IN CLASSIFICATION: _CO I_

SUPERVISOR'S NAME: _Warden Terrance McDonnell_  SECT/SHIFT: _2nd_

NATURE OF GRIEVANCE: _Being considered for dismissal for_
_making a defensive act facing down two female officers and_
_a civilian female who made agressive moves toward Officer_
_Felicia Hendricks. (See continuation for further details). Inclosures 1 thru 6_

REMEDY SOUGHT

_For my actions I deserve some form of discipline/guidance but not_
_dismissal. I am willing to attend and complete anger management_
_classes, if desired. I'm a single parent with two young girls to support_
_and I need my job being a single parent and doing a professional_
_job with D.O.C. I request approaite actions_         _Felicia Hendricks_
_to be taken against the other parties._         SIGNATURE OF GRIEVANT

DECISION AT STEP _____

_____

_____

_____

_____

SIGNATURE/TITLE/DATE

Annex B to AR 213

INCL. 1

On February 10, 2005, at approximately
10:00am CO1 Felicia Hendricks wanted to
CO1 Latoya Nelson to ask her (Nelson)
about the rumors spreading inside the
institution among officers, nursing staff
and inmates. We CO1 Nelson approached
her car, which both (Hendricks and Nelson)
cars were parked side by side. CO1
Hendricks asked CO1 Nelson in a calmly
manner. "Do you have anything to say to
me?" CO1 Nelson said "No" in a
smarter tone. CO1 Hendricks said "Are
you sure?" Then CO1 Hendricks said
to Mrs. Nelson then, "Why is you going
around her telling people that, I stole
your money?" CO1 Nelson replied, "You
did." I (Hendricks) told Mrs. Nelson
that, I (Hendricks) don't have to steal
from you, after all the times I let you
borrow money. By that time our voices
(Hendricks & Nelson) started getting louder.
We both (Hendricks & Nelson) were in each
other face yelling and crying. Then
CO1 Kammie Plan, Roxwell Bethoney,
Joey Craig and stated you'll need to

leave that man alone. CO1 Michael
Armstong observed the incident from
his car. CO1 Penn, Pettaway and Craig
stated you'll need to leave. CO1
Nelson stated, "I'm not leaving and
aint nobody fixing to fight. I need
to talk to Ms. Hendricks and
get this off my chest." CO1 Penn
stated to CO1 Nelson, "I'll give
you $100 dollars and you'll just
leave with this man. Then CO1
Nelson stated, "The money isn't the
issue. Ms. Hendricks haven't spoke
to me or said anything to me in
two whole weeks and that's why
I thought she had my money." I
replied to Ms. Nelson, "I don't
have your money and why would
I steal from you anyway. I
don't have to steal. By that
time Ms. Nelson said, "you'll leave
me alone I just want to talk
to Ms. Hendricks alone." Then after
that Ms. Nelson asked me to
get in her (Nelson) car and I did.

The arguing had ceased as CO1
Hendricks and Nelson was in
her car talking to each other. I
told Mrs. Nelson, I don't have
your money and why would I
steal from you anyway after all the
times I gave you money for gas
and whenever you asked me I
gave it to you and I never
hounded you about paying me
back. Then Mrs. Nelson replied,
"Damn, its been two weeks and
you haven't spoke to me or said
a word to me." I told Mrs. Nelson
what do you expect for me to
say when you're going around
accusing me of stealing your
money. The right thing you could
have done was come to me
and ask me instead of accusing
me. CO1 Hendricks and Nelson
both apologized to each other. By
that time CO1 Lilmayn Colbert, a
female friend and a child had
pulled up in front of CO1 Nelson's

car. In which, COI Colbert had left the parking lot for home and returned back. COI Colbert got out of her (Colbert) car and approached COI Nelson's driver door, opened it and stated to COI Nelson, "Are you alright?" COI Nelson replied, "I'm fine, I just want to talk to Ms Hendricks. Then COI Colbert stated to COI Nelson, "You're my friend and I'm not leaving." I told COI Nelson that, I'll see you later. As I (Hendricks) got out the passenger side of Nelson's car while COI Colbert was standing at the driver side, COI Colbert stated to COI Nelson, "I told you that Bitch aint shit." COI Hendricks replied to COI Colbert "this doesn't have anything to do with you." Then Colbert stated to Hendricks, "We (Colbert + Nelson) don't like you anyway." COI Hendricks replied; "Who cares because I don't like you either."

Then Colbert walks to her car
pulled off her jacket, pulled her
shirt out and said, calling
Hendricks all kinds of Bitches
and Hoe's, telling me to bring it
on. At that time Colbert
continued to walk back and
forth to her car yelling out
loudly. By that time her female
friend got out the car and
opened the back door, then that's
when I grabbed my pocket knife
from the inside of my drive
door and pulled it out. By that
time CO1 Penn had grabbed
my hand and took it from me.
Then CO1 Colbert started yelling
"she's got a knife, Bitch you
got to use a knife. I replied
to CO1 Penn who was holding
me that, "That Bitch ain't shit."
Then CO1 Penn pushed me in
my car and closed the door
and I CO1 Hendricks pulled off
and left, then CO1 Nelson

6087

followed me (Hendricks)

On February 27, 2005 at approximately 10:35 pm, COI Hendricks called COI Nelson on her (Nelson) cell phone and we talked. COI Nelson said she was wondering when I was going to call her. I (Hendricks) to her that I didn't know if you really wanted to talk to me. COI Nelson said "I'm not mad at you" and I told her I wasn't mad at her either. Then we talked about a few things and then she said she didn't think that things would have gone this far. She (Nelson) said that she heard that I (Hendricks) could lose my job and she (Nelson) didn't want that to happen. Then I (Hendricks) asked her do you have a problem working with me and she (Nelson)

said "no." But she (Nelson)
said that Ms Colbert said
"she (Colbert) didn't want me
to lose my job either, but
she (Colbert) can't work with
me in fear of her (Colbert) life.
I asked Mrs Nelson could
she write a statement and
she did say "yes," she have
no problem with that, and
that she (Nelson) would get
back with me the next
morning, but she never did.

*Felicia Hendrick*

INCL. 2

On 2-10-05 at approx. 10:23 PM, upon ending my tour of duty at Kilby Correctional Facility, I CO Joey Craig was heading toward my car in the parking lot. I CO Craig observed CO Felicia Hendrix and CO Latoya Nelson getting in CO Nelson's car. At approx. 10:25 PM, as I CO Craig began to pull out of the parking lot, CO Takenya Tolbert pull up her car behind me and blocked my way out. I CO Craig then asked CO Tolbert could she move her car for me please. CO Tolbert then told somebody in her car to move it. They moved the car. I CO Craig began to exit the property and observed CO Tolbert walk toward CO Nelson's car and open the drivers side door. I CO Craig then drove off and did not witness anything else.

Joey Craig CO

## DUTY POST LOG

| DATE | PRINTED NAME AND RANK SIGNATURE | SHIFT (1, 2, 3, Adm, Etc.) | DUTY POST ASSIGNMENT |
|------|--------------------------------|---------------------------|---------------------|
| ENTRY TIME | | | |

On Thursday Feb 10, 2005 at approx. 10:10 pm I CO1 Roosevelt Pettaway, seen CO1 Lilkenya calbert leaving the parking lot of Killy Correction facility. She left state property and returned to the parking lot area. CO1 Lilkenya Calbert parked her car in front of CO1 Latoya Nelson car. As I was walking toward my vehicle I observed CO1 L. Calbert walking toward the passenger side of ¹CO1 L. nelson Car. As I enter my vehicle to start it up, I observed 51 Tchernaria Blackman an 52 Kenneth Cash running toward the area where the girls were. As they were running 51 Tchernaria Blackman fell in the parking lot. 52 Kenneth Cash and I helped her up off the ground. I then got into my vehicle and lefted.

DOC N054   Rev 6-20-89

INCL: 4

1 of 3

On February 10, 2005 at approximately 10:02p.m. after leaving the institution and entering the parking lot. After walking to my car I observed COI felicia Hendricks and COI lataya Nelson arguing loudly. I immediately grabbed COI Hendricks by the arm and tried to place her in the car. COI Hendricks stated that she was not going anywhere until she gets straight with COI Nelson because she was not a thief. COI Nelson came behind COI Hendricks yelling you got my money because it was in the car and you and I were the only one's in the car. I told COI Nelson to get in her car and drive down the road and to get this settle down the road off of state property. I told them not to do this in front of everybody and that this shit is going to be all over the prison. Both stated that where not going anywhere until they got it straight I told COI Nelson that if it was over a $100 dallars hat I would give her a $100 dollars

COI Nelson stated that it wasn't about the money. After After arguing about 2 minutes COI Nelson and COI Hendricks got into COI Nelson's car. The loud arguing had ceased. COI Colbert who had left the institution had come back to the parking lot, parked her car in front of COI Nelson's car got out of her car and walked to the driver's side where COI Nelson was sitting yelling I'm not going to let you jump on my friend and we are not studing you. COI Hendricks got out of the car and said this ain't got nothing to do with you Ms. Colbert COI Nelson jumped out of the car and told COI Colbert to go home. COI Colbert went back to her car. and pulled off her jacket and pulled her shirt out and told COI Hendricks to bring it on. COI Colbert began to walk towards COI Hendricks. cusing COI Hendricks calling her Bitches and whores. I observed the female civilian in COI Colbert's car open the passenger door and get out and open the back passanger door. of COI Colbert's car. COI colbert continued to walk toward COI Hendricks. COI Nelson was standing next to the passanger's side of COI Hendricks car. COI Hendricks then reached in the driver's side door a grabbed a pocket knife. COI I then immediately Grabbed the knife from COI Hendricks and dropped the knife back in the door, and pushed COI Hendricks

back into her car. CoI Colbert stated you see that the bitch had to get a knife for me. CoI Hendrick had pulled out of the parking lot. CoI Nelson had immediately followed CoI Hendricks. After the incident I had ran to assist Lt. Tchernavia Blackmon who had fallen. After checking on Lt. Blackmon I departed the parking lot.

INCC·5

## PETETION FOR COI FELICIA HENDRICKS TO REMAIN WITH THE DEPARTMENT OF CORRECTIONS

1. _____
2. Katie Bailey LPN.
3. COI Calvin Banks
4. Charles Caldwell COI
5. Eric Richardson COI
6. _____ P— COI
7. Kenen Wallace COI
8. Lorraine Shores LPN
9. Franklin Brown COI
10. Dallas Dixon
11. _____
12. _____ COI
13. Latrika Henderson LPN
14. Daniel Randolph, COII
15. Roosevelt Pettaway
16. Cynthia M. Britton, MHAI
17. _____ COI
18. _____ COII
19. _____ COII
20. _____

21. *[illegible signature]* LPN
22. *[illegible] F. Richardson* COI
23. *[illegible]* COI
24. *[illegible] Cannon* COI
25. *Lenard Cannon* COI
26. *Tommy [illegible]*
27. *[illegible]* COI
28. *Robin Young* COI
29. *B. [illegible]* COI
30. *[illegible]*
31. *Ronald S. G[illegible]* COI
32. *Allirsda Boswell* RN
33. *Mary Jarrett*
34. *[illegible] Hall*
35. *[illegible]*
36. *[illegible] Moore*
37. *William [illegible]*
38. *Yusuf A. Hasan*
39. *Nathaniel Br[illegible]*
40. *[illegible]*
41. *Antoine [illegible]*
42. *[illegible]*
43. *Michael [illegible]*

44. _[signature]_
45. _[signature]_
46. _[signature]_
47. _[signature]_
48. _[signature]_
49. _____
50. _____
51. _____
52. _____
53. _____
54. _____
55. _____

Case 2:05-cv-00714-MEF-CSC     Document 1-2     Filed 08/01/2005     Page 20 of 20

INCL. 6

GRIVANCE (COMPLAINT FORM) FOR STEP I _____ **

PLEASE CIRCLE CAUSE OF COMPLAINT:

Race  Color  Sex  Religion  National Origin  Retaliation  Age  Disability
Other (specify) Information Clarification

DATE: February 17, 2005          NAME: Felicia Hendricks

SSN: 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                 CLASSIFICATION: Correctional Officer I

INSTITUTION: Kilby _____ Section/Shift: 2nd

SUPERVISOR'S NAME/POSITION: Tchernavia Blackmon, COSI/ Kenneth Cash, COII

DATE OF OCCURRENCE CAUSING THE COMPLAINT: February 10, 2005 _____

NATURE OF COMPLAINT: On 2-10-05 at approximately 10:05 p.m., in the parking lot at Kilby Prison,
Officer Felicia Hendricks was in discussion in Officer Latoya Nelson's vehicle on some money that was
lost or disappeared. At approximately 10:14 p.m., I, Officer Hendricks was approached by Officer Lilkenya
Colbert and a civilian who was driving her (Colbert) car which had left Kilby Institution and returned.
Officer Colbert exited her (Colbert) car and approached Officer Nelson's car and starting making
threathing remarks toward Officer Hendricks, who had left Officer Nelson's car for her (Hendricks) car
persued by Officers Colbert, Nelson, and an unidentified female who was driving Officer Colbert's car. At
approximately 10:15 p.m., Officer Hendricks felt/ threthened by the three individuals and took a small
knife out of the driver door of Officer Hendricks' car to ward off the aggression of the three people
mentioned above.

REMEDY SOUGHT: A thoroughly investigation of the events on 2-10-05, further information may be
obtained from: Officers K. Penn, R. Pettaway, J. Craig, M. Anderson, M. Armstrong which will shed more
light on this unusual occurance that may exonerate Officer Hendricks from the alleged allegations. Based
on Administrative Regulation # 205, biding on shift institution and days off was elected for Kilby and
Second Shift. Officer Hendricks wish to remain at Kilby based on being a single parent with two daughters
and being established in the Montgomery area and having a trailer.

COPY OF STEP _____ AND **              Felicia Hendricks 2/17/05

DECISION ATTACHED                      EMPLOYEE SIGNATURE/DATE

DECISION AT STEP _____ *

_____
_____
_____
                              _____
                              SIGNATURE/TITLE/DATE

**ENTER APPROCATE STEP NUMBER AND ATTACH COPY OF PREVIOUS STEP IF
PROCEEDING TO HIGHER STEP

ANNEX B

AR206 – February 22, 2000

IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
ALABAMA

RECEIVED

2005 OCT -5  P 4: 19

FELICIA S. HENDRICKS
PLANTIFF,

V.                                              CIVIL ACTION NO. 2:05-cv-714-F

WARDEN MCDONNELL, ET.AL.,
DEFENDANDTS

### MOTION TO AMEND COMPLAINT FOR VIOLATION OF EQUAL PROTECTION OF THE LAW, VIOLATION OF CIVIL RIGHTS AND DUE PROCESS OF LAW.

Comes now Felicia S. Hendricks, the Plaintiff and she moves this honorable court to amend her above-style complaint to add the following arguments of law.

1) Plaintiff shows she was dismissed from her job in and arbitrary and capricious manner in violation of her civil rights under the civil rights act of 1964. Plaintiff brought her action under this claim pursuit to 42 U.S.C SECTION 1983.

   Plaintiff will show that she was deprived of her rights as a female, to be treated the same as a male Correctional Officer in that at the Kilby Correctional Facility located Mt. Meigs, Alabama, both female and male officers have been involved in altercations with fellow correctional personel without even the slightest reprimand.

   Plaintiff shows in her amended complaint and in the original complaint, that male and female correctional officers are allowed to carry a pocket knife or box cutter type knives in the line of their duties.

   Plaintiff shows under West Digest, Civil Rights, Key number 1004, that section 1983 is designed to DETER STATE ACTORS from using the badge of their authority to deprive individuals of their federally guaranteed rights, and to provide relief to victims if such deterrence fails. 42 U.S.C. 1983 Greffey V. State of Alabama Dept. of Corrections 996 F.SUPP. 1368.

   Conduct on part of Government officials which results in disparate treatment towards members of particular race must be subjected to the most rigid scrutiny. Henderson V. Macon County, Alabama 319 F.SUPP. 430 Disparate Treatment is defined as; The practice, ESP. In employment, of Intentionally Dealing With Person Differently, Because of their Race, Sex, National origin, age, or disability, to succeed on a disparate treatment claim, the plaintiff must prove that the defendant (s) acted with discriminatory intent or motive.



DEFENDANT'S
EXHIBIT
3

Plaintiff shows this claim of her civil rights being violated is meritorious upon its face. At the very moment this document is drawn male. Correctional Officers have in their personal possession, a pocketknife or a box cutter type knife in the performance of their duties. These Knives are used to open incentive packages, cut clothes lies off the bunks of inmates who string them in violation of institutional rules, to cut open inmate writing boards mad from cardboard to search for contraband, to open Christmas and other packages coming into the institution to seek out contraband and other objects that may threaten the security of other inmates and correctional personal. The Civil Rights act is to be afforded a liberal Construction in order to carry out purpose of congress to eliminate in inconvenience, unfairness and humiliation of racial discrimination. Civil Rights Act of 1964 section 201 ET SEQ U.S. V. Johnson Lake Inc. 312 F. SUPP. 1376 For the States Reasons, Plaintiffs rights pursuant to the Civil Rights Act of 1964 were clearly violated in this cause and this court is to now order that her job be returned, and that all other relief sought by her be granted.

2) Plaintiff shows in her Amended complaint that she has been denied equal protection of the law in violation of her 14th Amendment Right under the United States Constitution, and violation of Article 1, section 6, of Alabama Constitution of 1901.

Plaintiff shows that as a female, she was treated different than the male officers at the Kilby Correctional facility located in Mt. Meigs, Alabama.

Plaintiff shows she was dismissed from her job for having in her possession (personal vehicle), a pocketknife. This pocketknife is not forbidden under admin. Reg #208 and does not require any special permission from the warden or his designee to possess.

Plaintiff shows at the very drawing of this document, male correctional officers have in their possession, A pocket knife, Plaintiff shows there has been open altercations between male officers at the institution which she was employed and these times male officers possessed pocket knives, further, no disciplinary action is or was taken against these officers by the Warden or Captain or any other shift supervisors.

For this same type conduct, Plaintiff was dismissed from her job.

The Equal Protection clause guarantee under the 14th Amendment Requires The State to give Similarly Situated Persons Equal Treatment

Plaintiff shows that the mere fact that male correctional officers are allowed to carry pocketknives based upon "All Men" usually do. Is no defense to claim of equal protection of a pocketknife? Const. Amend. 14, Article1, Sec. 6 Ala. Const. 1901.

Under West Digest, Constitutional Law Key 224 (3) Employees have constitutional right to be free from unlawful sex discrimination and sexual harassment in public employment U.S.C.A Const. Amend 14. Cross V. State of Alabama Department of Mental Health and Mental Retardation 49 F.3d 1490, Rehearing 59 F.35. 1248

Plaintiff shows that the actions of the defendants clearly create a sex-based hostile work environment where the defendants acted with discrimation purpose or intent. U.S.C.A. Const. Amend. 14; 42 U.S.C.A. sec 1983; Taylor V. Alabama 95 F. SUPP. 2d. 1297

For good cause shown, Plaintiff, as a female, was clearly removed from her job in violation of equal protection of the law and as a female was removed where male officers are allowed to conduct themselves in the very same manner without threat of disciplinary action or removal from their job.

Wherefore, premises considered, plaintiff moves this honorable court for permission to amend her complaint, and prays this honorable court to accept the same.

Respectfully Submitted

On this the _4th_ day of _October_ 2005

_____
Plaintiff





# State of Alabama
# Alabama Department of Corrections

Research and Planning
P. O. Box 301501
Montgomery, AL 36130-1501

**BOB RILEY**
GOVERNOR

**DONAL CAMPBELL**
COMMISSIONER

May 11, 2004

ADMINISTRATIVE REGULATION                    OPR: PERSONNEL
NUMBER                    207

## STANDARDS OF CONDUCT

### I.    GENERAL

This Alabama Department of Corrections (ADOC) Administrative Regulation (AR) establishes responsibilities, policies, and procedures for implementing and ensuring Standards of Conduct to govern employee behavior and work performance.

### II.    POLICY

It is the policy of the ADOC that all employees maintain the highest level of behavior and efficiency, reflect the best image of public service, and uphold with integrity the public confidence entrusted in them.

### III.    DEFINITION(S) AND ACRONYM(S)

A.    <u>Employee</u>:  Any person employed by the ADOC as a full-time, part-time, temporary or contract employee.

B.    <u>Family Member</u>:  An employee's spouse, child, grandchild, parent, grandparent, sibling, mother-in-law, or father-in-law.

C.    <u>Inmate</u>:  Any person committed to the custody of the ADOC to serve a state prison sentence.

D.    <u>Sexual Misconduct</u>:  Any behavior or act of a sexual nature directed toward an employee, volunteer, visitor or contract employee. This includes but is not limited to:

1.    Acts or attempts to commit such acts as sexual assault, sexual abuse, sexual harassment, sexual contact, actions designated for the gratification of any party, conduct of a sexual nature or implication, obscenity and unreasonable invasion of privacy.

1 of 5

AR207 – May 11, 2004



DEFENDANT'S
EXHIBIT
4

2.  Conversations or correspondence, which suggests a romantic or sexual relationship between any party mentioned above.

## IV.  RESPONSIBILITIES

A.  The Commissioner shall ensure that all employees are fairly and equally held accountable for compliance with ADOC Standards of Conduct.

B.  The Personnel Division Director shall ensure that the Standards of Conduct are in accordance with state laws and regulations.

C.  Wardens/Division Directors shall ensure that:

1.  All new ADOC employees are thoroughly orientated as to the content of this regulation, and that all employees under his/her supervision review this regulation at least once annually.

2.  A copy of this regulation is posted on employee bulletin boards.

D.  It is the responsibility of all ADOC employees to adhere to the Standards of Conduct. Failure to so shall result in disciplinary procedures as outlined under AR 208, Employee Discipline.

## V.  PROCEDURES

A.  All ADOC employees shall adhere to the following standards:

1.  Report for work on time and in a condition to perform their job properly.

2.  Render full, efficient, and industrious service.

3.  Respond promptly to directions and instructions.

4.  Exercise courtesy and tact.

5.  Maintain a clean and neat appearance.

6.  Protect and conserve funds, property, equipment and materials.

7.  Observe all laws, rules and regulations.

8.  Take an active part in the Department of Corrections affairs.

9.  Uphold, with integrity, the public's trust involved in their positions.

10.  Prevent any abuse of authority attached to the use of a badge that does not relate to a correctional officer performing and executing his/her duties in accordance with Title 14, Code of Alabama 1975, as amended.

11. Immediately inform and provide a written report to the Warden/Division Director regarding any incident of arrest or conviction of a felony or misdemeanor (except minor traffic violations) and any requirement to appear as a defendant in a criminal court.

12. Obtain prior approval from the Warden/Division Director before becoming financially involved with an inmate.

13. Promptly report any incidents of sexual misconduct.

14. Report all instances when the ability to supervise a subordinate employee is affected by a personal and/or non-working relationship with that employee.

15. Notify the Warden/Division Director immediately and follow the inmate visiting regulations when a family member is incarcerated in the ADOC.

B. Each employee's conduct shall, at all times, be consistent with the maintenance of proper security and welfare of the institution and of the inmates under his/her supervision.

C. Employees shall **not**:

1. Report for duty or exercise supervision or control over inmates while under the influence of an intoxicant and/or illegal drug.

2. Report for duty or exercise supervision or control over inmates while under the influence of a narcotic, barbiturate, hallucinogenic drug, central nervous system stimulant or depressant. Exceptions may be made only for medications that have been prescribed by and are taken under a doctor's care, and only if such medications do not impair the employee in performing his/her required job duties.

3. Use profane or abusive language in supervising inmates.

4. Use profane or abusive language in supervising and/or working with other employees.

5. Abuse inmates in any manner.

6. Trade, barter, or accept a gift from or give a gift to an inmate, an inmate's family, or any other person on behalf of that inmate, or those on parole.

7. Correspond or fraternize socially with an inmate or an inmate's family, unless approved by the Warden/Director of the employee and of the inmate.

AR207 – May 11, 2004

8.  Take any article or property whatsoever from any institution or from state property not specifically authorized by regulation.

9.  Introduce into any institution or bring upon an ADOC state property any article or property that is not authorized by written directive nor has the approval of the Warden/Division Director.

10. Recommend or furnish any advice concerning the selection of a specific lawyer for an inmate.

11. Carry any weapon, tear gas, ammunition, or blackjack into the institution or on the grounds of any ADOC state property, except as authorized by the Warden/Division Director.

12. Have keys to any area of an ADOC facility without authorization.

13. Abuse sick leave. (Refer to AR 220, Departmental Leave)

14. Deliberately or carelessly misuse state equipment or supplies resulting in loss or damage.

15. Show partiality toward or become emotionally involved with an Alabama State inmate or parolees.

16. Disregard ADOC procedures concerning the proper conduct and notification when family members are incarcerated in the Alabama Prison System.

17. Apply physical force to an inmate, except and only to the degree that is reasonably necessary in self-defense, to prevent an escape, to prevent an injury to a person or the destruction of property, to quell a disturbance, or to restrain an inmate who exercises physical resistance to a lawful command. (Refer to AR 327, Use of Force, in reference to physical force)

18. Use ADOC owned property or any state-owned property for his/her personal use without the approval of the Commissioner.

19. Provide any information to any source including newspapers, radio, television, or any other source or agency except as directed by ADOC regulations. (Refer to AR 005, Public and Community Relations)

D.  Employees shall make a complete written report (Incident Report) of all unusual incidents that occur during a tour of duty.

E.  Employees shall submit to a personal search whenever required by the proper authority. This search may also be extended to the employee's personal property and vehicle located on ADOC owned or state-owned property.

AR 207 – May 11, 2004

F.   Employees shall obtain approval for any absence from work. An unauthorized absence may subject the employee to disciplinary action.

G.   Any employee, while on duty, that is found using or under the influence of intoxicants or illegal drugs shall be subject to disciplinary action.

H.   Security employees, except by the written approval of the ADOC Commissioner, shall be prohibited from engaging in law enforcement or investigative work.

I.   Employees shall be subject to disciplinary action for falsifying documents in connection with the application process, their job duties, or a departmental requirement.

J.   A security employee shall be subject to dismissal action for the conviction of an offense that disqualifies him/her from employment as a law enforcement officer under the Alabama Peace Officers Standards and Training Commission Rules and Regulations (Title 36, Code of Alabama, 1975).

## VI.  DISPOSITION

There are no forms used in this regulation, therefore, no disposition instructions are needed.

## VII.  FORMS

There are no forms prescribed in this regulation.

## VIII.  SUPERCEDES

This regulation supersedes Administrative Regulation 207, dated November 2, 1994, as amended.

## IX.  PERFORMANCE

This administrative regulation updates departmental policies and procedures pertaining to the Standards of Conduct expected of ADOC employees and is based on, but not limited to, the interpretation and application of the regulations and laws, as amended, below:

A.   ADOC Administrative Regulations (AR 208, AR 220, AR 327, AR 005 – Titles are stated within the body of this regulation)

B.   Rules of the Alabama State Personnel Board

C.   Title 14, Code of Alabama, 1975

D.   Title 36, Code of Alabama, 1975

Donal Campbell, Commissioner

5 of 5

AR207 – May 11, 2004



STATE OF ALABAMA

## DEPARTMENT OF CORRECTIONS

Research, Monitoring, & Evaluation
Post Office Box 301501
Montgomery, Alabama 36130-1501

**Don Siegelman**
GOVERNOR

**Michael W. Haley**
COMMISSIONER

July 26, 2000

**ADMINISTRATIVE REGULATION**
**NUMBER          208**

**OPR: PERSONNEL**

## POSITIVE (PROGRESSIVE) EMPLOYEE DISCIPLINE

I.    **POLICY**

    A.    All elements of the Department of Corrections shall implement this regulation for the administration of a positive, progressive employee discipline program in this department.

    B.    Employee disciplinary action will occur within the principles of progressive discipline, which involves steps of discipline to be used to correct negative behavior or poor job performance.

    C.    Offenses will be identified according to Groups with Group I denoting minor offenses, Group II denoting more severe offenses not resulting in an issue of significant consequences, Group III and Group IV denoting serious offenses resulting in significant consequences and Group IV which results in dismissal on the first offense.

II.    **GENERAL**

    A.    Progressive discipline is a form of positive discipline. It is a way for the supervisor to bring awareness to employees of their weaknesses in a job-related area. This allows an employee the opportunity to change the undesired behavior. The objective, then, of progressive discipline is a change in an employee's behavior toward the desired result.

    B.    The word discipline is derived from a Latin word meaning "to teach". Therefore, the structure of DOC progressive discipline combines this teaching principle with certain basic steps. The basic steps involved in progressive discipline include:

        1.    Inform employees of expectations. Supervisors must take reasonable actions to ensure that employees are informed of their responsibilities.

        2.    When an employee is not meeting expectations/standards the supervisor at his/her discretion, in a positive, non-threatening manner, may inform the employee of



DEFENDANT'S
EXHIBIT
5

AR208-July 26, 2000

shortcomings, remind employee of expectations, and how to meet them or may by-pass this step and apply a group sanction.

1.  If the employee's behavior/work performance does not change/improve, the supervisor may decide that informal Supervisory Instruction (SI) is required, see Annex B. The supervisor should at that time inform the employee that continued substandard performance/behavior will result in the use of formal corrective action.

4.  If the substandard behavior/work performance continues, the supervisor must resort to formal discipline, beginning with a Warning, see Annex B. If an employee receives a Warning during an evaluation period, it must be noted on the employee's annual evaluation in the Work Habits Section and included in the Disciplinary Action Section. Warnings are not included in the disciplinary score on evaluations. Documentation should include the disciplinary step taken, the date of the action, and the reason/nature of unwanted behavior or performance.

5.  If the substandard performance continues to persist, the supervisor must move to the next appropriate level of progressive discipline. This is usually a Written Reprimand, see Annex C. Employees who receive a Written Reprimand during an evaluation period will have their annual evaluation score reduced by 7 points. A copy of the Written Reprimand must be forwarded to DOC Personnel along with the Annual Evaluation Form. A Warden/Division Head, or higher supervisor, in an employee's chain of supervision has the authority to impose a Written Reprimand. Employees should be advised that continued substandard performance will result in more severe disciplinary action.

6.  If the substandard performance continues, the supervisor must resort to suspension from duty without pay, see Annex E. Employees who receive a suspension during an evaluation period will have their annual evaluation score reduced by 17 points. A copy of the suspension letter should be forwarded to DOC Personnel along with the Annual Evaluation Form. Only the Commissioner through his original signature as the appointing authority is authorized to impose a suspension.

7.  Dismissal is the last step in progressive discipline. This step should be taken only when an employee has failed to correct performance/behavior using the previous disciplinary steps or when an employee violates a rule of such a nature as to require, dismissal, i.e. positive drug screen. It should be used when an employee either cannot or will not perform to meet job responsibilities. Recommendations for dismissal should be sent to DOC Personnel for review and will be forwarded to the Commissioner's office, see Annex I. Only the Commissioner through his original signature as the appointing authority is authorized to impose a dismissal.

8.  Supervisors should carefully review this regulation and become familiar with its contents in order to properly implement disciplinary action in a positive encouraging manner. Supervisory communication and discretion is essential in successfully executing this regulation. Employees should be educated regarding the steps involved in implementing a positive discipline program.

AR208-July 26, 2000

C.  Supervisors shall use the discipline system hand-in-hand with the performance appraisal system. These are the two most important management tools a supervisor possesses. Some supervisors try to use the appraisal system to discipline an employee. Their thought is that if an employee has an undesirable behavior, the best way to handle the situation is to threaten or actually give an employee a lower score on the performance appraisal. Appraisal is not the discipline tool. Performance appraisal is simply a mirror that should reflect what has occurred during the rating period. If discipline has occurred, behavior/performance warranting the corrective action must be documented on the appraisal form, and in some instances must be attached to the form. This would, obviously, lower the appraisal score, but only as a reflection of what has occurred during the preceding year. Positive discipline is the corrective tool to use when infractions occur in work habits or when a weakness exists in the performance of work responsibilities. A maximum of 17 points can be deducted for disciplinary actions per evaluation period.

D.  Guidelines for Corrective Actions:

1.  Set the example.

2.  Provide training when appropriate.

3.  Implement regulations consistently and objectively.

4.  Use progressive discipline when behavior/performance violates a rule, regulation, procedure, standard, etc.

5.  Eliminate the appearance of favoritism by fairly and equitably implementing rules and regulations.

6.  Misconduct should be thoroughly evaluated before corrective action is taken.

7.  Document employee's performance/behavior whether positive or negative in nature.

## III.  PROCEDURES

A.  Offenses. Supervisors may use discretion in executing all disciplinary action. The severity of the offense and/or the number of offenses should determine the level/severity of disciplinary action in a stated period of time. The employee's work history, length of service and any disciplinary action within the past twelve months should be considered in determining the penalty. It is important for a supervisor to have adequate justification when a decision is made to offer a lesser or a more severe penalty. Offenses are grouped as follows.

1.  Group I

a.  Offenses of a minor nature that normally result in progressive disciplinary action.

b.    Corrective Action for Group I Offenses:

(1) Supervisory Instruction (SI) (Discretion)

(2) Warning (Will reflect on the employee's Performance Appraisal without a point penalty)

(a) Violations of safety rules which <u>do not</u> endanger life or property.

(b) Abuse or misuse of equipment, <u>not</u> causing damages.

(c) Conviction for a minor traffic offense while driving a State or public use vehicle.

(d) Unauthorized use of telephones, bulletin boards, or other State property.

(e) Participation in unauthorized activity of a minor nature at the work place and/or improper use of duty time.

(f) Deviation from policies, procedures, regulations, etc.

(g) Use of abusive or threatening language to other employees, inmates or the public.

(h) Failure to follow proper notification procedures when calling in, i.e., tardy, absences.

(i) Tardiness and unexcused absences. (See AR #220)

<u>Repeated abuse of any Group I offense may result in Group II corrective action. Group I offenses shall remain active for one year from the date of corrective action. An employee's work history, annual evaluations and any disciplinary action within the last twelve months should be evaluated in determining the penalty.</u>

2.    Group II

a.    Offenses that are more severe than Group I and not resulting in an issue of significant consequences.

b.    Corrective Action for Group II Offenses:

(1) Warning (Will reflect on the employee's Performance Appraisal without a point penalty)

(2) Written Reprimand (7 point deduction on employee's Performance Appraisal)

(a) Failure to perform job properly, <u>not resulting</u> in actual consequences.

(b) Failure to follow a supervisor's instructions; noncompliance with policies and procedures.

(c) Leaving assigned post and/or work station before the end of the shift/work day without permission from proper authority or proper relief and no serious consequences occur.

(d) Disagreeable behavior, including a lack of cooperation.

(e) Failure to immediately report to the proper authority (supervisor) the violation of any rule, practice, or policy that results in minor consequences.

(f) Violation of security regulations/procedures when the potential consequences are serious, but consequences do not actually occur.

(g) Inattention to the job.

(h) Taking into an institution any article, item, or property which is not specifically authorized by regulation, or without the approval of the Warden.

(i) Serious violations of other rules, procedures, laws, or reasonable conduct expectations.

(j) Tardiness and unexcused absences. (See AR # 220)

(k) Non-compliance with policies, procedures, regulations, etc.

Repeated abuse of any Group II Offense may result in Group III corrective action. Group II offenses shall remain active for one year from the date of corrective action. An employee's work history, annual evaluations and any disciplinary action within the last twelve months should be evaluated in determining the penalty.

3.    Group III

a.  Offenses that are serious and/or result in serious consequences.

b.  Corrective Action for Group III Offenses:

(1) Written Reprimand (7 point deduction on employee's Performance Appraisal)

(2) Suspension (5 to 15 days – 17 point deduction on employee's Performance Appraisal)

(3) Demotion

(4) Dismissal

AR208-July 26, 2000

(a) Fighting, assault, physical violence or disruptive behavior.

(b) Theft or unauthorized possession of DOC or another individual's property.

(c) Leaving assigned post and/or work station before the end of the shift/workday without permission from proper authority or proper relief, resulting in severe consequences.

(d) Tampering with a drug screen sample, or any similar action that may invalidate or falsify the test results.

(e) Sleeping or the appearance of sleeping on duty.

(f) Abuse or misuse of authority, including but not limited to departmental property and/or DOC identification cards/items.

(g) Harassment as defined in Administrative Regulation # 206.

(h) Discrimination in employment based upon race, religion, color, age, sex, national origin or disability. (See Administrative Regulation #206)

(i) Failure to immediately inform and provide a written report to the Commissioner, through COS II/Division Head or above, concerning any incident of arrest for any misdemeanor, DUI, or felony, except minor traffic violations, or when required to appear as a defendant in any criminal court.

(j) Abusive or excessive physical force in dealing with inmates.

(k) Refusal of a supervisor's instruction to remain on duty during a shortage of personnel situation and/or an emergency situation.

(l) Borrowing/receiving money, or other items from, or giving money/items to inmates or an inmate's family. Giving preferential treatment to an inmate(s), corresponding with an inmate, or an inmate's family, in any capacity that is not officially required and in the line of duty.

(m) Failure to report, or violation of safety/security rules that result in injury to persons, or significant damage to property.

(n) Conduct that is disgraceful, on or off the job, that does adversely affect an employee's effectiveness on the job.

(o) Refusal to submit to screening or under the influence of alcohol or other substances on the job which interferes with the discharge of assigned duties.

(p) Failure to meet and/or maintain APOSTC standards, when applicable.

(q) Gross negligence that allows an inmate(s) to escape.

(r) Refusal to submit to personal search, or search of personal property, or vehicle on institutional property, when required by proper authority.

(s) Possession or use of firearms, weapons, explosives, or other dangerous items, except on duty and in designated areas and as authorized in regulations and/or procedures.

(t) Lack of cooperation or refusal to give information or verbal/written statements in connection with employment, an investigation, or injury. Giving false information, altering an investigative or incident report, and/or intentionally omitting facts pertinent to the incident.

(u) Tardiness and unexcused absences. (See Administrative Regulation #220)

(v) Serious violations of other rules, procedures, laws, or reasonable conduct expectations.

Supervisors should use discretion in recommending any actions noted in Group III and suspension/demotion/dismissal should be recommended only in cases where previous disciplinary action has failed to correct behavior or when the infraction is so serious as to warrant suspension, demotion or dismissal for the first offense. Progressive discipline should be followed in applying disciplinary action. Group III offenses shall remain active for one year from the date of the corrective action. An employee's work history, annual evaluations and disciplinary actions within the last twelve months should be thoroughly reviewed before recommendations are submitted.

4.    Group IV

a.    Offenses that will result in Dismissal on the first offense.

(1) Possession of drugs or a positive drug screen.

(2) Deliberate breach of security resulting in escape, riot, etc.

(3) Conviction for a felony (Title 36, Section 36-21-46(a), <u>Code of Alabama, 1975</u>) that would disqualify an individual from employment in the classification in which employed or a conviction of a misdemeanor crime of domestic violence.

5.    Other Authorized Personnel Action(s)

a.    Job Abandonment

State Personnel Board Rule 670-x-19-.01(k) — consists of three (3) days of unexcused, unreported absence.

Procedure:  An employee who abandons his/her job will not be allowed to return to work.  The Warden/Division Head will send a letter, similar to Annex G, by certified mail (return receipt requested) to the employee.  If no reply is received from the employee within seven (7) calendar days, the Warden/Division Head will notify the Department Personnel Director, who will prepare a Letter of Dismissal and forward it through channels for approval/signature by the Commissioner.  The Warden/Division Head will forward substantiating documents to the DOC Personnel Director as soon as possible but no later than three (3) work days.

If a reply is received within seven (7) calendar days, the Warden/Division Head shall consider the information submitted and impose/recommend appropriate disciplinary action.

b.    Demotions

Demotions may occur with the approval of the appointing authority and State Personnel under the following circumstances.  Wardens/Division Heads may recommend an employee be demoted after a thorough review of the employee's work history, annual evaluations and disciplinary actions.

(1) Employees may voluntarily request a demotion to a lower classification.

(2) Involuntary demotions may occur during a departmental layoff.

(3) The appointing authority may direct a demotion to a job classification more comparable to the employee's level of performance.  In cases where demotions are directed, the appointing authority may use this action in lieu of dismissal or when its deemed necessary for the good of the Department.

c.    Action initiated

(1) A demotion action is initiated by a Warden/Division Head by preparing a written notice of the intent to recommend demotion (see sample letter – Annex H) to the employee.  Concurrently, the Warden/Division Head will fax a copy of the letter to the Department's Personnel Director, who will schedule a hearing officer, and notify the Warden/Division Head of the time, date, and location by E-mail.  The Warden/Division Head will inform the employee of this information by copy of E-mail.

(2) The written notice must state the charges in sufficient detail to permit the employee to prepare for the hearing.

    (a) A person designated under procedures approved by the Commissioner will conduct a hearing to receive information in support of and against the reasons for the demotion. This person will evaluate the information and make a recommendation to the Commissioner.

    (b) Employees may choose to be represented at their own expense, and may call witnesses who have direct knowledge of the actions/incidents upon which the charges are based. Employees may also present evidence during the hearing.

    (c) The employee may elect to waive a hearing (Annex I) and accept the action recommended by the Warden/Division Head, subject to approval by the Commissioner.

    (d) The Commissioner will consider the recommendation of the Warden/Division Head, information presented during the hearing and the findings of the hearing officer, as provided in the hearing officer's record of hearing, and approve the recommendation, approve lesser discipline, specify that no action is to be taken, or return the recommendation to the Warden/Division Head for another hearing. If the demotion stands, a copy will be sent to the State Personnel Department for final approval.

B.     <u>Corrective Action History</u>. Each Warden/Division Head will ensure that a Corrective Action History Record (Annex A) is maintained in the file of all employees who have received corrective action. This form is retained as one of the first items seen when opening the file. Supervisory personnel will review the Corrective Action History Record before deciding on the appropriate disciplinary action for any employee. Supervisors must remain alert to the advantages of progressive discipline and any developing trends (positive or negative) in the employee's behavior. Use the minimum action necessary to correct behavior and prevent recurrence of the infraction, within the published guidelines/schedules in this and other regulations.

C.     <u>Supervisory Instruction</u> is not disciplinary action. The immediate supervisor must record details regarding the incident/occurrence on DOC Form N008 (Annex B) and distribute as indicated on the form. This action will not be noted in the disciplinary action section on the employee's annual evaluation, nor under the work habits section.

D.     Warning

    1.     The supervisor will conduct the warning in a private setting and without embarrassment to the employee. Another supervisor may attend as a witness, but **normally** a non-supervisory employee, or other person, should not attend.

    2.     The supervisor will inform the employee of the specific offense and give the employee an opportunity to explain or respond.

3.   The supervisor will record the basic facts of the discussion, reason for the Warning, and corrective action on DOC Form N008 (Annex B). This information will also be noted in the disciplinary action section on the employee's annual evaluation and under the work habits section.

4.   Supervisors must inform the employees that they are imposing the first step of progressive discipline.

E.   Written Reprimand

1.   The Warden/Division Head will conduct the Reprimand in a private setting and without embarrassment to the employee. Another supervisor may attend as a witness, but normally a non-supervisory employee, or other person, should not attend.

2.   The Warden/Division Head will inform the employee of the specific offense and give the employee an opportunity to explain or respond.

3.   The Warden/Division Head will complete DOC Form N009 (Annex C to AR 208) to impose a Written Reprimand.

4.   The Warden/Division Head will inform the employee that after receipt of the Written Reprimand the employee has five calendar days to submit a written reply/explanation.

5.   After considering the employee's reply/explanation, the Warden/Division Head decides if the Written Reprimand will stand. The Warden/Division Head will inform the employee by indicating approval or denial on the employee's rebuttal statement. If the employee fails to submit a Written Rebuttal, within the allotted timeframe, the Written Reprimand will stand. The Warden/Division Head will forward a copy of all correspondence to the Department Personnel Director. If action is implemented, a copy of the Written Reprimand must accompany the employee's annual evaluation with a disciplinary score of 7 points deducted.

F.   Suspension

1.   Suspension is used only after warnings and reprimands have not been effective or when the gravity of the offense requires more stringent corrective action. A suspension puts an employee in an involuntary non-duty and non-pay status, and results in lost production to the Department, and a financial loss to the employee. During suspensions, an employee does not accrue annual leave, sick leave, longevity for retirement, law enforcement bonus, or service pins.

2.   The maximum days an employee can be suspended is fifteen (15) days per infraction.

3.   Prior to a suspension, a person designated under procedures approved by the Commissioner will conduct a hearing to receive information in support of and against the reasons for the suspension. The hearing shall be tape recorded. The

Warden/Division Head will retain the tape for two years for future reference. The hearing officer shall, within five work days, forward a record of hearing, similar to the example in Annex D, to the Department's Personnel Director, who will forward it to the Commissioner through the appropriate Deputy Commissioner.

4.  Action initiated.

    a.  A suspension action is initiated by a Warden/Division Head by preparing a written notice of the intent to recommend suspension (see sample letter – Annex E) to the employee. Concurrently, the Warden/Division Head will fax a copy of the letter to the Department Personnel Director, who will schedule a hearing officer, and notify the Warden/Division Head of the time, date, and location by E-mail. The Warden/Division Head will inform the employee of this information by copy of the E-mail.

    b.  The written notice must state the charges in sufficient detail to permit the employee to prepare for the hearing.

        (1) A person designated under procedures approved by the Commissioner will conduct a hearing to receive information in support of and against the reasons for the suspension. This person will evaluate the information and make a recommendation to the Commissioner.

        (2) Employees may choose to be represented at their own expense, and may call witnesses who have direct knowledge of the actions/incidents upon which the charges are based. Employees may also present evidence during the hearing.

        (3) The employee may elect to waive a hearing (Annex F) and accept the action recommended by the Warden/Division Head, subject to approval by the Commissioner. A suspension imposed through waiver, or otherwise, includes a stipulation that an employee will not be recommended for promotion until completion of one year of creditable service commencing after the period of suspension.

        (4) The Commissioner will consider the recommendation of the Warden/Division Head, information presented during the hearing and the findings of the hearing officer, as provided in the hearing officer's record of hearing, and approve the recommendation, approve lesser discipline, specify that no action is to be taken, or return the recommendation to the Warden/Division Head for another hearing. If the suspension stands, a copy of the suspension letter must accompany the employee's annual evaluation with a disciplinary score of 17 points deducted.

G.  Dismissal

    1.  In recent years, the U.S. Supreme Court has held that where the State provides full post-termination due process, a pre-termination hearing need not be elaborate. Adequate post-termination due process through a full, adversarial, post-termination evidentiary hearing is provided by the State Personnel Board.

2. The following procedures shall be followed with regard to the dismissal of an employee and the appropriate departmental official shall give the employee an advance written notice of his intent to recommend dismissal see Annex J. The written notice must:

a. State the action proposed.

b. State the charges in sufficient detail to enable employee to prepare a suitable response to be presented at the pre-dismissal conference.

c. Specify which offenses were used in determining corrective action; also, specify which standards, policies, regulations or criteria were violated.

d. State that a pre-dismissal conference will be held at least seven (7) days after employee's receipt of notice of intent to recommend dismissal. The purpose of this conference is to allow the employee to respond to the charges, explaining his/her side of alleged charges. Indicate that a reasonable extension may be granted if requested and justified by the employee.

e. State that if dismissal is indicated, after the pre-dismissal conference, this recommendation will be made to the Commissioner.

f. State that the employee may resign voluntarily in lieu of dismissal at any time prior to the pre-dismissal conference or during the conference, see Annex K.

3. At least seven (7) work days after delivery of notice of intent to recommend dismissal, the recommending official shall meet with the employee to hear the response/explanation. At the conclusion of the conference, a Pre-Dismissal Conference Form Memorandum (see Annex L) must be completed and signed by the employee and the person conducting the conference.

4. If, after the conference, the departmental official decides to continue the recommendation to dismiss, the official will forward the Notice of Intent to Recommend Dismissal and all supporting documentation, including Pre-Dismissal Conference Form Letter to the Department's Personnel Director. Documentation should include, but is not limited to, copies of SOPs and other directives violated (other than Administrative Regulations) statements, incident reports, and any other document(s) needed to support the charges. It should also include copies of all previous corrective actions.

5. If the departmental official determines that neither dismissal, suspension, nor demotion is indicated, the official may drop the action entirely or impose lesser discipline. If dropped, all correspondence referring to the action will be removed from employee's departmental and institutional personnel records file.

6. Where dismissal is recommended, the Commissioner may approve the dismissal, specify that no action is to be taken, or approve lesser discipline such as a

suspension in which case a hearing would be required.

7.   Employees may, at their own expense, have representation at the pre-dismissal conference, but only as an observer, not as a participant.

8.   The pre-dismissal conference outlined above is for the purpose of allowing employees to present information to the appropriate departmental official regarding disciplinary action under consideration; i.e., a chance for employees to "tell their side of the story." The discussion is informal. The employee is allowed to present written statements of witnesses or any other information with regard to the charges. With exception of representation, as specified above, attendance and participation by persons other than recommending officials and employee is at the discretion of the recommending official.

9.   Nothing in this regulation is intended to abrogate authority granted the Commissioner under Section 36-26-27, Code of Alabama, 1975, and 670-X-18-.02, Rules of the State Personnel Board.

10.  Under the provisions of Rules of the State Personnel Board 670-X-18-.02, a permanent employee who has been dismissed may, within ten days after receiving written notice, appeal the dismissal by filing a written answer to the charges with the State Personnel Director, 64 North Union Street, Montgomery, AL 36130.

H.   Probationary and Annual Performance Appraisals.   (See Guidelines for Performance Appraisal, Annex M, Pages 1-16)

## IV.   DISSEMINATION OF CONTENTS

Wardens, Directors, and Department Division Heads are responsible for the dissemination of the contents of this regulation to all employees. Post a copy on bulletin boards for access by all employees.

## V.   REFERENCES

A.   Rules of the State Personnel Board, State of Alabama.

B.   Department of Corrections' Administrative Regulation 207, Standards of Conduct, Department of Corrections Employees.

C.   Department of Corrections' Administrative Regulation 213, Reporting and Resolution Procedures for Harassment, Sexual Harassment, Complaints, and Grievances.

D.   Department of Corrections' Administrative Regulation 227, Controlled Substances Testing for Employees of the Alabama Department of Corrections.

## VI.  SUPERSESSION

This regulation supersedes Administrative Regulation 208, dated September 1, 1998, and is effective July 26, 2000.

Michael W. Haley, Commissioner

## ANNEXES

ANNEX A    Corrective Action History Record
ANNEX B    Memo for the Record – WARNING/SUPERVISORY INSTRUCTION
            DOC Form N008
ANNEX C    DOC Written Reprimand – DOC Form N009
ANNEX D    Sample Record of Administrative Hearing
ANNEX E    Sample Notice of Pre-Suspension Hearing
ANNEX F    Sample Format for Waiving Due Process Disciplinary Hearing
ANNEX G    Sample Job Abandonment Letter
ANNEX H    Sample Notice of Intent to Recommend Demotion
ANNEX I     Sample Format for Waiving Demotion Hearing
ANNEX J     Sample Notice of Pre-Dismissal Conference
ANNEX K    Sample Format for Resignation from Employment
ANNEX L    Sample Pre-Dismissal Conference Memorandum
ANNEX M    Guidelines for Performance Appraisal

## SUMMARY OF CHANGES

Changes the number of days employees may be suspended during a calendar year, changes the duration of offenses, deletes repetition in offenses listed in Groups I, II, and III, and adds Group IV.

*my copy*

*State of Alabama*

## Alabama Department of Corrections

Kilby Correctional Facility
P.O.Box 150
Mt. Meigs, AL 36057

TERRANCE MCDONNELL
WARDEN III

334-215-6603
Fax-215-6606

February 18, 2005

**MEMORANDUM:**

**FROM:**    TERRANCE MCDONNELL, WARDEN

**TO:**    **CO I FELICIA HENDRICKS**

**SUBJECT:**    **NOTICE OF PRE-DISMISSAL CONFERENCE**

It was reported to me that on February 10, 2005, at approximately 10:06 PM Lt. Tchernavia Blackmon and Sgt. Kenneth Cash observed a disturbance in the Kilby parking lot involving you, CO I Latoya Nelson, and CO I Lilkenya Colbert. Voices were heard screaming and cursing while another officer was attempting to restrain you.

An investigation was conducted by Mr. Demus, I & I Investigator, which revealed the following:

You, CO I Hendricks, did admit to Mr. Demus that you did pull a knife on CO I Colbert, in the Kilby parking lot. You turned the knife into Mr. Demus on Monday, February 14, 2005, stating it was the knife you pulled on CO I Colbert on the night of 2-10-05. Also, you admitted to Investigator Demus that you bullied CO Nelson by brushing up against her with your chest while pushing her backwards (with your chest). Another officer had to restrain you from attacking/going after CO Colbert while you were struggling to get to CO Colbert. There were numerous witnesses to this incident in the parking lot regarding your involvement in pulling the knife and/or physical and verbal confrontation on CO Is Colbert and Latoya Nelson.

Your actions are in direct violation of Administrative Regulation 207: Standards of Conduct:

II. Policy: It is the policy of the ADOC that all employees maintain the highest level of behavior and efficiency, reflect the best image of public service, and uphold with integrity the public confidence entrusted in them.

V. A. 7. Observe all laws, rules and regulations.
        9. Uphold, with integrity, the public's trust involved in their positions.
  B. Each employee's conduct shall, at all times, be consistent with the maintenance of proper security and welfare of the institution ...

DEFENDANT'S EXHIBIT

1

C. Employees shall not:
11. Carry any weapon...on the grounds of any ADOC state property, except as authorized by the Warden/Division Director.

This type behavior can not be tolerated. It creates a tremendous risk for the life and safety of other employees at this institution and to the orderly operations of Kilby. Employees behaving in this manner can not work together to provide for a safe and secure work environment. Due to the extreme seriousness of your infractions, the penalties for the above violations are reflected in AR 208: III.A.3.a.b. and warrants (4)Dismissal.

    (a)    Fighting, assault, physical violence or disruptive behavior.
    (n)    Conduct that is disgraceful, on or off the job, that does adversely affect an employee's effectiveness on the job.
    (s)    Possession or use of ...weapons... or other dangerous items, except on duty and in designated areas and as authorized in regulations and/or procedures.
    (v)    Serious violations of other rules, procedures, laws, or reasonable conduct expectations.

A review of your file does not indicate any active disciplinary action.

In accordance with AR 208, I have scheduled a pre-dismissal conference in my office on *Wednesday, March 2, 2005, at 10:00 AM*. This dismissal conference is for the purpose of allowing you to present information to me regarding the action under consideration; i.e., a chance for you to "tell your side of the story". Our conference shall be informal. You may present written statements of witnesses or any other information regarding these charges. You may, at your own expense, have representation present at this conference, but only as an observer, not a participant.

You may voluntarily resign in lieu of dismissal. However, it is highly probable that you will not be recommended for re-employment with the Department of Corrections.

cc: file

| Witness | Date | TIME | | Received | Date |

2

*State of Alabama*

# Alabama **Department of Corrections**

Kilby Correctional Facility
P.O.Box 150
Mt. Meigs, AL 36057

TERRANCE MCDONNELL
WARDEN III

334-215-6603
Fax-215-6606

**March 2, 2005**

**MEMORANDUM:**

**FROM:**    TERRANCE MCDONNELL, WARDEN

**TO:**    COMMISSIONER DONAL CAMPBELL

**THRU:**    DORA JACKSON, ADOC PER. DIRECTOR

**SUBJECT:**    PRE-DISMISSAL CONFERENCE
CO I FELECIA HENDRICKS

The Pre-Dismissal Conference was held in my office today. Attached is the required summary of this meeting.

CO Hendricks did not present any new information at the hearing to change my decision to recommend her for dismissal. This incident of 2-10-05 involving Ms. Hendricks pulling a knife on another employee in Kilby's Parking Lot was investigated by I & I, Inv. Errick Demus. Tape-recorded statements taken by Mr. Demus from the witnesses confirmed that CO Hendricks did pull a knife on another officer and bumped the other female in the chest pushing her backwards. If the other employee had pressed charges against CO Hendricks, she would be facing a felony. If the other officers witnessing this incident had not intervened this problem would have escalated resulting in serious injuries.

It is still my recommendation that CO Hendricks be dismissed from the ADOC.



DEFENDANT'S EXHIBIT
7

KILBY CORRECTIONAL FACILITY
PRE-DISMISSAL CONFERENCE MEMORANDUM


TO:            DONAL CAMPBELL, COMMISSIONER

FROM:          TERRANCE MCDONNELL, WARDEN

SUBJECT:       CO I FELICIA HENDRICKS


On 2-18-05 the attached Notice of Intent to Recommend Dismissal was served on CO I Felicia
Hendricks. On 3-2-05 at 10:08 AM, CO I Hendricks and I met in my office at Kilby. (Copy of Notice of
Intent to Recommend Dismissal is attached.) CO Hendricks had no representative present as an observer.

**The employee responded to the Notice of Intent as follows:**

I request to remain as a Correctional Officer I and remain at Kilby. I bid for a shift at Kilby for 1 year 1-2-
05 to 1-2-06. I have 2 daughters. I am not financially able to drive to another institution. I have a trailer.
I will attend an Anger Management Class if deemed necessary.

I did pull a knife for my own defense on 2-10-05 in the parking lot. We both bumped chest to chest.


**In addition to her response the employee submitted the following documents (attached):**

CO Hendricks presented documents stapled together as her statement/defense for the incident which
occurred on 2-10-05 in the Kilby Parking Lot at app. 10:06 PM. The documents stapled included were:
Grievance Form for Step 3 signed by CO Hendricks dated 3-1-05; CO Hendricks 7 page statement;
Signed statement from CO I Joey Craig; Unsigned statement from CO Roosevelt Pettaway; Unsigned 3
page statement with no notation as to who this was from other than CO Hendricks verbally stating it was
from CO I Krammer Penn; A petition for CO Felicia Hendricks to remain with the Department of
Corrections signed by 48 KCF and PHS employees; and a Grievance/Complaint Form for Step 1 signed
and dated by CO Hendricks on 2-17-05.


_Terrane McDonnell_ 3-2-05          _Felicia Hendricks_ 3/2/05
RECOMMENDING OFFICIAL   DATE        EMPLOYEE            DATE

**Pending resolution of this problem, the employee can be contacted at the following address and
telephone number:** *Felicia Hendricks*
*5113 Loblolly Pine Dr.*
*Montgomery, Al 36116*
*(334) 288-2429*

DEFENDANT'S
EXHIBIT
8

GRIEVANCE FORM FOR STEP $\frac{3}{(1-3)}$

DATE OF GRIEVANCE (ACT): 03/01/05
CHECK IF ADA FILING: _____
FILE STEP 2: _____
FILE STEP 3: 3

FILED STEP 1: _____
COMPLETED STEP 1: _____
COMPLETED STEP 2: _____
COMPLETED STEP 3: _____

NAME: Felicia Hendricks

SSN: 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

INSTITUTION: Kilby Correctional Facility

CLASSIFICATION: COI

YEARS OF SERVICE W/DOC: 5

IN CLASSIFICATION: COI

SUPERVISOR'S NAME: Warden Terrance McDonnell    SECT/SHIFT: 2nd

NATURE OF GRIEVANCE: Being considered for dismissal for making a defensive act facing down two female officers and a civilian female who made agressive moves toward Officer Felicia Hendricks. (See continuation for further details). Inclosures 1 thru 6

REMEDY SOUGHT

For my actions I deserve some form of discipline/guidance but not dismissal. I am willing to attend and complete anger management classes, if desired. I'm a single parent with two young girls to support and I need my job being a single parent and doing a professional job with D.O.C. I request appoaite actions to be taken against the other parties.

Felicia Hendricks
SIGNATURE OF GRIEVANT

DECISION AT STEP _____

_____

_____

_____

_____

SIGNATURE/TITLE/DATE

Annex B to AR 213

On February 10, 2005, at approximately
10:00pm CO1 Felicia Hendricks wanted for
CO1 Latonya Nelson to ask her (Nelson)
about the rumors spreading inside the
institution among officers, nursing staff
and inmates. As CO1 Nelson approached
her car, which both (Hendricks and Nelson)
cars were parked side by side. CO1
Hendricks asked CO1 Nelson in a calmly
manner, "Do you have anything to say to
me?" CO1 Nelson said, "No" in a
smuther tone. CO1 Hendricks said, "Are
you sure?" Then CO1 Hendricks said
to Mrs. Nelson then, "Why is you going
around her telling people that I stole
your money?" CO1 Nelson replied, "You
did." I (Hendricks) told Mrs. Nelson
that I (Hendricks) don't have to steal
from you, after all the times I let you
borrow money. By that time our voices
(Hendricks & Nelson) started getting louder.
We both (Hendricks & Nelson) were in each
others face yelling and crying. Then
CO1 Kammin Kian, Roswell Pettiway,
Joey Craig and stated you'll need to

leave that man alone. CO2 Michael
Armstrong observed the incident from
his car. CO1 Penn, Pettaway and Craig
stated you'll need to leave. CO1
Nelson stated, "I'm not leaving and
aint nobody fixing to fight, I need
to talk to Mrs. Hendricks and
get this off my chest." CO1 Penn
stated to CO1 Nelson, "I'll give
you $100 dollars and you'll just
leave with the man." Then CO1
Nelson stated, "The money isn't the
issue, Mrs. Hendricks haven't spoke
to me or said anything to me in
two whole weeks and that's why
I thought she had my money." I
replied to Mrs. Nelson, "I don't
have your money and why would
I steal from you anyway. I
don't have to steal. By that
time Mrs. Nelson said, you'll leave
me alone. I just want to talk
to Mrs. Hendricks alone." Then after
that Mrs. Nelson asked me to
get in her (Nelson) car and I did.

The arguing had ceased as COI.
Hendricks and Nelson were in
her car talking to each other. I
told Mrs. Nelson, I don't have
your money and why would I
steal from you anyway after all the
times I gave you money for gas
and whenever you asked me I
gave it to you and I never
hounded you about paying me
back. Then Mrs. Nelson replied,
"Damn, it's been two weeks and
you haven't spoke to me or said
a word to me." I told Mrs. Nelson
what do you expect for me to
say when you're going around
accusing me of stealing your
money. The right thing you could
have done was come to me
and ask me instead of accusing
me. COI Hendricks and Nelson
both apologized to each other. By
that time COI Killenya Colbert, a
female friend and a child had
pulled up in front of COI Nelson's

car. In which, CO1 Colbert had left the parking lot for home and returned back. CO1 Colbert got out of her (Colbert) car and approached CO1 Nelson's driver door, opened it and stated to CO1 Nelson, "Are you alright?" CO1 Nelson replied, "I'm fine, I just want to talk to Mr. Hendricks. Then CO1 Colbert stated to CO1 Nelson, "You're my friend and I'm not leaving." I told CO1 Nelson that I'll see you later. As I (Hendricks) got out the passenger side of Nelson's car while CO1 Colbert was standing at the driver side, CO1 Colbert stated to CO1 Nelson, "I told you that Bitch ain't shit." CO1 Hendricks replied to CO1 Colbert "this doesn't have anything to do with you." Then Colbert stated to Hendricks, "We (Colbert + Nelson) don't like you anyway." CO1 Hendricks replied, "Who cares because I don't like you either".

Then Colbert walks to her car,
pulled off her jacket, pulled her
shirt out and and calling
Hendricks all kinds of Bitches
and Hoe's, telling me to bring it
on. At that time Colbert
continued to walk back and
forth to her car yelling out
loudly. By that time her female
friend got out the car and
opened the back door, then that's
when I grabbed my pocket knife
from the inside of my drivers
door and pulled it out. By that
time CO1 Penn had grabbed
my hand and took it from me.
Then CO1 Colbert started yelling
"she's got a knife, Bitch you
got to use a knife. I replied
to CO1 Penn who was holding
me that, "That Bitch ain't shit."
Then CO1 Penn pushed me in
my car and closed the door
and CO1 Hendricks pulled off
and left, then CO1 Nelson

608?

followed me (Hendricks).

On February 27, 2005 at approximately 10:35 pm, COI Hendricks called COI Nelson on her (Nelson) cell phone and we talked. COI Nelson said she was wondering when I was going to call her. I (Hendricks) to her that I didn't know if you really wanted to talk to me. COI Nelson said "I'm not mad at you" and I told her I wasn't mad at her either. Then we talked about a few things and then she said she didn't think that things would have gone this far. She (Nelson) said that she heard that I (Hendricks) could lose my job and she (Nelson) didn't want that to happen. Then I (Hendricks) asked her do you have a problem working with me and she (Nelson)

said "no." But she (Nelson)
said that CO1 Colbert said
"she (Colbert) didn't want me
to lose my job either, but
she (Colbert) can't work with
me in fear of her (Colbert) life."
I asked Mrs Nelson could
she write a statement and
she did say "yes," she have
no problem with that, and
that she (Nelson) would get
back with me the next
morning, but she never did.

*Shawn Hendricks*

INCL. 2

On 2-10-05 at approx. 10:23 P.M. upon ending my tour of duty at Kilby Correctional Facility. I, COI Joey Craig was heading toward my car in the parking lot. I COI Craig observed COI Tylicia Hendrix and COI Latoya Nelson getting in COI Nelson's car. At approx. 10:30 P.M. As I COI Craig began to pull out of the parking lot. COI Jahenya Tolbert pull up her car behind me and blocked my way out. I COI Craig then asked COI Tolbert could she move her car for me please. COI Tolbert then told somebody in her car to move it. They moved the car. I COI Craig began to exit the property and observed COI Tolbert walk toward COI Nelson's car and open the drivers side door. I COI Craig then drove off and did not witness anything else.

Joey Craig COI

INCL: 3

**DUTY POST LOG**

| DATE | PRINTED NAME AND RANK SIGNATURE | SHIFT (1, 2, 3, Adm, Etc.) | DUTY POST ASSIGNMENT |
|------|--------------------------------|----------------------------|----------------------|
| **ENTRY TIME** | | | |

On Thursday Feb. 10, 2005 at approx. 10:10 pm, I COI Roosevelt Pettaway, seen COI Lilkenya Calbert leaving the parking lot of Kilby Correction facility. She left state property and returned to the parking lot area. COI Lilkenya Calbert parked her car in front of COI Lataya Nelson car. As I was walking toward my vechile I observed COI L. Calbert walking toward the passenger side of 1st L. Nelson car. As I enter my vechile to start it up, +I observed S1 Tchernavia Blackman an S2 Kennoth Cash running toward the area where the girls were. As they were running S1 Tchernavia Blackman fell in the parking lot. S2 Kennoth Cash and I helped her up off the ground. +I then got into my vechile and lefted.

INCL: 4

On February 10, 2005 at approximately 10:02 p.m. after leaving the institution and entering the parking lot. After walking to my car I observed COI Felicia Hendricks and COI Lataya Nelson arguing loudly. I immediately grabbed COI Hendricks by the arm and tried to place her in the car. COI Hendricks stated that she was not going anywhere until she gets straight with COI Nelson because she was not a thief. COI Nelson came behind COI Hendricks yelling "you got my money" because it was in the car and you and I were the only one's in the car. I told COI Nelson to get in her car and drive down the road and to get this settle down the road off of state property. I told them not to do this in front of everybody and that this shit is going to be all over the prison. Both stated that where not going anywhere until they got it straight. I told COI Nelson that if it was over a $100 dollars that I would give her a $100 dollars.

...about stated that it wasn't about the money. After After arguing about 2 minutes COI Nelson and COI Hendrid got into COI Nelson's car. The loud arguing had ceased. COI Colbert who had left the institution had come back to the parking lot, Parked her car in front of COI Nelson's car got out of her car and walked to the driver's side where COI Nelson was sitting yelling I'm not going to let you jump on my friend and we are not scared of you. COI Hendricks got out of the car and said this ain't got nothing to do with you Ms. Colbert COI Nelson jumped out of the car and told COI Colbert to go home. COI Colbert went back to her car and pulled off her jacket and pulled her shirt out and told COI Hendricks to bring it on. COI Colbert began to walk towards COI Hendricks. cusing COI Hendricks calling her Bitches and whores. I observed the female civilian in COI Colbert's car open the passenger door and get out and ope the back passenger door of COI Colbert's car. COI Colbert continued to walk toward COI Hendricks. COI Nelson was standing next to the passanger's side of COI Hendricks car. COI Hendricks then reached in the driver's side door a grabbed a pocket knife. COI's I then immediately grabbed the knife from COI Hendricks and dropped the knife back in the door, and pushed COI Hend...

back into her car. CoI Colbert stated you see that the bitch had to get a knife for me. CoI Hendrix had pulled out of the parking lot. CoI Nelson had immediately followed CoI Hendricks. After the incident I had ran to assist Lt. Tchernavia Blackmon who had fallen. After checking on Lt. Blackmon I departed the parking lot.

# PETETION FOR COI FELICIA HENDRICKS TO REMAIN WITH THE DEPARTMENT OF CORRECTIONS

1. _[signature]_
2. Katie Bailey LPN.
3. COI Calvin Banks
4. charles caldwell COI
5. Eric Richardson COI
6. _[signature]_ COI
7. Kevin Wallace COI
8. Lorraine Staves LPN
9. Frankie Brown COI
10. Dallas Duggin
11. _[signature]_
12. _[signature]_ COI
13. Latrika Henderson LPN
14. Daniel Rudolph, COII
15. Roosevelt Pettaway
16. _[signature]_ M. Britt, MHA-I
17. _[signature]_ COI
18. _[signature]_ COI
19. _[signature]_ COI

21. Alfreda Dulaney LPN
22. John F. Richardson COI
23. Gary Finch COI
24. Jerald Cannon COI
25. Lenard Cannon COI
26. Tommy _____ COI
27. _____ COI
28. Robin Young COI
29. B. Cleey, COI
30. _____
31. Ronald S. Gillim COI
32. Alhirda Boswell RN
33. Mary Jarrett
34. Clara Hall
35. Conya Jones
36. Leonard Moore
37. William Kot
38. Yusuf A. Hasan
39. Nathaniel Brooks
40. William Free
41. Antwine Turner
42. _____

44. _____
45. Mr. Augtry J. Barber
46. Carolyn Harris
47. _____
48. Sheryl Vaughn, GPS
49. _____
50. _____
51. _____
52. _____
53. _____
54. _____
55. _____

INCL: 6

**GRIVANCE/COMPLAINT FORM FOR STEP I**_____ **

PLEASE CIRCLE CAUSE OF COMPLAINT:

Race  Color  Sex  Religion  National Origin  Retaliation  Age  Disability
Other (specify) Information Clarification

DATE: February 17, 2005          NAME: Felicia Hendricks

SSN: 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                          CLASSIFICATION: Correctional Officer I

INSTITUTION: Kilby_____ Section/Shift: 2nd

SUPERVISOR'S NAME/POSITION: Tchernavia Blackmon, COSI/ Kenneth Cash, COII

DATE OF OCCURRENCE CAUSING THE COMPLAINT: February 10, 2005_____

NATURE OF COMPLAINT: On 2-10-05 at approximately 10:05 p.m., in the parking lot at Kilby Prison, Officer Felicia Hendricks was in discussion in Officer Latoya Nelson's vehicle on some money that was lost or disappeared. At approximately 10:14 p.m., I, Officer Hendricks was approached by Officer Lilkenya Colbert and a civilian who was driving her (Colbert) car which had left Kilby Institution and returned. Officer Colbert exited her (Colbert) car and approached Officer Nelson's car and starting making threathing remarks toward Officer Hendricks, who had left Officer Nelson's car for her (Hendricks) car persued by Officers Colbert, Nelson, and an unidentified female who was driving Officer Colbert's car. At approximately 10:15 p.m., Officer Hendricks felt/ threthened by the three individuals and took a small knife out of the driver door of Officer Hendricks' car to ward off the aggression of the three people mentioned above.

REMEDY SOUGHT: A thoroughly investigation of the events on 2-10-05, further information may be obtained from: Officers K. Penn, R. Pettaway, J. Craig, M. Anderson, M. Armstrong which will shed more light on this unusual occurance that may exonerate Officer Hendricks from the alleged allegations. Based on Administrative Regulation # 205, biding on shift institution and days off was elected for Kilby and Second Shift. Officer Hendricks wish to remain at Kilby based on being a single parent with two daughters and being established in the Montgomery area and having a trailer.

COPY OF STEP_____AND **              _Felicia Hendricks_ 2/17/05

DECISION ATTACHED                        EMPLOYEE SIGNATURE/DATE

DECISION AT STEP_____*

_____
_____
_____

                              SIGNATURE/TITLE/DATE

**ENTER APPROCIATE STEP NUMBER AND ATTACH COPY OF PREVIOUS STEP IF
PROCEEDING TO HIGHER STEP

ANNEX B

AR206 – February 22, 2000

FEB-28-2005 09:35 FROM:D.O.   I DIVISION 334-353-8922              92156606

## STATEMENT OF COI FELICIA HENDRICKS

This following will be a tape statement. This statement will be taken from a Ms. Felicia Hendricks. She'll be a correctional officer at Kilby Correctional Facility. This statement will be concerning the employee misconduct, which was said to have occurred at Kilby Correctional Facility parking lot on February 10, 2005, at 10:08 p.m.

**ED**   If you will, Ms. Felicia Hendricks, tell me exactly what you know about this case.

**FH**   Okay. On February the February the 10th, 2005, at approximately after 10 p.m. when I received my car from the front lobby, I went out to my car, I crunk my car up and I sat there and I waited on Ms. Ms. Latoya Nelson to come out. When Ms. Latoya Nelson, Nelson came out, I as she came to her car, I, Officer Hendricks, had asked Officer Nelson did you have anything that you wanted to say to me. And she said a lil smirk and said No. And I said are you sure? And she said yeah I'm sure. And I said why are you going around telling people I stole your money. She said you did steel my money. I said Ms. Nelson, I did not steal your money. I said I helped you that night tried to backtrack on what you did with your money and you sat there and you said that you was gonna call the bank and check with the bank and you was gonna find out what happened to your money and therefore. Anyway, when you got (inaudible) home, you supposed to had call me, but Ms. Nelson didn't call me. So from then when I had left, then come back the next day, it was more confrontation about that. Okay. When I had asked her about the money again and she said that I said you had my money. Okay and I told her I don't have her money. I told her that if anything that she want from me, she could ask me. Much as I have helped her.

**ED**   Okay, let's get to about what happened last night on the tenth.

**FH**   Okay. On the tenth of what happened, I was waiting on my car, waiting at my car for Ms. Nelson came. When Officer Nelson came to her car, uh I asked about the money and she said that I had her money and I told her no I didn't. Okay. From then on as we was talking, things got to escalating. We both was crying at each other and we was both holling. I had stepped to Ms. Nelson and I pushed her with my chest, no hand contact whatsoever.

**ED**   Why did you do that?

**FH**   Because I told her I mean that just I don't know, it just was in me. I just had. That was just in me.

DEFENDANT'S
EXHIBIT

9

ED    So you saying you stepped up to her and put your chest to her chest?

FH    Yes sir. I did

ED    Kinda bumped her in the chest?

FH    Yes sir. I did

ED    Did she have, did she go backwards?

FH    Yes sir. And then she stepped back forward to me.

ED    Okay. What happened after that?

FH    After that, then uh by that time, that's when everybody came out. Uh other officers had started coming and they was pulling me and Ms. Nelson apart and me and Ms. Nelson both was still crying, saying you know, still talking about the money and all this here. Then uh she told them to just leave her alone. That she wanted to talk to me. So me and her had got in her car and we was talking. When we got in her car and was talking, then uh officer Colbert had pulled up and had came to Ms. Nelson side of her window and she knocked on the window and she asked Ms. Nelson are you alright. And I told her yes, Ms. Nelson is fine. Which Ms. Nelson told her she said yeah. I'm alright. She said just leave me alone. I want to talk to Officer Hendricks. So me and her was talking. Okay Officer Colbert opened the door back up again and said well I'm not leaving. I'm not going nowhere. You my friend. And uh Ms. Nelson told her again. She said I'm alright. I said Ms. Colbert, I said Ms. Nelson alright. I said we talking. Then Ms. Colbert want to tell me talking about, Bitch we don't like you anyway. And you know things started escalating with me and Officer Colbert. So by that time, I had got out my car after I after I told Ms. Nelson I would meet her down the road. I got out the car and I walked over to my car. When I got to my car, then Officer Colbert was still running her mouth and I said some words back to her. We both passed words to each other and after that, then when I had to my car, she said that, I can't remember exactly what she said, but she said some more words. By that time, I had rushed down to my left side of my door, door panel and I had a knife, which I opened the knife and when she said uh Bitch, I'ma get you or whatever. And then I told her (inaudible) I said naw, I'ma get you. I said I want you anyway. Like that. And after that, then Officer Penn had grabbed my right hand, which the knife was in my right hand, he got the knife, and what he did with the knife, I don't know. And then after that, me, I got back in my car when Officer Penn had tried to push me back in my car twice. I finally got back in my car, then me and Ms. Nelson pulled out. I pulled out first, then Officer Nelson pulled out

behind me, and we left. We went down to the Pike Road post office and when we got down there, me and her was down there talking.

ED     You and who?

FH     Me and Officer Nelson.

ED     Okay

FH     Latoya Nelson

FH     When we got down there, it is no conflict or nothing like that with her, cause we had, we had solved everything right there where we was talking. And she said that she was sorry if she said anything, I told her that affected me because you lied on me. And she said that she was sorry and I told her I was sorry. And that was that.

ED     Why did you pull the knife on Officer Colbert?

FH     I don't know, because number one Officer Colbert had, she had another female friend with her and I've always been in situations to where I had been by myself, so I mean that was the only thing I thought at that time, that was the only thing I could think of.

ED     Okay. Where is that knife at right now?

FH     It's at home.

ED     Are you positive it's at home?

FH     I'm positive.

ED     Where's it at, at home?

FH     At home in my drawer.

ED     Is it not in your car at this time?

FH     No sir, it's not.

ED     Anything else you'd like to add to this statement?

FH     No more than I can tell Ms. Nelson, that I am sorry.

ED     Have you told the complete truth in this statement?

FH   Yes sir, I have.

ED   This will conclude the taped statement taken from Felicia Hendricks.
     Ending time of this statement will be 4:25 pm.

ED/ch





### State of Alabama
## Alabama Department of Corrections

301 South Ripley Street
P. O. Box 301501
Montgomery, AL 36130

Bob Riley
GOVERNOR

DONAL CAMPBELL
COMMISSIONER

March 4, 2005

Ms. Felicia S. Hendricks, CO I
Kilby Correctional Facility
Montgomery, AL 36057

Dear Ms. Hendricks:

On March 2, 2005 you appeared at a Pre-Dismissal Conference held by Warden Terrance McDonnell to answer the following charges against you:

1. Employees shall observe all laws, rules and regulations. (Administrative Regulation 207, Section V, Paragraph A7)

2. Employees shall uphold, with integrity, the public's trust involved in their positions. (Administrative Regulation 207, Section V, Paragraph A9)

3. Each employee's conduct shall, at all times, be consistent with the maintenance of proper security and welfare of the institution and of the inmates under his/her supervision. (Administrative Regulation 207, Section V, Paragraph B)

4. Employees shall not carry any weapons, tear gas, ammunition, or blackjack into the institution or on the grounds of any ADOC state property, except as authorized by the Warden/Division Director. (Administrative Regulation 207, Section V, Paragraph C11)

In determining the appropriate disciplinary action for violations of Administrative Regulation 207, I have also considered the following offenses under Administrative Regulation 208:

1. fighting, assault, physical violence and disruptive behavior. (Administrative Regulation 208, Section III, Group III Offenses, Paragraph A.3.b.(4)(a))

DEFENDANT'S EXHIBIT
10

Telephone (334) 353-3883          Fax (334) 353-3967

Page 2
Ms. Felicia S. Hendricks

2.    Conduct that is disgraceful, on or off the job, that does adversely affect employee's effectiveness on the job. (Administrative Regulation 208, Section III, Group III Offenses, Paragraph A.3.b.(4)(n))

3.    Possession or use of firearms, weapons, explosives, or other dangerous items, except on duty and in designated areas and as authorized in regulations and/or procedures. (Administrative Regulation 208, Section III, Group III Offenses, Paragraph A.3.b.(4)(s))

4.    Serious violations of other rules, procedures, laws, or reasonable conduct expectations.    (Administrative Regulation 208, Section III, Group III Offenses, Paragraph A.3.b.(4)(v))

On or about February 10, 2005 it was reported that a disturbance occurred in the parking lot of Kilby Correctional Facility that involved you and two (2) other officers.   Voices were heard screaming and cursing while another officer was attempting to restrain you.

An investigation on the above referenced incident revealed that you pulled a knife on one (1) of the officers in the Kilby parking lot.   You admitted to one (1) of the department's investigator that you did pull the knife on the officer and turned the knife in to him.   You further admitted that you bullied the officer by brushing up against her with your chest while pushing her backwards.   There were numerous witnesses to this incident regarding your involvement in pulling the knife and/or physical and verbal confrontation on two (2) officers.

A review of your overall work record reveals no active or previous disciplinary action.

Having reviewed the Warden's Notice of Intent to Recommend Dismissal and associated documents, your overall work record, and the defense you offered at the Pre-Dismissal Conference; I do hereby order your dismissal, for the good of the service, to be effective the close of business March 4, 2005.

I regret this action is necessary, but Alabama Department of Corrections' employees are expected to maintain reasonable standards of conduct.   Your failure to meet these standards cannot be condoned.

Page 3
Ms. Felicia S. Hendricks


If you think your dismissal is unwarranted, you may appeal the
dismissal to the State Personnel Department within ten (10) days
by filing an answer to the charges made against you.     Such
request should be forwarded to the State Personnel Department,
Personnel Director, Folsom Administrative Building, 300 Folsom
Administrative Building, Montgomery, Alabama 36130-4100.

                              Sincerely,


                              Donal Campbell
                              Commissioner

DC:ne

CC:  Mr. Tommy Flowers, State Personnel Director
     Warden Terrance McDonnell, Kilby Correctional Facility
     Mrs. Dora Jackson, Departmental Personnel Director



**STATE OF ALABAMA**

# DEPARTMENT OF CORRECTIONS

STATE OF ALABAMA

*Montgomery*, County

I.   OATH OF OFFICE   I, *Felicia S. Hendricks*
do solemnly swear (or affirm, as the case may be) that I will support
the Constitution of the United States and the Constitution of the State
of Alabama, so long as I remain a citizen thereof; that I will faith-
fully execute and discharge all the duties required of me as
*Correctional Officer I* (office you hold), and observe all
the rules and regulations prescribed for the government of convicts,
so far as concerns my office; and will, in no case ill treat or abuse
any convict under my charge or control, nor inflict upon him any other
or greater punishment than may be prescribed by said rules and regula-
tions, so help me God.

II.   CONTRABAND.   I understand that if I do not report each and every
incident of approach made to me for bringing in contraband that I will
place myself in violation of Title 14, Chapter 2, Code of Alabama,
and that the penalty for such violation, upon conviction, is a fine
of not less than $25.00 nor more than $500.00 and/or imprisonment or
sentence to hard labor for a term of not exceeding six months.

III.   CONSENT TO SEARCH.   I understand that an administrative condition
of employment with the Alabama Department of Corrections is that I
must submit to personal search whenever required by proper authority
and that the search may also be extended to a search of my personal
property and vehicle located on Department of Corrections-owned pro-
perty or state-owned property and hereby knowingly and willingly do
consent to these conditions.

IV.   COMPENSATORY TIME AGREEMENT.   I, the undersigned, accept as a con-
dition of employment that any overtime hours worked may be compensated
for through the use of compensatory time off in lieu of monetary pay-
ment.   I understand that such decisions will be consistent with
applicable laws and regulations and will govern only those employees
ruled eligible for overtime compensation.

*Felicia S. Hendricks*
Employee Signature

Sworn to and subscribed before me this 25th day of April, 2000.

*[signature]*
Notary Public

DEFENDANT'S
EXHIBIT
12

## Statement

On February 27, 2004, I Felicia Hendricks was assigned to West Ward.  I visually observed Sgt. Gus White pulled a pocketknife from his pocket and attempted to cut down inmate, Timothy Welch from West Ward Isolation cell #1 whom was attempting to commit suicide.



DEFENDANT'S
EXHIBIT
#14



A Memorandum of Understandings involving my employment at D.O.C. (See inclosures 1-11) for further information. All D.O.C. employees still remained with D.O.C. with no discrepancy.

1. Lt. Eddie Browning was arrested and charged with stalking and sexual harassments in an event that was highly televised. He was immediately transferred to Staton Correctional Facility.

2. Lt. Victor Napier had problems with his wife where as his wife came to the facility and picked him up. Lt Napier abandoned his post. He was the only supervisor on duty and left the facility unsupervised.

3. Sgt. John Crow assaulted his wife about a relationship with an inmate. Nothing was done.

4. Sgt. William Miller was involved in a relationship with COI Kenneth McMann's wife (Tracy McMann) while both were employed at the same institution. Which eventually led to a dispute and a transfer.

5. Sgt. Patricia Davis and COI Johnnie Dumas were both involved in a physical altercation that involved a weapon (radio) at the Montgomery Work Center. Both Davis and Dumas were involved in a love affair with Warden Jeffery Williams. Both Officers were transferred to other institutions.

6. COI Jimmy Glenn and COI Albert Potterfield were involved in a physical altercation where to a weapon (Knife) was used in the Receiving Unit at Kilby.

7. COI Jerry Redic and COI William Scott were involved in a physical / verbal altercation in the Segregation Unit and Kilby Correctional Facility.

8. COI Mary Holmes and COI Debra Caldwell were involved in an altercation at the Montgomery Work Center. COI Holmes was transferred to another institution after COI Caldwell threatened to assault COI Holmes with a weapon (hand-held-radio).

9. COI Willie Lawrence was involved in a physical altercation with his wife after his wife had an involvement with a fellow employee at the sheriff's department. The incident led to COI Lawrence getting a domestic violence charge.

10. COI Charles Caldwell received a Domestic Violence charge after assaulting his wife because of an affair that COI Caldwell was having with Nurse Katie Bailey a former employee at the D.O.C. No actions taken.



DEFENDANT'S EXHIBIT
/5

11. COI Bernard McClain was involved in an altercation with his girlfriend which led up to his arrest and charged with domestic violence.

I Felicia Hendricks was involved in a dismissal hearing by Kilby Correctional Facility/ D.O.C. which in my opinion was unfair and illegal due to my being involved in a first discrepancy with D.O.C.  See inclosures (1-11) and D.O.C. Administration Regulations #207, #208, and #220 for further clarification.

The incidents involving my dismissal in my opinion was prejudice and unfavorable due to two of my fellow officers and an unknown female later recognized as Selena Davis approaching me in an unfriendly manner which caused me to reach in the door of my car where I was standing and pick up a small pocket knife and made it visible to them to distract or detour them from approaching any further. At this time all actions were interrupted by other officers whom were observing this incident. Other Officers whom observed are Charles Fuller, Krammer Penn, Roosevelt Pettaway, Michael Armstrong, Jarvin Jarrett, Joey Craig, Michael Anderson, and Anthony Barber. See inclosures which does not include everyone who observed this incident.

I request copies of all statements in this incident that were favorable or unfavorable against me.