Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


FELICIA S. HENDRICKS,

     Plaintiff,

vs.             CASE NO. 2:05-CV-714-F

TERRANCE McDONNELL, et al.,

     Defendants.


\* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF TERRANCE G. McDONNELL,
taken pursuant to stipulation and agreement
before Sherry Mack, Court Reporter and
Commissioner for the State of Alabama at Large,
in the Legal Offices of The Department of
Corrections, 301 South Ripley Street, Criminal
Justice Building, Montgomery, Alabama, on
Tuesday, May 16, 2006, commencing at
approximately 1:36 p.m.

\* \* \* \* \* \* \* \* \* \* \*

DEFENDANT'S
EXHIBIT
B

DEPOSITION OF TERRANCE G. MCDONNELL                     May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

2 (Pages 2 to 5)

---

**Page 2**

```
 1            APPEARANCES
 2  FOR THE PLAINTIFF:
 3  Mr. Amardo Wesley Pitters
       Attorney at Law
 4  1145 South Perry Street
       Montgomery, Alabama 36104
 5
    FOR THE DEFENDANTS:
 6
    Mr. Greg Biggs
 7  Assistant Attorney General
       ALABAMA DEPARTMENT OF CORRECTIONS
 8  301 South Ripley Street
       Montgomery, Alabama 36104
 9
           * * * * * * * * * * *
10
         EXAMINATION INDEX
11
    TERRANCE G. McDONNELL
12    BY MR. PITTERS          4
      BY MR. BIGGS           99
13    BY MR. PITTERS        114
14        EXHIBIT INDEX
    DEFENDANTS' EXHIBIT NO.:
16  1  Notice of predismissal    49,50,55,56
         conference          83,99,101
17
    2  Administrative Reg 208      99
18
    3  Summary of predismissal    103
19     conference from McDonnell
       to Campbell
20
    4  Predismissal conference  103-106
21     memorandum
22  5  Grievance/complaint form  105,106,108
23  6  Administrative Reg 213  106,107,109
```

---

**Page 3**

```
 1  (DEFENDANTS' EXHIBITS CONTINUED:)
 2  7  Administrative Reg 206      108
 3  8  3/4/05 letter to Hendricks  109
         from Campbell
 4
    9  Grievance filed by          109
 5     Ms. Hendricks
 6  10 Criminal Code of Alabama    110
 7        * * * * * * * * * * *
 8        STIPULATIONS
 9     It is hereby stipulated and agreed by
10  and between counsel representing the parties that
11  the deposition of Terrance G. McDonnell is taken
12  pursuant to the Federal Rules of Civil Procedure
13  and that said deposition may be taken before
14  Sherry Mack, Court Reporter and Commissioner for
15  the State of Alabama at Large, without the
16  formality of a commission; that objections to
17  questions other than objections as to the form of
18  the questions need not be made at this time but
19  may be reserved for a ruling at such time as the
20  deposition may be offered in evidence or used for
21  any other purpose as provided for by the Federal
22  Rules of Civil Procedure.
23     It is further stipulated and agreed by
```

---

**Page 4**

```
 1  and between counsel representing the parties in
 2  this case that said deposition may be introduced
 3  at the trial of this case or used in any manner
 4  by either party hereto provided for by the
 5  Federal Rules of Civil Procedure.
 6        * * * * * * * * * *
 7      COURT REPORTER:  What about signature,
 8      Mr. Biggs?
 9      MR. BIGGS:  Yes, he'd like to read.
10      That's fine.
11      TERRANCE G. McDONNELL
12      The witness, having first been duly
13  sworn to speak the truth, the whole truth, and
14  nothing but the truth, testified as follows:
15         EXAMINATION
16  BY MR. PITTERS:
17  Q. All right.  Please state your name for the
18      record, sir.
19  A. Terrance G. McDonnell.  Spelling is
20      M-C-D-O-N-N-E-L-L.
21  Q. And did you say M-C-D-O --
22  A. -- O-N-N-E-L-L.
23  Q. And what does the G in McDonnell stand
```

---

**Page 5**

```
 1      for -- the G in -- the middle initial.
 2  A. Gregory.
 3  Q. Gregory.  What's your date of birth?
 4  A. 11/30/59.
 5  Q. What's your address?
 6  A. 11855 Wares Ferry Road.
 7  Q. 36117?
 8  A. Yes, sir.
 9      MR. PITTERS:  Let's go off the record.
10        (Off-the-record discussion)
11  Q. Date of birth, address.  Where are you
12      employed?
13  A. State of Alabama Department of Corrections.
14  Q. What do you do?
15  A. I'm the deputy commissioner for plans and
16      program.
17  Q. Deputy commissioner of what, now?
18  A. For plans and programs.
19  Q. Plans and programs.  In that capacity, what
20      are you supposed to do?  I mean, what's your
21      duties and responsibilities?  Tell me what
22      you do.
23  A. I supervise the Alabama Correctional
```

DEPOSITION OF TERRANCE G. MCDONNELL                May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

3 (Pages 6 to 9)

Page 6

1    Industries Program. There's a director of
2    that program. I'm his immediate supervisor.
3    I supervise the Research and Planning
4    Division, directly supervise the director of
5    the Research and Planning Division, supervise
6    the director of the Central Records Division,
7    supervise or oversee religious programming
8    for the State, and educational/vocational
9    training programs, and the victims
10   constituency officer.
11 Q. In all of what you just said, did I hear you
12   correctly that you supervise the director of
13   records?
14 A. Yes, that's one of the functions, et cetera.
15 Q. Now, tell me about the director of records.
16   What does the person who occupied that
17   capacity, what do they do?
18 A. She -- she oversees the Central Records
19   Divisions for the Department of Corrections,
20   maintaining all the records for -- inmate
21   records.
22 Q. Does that have anything to do with personnel
23   records?

Page 7

1 A. No.
2 Q. Who's in charge of personnel records?
3 A. The director -- personnel director for the
4   Department.
5 Q. Do you supervise that person?
6 A. No.
7 Q. Do you have any contact with the -- strike
8   that. So there is a director of personnel;
9   is that correct? For DOC?
10 A. Yes.
11 Q. Who is that person?
12 A. Dora Jackson.
13 Q. Is Ms. Jackson's office in the commissioner's
14   office?
15 A. No.
16 Q. Or do you know where her office is?
17 A. It's in this building.
18 Q. Is this building -- the commissioner's office
19   in this building?
20 A. Yes.
21 Q. And this building, for the record, is what
22   building?
23   MR. BIGGS: It's the Criminal Justice

Page 8

1    Center. It houses the Department
2    of Corrections, Department of
3    Public Safety, and Board of
4    Pardons and Paroles.
5 Q. Now, when did you begin to occupy this
6   position of deputy commissioner of plans and
7   programs?
8 A. Early March.
9 Q. Of what year?
10 A. Of this year.
11 Q. What did you do before that?
12 A. I was the warden at Kilby Correctional
13   Facility.
14 Q. How long had you been warden at Kilby
15   Correctional Facility?
16 A. About four and a half years.
17 Q. Now, you were present during the deposition
18   of the plaintiff in this case, Felicia
19   Hendricks; is that correct?
20 A. For probably the last hour or two of that
21   deposition.
22 Q. And for the time period that you were
23   present, would I be correct in representing

Page 9

1    for the record that you heard the testimony
2    that the witness gave?
3 A. For the time that I was present, yes.
4 Q. And you were privy to exhibits that were
5   offered during the course of the deposition
6   for the time that you were present?
7 A. I -- I -- I saw -- I saw some of the exhibits
8   that were -- that were being referred to.
9 Q. And for the time that you were present, with
10   respect to those exhibits, by and large,
11   there was testimony about an incident that
12   occurred at -- somewhere adjacent to Kilby on
13   some -- in the parking lot of Kilby? Do you
14   recall that?
15 A. Yes.
16 Q. And that incident occurred on or about
17   February 20 -- well, sorry.
18   (Brief pause)
19 Q. February 10th, 2005?
20 A. Yes.
21 Q. Do you recall an incident that occurred
22   involving Ms. Kendricks -- I mean,
23   Ms. Hendricks and other employees of Kilby?

DEPOSITION OF TERRANCE G. MCDONNELL                    May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

4 (Pages 10 to 13)

**Page 10**

1  A. Yes.
2  Q. Or other employees of DOC that work at Kilby?
3  A. Yes.
4  Q. Would that be a more accurate sentence?
5     They're employees. They're not employees of
6     Kilby. They're employees of DOC, but they
7     work at Kilby or they're assigned to Kilby;
8     is that correct?
9        MR. BIGGS: And I object to the form.
10          I mean, you said, all the
11          employees. I mean, it's just only
12          a few employees were out there.
13 Q. Well, for the record, an incident that
14    occurred in the parking lot at Kilby, on or
15    about February 10th, 2005, involving
16    Ms. Hendricks and other employees of DOC who
17    work at Kilby?
18 A. Yes.
19 Q. All right. And at all times material
20    thereto, you were the warden at Kilby; is
21    that correct?
22 A. Yes.
23 Q. And before -- and as warden, what were your

**Page 11**

1     duties and responsibilities?
2  A. There -- there were a myriad of
3     responsibilities. I -- I oversaw the -- the
4     operation of the facility.
5  Q. All right. And before you became warden in
6     the four and a half years that you were
7     warden, in what capacity -- or where were you
8     employed?
9  A. Previous to Kilby, I was the warden at
10    Tutwiler Prison for Women.
11 Q. So previous to Kilby, you were employed with
12    the State of Alabama, correct?
13 A. Yes.
14 Q. DOC, correct?
15 A. Yes.
16 Q. Assigned to Tutwiler facility?
17 A. Yes.
18 Q. As warden?
19 A. Yes.
20 Q. And how long were you a warden there?
21 A. About nine months.
22 Q. Before that, where were you employed?
23 A. Ventress.

**Page 12**

1  Q. And that would be Ventress Correctional
2     Facility?
3  A. Yes.
4  Q. Which is located down in Clayton, correct?
5  A. Yes.
6  Q. And how were you the warden there? Well,
7     strike that. Were you the warden there?
8  A. Yes.
9  Q. How long were you the warden there?
10 A. Three years or so.
11 Q. And when you say, or so, probably three
12    years, thereabout?
13 A. Yeah, probably three, three and a half years.
14 Q. And before that, where were you employed?
15 A. I was the warden at Frank Lee Youth Center.
16 Q. Franklin?
17 A. Frank Lee.
18 Q. Frank Lee, L-E-E?
19 A. L-E-E, yes, sir.
20 Q. And where's that located?
21 A. Deatsville, Alabama.
22 Q. And that's operated by the Alabama Department
23    of Corrections?

**Page 13**

1  A. Yes.
2  Q. How long were you -- strike that. What were
3     you at Frank Lee Youth Center?
4  A. I was the warden.
5  Q. How long were you there?
6  A. Six months.
7  Q. Where were you before that?
8  A. At Tutwiler.
9  Q. What capacity were you working at Tutwiler?
10 A. The Warden II, the assistant warden position.
11 Q. How long were you an assistant warden,
12    Warden II, at Tutwiler?
13 A. Six months.
14 Q. Where were you before that?
15 A. Ventress.
16 Q. What capacity?
17 A. Warden II, assistant warden.
18 Q. How long were you there?
19 A. Fifteen months, eighteen months, something
20    like that.
21 Q. Where were you before that, as far as
22    employment with DOC or if you were employed
23    with the ADOC?

DEPOSITION OF TERRANCE G. MCDONNELL                    May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

5 (Pages 14 to 17)

---

Page 14

1  A. I was at Kilby before that.
2  Q. In what capacity were you working at Kilby?
3  A. Captain -- captain and lieutenant at that
4     time.
5  Q. How long were you at Kilby in those
6     positions?
7  A. Between the two of them, ten years.
8  Q. All right. Now, how is the position at Kilby
9     as captain and lieutenant different from your
10    working as the warden, either warden or
11    warden assistant?
12 A. Captain is supervised by a Warden II, and the
13    Warden II is supervised by a Warden III.
14    Captain's job oversees the shift operations.
15    The Warden II's job oversees the captain and
16    then some other support functions at the
17    facility. The warden's job then encompasses
18    the -- the whole arena.
19 Q. What about lieutenant?
20 A. Lieutenants normally serve in the capacity of
21    a shift commander or a division commander
22    within the prison.
23 Q. Have you ever given a deposition before?

---

Page 15

1  A. I think so.
2  Q. What caused you to give a deposition before?
3  A. I believe the last time I gave one
4     was a -- an inmate lawsuit or another
5     employee action. I don't recall
6     specifically.
7  Q. But you weren't a party to the lawsuit as a
8     defendant or --
9  A. As a defendant.
10 Q. -- plaintiff, were you?
11 A. As a defendant.
12 Q. How many times have you been sued as a
13    defendant?
14 A. I don't have any idea.
15 Q. Well, you're a defendant in this case, aren't
16    you?
17 A. Yes.
18 Q. And we know the one that you gave the
19    deposition in. Other than those two, have
20    you been sued in any other litigation?
21 A. Yes.
22 Q. And what were the nature of those suits
23    that -- I mean, where you're named as a party

---

Page 16

1     defendant?
2  A. Employee dismissal actions and employee
3     actions of other natures, many times from
4     inmates over the years.
5  Q. Now, in employee actions, have you
6     been sued -- well, your testimony is you have
7     been sued with respect to dismissal of
8     employees, correct?
9  A. Yes.
10 Q. Have you been sued with respect with those
11    dismissals for discriminatory conduct?
12 A. I don't remember specifically what the
13    allegations were. I've been sued for
14    discriminatory conduct before, and I -- and I
15    don't remember specifically if it was related
16    to a dismissal.
17 Q. Has anyone ever sued you as a party
18    defendant of DOC alleging racial
19    discrimination?
20 A. Race discrimination?
21 Q. Yes, sir.
22 A. Yes.
23 Q. Do you recall who the plaintiffs were?

---

Page 17

1  A. Brenda Penn was one. Brenda Penn, P-E-N-N.
2     When I say that on Brenda, that might have
3     been age and gender. I don't know if that
4     was race or not. I don't recall
5     specifically.
6  Q. And apparently, there's been other claims of
7     discrimination. You mention age and
8     gender --
9  A. There's been others.
10 Q. Outside of race, correct?
11 A. Yes.
12 Q. All right. Have you been to trial in any of
13    those cases, or has any of those cases gone
14    past what we call summary judgment where you
15    actually either end up going to trial?
16 A. No, never been to trial. No.
17 Q. Have you settled any of those cases, or do
18    you know if any of those cases were settled?
19 A. None -- none were settled.
20 Q. All right. Have you ever been arrested
21    before?
22 A. No.
23 Q. Have you ever been subjected to any kind of

DEPOSITION OF TERRANCE G. MCDONNELL                                    May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

6 (Pages 18 to 21)

Page 18

1    disciplinary action during your years of
2    service with DOC?
3    A. No.
4    Q. How long have you been with the DOC?
5    A. Over 25 years.
6    Q. And of those 25 years, how many would you
7       attribute to Warden II, all the way up to
8       your present position as deputy? How many
9       years are we talking about?
10        MR. BIGGS: You want the total of how
11          many --
12   Q. No. I've got -- well, I know of ten between
13      captain and lieutenant, so that leaves me
14      with 15 years plus. Of those 15 years plus,
15      how many of them have you served as Warden II
16      up to your present deputy position?
17   A. Probably about 11.
18   Q. So you've been a Warden II and/or warden for
19      approximately 11 years; correct?
20   A. Yes.
21   Q. And as such, you -- I mean, as such, meaning
22      with respect to those 11-plus years or
23      roughly 11 years, you're familiar with the

Page 19

1    rules and regulations of the DOC?
2    A. Yes.
3    Q. As far as the operations of its correctional
4       facilities; correct?
5    A. Yes.
6    Q. All right. Do you read the regulations?
7    A. Do I read the regulations?
8    Q. Yes, sir.
9    A. Yes.
10   Q. Did you consult the regulations with respect
11      to the facts and circumstances surrounding
12      Ms. Hendricks and the February 10th, 2005,
13      incident?
14   A. Yes.
15   Q. What's your understanding of the progressive
16      discipline that DOC uses or used with respect
17      to employee discipline?
18        MR. BIGGS: Object to the form. What
19          kind of -- I think you have to
20          narrow the scope of what
21          particular incident you need him
22          to describe and how that relates
23          to the different processes

Page 20

1       contained in that administrative
2       regulation.
3       MR. PITTERS: I don't think I have to
4          do that, Counsel. I mean, I'm
5          asking him -- I'm not asking him
6          about any specific instances. I'm
7          asking him --
8       MR. BIGGS: Just a generic question?
9       MR. PITTERS: What is -- exactly. What
10         is his understanding -- well,
11         strike that.
12   Q. Let me ask you this. Do you have any
13      knowledge -- and if you don't, you can tell
14      me if you don't. Do you have any knowledge
15      whatsoever that the DOC's employee discipline
16      policy is premised on one of progressive
17      discipline?
18   A. Yes.
19   Q. And what's your understanding of progressive
20      discipline within the policies and
21      regulations of the DOC?
22   A. My understanding is that you take the
23      situation, conduct an investigation,

Page 21

1    determine the facts of the case, and then let
2    the facts of that case determine where in the
3    disciplinary process the employee should be
4    disciplined at. Minor offenses should be on
5    the lower end of the -- of the disciplinary
6    continuum. More serious offenses should be
7    on the higher end of the disciplinary
8    continuum. Offenses for repeated infractions
9    should progressively get worse, depending on
10   the details of the repeated infractions.
11   Q. Are you aware that the regulation or the
12      administrative regulation number 208, are you
13      familiar with that?
14   A. Yes, sir.
15   Q. And is it not true that that policy states
16      that employee disciplinary action will occur
17      within the principles of progressive
18      discipline which involves steps of
19      discipline?
20   A. I -- I didn't follow you through all of that.
21        MR. BIGGS: Do you need to see the reg?
22   Q. Is it not true --
23        THE WITNESS: Yes.

DEPOSITION OF TERRANCE G. MCDONNELL                    May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

Page 22

1    MR. PITTERS: That's fine. You can see
2        it if your lawyer wants you to
3        look at it. And I have it if you
4        need to see it. If you don't --
5        but I mean, if you want to see it,
6        you can look at it.
7    MR. BIGGS: Would you like to see it?
8    THE WITNESS: Yes.
9        (Brief pause)
10   THE WITNESS: Could you repeat that
11       question?
12   Q. Is it not true that under the Administration
13       Regulation 208, that it represents that
14       employee disciplinary action will occur
15       within the principles of progressive
16       discipline, which involves steps of
17       discipline to be used regarding employee's
18       conduct?
19       MR. BIGGS: Where are you reading from
20           there, Mr. Pitters, on 208? Are
21           you reading that from 208? I'm
22           trying to look it up.
23       MR. PITTERS: I'm not reading it

Page 23

1        verbatim.
2    MR. BIGGS: Are you paraphrasing?
3    MR. PITTERS: That's correct.
4    A. All right. What was the question, then?
5    Q. Is it not true that employee disciplinary
6        action under Regulation 208 with respect to
7        progressive discipline that employee
8        disciplinary action is to occur within the
9        principles of progressive discipline which
10       involves steps of discipline to be used
11       regarding employee behavior?
12       MR. BIGGS: Object to the form. Reg
13           speaks for itself. You may answer
14           if you can.
15   A. I -- I agree that's what the reg says.
16   Q. And with respect to steps of discipline, the
17       reg calls for -- enumerates offenses in
18       various groups, group three, group four,
19       group one, and group two, et cetera, correct?
20   A. Yes.
21   Q. And with respect to those offenses, the regs
22       require that among other things, that the
23       employee disciplinary record and personnel

Page 24

1        file with respect to prior disciplinary
2        actions be taken into consideration in meting
3        out future actions, correct?
4        MR. BIGGS: Object to the form. You
5            may answer if you can.
6    A. Yes.
7    Q. Now, it is true that under the DOC's policy
8        of progressive discipline that there is a
9        reason why y'all have progressive discipline
10       at the DOC, correct?
11       MR. BIGGS: Object to the form. Answer
12           if you can.
13   A. Yes, there's a reason.
14   Q. Do you know what the reason is why y'all have
15       progressive discipline at the DOC?
16   A. I think -- I think the reason for it is -- is
17       just -- it's consistent with the philosophy
18       of trying to dole out punishment that's
19       consistent with the violation.
20   Q. And progressive discipline as used by the DOC
21       does not necessarily involve termination or
22       dismissal -- dismissing employees on a first-
23       time infraction, correct?

Page 25

1        MR. BIGGS: Object to the form. Answer
2            if you can.
3    A. It does -- it does not necessarily require
4        dismissal for a first offense, but it allows
5        for dismissal as a first offense.
6    Q. Do you know what scenarios does y'all's
7        policy allow for dismissal on the first
8        offense?
9    A. There's -- there's numerous.
10   Q. Well, tell the Court about some of them, if
11       you know.
12   A. Allowing an -- knowingly allowing an inmate
13       to escape. They're listed in the regulation
14       there. Situations that Ms. Hendricks got
15       involved with would be a situation where you
16       could use force. Any group three or group
17       four offense is appropriate to recommend
18       dismissal for a first offense if the -- if
19       the circumstances surrounding that incident
20       warrant it.
21   Q. Now, take a look at page 7 of Regulation
22       Number 8.
23   A. Okay.

DEPOSITION OF TERRANCE G. MCDONNELL                    May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

8 (Pages 26 to 29)

Page 26

1  Q. Group four lists offenses that will result in
2     dismissal on the very first offense, correct?
3  A. It -- it lists offenses that will result in
4     dismissal on the first offense.
5  Q. And it has enumerated three offenses,
6     correct?
7  A. Yes.
8  Q. None of those three offenses involve
9     Ms. Hendricks, correct?
10 A. Correct.
11 Q. In fact, the offense that you -- strike
12    that. Strike that. Now, for what occurred
13    with Ms. Hendricks on February 10, 2005, at
14    that time, you're the warden, correct?
15 A. Yes.
16 Q. And when did you first find out or found out
17    about what happened or what had occurred?
18 A. I got a call at -- at my house about sometime
19    shortly after 10 o'clock on the night of the
20    10th.
21 Q. Okay. Who called you at home?
22 A. I don't recall.
23 Q. Now, with all due respect, Mr. McDonnell, did

Page 27

1     you -- you recommended Ms. Hendricks'
2     termination, correct?
3  A. Yes, I did.
4  Q. And you represented to the Court a short
5     while ago in your testimony that her -- what
6     had occurred was so serious of an infraction
7     that it falls within -- that it warranted
8     dismissal on the very first offense, correct?
9  A. Yes.
10 Q. And for the record, Ms. Hendricks had no
11    prior disciplinary action at -- during her
12    employment with DOC up to the night of this
13    occurrence on February 10, 2005, correct?
14 A. No.
15 Q. And no, meaning she did not, correct?
16 A. No, meaning that is incorrect. She has
17    had some previous disciplinary actions.
18    There were no current -- there were no active
19    disciplinary actions at the time this was
20    taken.
21 Q. Did you represent in any documentation that
22    she had not had any -- because I thought I
23    saw it in here.

Page 28

1        MR. PITTERS: Hold on. Strike all
2        that. Let me find it.
3        (Brief pause)
4  Q. Now, in the interest of -- we have marked
5     some exhibits before. And during
6     Ms. Hendricks' deposition, I tried to keep up
7     with what we marked in the interest of not
8     duplicating exhibits. And according to my
9     notes Defendants' Exhibit Number 10 is a
10    letter that was written, dated March 4th,
11    2005, to Ms. Hendricks from Donal or -- how
12    do you pronounce that; do you know?
13    Campbell?
14 A. Donal.
15 Q. Donal Campbell, Commissioner. Now, the
16    second page of that -- and I represent to you
17    that I'm showing you that letter. The
18    highlight is what I did, and the blue ink is
19    my notes, Defendants' Exhibit Number 10. If
20    you look at the second page, the third
21    paragraph, one, two, three, the third
22    paragraph that's not numbered. The first
23    three paragraphs are numbered two, three, and

Page 29

1     four. And then there are one, two, three,
2     four, five paragraphs that I've not
3     numbered. I'm going to direct your attention
4     to this third paragraph that's not numbered.
5     Could you read for the record what's
6     represented in that letter from the
7     commissioner to Ms. Hendricks, regarding his
8     acting on your recommendation that
9     Ms. Hendricks' employment be terminated as a
10    result of what occurred on February 10th,
11    2005?
12 A. Paragraph reads, A review of your overall
13    work record reveals no active or previous
14    disciplinary action.
15 Q. Thank you, sir. Does what you read a short
16    while ago accurately reflect what's contained
17    in this correspondence from Commissioner
18    Donal Campbell to Ms. Hendricks on or about
19    March 4th, 2005?
20 A. The paragraph that I just read?
21 Q. Yes, sir.
22 A. Yeah.
23 Q. All right. Now, on to group three. You did

DEPOSITION OF TERRANCE G. MCDONNELL                    May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

9 (Pages 30 to 33)

Page 30

1   concede, by the way, a short while ago that
2   what occurred with Ms. Hendricks is not
3   enumerated under group four of the offenses
4   warranting immediate dismissal, correct?
5  A. Requiring immediate dismissal, yes, sir.
6  Q. All right. So the three offenses that are
7   enumerated under group four of Regulation
8   208, what occurred with Ms. Hendricks is not
9   listed as one of those offenses, correct?
10  A. That's correct.
11  Q. Now, under group three, there is
12   representation from the letter -- in the
13   letter dated March 4, 2005, from the
14   commissioner to Ms. Hendricks, there's
15   enumerated under group three, parenthesis S,
16   and parenthesis A and parenthesis N, offenses
17   that characterize or otherwise describe what
18   occurred with Ms. Hendricks, correct?
19  A. Yes.
20  Q. And immediately following the -- there is
21   enumerated parenthesis from A through V,
22   there's a paragraph.
23  A. Say preceding it or --

Page 31

1  Q. Immediately following it.
2  A. Following it?
3  Q. Yes, sir. Could you read for the Court what
4   that paragraph says, sir?
5  A. On page 7, correct?
6  Q. That is correct.
7  A. Supervisors should use discretion in
8   recommending any actions noted in group
9   three. And suspension, demotion, dismissal
10   should be recommended only in cases where
11   previous disciplinary action has failed to
12   correct behavior or when the infraction is so
13   serious as to warrant suspension, demotion,
14   or dismissal for the first offense.
15   Progressive discipline should be followed in
16   applying disciplinary action.
17       Group three offenses shall remain active
18   for one year from the date of the corrective
19   action. An employee's work history, annual
20   evaluations, and -- and disciplinary actions
21   within the last 12 months should be
22   thoroughly reviewed before recommendations
23   are submitted.

Page 32

1  Q. Tell the Court what about or what of
2   Ms. Hendricks' -- strike that. Ms. Hendricks
3   was terminated, correct, for what occurred on
4   February 10, 2005; is that correct?
5  A. Yes.
6  Q. And she was terminated by Donal Campbell?
7  A. That's correct.
8  Q. And Donal Campbell's dismissal of the
9   plaintiff was as a direct result of a
10   recommendation that she made to him, correct?
11      MR. BIGGS: Object to form. You can
12          answer it if you can.
13  A. Yes.
14  Q. And but for your recommendation, Mr. Campbell
15   would not have terminated the plaintiff,
16   correct?
17      MR. BIGGS: Object to the form. Answer
18          if you can.
19  A. I don't -- I don't know what he'd have done
20   had I not given him a recommendation.
21  Q. But for -- he adopted your recommendation,
22   correct?
23  A. He concurred with it, yes, sir.

Page 33

1  Q. And tell the Court what of Ms. Hendricks'
2   work history did you use in making your
3   decision that what occurred on February 10th
4   was of such a serious nature that it
5   warranted immediate dismissal. What did you
6   factor in from her work history in coming to
7   that conclusion?
8  A. I don't know that I understand what you're
9   asking me.
10  Q. Well, if you look -- look at the paragraph
11   that you just read, sir.
12  A. All right.
13  Q. Is it not true that it says an employee's
14   work history, annual evaluations, and
15   disciplinary actions within the last 12
16   months should be thoroughly reviewed before
17   recommendations are submitted?
18  A. I did that.
19  Q. And did you read that? Did you see where I
20   read that?
21  A. Yes.
22  Q. Did I accurately read that?
23  A. I didn't follow it verbatim.

DEPOSITION OF TERRANCE G. MCDONNELL                        May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

10 (Pages 34 to 37)

---

Page 34

1  Q. Well, I want you to follow it verbatim
2     because, I mean --
3  A. I read it awhile ago, and I did what this
4     called for me to do.
5  Q. And I just asked you to tell the Court what
6     of her work history did you thoroughly
7     review?
8  A. I looked at her institutional file that we
9     keep on record there. I looked at the
10    incident report. I looked at the
11    recommendation -- or the findings of the
12    investigating officer. I talked to
13    Ms. Hendricks. I talked to other witnesses
14    that were there. That's included in that
15    institutional file, was any previous
16    disciplinary actions that were contained as a
17    matter of record. There was copies of her
18    last evaluations. I considered all of that
19    when I made that recommendation for
20    dismissal.
21 Q. All right. I understand what you testified
22    to. Okay? Listen to my question. I'm not
23    asking you about anything you factored in

---

Page 35

1     with respect to what occurred on February the
2     10th as far as witnesses and all that that
3     you looked at, okay, or statements that were
4     taken. What I'm asking you to do is tell the
5     Court what of her work history -- history
6     means, Mr. McDonnell, that you go back in
7     time and look at circumstances that occurred
8     over said period of time. What of her work
9     history, for the period of time that she
10    worked at the DOC, that you considered with
11    respect to Ms. Hendricks in submitting a
12    recommendation that she should be dismissed?
13        MR. BIGGS: Object to form. Asked and
14           answered. You can answer it if
15           you can.
16 A. And I did already answer that question.
17 Q. What within her work history? Tell the Court
18    specifically what actions or what occurrences
19    within her work history at the DOC that you
20    used in arriving at your decision that she
21    should be terminated.
22        MR. BIGGS: Object to form. Asked and
23           answered. Already answered it.

---

Page 36

1        You can answer it if you change
2        your -- answer it in any way you
3        can answer it, if you'd like to
4        answer it any other way.
5  A. I've already answered it.
6  Q. No, sir, you did not. You told me about the
7     incident and testimony -- the statements from
8     witnesses. I tell you what.
9  A. And I told you that I read the file, looked
10    through her institutional file.
11 Q. All right. You looked in her institutional
12    file. But tell the Court what you saw in her
13    institutional file with respect to work
14    history that warranted dismissal.
15        MR. BIGGS: Object to the form.
16        MR. PITTERS: Wait a minute, now.
17           Don't coach him.
18        MR. BIGGS: I think you're
19           mischaracterizing his answer. I
20           mean, I think you are. You
21           mischaracterize -- all he's trying
22           to do is say, I looked at the
23           file, I examined her evaluation.

---

Page 37

1        He's trying to answer your
2        question.
3        MR. PITTERS: I want him to tell me
4           what was in her file. I think I'm
5           entitled to know what he looked at
6           in the file. And if he's not
7           going to tell me --
8        MR. BIGGS: He just told you he looked
9           at the last evaluation.
10       MR. PITTERS: No. No.
11       MR. BIGGS: Is there anything else you
12          looked at in the file?
13 A. There was -- there were other disciplinary
14    actions. There were past evaluations and all
15    of that, but none of that weighed heavily in
16    the decision --
17 Q. Well, I'm not going --
18 A. -- of the dismissal.
19 Q. I'm not getting -- I'm not getting there yet.
20    I'm not going to ask you what weighed
21    heavily. I want to take them one by one in
22    this regulation that outlines employee's work
23    history, it outlines annual evaluations, and

DEPOSITION OF TERRANCE G. MCDONNELL
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

May 16, 2006

11 (Pages 38 to 41)

Page 38

1  it outlines disciplinary actions. I want to
2  take them one at a time. I want you to tell
3  me each one -- as I go over each one, to tell
4  me what about her work history that factored
5  into your decision that she should be -- that
6  based on what occurred on February the 10th,
7  she should be terminated.
8      MR. BIGGS: Well, he just answered
9      that. He said that's got nothing
10     to do with the factors of him
11     recommending her dismissal. You
12     know, if you ask him, What did you
13     review, that's a different
14     question. But you're trying to
15     say, What did you review in the
16     file that related to you
17     recommending her dismissal. And I
18     think he's trying to tell you that
19     he looked at it all, he evaluated
20     it all, but that had nothing to do
21     with the ultimate decision to
22     dismiss her. I think that's what
23     he's trying to say.

Page 39

1  Q. Wait a minute now. Do you adopt exactly what
2     your lawyer just said?
3  A. That's, I think, pretty close to what I've
4     already said.
5  Q. No, I don't want to hear no pretty close. I
6     want answers here. I'm here to get answers
7     to --
8      MR. BIGGS: All right. Well, ask the
9      question, and he can answer it.
10 Q. Your lawyer just said that your testimony is
11    that whatever was in her work history did not
12    factor into your decision to recommend to the
13    warden that she be terminated; is that true?
14 A. I considered the work history. I considered
15    the previous evaluations. I considered the
16    previous disciplinary actions. I based my
17    decision largely on the behavior that night.
18 Q. All right. What about her work history that
19    you considered? Tell the Court what of her
20    work history that you considered.
21 A. I don't know what you're talking about.
22    Contained in that institutional file is any
23    previous disciplinary actions and her

Page 40

1  evaluations. That's what I considered.
2  Q. Where is the institutional file?
3  A. Where is it?
4  Q. Yes, sir.
5  A. Kept in the payroll -- personnel assistant's
6     office.
7      MR. BIGGS: That's the personnel file.
8      Are you talking about the
9      personnel file?
10     THE WITNESS: Yes, institutional
11     personnel file.
12     MR. BIGGS: You got a copy of the
13     personnel file. Has all the
14     evaluations and all her
15     discipline, all the things in it.
16     MR. PITTERS: Did you produce that to
17     me?
18     MR. BIGGS: Yeah. That's the very
19     first thing I gave you. As a
20     matter of fact, I thought -- well,
21     you got it.
22     MR. PITTERS: I don't see where you
23     produced it to me. I see the

Page 41

1  initial disclosures. And you
2  enumerate them, but I don't see
3  where I --
4      MR. BIGGS: I thought it was part of
5      the initial disclosure that we
6      sent you.
7      MR. PITTERS: No, sir, I don't have any
8      of that. Don't have any of that.
9      Here's my entire file, and there
10     is nothing -- let's see.
11        (Brief pause)
12     MR. BIGGS: All I can say is I thought
13     I did, and I filed it. If you
14     didn't get it back on February
15     17th, or thereabout, 2006, then
16     you should have let me know,
17     because I -- if I represented to
18     the Court I sent it to you, I sent
19     it to you. And when you get that,
20     it's up to you to look over it and
21     make sure you got everything you
22     got. So I -- unless you prove
23     otherwise, I sent it. I mean, I

DEPOSITION OF TERRANCE G. MCDONNELL
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.                    May 16, 2006

12 (Pages 42 to 45)

---

Page 42

1     can't go back and remember exactly
2     what I did, but I usually don't
3     file stuff, giving notice that we
4     sent things and don't send them.
5     MR. PITTERS: So you're telling me,
6         Counsel, that all these documents
7         that you listed in here -- look at
8         the crease in the thing. You're
9         telling me -- this looks like,
10        what, 11-by-4, those envelopes?
11    MR. BIGGS: Mr. Pitters, I don't --
12    MR. PITTERS: You're telling me that
13        all these documents --
14    MR. BIGGS: I don't care if it has
15        folds in it or not.
16    MR. PITTERS: -- in one of these -- all
17        that came in? This looks rather
18        voluminous, and you're telling the
19        Court that all that was folded in
20        one little bitty envelope and was
21        sent to me, and this thing -- all
22        these documents?
23    MR. BIGGS: Counselor, I'm going to

---

Page 43

1     tell you, if you got that document
2     in February of 2006 and you didn't
3     get everything that was contained
4     in that document, it's up to you
5     to call me on the phone and say, I
6     didn't get that. But as far as
7     I'm concerned, we sent it to you.
8     That's all I can tell you. And
9     today is May 17th, 2006, and this
10    is the first time you've brought
11    up that you haven't received
12    things that we filed with the
13    Court that we sent you?
14    MR. PITTERS: You're telling me -- are
15        you saying you filed these
16        documents with the Court?
17    MR. BIGGS: No. I filed the notice.
18        You're not supposed to file the
19        discovery.
20    MR. PITTERS: Exactly. You're
21        saying -- you just said you filed
22        something. What did you file?
23    MR. BIGGS: I filed the actual notice,

---

Page 44

1     Defendants' initial disclosure.
2     We filed that with the Court.
3     You're not supposed to file the
4     attached documents that we send to
5     lawyers.
6     MR. PITTERS: You're not supposed to
7         file any notice with the Court.
8         In fact, I recall the Court
9         issuing an order saying not to
10        file anything with the Court.
11    MR. BIGGS: Okay. Well, I assumed that
12        we filed that notice. But I would
13        not -- I know I wouldn't file the
14        documents attached to that. But
15        you did get a copy of it.
16    MR. PITTERS: Well, I did not. And I
17        want a copy of --
18    MR. BIGGS: You've got it in your hands
19        right now.
20    MR. PITTERS: Okay. I got this. This
21        is not the document.
22    MR. BIGGS: I understand.
23    MR. PITTERS: The institutional file --

---

Page 45

1     MR. BIGGS: I understand what you're
2         claiming. You're claiming that
3         you didn't get the documents
4         associated with that notice. But
5         back in February when you got that
6         document, if you -- if you're
7         claiming that you didn't receive
8         the documents that it says that
9         you're supposed to receive, it's
10        up to you to say then, I didn't
11        get these documents.
12    MR. PITTERS: Are you going to provide
13        me with these documents? Are
14        these documents here in this
15        building? We can take a
16        ten-minute pause and get them.
17    MR. BIGGS: No, we're not. We're not
18        doing that.
19    MR. PITTERS: Well, I mean, I want him
20        to tell me --
21    MR. BIGGS: We can come back another
22        time, but I'm telling you --
23    MR. PITTERS: All right. We'll come

DEPOSITION OF TERRANCE G. MCDONNELL                                May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

13 (Pages 46 to 49)

Page 46

1    back another time.
2    MR. BIGGS: -- we sent you those
3    documents.
4    MR. PITTERS: We'll come back another
5    time. He's going to have to tell
6    me in those employee work history,
7    what he factored, what he used to
8    recommend that she be dismissed.
9    MR. BIGGS: Well, that --
10   MR. PITTERS: And as I sit here today,
11   he can't tell me.
12   MR. BIGGS: He -- well, I'm going to
13   object to that. He's been trying
14   to tell you. I don't know why
15   you're arguing with him.
16   MR. PITTERS: Let me sit down and
17   listen one more time. Maybe I
18   wasn't listening.
19 Q. Tell me what was in her employee work history
20   that you considered from reviewing her
21   initial -- her institutional file that she
22   should be fired instantaneously for what
23   occurred on October -- I mean, on February

Page 47

1    10th, 2005.
2    MR. BIGGS: Object to form. Asked and
3    answered. Answer if you can.
4 A. As I previously stated, I looked through the
5    file. I looked at the documentation that I
6    had as far as the incident, and that's what I
7    based my recommendation on.
8 Q. Tell me -- I'm sorry. Go ahead.
9 A. Gone through the entire file.
10 Q. What did you see in her employee -- entire
11   file that adversely reflected -- strike
12   that. For you to have recommended that she
13   be fired for the first offense, is it true
14   that you must have seen something adverse or
15   something that adversely reflected her
16   employment history with the State of Alabama
17   or the DOC?
18 A. In that file?
19 Q. Yes, sir.
20 A. No, sir, that would not be true. It wouldn't
21   be required that I found something in that
22   file.
23 Q. Well, did you see anything that adversely

Page 48

1    reflected on her competency to serve the
2    State of Alabama in the capacity that she was
3    in on February 10, 2005, when you reviewed
4    her employee work history?
5 A. No. I based my recommendation on the
6    behavior that night.
7 Q. All right. And I know you want to get
8    there. And your lawyer wants you to
9    anxiously get there and tell me what you
10   based the recommendation on. And trust me,
11   I'll get there.
12       But for the meantime, let's limit it as
13   to the question I'm asking. Okay? And I
14   think I got an answer from you awhile ago,
15   and I'm going to move on. All right?
16       Similarly, did you see anything
17   adversely that reflected on her ability to
18   serve the State of Alabama when you reviewed
19   her annual evaluations?
20 A. No.
21 Q. Did you see anything that adversely reflected
22   on her fitness to continue to be employed by
23   the State of Alabama DOC when you looked at

Page 49

1    her previous disciplinary actions?
2 A. No.
3 Q. Okay. Which brings me to what y'all want to
4    tell me all this time, that the sole reason
5    that you based the decision to recommend her
6    termination was, according to your lawyer, on
7    what occurred that night; is that correct?
8    MR. BIGGS: Object to the form. Answer
9        it if you can.
10 A. My bases for bringing the dismissal action
11   are detailed in this exhibit. It spells it
12   out perfectly.
13 Q. And for the record, hand me this exhibit.
14   Let me look at it.
15   MR. BIGGS: I'll mark it because I'm
16        going to use it, if you want to
17        use it.
18   MR. PITTERS: You're going to mark
19        this?
20   MR. BIGGS: Yeah, I'll mark --
21   MR. PITTERS: Well, let's mark it
22        Defense #1 to his deposition.
23   MR. BIGGS: Sure. That's good.

DEPOSITION OF TERRANCE G. MCDONNELL                    May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

14 (Pages 50 to 53)

Page 50

1       MR. PITTERS: Let's get off the record,
2           Ms. Mack.
3           (Off-the-record discussion)
4       MR. PITTERS: We're back on the record.
5   Q.  I'm going to show you what we have marked as
6       Defendants' Exhibit #1 to your deposition,
7       Mr. McDonnell. And it is -- we believe --
8       your lawyer and myself believes -- I'm
9       looking for my exhibits to her deposition.
10      But we're almost certain -- we may be wrong,
11      but we're almost certain it's the same as
12      number six to the plaintiff's deposition that
13      we took awhile back, a few weeks ago.
14          You were just referencing that exhibit
15      as you having made your decision based on
16      quote, unquote, this -- this -- I think you
17      said this exhibit or this document. But
18      regardless if you said this exhibit or this
19      document, Defendants' Exhibit #1, according
20      to your testimony, is what you based your
21      decision on in recommending her termination;
22      is that correct?
23  A.  I didn't base my decision on this document.

Page 51

1       This document reflects -- it cites the
2       reasons I recommended her dismissal.
3   Q.  Okay. And tell the Court what are those
4       reasons?
5   A.  She violated Administrative Regulation 207,
6       standards of conduct, paragraph Roman numeral
7       II, policies: It's the policy of the ADOC
8       that all employees maintain the highest level
9       of behavior and efficiency, reflect the best
10      imagine of public service, and uphold with
11      integrity public confidence entrusted in
12      them.
13          She violated Roman numeral V.A.7,
14      Observe all -- all laws, rules, and
15      regulations. Number nine, uphold with
16      integrity the public's trust involved in
17      their positions. B, each employee's conduct
18      shall at all times be consistent with the
19      maintenance of proper security and welfare of
20      the institution. C, employees shall not,
21      number 11, carry any weapon on the grounds of
22      any ADOC state property except as authorized
23      by the warden or division director.

Page 52

1       And then I related those 207 violations
2       to the paragraphs and Administrative
3       Regulation 208, paragraph III.A.3.a.b. A,
4       fighting, assault, physical assault, or
5       disruptive behavior; N -- N, conduct that is
6       disgraceful on or off the job that does
7       adversely affect an employee's effectiveness
8       on the job; S, position or use -- possession
9       or use of weapons or other dangerous items
10      except on duty and in designated areas and as
11      authorized in regulations and/or procedures;
12      and V, serious violations of other rules,
13      procedures, laws, or reasonable conduct
14      expectations.
15  Q.  All right. When you used -- what, Regulation
16      207 you represented; is that correct?
17  A.  Yes.
18  Q.  Did you consult Regulation 208?
19  A.  I did.
20  Q.  And notwithstanding your prior testimony
21      about her work history, her annual
22      evaluations, and her disciplinary actions,
23      you still maintain that you consulted 208 in

Page 53

1       conjunction with 207, correct?
2   A.  Yeah.
3   Q.  Now, 208 -- Regulation 208 indicates that
4       suspension, demotion, or dismissal should be
5       recommended only in cases where previous
6       disciplinary action has failed to correct
7       behavior.
8           At the time that you make your decision,
9       did you -- you would agree with me that there
10      were no previous disciplinary or failure of
11      disciplinary action that was taken against
12      Ms. Hendricks pertaining to what had occurred
13      on February 10th, 2005, or any similar
14      conduct by her previously, correct?
15      MR. BIGGS: Object to form. Asked and
16          answered. You can answer if you
17          can.
18  A.  Well, the first part of your statement is --
19      is incomplete. The suspension, demotion,
20      dismissal should be recommended only in cases
21      where previous disciplinary actions fail to
22      correct behavior or when the infraction is so
23      serious as to warrant suspension, demotion,

DEPOSITION OF TERRANCE G. MCDONNELL                    May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

15 (Pages 54 to 57)

Page 54

1    or dismissal for the first offense.
2    Q. I understand that, but what I'm trying to
3       establish is --
4       MR. BIGGS: And I object to you cutting
5       him off. He's trying to answer
6       your question. And let him finish
7       his answer before you ask him a
8       question. You can answer.
9    Q. All right. Well, go ahead. Were you
10      finished?
11   A. No, I wasn't finished.
12   Q. Okay. Go ahead.
13   A. But I forgot the question part of your
14      thing. You made that statement, and then you
15      asked me a question. What was that
16      question?
17   Q. I was asking you is it true -- is it not true
18      that there were no prior or previous
19      disciplinary action that had failed to
20      correct any similar behavior by Ms. Hendricks
21      as had occurred on February 10th, 2005?
22      MR. BIGGS: Object to form. Asked and
23      answered. Answer it if you can.

Page 55

1    A. I didn't see any similar disciplinary actions
2       in her file.
3    Q. You didn't see any previous disciplinary
4       action in her file, did you?
5    A. Yes, I did.
6    Q. You didn't see where any previous
7       disciplinary action in her file had failed to
8       correct prior behavior, did you?
9    A. There was some progressive disciplinary
10      actions in her file, none of which lead to my
11      decision to recommend dismissal.
12   Q. In other words, you were -- you acted solely
13      on what follows the conjunction or that you
14      read a short while ago; that is, when the
15      infraction is so serious as to warrant
16      suspension, demotion, or dismissal for the
17      first offense, correct?
18   A. That's -- that's what I weighed it on, yes,
19      sir.
20   Q. All right. Now, this document, Exhibit #1 --
21      Defendants' Exhibit #1 to your deposition, is
22      dated February the 18th, 2005, correct?
23   A. Yes, sir.

Page 56

1    Q. And that's within eight days of what had
2       occurred, correct?
3    A. Yes, sir.
4    Q. Is it your contention that you had gathered
5       all information that was relevant to and
6       probative of your making a final
7       determination to recommend her dismissal to
8       the commissioner within those eight days?
9    A. Yes.
10   Q. Now, the document, Exhibit #1 -- Defendants'
11      Exhibit #1 to your deposition, is it fair and
12      accurate to say that document reflects the
13      nature of the offense or offenses that
14      Ms. Hendricks has committed -- had committed
15      that you determined warranted her immediate
16      dismissal?
17   A. Yes.
18   Q. All right. Now, you've been what, warden for
19      I, II -- Warden, Warden II for roughly 11
20      years, correct?
21   A. Yes, Warden II, Warden III.
22   Q. And you're under oath. You know that,
23      correct?

Page 57

1    A. Yes.
2    Q. Did the court reporter swear you in under
3       oath?
4    A. Yes.
5    Q. Do you know what it means to be under oath?
6    A. Yes.
7    Q. Have you ever heard about the word -- did you
8       know -- I've heard about and/or know the word
9       truth, don't you?
10   A. Yes.
11   Q. You understand that you've been placed under
12      oath, you're supposed to testify truthfully,
13      don't you?
14   A. Yes.
15   Q. And the 11 or so years that you've been in
16      the position of Warden II or I or in the
17      capacity of warden, are you familiar with
18      instances that have occurred substantially
19      similar to what occurred with Ms. Hendricks?
20      MR. BIGGS: Object to the form. You
21      asked him to draw a legal
22      conclusion about what's
23      substantially similar, which is a

DEPOSITION OF TERRANCE G. MCDONNELL
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

May 16, 2006

16 (Pages 58 to 61)

Page 58

1  legal term, legal phrase. He's
2  not an attorney. Answer if you
3  can.
4  A. I'm not -- I -- I don't know of anything. I
5  don't recall specifically anything
6  substantially the same as this incident.
7  Q. Who keeps documents or records pertaining to
8  what happened involving Ms. Hendricks on
9  February the 8th -- February 10th, 2005?
10 A. Who keeps what documents?
11 Q. The records pertaining to statements,
12 investigations or the occurrences. Who is
13 the custodian of those records? Whatever
14 investigation was done, whatever statements
15 you received, whatever documents you
16 prepared, the letter from the commissioner
17 dated February -- March 4th, 2005, who can I
18 depose or have your lawyer contact to produce
19 me records pertaining to all that occurred --
20 all documents that were generated from what
21 occurred with Ms. Hendricks on February 10,
22 2005?
23 A. The part of this package that -- that

Page 59

1  involved her dismissal, any documents
2  associated with that would be maintained in
3  the warden's office at Kilby. Any
4  investigative records that Mr. Demus or any
5  other investigators that might have assisted
6  him with that investigation would be kept in
7  their office. Of course, the commissioner
8  would keep copies of whatever documents he
9  might have generated or the personnel
10 division.
11 Q. And so anything that occurred of a similar
12 nature as occurred with Ms. Hendricks -- for
13 example, any fights, anyone pulling guns,
14 anyone pulling weapons or using weapons with
15 respect to disputes with employees or
16 inmates, those occurrences are of a serious
17 nature as far as you're concerned, correct?
18 A. Yes.
19 Q. And those occurrences would warrant drastic
20 actions as you took against Ms. Hendricks,
21 correct?
22    MR. BIGGS: Object to the form. Calls
23    for him to speculate. You can

Page 60

1  answer if you can.
2  A. Well, each -- each time an incidence occurs,
3  you look at the circumstances. And you're
4  going to tailor your -- your punishment to
5  the details that you -- that you uncover.
6  Your investigation is going to dictate to you
7  what type of disciplinary actions you go
8  forward with.
9  Q. As you sit here today, are you telling
10 Judge -- I think Watkins -- that if someone
11 use a weapon as allegedly Ms. Hendricks did,
12 Ms. Hendricks would be fired; but then you'd
13 look at the facts and circumstances for those
14 other persons and don't fire them? Is that
15 what you're telling this Court?
16    MR. BIGGS: Object to form. That's not
17    what he's saying.
18 A. Well, no. If they did very similar work
19 Ms. Hendricks did, they would be dismissed
20 just as Ms. Hendricks was. What I'm telling
21 you, you listed a series of different things
22 that could come up. I would take each
23 incident as it comes up, conduct an

Page 61

1  investigation, compare it to the regulations,
2  and make a decision based on that value.
3  Q. If an employee similar -- a similarly
4  situated employee -- if someone as
5  Ms. Hendricks is employed at DOC, used a
6  weapon or pulled a weapon in a dispute as
7  occurred between Ms. Hendricks and her
8  employee, would that employee be terminated?
9  A. Yes.
10 Q. And if that employee is not terminated, then
11 you would concede that your treatment and the
12 disciplinary action that you and the
13 Commissioner Campbell imposed on
14 Ms. Hendricks would be different from the
15 employee as I just illustrated, correct?
16    MR. BIGGS: Object to form. You can
17    answer it if you can.
18 A. I didn't -- I didn't follow your question.
19 Repeat it for me.
20 Q. I think I asked you -- and the court reporter
21 will correct me if I'm wrong. If an employee
22 similarly situated to Ms. Hendricks used a
23 weapon in a dispute with another co-employee

DEPOSITION OF TERRANCE G. MCDONNELL
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

May 16, 2006

17 (Pages 62 to 65)

Page 62

1  of the DOC or used a weapon with respect to a
2  dispute with an inmate, that employee would
3  be terminated. And I think your response was
4  yes, correct?
5        MR. BIGGS: Object to form. That's not
6        what he said. That's not your
7        question.
8        MR. PITTERS: Well, I tell you what. I
9        won't even speculate. I mean,
10       she's here and that's her job.
11       I'm going to have her repeat --
12       read back the question to him as
13       he gave me an affirmative answer
14       yes. When he said yes, read the
15       question that he said yes to.
16           (The court reporter read the
17            pending question.)
18  Q. Did you hear the question?
19  A. I did.
20  Q. Did you hear your response?
21  A. Yes.
22  Q. Do you stand by that response?
23  A. Yes.

Page 63

1  Q. Now, if, as I said in that question awhile
2     ago, an employee pulls a weapon as allegedly
3     Ms. Hendricks did in a dispute with another
4     employee or if the employee pulls a weapon in
5     a dispute with an inmate and that employee is
6     not terminated, then you would agree with me
7     that that employee would have been treated
8     differently than how you treated
9     Ms. Hendricks, correct?
10       MR. BIGGS: Object to form.
11  A. They're -- they're not similar circumstances,
12     so there may be reasons for treating those
13     situations differently.
14  Q. Well, how are they not similar when they use
15     a weapon and use of a weapon calls for
16     disciplinary -- immediate termination?
17  A. There's appropriate times when you might use
18     a weapon, dealing with an inmate.
19  Q. What about an employee to an employee in a
20     situation that -- involving Ms. Hendricks?
21       MR. BIGGS: Object to form.
22  A. I've already answered that.
23  Q. And what's the answer?

Page 64

1  A. Yes, they're -- if they're the same
2     circumstances, then they're the same. But
3     you threw some different variables in the
4     question.
5  Q. And it's your testimony that there are
6     circumstances in which it would be
7     appropriate for an employee to pull a weapon
8     on an inmate?
9  A. Yes.
10  Q. Did y'all allow employees to bring weapons
11     into the facilities?
12  A. Not under normal circumstances.
13  Q. Therefore, under what circumstances would it
14     be appropriate for an employee to use -- pull
15     a weapon on an inmate and not be terminated?
16  A. Might be escorting to a hospital appointment,
17     escape attempt, assault.
18  Q. Now, let's stick to employees since we're --
19     with Ms. Hendricks, we're dealing with
20     employee/employee as opposed to
21     employee/inmates. Okay? All right. Where
22     an officer -- do you ever heard the name of
23     Officer Preston Herbert?

Page 65

1  A. Yes.
2  Q. How about Warden Sylvester Folks?
3  A. I know Mr. Folks.
4  Q. Now, let's start with those two. In 1991,
5     where can I find -- oh, strike that.
6        If in 1991 there was a fight between
7     Warden Sylvester Folks and Officer Preston
8     Herbert in the parking lot of Bullock
9     Correctional Facility, that incident should
10     have been -- there should've been an incident
11     report about that, correct?
12  A. Probably would be one.
13  Q. And where can I find that for Mr. Biggs to
14     produce it to me? Who would be the custodian
15     within the DOC that should have that incident
16     report?
17  A. The I&I Division.
18  Q. The what?
19  A. I&I Division.
20  Q. What does I&I stand for?
21  A. Inspection and Investigation Division.
22  Q. Inspection and Investigation?
23  A. Division.

DEPOSITION OF TERRANCE G. MCDONNELL                    May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

18 (Pages 66 to 69)

Page 66

1  Q. Now, in 1995, if -- ever heard of
2     lieutenant -- strike that. Strike that.
3         Preston Herbert, is he still employed at
4     DOC, to your knowledge?
5  A. I believe he is.
6  Q. What about Warden Sylvester Folks?
7  A. Yes, he is.
8  Q. All right. If in 1995 -- strike that.
9     Lieutenant Henry Perkins, do you know him?
10 A. Yes.
11 Q. Ever heard of him?
12 A. Yes.
13 Q. He's now a captain, according to my --
14 A. I think so.
15 Q. -- files. Okay. If in 1995, he and an
16    Officer Hamilton had a fight where he choked
17    Officer Hamilton, y'all should have an
18    incident report in that?
19 A. There should be an incident report or some
20    sort of documentation at the facility or at
21    the I&I Division. I'm not familiar with
22    either of those scenarios.
23 Q. Okay. In 1997, Lieutenant Perkins again,

Page 67

1     who's now captain, shot into a moving vehicle
2     and shot a free-world man that was with an
3     Officer Holmes. Do you know who Officer
4     Holmes is?
5  A. Never heard about that.
6  Q. Never heard about the incident or never heard
7     about Officer Holmes?
8  A. I don't know -- I don't know -- I know an
9     Officer Holmes, a female Officer Holmes. I
10    don't know of -- I've never heard of that
11    incident.
12 Q. But if Lieutenant Perkins, who's now Captain
13    Perkins, shot into a moving vehicle, and that
14    would be of an aggravated offense warranting
15    termination --
16        MR. BIGGS: Object to form.
17 Q. -- where Officer Holmes has an inmate or --
18    well, it's not an inmate; it's a free-world
19    man, a civilian in the vehicle.
20        MR. BIGGS: Object to form. Calls for
21        him to speculate. Answer if you
22        can.
23 A. What was the question?

Page 68

1  Q. If it is true that Officer -- I mean, Captain
2     Perkins shot into this moving vehicle and
3     shot at Officer Holmes and this other
4     gentleman in the vehicle back in -- I think
5     this is 1997 -- would that be something that
6     the DOC would be concerned about with respect
7     to its employees?
8         MR. BIGGS: Object to form. Answer it
9         if you can.
10 Q. Such that an investigation would be
11    warranted?
12        MR. BIGGS: Object to form. Answer it
13        if you can.
14 A. Well, it -- it would depend on if the -- if
15    the information was that it happened on state
16    property or while on duty. That could be a
17    variable in -- as far as how much
18    investigation is done.
19 Q. And so based on that--
20 A. If it's a --
21 Q. I'm sorry.
22 A. If it's a criminal matter and the police are
23    investigating it, then we would allow them to

Page 69

1     continue their investigation.
2  Q. At the conclusion of the investigation, y'all
3     would take some disciplinary action, I
4     presuppose?
5         MR. BIGGS: Objection to form.
6  Q. You can see --
7         MR. BIGGS: Objection to form. Calls
8         for him to speculate. Answer it
9         if you can.
10 A. I -- I mean, I'd just be speculating.
11 Q. All right. 1995 -- strike that. Ever heard
12    of an Officer Janet Sanders?
13 A. No.
14 Q. An Officer Franklin?
15 A. No.
16 Q. Bullock County Correctional Facility?
17 A. No.
18 Q. If something happens at Bullock County
19    Correctional Facility where in 1997 an
20    Officer Janet Sanders pulled a knife on
21    Officer Franklin and cut him in the upper
22    body area of the Bullock Correctional
23    Facility, that's on DOC property.

DEPOSITION OF TERRANCE G. MCDONNELL
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

May 16, 2006

19 (Pages 70 to 73)

---

**Page 70**

1    Presumably, there should be some written
2    documentation about that incident, correct?
3  A.  I would expect so.
4  Q.  And based on what I've described in that
5    particular incident, do you think that is
6    substantially similar to the nature of the
7    offense for which you warranted Ms. Hendricks'
8    termination?
9        MR. BIGGS:  Object to the form.  Calls
10           for legal conclusion, invading the
11           province of the judge.  Answer if
12           you can.
13  A.  I'd just be speculating.  I don't know any of
14    the details of that.
15  Q.  Well, let me ask you this.  Hypothetically
16    speaking, if it were true that an Officer
17    Janet Sanders pulled a knife on a fellow
18    officer, namely Officer Franklin, at the
19    Bullock County Correctional Facility and used
20    that knife to cut him in the upper body area,
21    would such a conduct warrant immediate
22    termination?
23        MR. BIGGS:  Object to form.  Answer if

---

**Page 71**

1    you can.
2  A.  I would recommend dismissal action if that
3    was the circumstances.
4  Q.  If in 1995 at the Bullock County Correctional
5    Facility, an Officer Janet Sanders pulled a
6    shotgun on a Sergeant R.V. Moore while on
7    duty on the outside of the facility, would
8    such an action, pulling a shotgun on a fellow
9    employee while on duty -- would such an
10    action warrant immediate dismissal?
11        MR. BIGGS:  Object to the form.  Answer
12           it if you can.
13  A.  I'd need more details, what were the
14    circumstances?  I'd --
15  Q.  If one officer pulls a shotgun on another
16    officer on duty, are you telling the Court
17    you need more information to give an opinion
18    as to whether or not the officer who pulled
19    the shotgun would be subject to termination?
20  A.  Yeah.  Given -- given that scenario, you
21    could have an officer on a tower and
22    somebody's approaching the tower and they put
23    a shotgun on them, halt, who -- who is that?

---

**Page 72**

1  Q.  Who could provide me with the information
2    pertaining to these incidents at the Bullock
3    County Correctional Facility as I have
4    enumerated to you so far?
5  A.  There would be an incident -- there should be
6    an incident report or other documentation
7    filed at the facility.  And normally, that
8    would be in the deputy warden or the warden's
9    office.  And the I&I Division would get a --
10    get the original copy of any incident report
11    that was generated for such incidents.
12        MR. BIGGS:  And for the record, these
13           are just speculation that these
14           things occurred.  I mean --
15        MR. PITTERS:  Well, I'll be sending --
16        MR. BIGGS:  We're not admitting or
17           stating that these things are for
18           factual, and your statement is
19           that they are.
20        MR. PITTERS:  I'm going to be sending
21           you a request for production of
22           documents for you to produce me
23           all these things.  Okay?

---

**Page 73**

1        MR. BIGGS:  If they exist, you can get
2           them.
3  Q.  You know about Sergeant John Crow?
4  A.  Yes.
5  Q.  Are you familiar with an altercation he had
6    with his wife regarding an alleged
7    relationship with an inmate?
8  A.  No.
9  Q.  Are you familiar with the Sergeant Patricia
10    Davis and CO-I Johnnie Dumas?
11  A.  I'm familiar with them.
12  Q.  Of the Montgomery Work Center?  Do you know
13    what the Montgomery Work Center is?
14  A.  I do.
15  Q.  And what's the relationship with Montgomery
16    Work Center and Kilby?
17  A.  They're -- Montgomery Work Center is located
18    on the grounds of Kilby Prison, but it is not
19    a part of Kilby Correctional Facility.  A
20    separate warden oversees the operation of
21    that facility.
22  Q.  While you were the warden at Kilby, did it
23    come to your attention about an altercation

DEPOSITION OF TERRANCE G. MCDONNELL                     May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

20 (Pages 74 to 77)

Page 74

1    involving Patricia Davis and CO-I Johnnie
2    Dumas where a physical altercation occurred
3    and a radio was used as an weapon?
4    A. I -- I don't remember a radio being involved
5        in that altercation. I remember --
6    Q. Do you remember the altercation?
7    A. -- there was an altercation, some pushing and
8        shoving.
9    Q. You don't recall any weapons being used?
10   A. No, I don't recall weapons being -- being
11       involved.
12   Q. Or a radio being used as a weapon?
13   A. I don't recall a radio being used as a
14       weapon.
15   Q. What actions did you take or did anyone at
16       the facility while you were there took with
17       respect to disciplinary --
18   A. I have no operational control over the
19       Montgomery Work Center. That is -- that is
20       overseen by a separate warden, and he handled
21       that matter.
22   Q. Okay. Jimmy Glenn, do you know Jimmy Glenn
23       is at Kilby?

Page 75

1    A. I know Jimmy Glenn.
2    Q. And Albert Potterfield?
3    A. Yes.
4    Q. Were you the warden there when -- let me ask
5        you this. Are you familiar with a physical
6        altercation between the two, meaning Jimmy
7        Glenn and Albert Potterfield wherein a weapon
8        was brought into play at the receiving unit
9        at Kilby?
10   A. No, I've -- I've never heard that.
11   Q. Never heard of that?
12   A. No.
13   Q. Have you heard of any altercation involving
14       Jimmy Glenn and Albert Potterfield at Kilby?
15   A. No. I don't recall a single thing. Both of
16       them guys are retired now, so we'd be going
17       back several years. But no, I don't recall
18       anything with them.
19   Q. If such an incident occurred or such
20       altercation occurred and a weapon was used or
21       brought into play, would that be sufficiently
22       similar to what occurred with Ms. Hendricks
23       warranting termination of either Mr. Glenn or

Page 76

1    Mr. Potterfield?
2        MR. BIGGS: Object to form. Calls for
3            legal conclusion. Invades the
4            province of the Court. Answer if
5            you can.
6    A. I'd just be speculating. I don't know any of
7        the details of this alleged incident. I knew
8        all of the details or felt like I knew all of
9        the details of the incident with
10       Ms. Hendricks and based a decision on that.
11   Q. Okay.
12           (Interruption and brief
13            recess)
14   Q. Now, with respect to these incidents that
15       have come to my attention that comparing to
16       the incident involving Ms. Hendricks,
17       Mr. McDonnell, let me establish this. If the
18       incidents occurred on state property -- and
19       y'all are contending the incident involving
20       Ms. Hendricks occurred on state property,
21       right?
22   A. Yes.
23   Q. And if these other incidents occurred on

Page 77

1    state property, then they would be subjected
2        to the -- the parties would be subjected to
3        the regulations of DOC or ADOC and its
4        disciplinary provisions, correct?
5        MR. BIGGS: Object to form. Calls for
6            speculation. Answer it if you
7            can.
8    A. Yeah, that would be appropriate.
9    Q. And there should be some paper trail or some
10       incident report or some documentation of what
11       investigatory action was taken by the
12       respective persons at the respective
13       facilities where these alleged incidents
14       occurred, correct?
15       MR. BIGGS: Objection to form. Answer
16           if you can.
17   A. There should be some documentation at the
18       facility.
19   Q. And your lawyer should be able to provide me
20       those documentations if I request them,
21       correct?
22       MR. BIGGS: Objection to form. He
23           doesn't know what the lawyer can

DEPOSITION OF TERRANCE G. MCDONNELL                    May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

21 (Pages 78 to 81)

Page 78

1           do.
2    A.  I would assume he could.
3    Q.  With diligent search by whoever he requests,
4         somebody should be able to produce some
5         documentation pertaining to that, correct?
6    A.  Yeah.  If they exist, yes.
7    Q.  And with respect to Patricia Davis and
8         Johnnie Dumas where you told me you're
9         familiar with -- you have some knowledge
10        about an altercation but not necessarily that
11        a radio was involved.  You were the warden at
12        Kilby when this incident occurred, correct?
13   A.  I was.
14   Q.  And the work center, the Montgomery Work
15        Center has it's only warden, correct?
16   A.  Yes.
17   Q.  Now, one of those individuals -- I'm not sure
18        if it's Dumas or Davis -- but one of those
19        individuals was transferred to your facility
20        from the work center?
21   A.  Correct.
22   Q.  Well, which one was it?  Do you recall?
23   A.  Ms. Dumas.

Page 79

1    Q.  Ms. Dumas.  And I may be wrong, but correct
2         me if I'm wrong.  Would it be -- I don't know
3         if the correct words are usual and
4         customary -- would it have been usual and
5         customary for the folks at the Montgomery
6         Work Center to apprise you of what happened
7         that warranted Ms. Dumas to be transferred to
8         your facility?
9    A.  That would be correct.
10   Q.  Were you apprised of what occurred?
11   A.  Yeah.  That's why I have that understanding
12        of -- I mean, I don't remember all the
13        details of it.  I don't remember there being
14        a radio involved in that.  But I was aware
15        that Ms. Dumas and Ms. Davis got into a
16        physical confrontation and that Ms. Davis --
17        Ms. Dumas was being sent to us to separate
18        those employees.
19   Q.  Now, when you said physical altercation, now,
20        in Ms. Hendricks' case, there was no physical
21        altercation was there?
22   A.  Yes, there was.
23   Q.  Tell us about that.

Page 80

1    A.  When Ms. Nelson got off of work, she was
2         approaching her car.  Ms. Hendricks was
3         sitting on the hood of Ms. Nelson's car.  And
4         at some point -- or leaned up against the
5         hood of Ms. Nelson's car -- and at some point
6         chest-bumped Ms. Nelson.
7    Q.  Now, the bumping of the chest in this
8         situation was less of an offensive nature
9         than what happened with Ms. Dumas and
10        Ms. Davis, was it?  There were --
11   A.  I don't -- I don't know.  I wasn't over
12        there.  I did not do an investigation of
13        that.  I accepted that employee from them.  I
14        did not get involved in what disciplinary
15        action or whatever -- any other action they
16        took over there at the work center.  I just
17        know that there was some contact.  Now,
18        whether it be incidental or there was some
19        allegation that she brushed up against her at
20        she was getting -- trying to cross paths with
21        her.  But you know, what that contact was,
22        how serious it was, how it compares to this,
23        I do not know.

Page 81

1    Q.  Would you agree with me that all the
2         facilities that collectively make up the
3         DOC's -- the DOC and housing of inmates are
4         governed by the same code of conduct,
5         regulations, policies, and disciplinary
6         actions; correct?
7    A.  Yes.
8    Q.  What's good for the goose is good for the
9         gander, so to speak, correct?
10            MR. BIGGS:  Object to the form.  Answer
11            if you understand what he's
12            asking.
13   A.  You know, I don't know what you're talking
14        about necessarily.
15   Q.  It's a uniform application of the regulations
16        uniformly, disciplinary policies, uniformly
17        applied to all facilities, correct?
18   A.  Should be.
19   Q.  And so where an incident occurs at Ventress
20        or Kilby or Limestone that involves the
21        allegations pertaining to what occurred with
22        Ms. Hendricks, wherever it occurs, the
23        discipline should be uniformly applied,

DEPOSITION OF TERRANCE G. MCDONNELL
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.                    May 16, 2006

22 (Pages 82 to 85)

Page 82

1    correct?
2         MR. BIGGS: Object to the form. Answer
3    if you can.
4    A. I'd just be speculating, but I think any
5    other warden that had that happen on their
6    grounds probably would have done the same
7    thing I did.
8    Q. And if there --if other wardens have similar
9    situations involving weapons being used or
10   physical altercation with employees other
11   than Ms. Hendricks at their facility, then
12   the disciplinary -- the disciplinary action
13   imposed on those employees should be similar
14   to what is imposed on Ms. Hendricks, correct?
15        MR. BIGGS: Object to the form.
16   A. You know, again, I'm speculating, but you got
17   to -- you've got to take all the
18   circumstances each time an incident occurs.
19   And so if all -- if the same incident
20   happened at another facility, then the same
21   thing should have happened to her. She
22   should've been dismissed at that facility.
23   But if it's similar things, then you've got

Page 83

1    to look at the similarities and the
2    differences and weigh those issues out.
3    Q. Now, you're not Ms. Hendricks' employer,
4    correct?
5    A. Now?
6    Q. On or about February 10th of 2005.
7    A. She was employed by the Department of
8    Corrections, by the State of Alabama, Kilby
9    Correctional Facility. I was indirectly her
10   supervisor.
11   Q. All right. And all employees at the various
12   facilities, be it Kilby, Bullock County,
13   Limestone, Ventress, they may be at different
14   facilities, but they have the same employer,
15   correct?
16   A. Correct.
17   Q. Now, I think in the letter from the
18   commissioner dated March 4th of 2005, he
19   adopted what you set forth in Defendants'
20   Exhibit #1 regarding Regulation 208, Roman
21   numeral III, capital A --
22        MR. PITTERS: What's the opposite of
23        Roman numeral? Regular number 3?

Page 84

1         A, B, and warrants, 4, dismissal.
2         I don't know if you got all
3         that. Did you get all that?
4    Q. Conduct that is disgraceful on or off the job
5    that does adversely affect an employee's
6    effectiveness on their job. When you cited
7    that, what -- this incident involving
8    Ms. Hendricks occurred in the parking lot,
9    correct?
10   A. Yes.
11   Q. They're off the clock, correct?
12   A. They were.
13   Q. On the way home?
14   A. They would have been if they had got in the
15   car and drove away.
16   Q. Tell me what -- how does that affect her job
17   performance or effectiveness -- adversely
18   affect her effectiveness on the job?
19   A. Talking about the paragraph that says conduct
20   on or off the job that adversely affects --
21   Q. Yes. What did you find about what occurred
22   that adversely affect her performance in the
23   job?

Page 85

1    A. She was in a fight with another employee --
2    well, in fact, two other employees -- and at
3    some point during those altercations with
4    those employees, pulled a knife. I consider
5    that criminal activity. I think that affects
6    her ability to go back in that facility and
7    work with her coworkers, to work with
8    inmates.
9    Q. Now, you also indicate fighting, assault,
10   physical violence, or disruptive behavior. I
11   guess that's self-explanatory. But with
12   respect to other -- how do you differentiate
13   that between what's your prior testimony as
14   far as looking at circumstances involving
15   other employees such as what I told you about
16   Ms. Davis and Ms. Dumas? I mean, if it's
17   fighting, it's fighting, is it not?
18        MR. BIGGS: Object to form. Answer if
19        you can. I don't understand the
20        question.
21   A. Break the question down again for me.
22   Q. How do you distinguish between fighting,
23   assault, violence, or disruptive behavior as

DEPOSITION OF TERRANCE G. MCDONNELL
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

May 16, 2006

23 (Pages 86 to 89)

Page 86

1  far as what occurred with Ms. Hendricks
2  versus what occurred with, for example,
3  Ms. Dumas and Ms. Davis?
4       MR. BIGGS:  Objection to form.  Calls
5            for him to speculate about that
6            event which he has no personal
7            knowledge and asks him to draw a
8            conclusion.
9       MR. PITTERS:  And he did -- strike
10            that.
11  Q.  You did say you didn't know anything about
12     what happened, correct, with Davis and Dumas?
13  A.  I'm vaguely familiar with it.
14  Q.  All right.  I'll leave that one alone.
15       MR. BIGGS:  Still object to the form.
16  Q.  Let me switch gears real quick.
17       MR. PITTERS:  Time out.
18            (Brief pause)
19  Q.  What, if any -- in arriving at your decision,
20     did you -- the matter was brought to your
21     attention at ten o'clock the night that it
22     occurred.  And then what did you do after you
23     thought about what had occurred?

Page 87

1  A.  What did I do after being informed?
2  Q.  Yes, sir.
3  A.  I immediately went to the prison.
4  Q.  You went to the prison that same night?
5  A.  I did.  And the report I got said that there
6     was a fight in the parking lot and a knife
7     was pulled.  And I went to the prison that
8     night.  And at that point, all of the
9     employees that were there had left the
10     parking lot.
11       Lieutenant Blackmon was still there on
12     the scene, and I talked to her.  I don't know
13     if anybody else involved in the altercation
14     was there, but -- or anybody else there as a
15     witness.  I think Lieutenant Blackmon may
16     have been there by herself.  I'm not -- I'm
17     not certain.
18  Q.  So there was an Officer Colbert; is that
19     correct?
20  A.  Officer Colbert?  Yes.
21  Q.  Yes.  That's the person that she had the
22     altercation with, correct?
23  A.  That's one of the people, yes, sir.

Page 88

1  Q.  And the other one is who?
2  A.  Latoya Nelson.
3  Q.  So Officer Nelson and Officer Colbert.
4  A.  Correct.
5  Q.  Were they gone?  Had they already left?
6  A.  As I recall, yes, they were gone.
7  Q.  So too had Ms. Hendricks, correct?
8  A.  That's correct.
9  Q.  And what did you do after -- you spoke with
10     Lieutenant Blackmon, and what else did you
11     do?
12  A.  Lieutenant Blackmon told me what she knew
13     about the incident, essentially what she put
14     in that incident report.  But in that
15     Ms. Colbert had told her that she wanted to
16     file charges against Ms. Hendricks for
17     pulling a knife on her and that she would be
18     in my office first thing the next morning.
19  Q.  And was she there the first thing the next
20     morning?
21  A.  She did come in the next morning, yeah.
22  Q.  But she didn't come in the first thing the
23     next morning?

Page 89

1  A.  Correct.
2  Q.  When the next morning did Ms. Colbert come
3     in?
4  A.  Sometime 8, 9, ten o'clock.  I don't recall
5     specifically.
6  Q.  Did she --
7  A.  But early morning.
8  Q.  Did she come in because you called her in?
9  A.  No.  She came in as a result of -- of the
10     incident the night before.
11  Q.  She came in on her own volition, in other
12     words?
13  A.  Yes.
14  Q.  And then what did you do?
15  A.  She brought me a statement at that time and a
16     statement from a lady that had picked her up
17     from work that night.  I took the statements
18     from them, and then I think I had already
19     talked to the investigative division by that
20     point and just collected the statements.
21     Didn't do any interviews with the people.
22     Decided that I would turn it over to the I&I
23     Division for an investigation.

DEPOSITION OF TERRANCE G. MCDONNELL
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

May 16, 2006

24 (Pages 90 to 93)

---

Page 90

1　Q.　When did you make a determination that
2　　　Ms. Hendricks should be terminated?
3　A.　What do you mean, what day?
4　Q.　When after having first known about what
5　　　occurred did you make a decision that she
6　　　should be terminated?
7　A.　Sometime prior to the 17th, I drafted the
8　　　paperwork to have her dismissed.
9　Q.　Did you have all the requisite information
10　　　from the various parties at the time?
11　A.　Yeah, before I made the recommendation, I
12　　　did. Now, exactly what date that was, I
13　　　don't know.
14　Q.　Had you talked to Ms. Hendricks at all?
15　A.　I spoke to Ms. Hendricks. I don't remember
16　　　interviewing Ms. Hendricks. I think I asked
17　　　Ms. Hendricks to come in, or we got her as
18　　　she came to work, I think is -- is what
19　　　happened. And the investigator was there at
20　　　that point and allowed the investigator to
21　　　interview her.
22　Q.　Did you direct the investigator to launch an
23　　　investigation into what had occurred?

---

Page 91

1　A.　I sent a letter to the investigative division
2　　　asking that investigation be conducted into
3　　　the circumstances of the incident that
4　　　occurred.
5　Q.　When did you do that?
6　A.　That -- the morning of the 11th, I guess it
7　　　would have been, and made a phone call as
8　　　well.
9　Q.　All right. What, if any, disciplinary action
10　　　did you take against Ms. Colbert?
11　A.　None.
12　Q.　What about Ms. Nelson?
13　A.　None.
14　Q.　Was Ms. Hendricks the only person against
15　　　whom you took disciplinary action?
16　A.　Relating to that incident?
17　Q.　Yes, sir.
18　A.　Mr. Penn received a reprimand, but I think
19　　　the deputy warden issued that reprimand. I
20　　　think I was temporarily reassigned to another
21　　　facility.
22　Q.　Do you know why he was reprimanded?
23　A.　He wasn't truthful in his statement to us

---

Page 92

1　　　about the weapon Ms. Hendricks had.
2　Q.　All right. Did you ever see the knife that
3　　　allegedly was -- Ms. Hendricks allegedly
4　　　pulled that night?
5　A.　Did I ever see it?
6　Q.　Yes, sir.
7　A.　No, sir.
8　Q.　With respect to -- do y'all do what they call
9　　　shakedowns or random check of employees
10　　　coming into the facility reporting for work,
11　　　et cetera?
12　A.　I didn't hear that last word.
13　Q.　Do y'all do random check of employees
14　　　reporting to work at the facility?
15　A.　Yes, sir.
16　Q.　One of the purpose of that is to check for
17　　　weapons or contraband, correct?
18　A.　Yes.
19　Q.　And y'all do that randomly, you know,
20　　　spontaneous without notice, correct?
21　A.　Correct.
22　Q.　And it's a violation if you -- under the
23　　　regulations of the DOC, if employees are

---

Page 93

1　　　found in possession of weapons or contraband,
2　　　it's grounds for immediate termination,
3　　　correct?
4　A.　If they're found in possession of -- of stuff
5　　　that they're not authorized to have. If
6　　　they're found in possession of contraband,
7　　　yes, absolutely.
8　Q.　And one of those contraband is weapons,
9　　　correct?
10　A.　That's one of them.
11　Q.　Where can I find the records pertaining to
12　　　individuals who have -- strike that. Let me
13　　　ask you this. Do you know of any individual
14　　　who have been found in possession of weapons,
15　　　any kind of knife, guns, or any weapons of
16　　　the sort as a result of random shakedowns or
17　　　random searches who have -- who were not
18　　　terminated from the employment at the DOC?
19　A.　I don't recall specifically anybody
20　　　that -- but, now, there's a difference
21　　　between somebody having a pocketknife and not
22　　　being authorized to have the pocketknife
23　　　who -- that's a possibility, to have somebody

DEPOSITION OF TERRANCE G. MCDONNELL
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

May 16, 2006

25 (Pages 94 to 97)

Page 94

1  that got caught with a pocketknife on a
2  shakedown. And they'd be directed to take it
3  back to their car, and they may have
4  disciplinary action pending against them that
5  doesn't rise to the level of a dismissal
6  action.
7  Q. Tell the Court what's the difference.
8  A. What's the difference --
9  Q. Yes.
10      MR. BIGGS: Object to the form. What
11         do you mean what's the
12         difference?
13      MR. PITTERS: What's that?
14      MR. BIGGS: What's the difference?
15         What do you mean?
16      MR. PITTERS: He said there's a -- his
17         word -- he said there's a
18         difference between someone having
19         a pocketknife --
20  Q. Is that correct?
21  A. Yes, sir.
22  Q. And tell us again what your testimony was is
23     the difference between someone having a

Page 95

1  pocketknife and what?
2  A. In Ms. Hendricks' situation where she
3     presented that pocketknife with a threat to
4     do bodily harm to another individual.
5  Q. Have you -- all right. Y'all have shakedowns
6     of individuals or -- strike that. Where do
7     y'all keep the records of shakedowns from
8     employees wherein weapons have been found in
9     possessions of those employees?
10  A. They would be in the deputy warden
11     secretary's office, and a copy of the report
12     is filed with I&I Division, just like any
13     other incident report.
14  Q. So if I submitted a request to Mr. Biggs
15     requesting all records pertaining to
16     shakedowns at facilities of the DOC, he
17     should -- for the past ten years, he should
18     be able to provide me with those records from
19     all wardens or all facilities in the DOC,
20     correct?
21  A. Truckloads of them.
22  Q. I'm sorry?
23  A. Truckloads of them.

Page 96

1  Q. And if those truckloads reveal truckloads of
2     incidents where employees were found with
3     more than pocketknives, you know, weapons,
4     guns, big knives, is there any reason why any
5     of those employees should still be in the
6     employ of the DOC?
7      MR. BIGGS: Object to form.
8         Speculation.
9  Q. I mean, you're a commissioner. You can tell
10     me something like that, can't you?
11      MR. BIGGS: About ten years worth of
12         records? I object.
13  A. We do shakedowns literally every day.
14  Q. Yeah. And if y'all have records documenting
15     where y'all have busted employees with guns,
16     knives, not just pocketknives but big knives,
17     do -- I mean, should any of those employees
18     be still within the employ of the ADOC?
19  A. We've had employees that walk in with a
20     sidearm on. They're assigned. They're
21     authorized to carry a sidearm.
22  Q. What's that?
23  A. We've had employees walk into the facility

Page 97

1  with sidearms on, guns on. They're
2  authorized to carry a weapon. They forget to
3  take the weapon off and either place it in
4  their tower or place it in their vehicle.
5  And they inadvertently walk into the
6  facility. That wouldn't necessarily give
7  rise to a dismissal action. They might be
8  reprimanded in a case like that.
9  Q. But it's -- that would be a violation of
10  Regulation 208, group three, S, correct?
11  A. That would be correct. And the disciplinary
12  table runs from a -- a written reprimand
13  through a dismissal. And as I --
14  Q. Or --
15  A. -- suggested, you might receive a reprimand.
16  Q. Or when the infraction is so serious as to
17  warrant suspension, demotion, or dismissal
18  for the first offense, correct?
19  A. Right.
20  Q. And you do have firsthand knowledge of such
21  occurrences, correct?
22  A. Like that?
23  Q. Yes.

DEPOSITION OF TERRANCE G. MCDONNELL                          May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

26 (Pages 98 to 101)

Page 98

1　A.　Where an employee has inadvertently walked in
2　　　the facility with a sidearm?
3　Q.　Yes.
4　A.　Yes.
5　Q.　Do you have any firsthand knowledge of
6　　　incidents where the conduct was not
7　　　inadvertence?
8　A.　With an employee and the weapon?
9　Q.　Yes, sir.
10　A.　No. Not -- other -- other than like small
11　　　pocketknives and that type.
12　Q.　Yes, sir.
13　A.　I don't recall specifically any other
14　　　weapons, no.
15　　　　　　(Brief pause)
16　Q.　Okay. What about shakedowns where vehicles
17　　　of inmates are -- I mean, not inmates --
18　　　employees are randomly searched and weapons
19　　　found? That would be a violation of the
20　　　Regulation 208, correct?
21　A.　No, not necessarily. An employee that, under
22　　　the law, is authorized to carry a weapon in
23　　　their vehicle if they're -- if they're a law

Page 99

1　　　enforcement officer; or a hunting weapon or a
2　　　knife, they can have that in their possession
3　　　in their vehicle as long as it doesn't --
4　Q.　On the property?
5　A.　-- violate the law.
6　Q.　On state property while they're at work?
7　A.　Yes.
8　Q.　And your regulation doesn't prohibit that?
9　A.　No, sir. As long as it's locked in the
10　　　vehicle.
11　Q.　If that's okay, why would shakedown extend to
12　　　searching of inmates -- of employee's
13　　　vehicles?
14　A.　Drugs, other contraband items.
15　　　　　MR. PITTERS: That's all I have.
16　　　　　MR. BIGGS: I have just a few. Can I
17　　　　　have Exhibit #1 back? Thank you.
18　　　　　　EXAMINATION
19　BY MR. BIGGS:
20　Q.　Commissioner McDonnell, I show you what's
21　　　marked as Defendants' Exhibit #2. Is that a
22　　　true and accurate copy of Administrative
23　　　Regulation 208, dated July 26, 2000, that was

Page 100

1　　　in effect on or about February 10th, 2005?
2　A.　Yes.
3　Q.　And it outlines some of the testimony you
4　　　have given regarding progressive employment,
5　　　the procedures and progressive -- excuse
6　　　me -- progressive discipline and the
7　　　procedures used in progressive discipline as
8　　　well as grouping the offenses of disciplinary
9　　　actions?
10　A.　Yes, it does.
11　Q.　And on page 5, 6, and 7 of that
12　　　administrative reg is group three offenses
13　　　and lists all the offenses and consequences
14　　　of those offenses?
15　A.　Yes.
16　Q.　All right. And my understanding that on or
17　　　about February 18th, 2005, you had a
18　　　conference with Ms. Hendricks whereby you
19　　　gave her notice of a predismissal conference
20　　　that was scheduled for sometime in early
21　　　March; is that correct?
22　A.　I wouldn't term it a conference, but I did
23　　　have a meeting with her and served this

Page 101

1　　　notice of the predismissal conference.
2　Q.　So at a meeting with Felicia Hendricks, you
3　　　gave her notice of a predismissal
4　　　conference. That was in early March of 2005?
5　A.　Right, March the 2nd.
6　Q.　And at that meeting, you reviewed the results
7　　　of the investigation that had been conducted
8　　　by I&I regarding the incident of February
9　　　10th, 2005, with Ms. Hendricks?
10　A.　I reviewed the results of that?
11　Q.　Right. You informed her of those results?
12　A.　Yes.
13　Q.　And you outlined the results of the
14　　　investigation in that memorandum, which we've
15　　　marked as Defendants' Exhibit #1.
16　A.　That's correct.
17　Q.　And you also outlined the different
18　　　regulations, 207 and 208, that you thought
19　　　applied in this situation?
20　A.　That's correct.
21　Q.　And on the second page of Defendants' Exhibit
22　　　#1, you indicate a review of your file does
23　　　not indicate any active disciplinary action,

DEPOSITION OF TERRANCE G. MCDONNELL                                    May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

                                                        27 (Pages 102 to 105)

**Page 102**

1    correct?
2    A. That's correct.
3    Q. And then the last paragraph set out that the
4       predismissal conference was to be in your
5       office on March 2nd, 2005, at ten a.m.,
6       correct?
7    A. Correct.
8    Q. And giving her a copy of this, she signed
9       saying that she received it on February 18th,
10      2005; correct?
11   A. Correct.
12   Q. Now, on or about that day, do you recall
13      Ms. Hendricks giving you any type of
14      grievance on that particular day?
15   A. No, I don't recall getting any grievance on
16      that day.
17   Q. Now, did you have a predismissal conference
18      on March 2nd, 2005, as scheduled?
19   A. Yes, we did.
20   Q. And what happened at that March 2nd, 2005,
21      predismissal conference?
22   A. We had -- it's more or less an informal
23      meeting. We sat down, asked Ms. Hendricks

**Page 103**

1    for her side of the story. That document
2    reflects her -- her very brief statement, and
3    then lists all of the documents that she
4    presented to me at that time.
5    Q. I show you what's marked as Defendants'
6       Exhibit #3. What is that?
7    A. After the predismissal conference, you
8       normally write a letter, attach it to the
9       record of that predismissal conference with
10      the attachments attached to it, forward it to
11      the commissioner's office through the
12      personnel director, advising them of your
13      findings and what action you recommend based
14      on that predismissal conference.
15   Q. So is this a memorandum that you compiled
16      after the predismissal conference?
17   A. Yes.
18   Q. Defendants' Exhibit #4, what is that?
19   A. Defendants' Exhibit #4 is the record of the
20      predismissal conference.
21   Q. The first page, is this compiled by you as a
22      result of the predismissal conference?
23   A. It is, and that's the format that the

**Page 104**

1    regulation calls for.
2    Q. And I see at the bottom of the first page,
3       there's a signature, Felicia Hendricks 3/2 of
4       '05; is that correct?
5    A. That's correct.
6    Q. Did she receive a copy of this that you
7       recall?
8    A. Yes. Yes.
9    Q. And attached to this one page of Defendants'
10      Exhibit #4 are several documents. And I
11      notice on the second page there is a form.
12      And it's entitled, Grievance Form For Step
13      Three. What is this group of documents,
14      including the first page?
15   A. It's a -- it's a grievance that she submitted
16      as part of her response at this hearing.
17      Basically, it details her statement and some
18      other witness statements of -- of what
19      occurred and her witnesses heard.
20   Q. This is a collection of documents that was
21      compiled and given to you by Ms. Hendricks,
22      correct?
23   A. That's correct.

**Page 105**

1    Q. And the first page is entitled, Grievance.
2       Is this attempted grievance that was filed by
3       Ms. Hendricks on March 2nd, 2005, with you?
4    A. I assume so, or she presented it at that
5       hearing, yes.
6    Q. And there's a collection of other documents.
7       The last page of that collection of documents
8       is -- at the top of it, it has I-N-C-L,
9       colon, six. And it says, Grievance Complaint
10      Form For Step One. And it's signed Felicia
11      Hendricks, 2/17 of '05. Prior to March 2nd,
12      2005, had you received any copy of this
13      particular grievance form that was signed by
14      Felicia Hendricks on February 17th, 2005?
15   A. No, I received all of that package together
16      at that predismissal conference on March the
17      2nd.
18   Q. Okay. All right. And to make the record
19      clear, that would be -- Defendants' Exhibit
20      #5, is that a copy of that last page of
21      Defendants' Exhibit #4?
22   A. Yes.
23   Q. Okay. And this page, Defendants' Exhibit #5,

DEPOSITION OF TERRANCE G. MCDONNELL
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

May 16, 2006

28 (Pages 106 to 109)

Page 106

1    and the second page of Defendants' Exhibit #4
2    appear to be handwritten and typed,
3    Grievances Filed by Ms. Hendricks, correct?
4    Attempted grievances, correct?
5    A. Yes.
6    Q. And in those two -- well, let me ask you
7    this. Have you reviewed both of these?
8    A. I have.
9    Q. Did Ms. Hendricks complain in either
10   Defendants' Exhibit #5 or the second page of
11   Defendants' Exhibit #4 of being treated
12   unequally because she was a female?
13   A. No, I don't -- I don't remember that being in
14   that allegation.
15   Q. I'm going to show you what's marked as
16   Defendants' Exhibit #6. Defendants' Exhibit
17   #6 is a true and accurate copy of
18   Administrative Regulation 213, dated January
19   24th, 2005; is that not correct?
20   A. Yes.
21   Q. And this is the administrative regulation
22   dealing with grievances with the Alabama
23   Department of Corrections that was in effect

Page 107

1    on or about February 10th, 2005 and
2    thereafter, correct?
3    A. Correct.
4    Q. Have you reviewed -- are you aware of this
5    particular administrative regulation?
6    A. Yes.
7    Q. This is an administrative regulation that
8    provides a grievance process for employees;
9    is that not correct?
10   A. That's correct.
11   Q. On page 2 of Defendants' Exhibit #6, Roman
12   numeral V, B, you see that?
13   A. I do.
14   Q. Okay. That says that any complaints of
15   harassment or discrimination shall be made in
16   accordance with Administrative Regulation
17   206, harassment and discrimination policy; is
18   that not correct?
19   A. That's correct.
20   Q. Paragraph C says that employee grievances
21   shall be presented in writing on ADOC Form
22   213, employee grievance form, in accordance
23   with three-step process below. Do you see

Page 108

1    that?
2    A. I do.
3    Q. Step one, a grievance shall be presented in
4    writing on ADOC Form 213 within five working
5    days of the occurrence of the incident. Do
6    you see that?
7    A. I do.
8    Q. Now, the facts of this case occurred on or
9    about February 10th, 2005, correct?
10   A. That's correct.
11   Q. And Defendants' Exhibit #5, which you did not
12   receive, is a purported grievance; but it was
13   filed or dated February 17th, 2005. Is that
14   not correct?
15   A. That's correct.
16   Q. I show you Defendants' Exhibit #7.
17   Defendants' #7 is a true and accurate copy of
18   Administrative Regulation of Alabama State
19   Department of Corrections' harassment and
20   discrimination policy dated January 27th,
21   2004; is it not?
22   A. Yes, it is.
23   Q. And this particular Administrative Regular

Page 109

1    206 was in effect on or about February 10th,
2    2005, was it not?
3    A. Yes.
4    Q. And is this the particular administrative
5    regulation referred to in Defendants' Exhibit
6    #6, Roman numeral V, paragraph B?
7    A. Yes, it is.
8    Q. Defendants' Exhibit #8, is that a true and
9    accurate copy of the letter served on
10   Ms. Hendricks, dated March 4, 2005 from Donal
11   Campbell dismissing her?
12   A. Yes.
13   Q. I show you what's marked as Defendants'
14   Exhibit #9, which I represent to you is a
15   copy of a form filed as attachments to
16   Ms. Hendricks' initial complaint in this case
17   dated March 17th, 2005. Have you ever seen
18   that before?
19   A. I think I saw that well after she had been
20   dismissed.
21   Q. And that's my point. This document, if it's
22   dated March 17th, 2005, and it purports to be
23   a grievance, was filed after she was no

DEPOSITION OF TERRANCE G. MCDONNELL
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

May 16, 2006

29 (Pages 110 to 113)

Page 110

1    longer an employee, correct?
2  A.  Correct.
3  Q.  I show you what's marked as Defendants'
4    Exhibit #10.  Look at each page of that.  Did
5    you review that?
6  A.  Previous to now?
7  Q.  Just have you reviewed it or are you aware of
8    those particular pages?
9  A.  Yes.
10  Q.  The first two pages are pages out of the
11    Alabama State Criminal Code, correct?
12  A.  Yes.
13  Q.  You previously testified in examination by
14    Mr. Pitters that you considered a crime being
15    committed in the parking lot of February
16    10th, 2005, by Ms. Hendricks, did you not?
17  A.  Yes, I did.
18  Q.  Is this the crime that you're talking about?
19      MR. PITTERS:  Objection.  Leading.
20  A.  Yes.
21  Q.  And the two crimes in Defendants' Exhibit #10
22    are assault in the first degree and assault
23    in the second degree, correct?

Page 111

1  A.  Yes.
2  Q.  How did you consider these statutes in
3    relation to what went on in the packing lot
4    on February 10th, 2005?
5  A.  Well, I didn't -- I didn't go and pull the
6    code and look at the laws.  What I -- what I
7    considered was that the information, the
8    facts of the case were that Ms. Hendricks
9    pulled a knife, opened that pocketknife up,
10    threatened to do bodily harm to another
11    employee.  I considered that a criminal act.
12    I felt like I had an obligation to protect
13    other employees that work there.  They ought
14    to be able to get off work at the end of
15    their shift, go to their vehicles, and leave
16    state property without being confronted by
17    another employee and, certainly, without
18    being confronted with an armed -- by an armed
19    employee.
20  Q.  And a knife is a deadly weapon, correct?
21  A.  Yes.
22  Q.  Now, Mr. Pitters, in his questions -- strike
23    that.  He referred to the other officers on

Page 112

1    the scene that night on February 10th, 2005,
2    Lieutenant Blackmon, is she a female?
3  A.  She is.
4  Q.  Is she an African-American?
5  A.  Yes.
6  Q.  Corrections Officer Colbert, is she a female?
7  A.  She is.
8  Q.  Is she an African-American female?
9  A.  Yes, she is.
10  Q.  Corrections Officer Nelson, is she a female?
11  A.  Yes.
12  Q.  Is she an African-American female?
13  A.  Yes, sir.
14  Q.  Then Mr. Pitters asked on a number of
15    questions the allegation that Ms. Hendricks
16    had a knife in the parking lot on February
17    10th, 2005.  Were you present during her
18    deposition, Ms. Hendricks' deposition back on
19    April 26, 2006, in this building?
20  A.  Yes.
21  Q.  Were you present when Ms. Hendricks testified
22    on page 92 to the question, What did you do
23    wrong?  Answer, I did pull a pocketknife, but

Page 113

1    I did not open the pocketknife.
2      Were you present when she said that?
3  A.  I recall her saying that during the course of
4    that.
5  Q.  So without a doubt, Ms. Hendricks had a
6    pocketknife on February 10th, 2005, on the
7    grounds of the Alabama State Department of
8    Corrections, correct?
9  A.  She did.
10  Q.  She also testified on that page on the
11    question -- or an answer:  Because I was on
12    state property, it was wrong for me to be on
13    state property.
14      Do you recall her saying that?
15  A.  Yes.
16  Q.  So without a doubt, Ms. Hendricks had a knife
17    and it was wrong admittedly for her to be on
18    state property.  That's what she said,
19    correct?
20  A.  Yes.
21      MR. BIGGS:  That's all.  Thank you.
22
23

DEPOSITION OF TERRANCE G. MCDONNELL
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

May 16, 2006

30 (Pages 114 to 117)

Page 114

EXAMINATION

BY MR. PITTERS:

1         EXAMINATION
2  BY MR. PITTERS:
3  Q. You testified you have not seen the knife,
4     correct?
5  A. I have not.
6  Q. And until this day, you still haven't seen
7     the knife, correct?
8  A. That's correct.
9  Q. And if her testimony was it was a pocketknife
10    and your -- that is in accordance with your
11    prior testimony, then there's nothing wrong
12    with having a pocketknife on state property,
13    correct?
14      MR. BIGGS: Object to the form.
15 A. Simply having a pocketknife on state property
16    is not a violation.
17 Q. Okay. Now, Lieutenant Blackmon, did you talk
18    to her about what she knew when you got back
19    there?
20 A. I did.
21 Q. I think you told me that. And did she tell
22    you that she had mentioned to Sergeant Cash
23    that something was going to happen, let's go

Page 115

1     over there, meaning over where Ms. Hendricks
2     and Colbert and Nelson were? Did she tell
3     you that?
4  A. Yes.
5  Q. That she had a hunch that something was going
6     to happen?
7  A. Yes.
8  Q. Did you ever inquire from her or took her up
9     on the notion that if she has a supervisor
10    or -- and a lieutenant is ranked higher than
11    Ms. Hendricks and Colbert and Nelson,
12    correct?
13 A. Yes.
14 Q. Which takes me back to the question I was
15    asking initially, Did you take her to task --
16    her, meaning Ms. Blackmon -- as to if she
17    knew or had reason to know that something was
18    going to happen, why did she not take some
19    action before something actually happened?
20    Did you have any discussion of that sort with
21    her?
22 A. No. What her words, as I understood it at
23    that point, because she heard the fussing and

Page 116

1     all that in the parking lot, she made that
2     statement, We need to get over there,
3     something is fixing to happen.
4       Now, she did tell me she had been
5     hearing these rumors in the camp, that
6     Ms. Hendricks and Ms. Nelson were at odds due
7     to Nelson making allegations that
8     Ms. Hendricks stole a hundred dollars from
9     her.
10      Now, didn't question her about whether
11    or not she intervened in that. That was
12    something that happened off the job. It was
13    a personal issue. She -- she didn't
14    intervene in that.
15 Q. Now, with respect to the issue that Counselor
16    Biggs raised about the timing of this
17    grievance that Ms. Hendricks filed, isn't it
18    true that you issued a memo to Ms. Hendricks
19    and to the facility, others at the facility,
20    that, A, she was on a mandatory leave,
21    correct?
22 A. That's correct.
23 Q. And B, that she should not be allowed any

Page 117

1     access to the Kilby facility or the campus.
2  A. To the property. That's correct.
3  Q. So as far as her knowing what was going on
4     with respect to the pending investigation and
5     whatever actions you were taking, clearly,
6     she had no ability to file this grievance
7     until you had completed your investigation
8     and done your recommendation that she be
9     terminated, correct?
10      MR. BIGGS: Object to the form.
11 A. She could -- she could've filed a
12    grievance -- based on what's contained in
13    that grievance, she could filed the grievance
14    either -- either the complaint or the
15    grievance based on what she knew when she was
16    barred from the facility.
17 Q. Well, but it wouldn't have been prudent for
18    her to have filed a grievance not knowing
19    what kind of disciplinary action was going to
20    be imposed against her, correct?
21      MR. BIGGS: Objection to form. Trying
22      to get into the mind of
23      Ms. Hendricks what's prudent and

DEPOSITION OF TERRANCE G. MCDONNELL    May 16, 2006
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

31 (Pages 118 to 121)

Page 118

1          not prudent. Answer if you can.
2   A.  I -- I don't know what her rationale was with
3       the weight on the grievance.
4   Q.  Well, I mean, did you put Ms. Hendricks on
5       notice that she should file a grievance
6       within five working days of the occurrence of
7       the incident? You didn't do that, did you?
8   A.  She's -- she's aware of the regulation. She
9       knows what the regulations say.
10  Q.  That's two different questions, though. The
11      question is not what she's aware of. The
12      question is, What did you do? And that is,
13      you did not instruct her to file a grievance
14      within five days of the occurrence of this
15      action, did you?
16  A.  I didn't instruct her to file a grievance at
17      all.
18  Q.  Exactly. In fact, the only thing you
19      instructed her to do was stay away from my
20      camp or my facility; you're on mandatory
21      leave, and stay away. That's all you
22      instructed her to do, correct?
23  A.  Until the point that I got the report back

Page 119

1       and called her out and served her notice of
2       the dismissal.
3   Q.  And that point was in excess of the five days
4       within which she could've filed a grievance,
5       correct?
6          MR. BIGGS: Object to the form.
7   A.  That's correct.
8   Q.  Your lawyer introduced an exhibit when we
9       were last here -- I was just looking at it a
10      while ago -- regarding infractions. And I
11      made a note of it. I think it's on
12      Regulation Number 207. Are you familiar with
13      Regulation 207?
14  A.  I am.
15         MR. BIGGS: That would be Defendants'
16             Exhibit 4 of Ms. Hendricks'
17             deposition.
18         MR. PITTERS: That's correct.
19  Q.  Tell the Court, when did you engage in
20      orientation with respect to Ms. Hendricks
21      pertaining to the Regulation 207?
22  A.  When did I orientate her to that?
23  Q.  Yes.

Page 120

1   A.  The shift commanders do that.
2   Q.  I'm sorry?
3   A.  The shift commanders do that.
4   Q.  Are they the same as the -- well, strike
5       that, please. The document that I'm looking
6       at, Reg 207 --
7   A.  Yes, sir.
8   Q.  -- dated May 11th, 2004, says that:
9       Warden/division director shall ensure that
10      all new DOC employees are thoroughly oriented
11      as to the contents of this regulation.
12  A.  Right.
13  Q.  Are the shift -- you say the shift
14      commanders, are they the same as division
15      directors?
16  A.  They're -- they're the one -- they're her
17      immediate supervisor. They're the ones that
18      do the annual evaluation and do her leave.
19         In addition, it's posted on the employee
20      bulletin board, so it's there for everybody
21      to see.
22         The initial orientation as that refers
23      to is done by the administrative lieutenant

Page 121

1       or the captain's office. And they sign all
2       of the regulations that are in effect then.
3       The ones that come out, then the shift
4       commander handles those.
5   Q.  Now, number 11 of Section C enumerates what
6       employees shall not do. Okay? And number 11
7       says: They shall not carry any weapon, tear
8       gas, ammunition, or blackjack into the
9       institution or on the grounds of any ADOC
10      state property except as authorized by the
11      warden/division director. Did I accurately
12      read that?
13  A.  Yes.
14  Q.  Does that include pocketknives?
15  A.  That would include pocketknives.
16  Q.  Does that include what you call the ones that
17      sit on the hip? What do you call those
18      things you -- I think you just --
19  A.  Sidearms.
20  Q.  Sidearm? Does that include sidearm?
21  A.  Yeah, except as -- except as they're
22      authorized.
23  Q.  And do you have any written authorization for

DEPOSITION OF TERRANCE G. MCDONNELL
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

May 16, 2006

32 (Pages 122 to 125)

Page 122

1 sidearms and any other weapons that --
2 A. For employees to carry?
3 Q. Yes, sir.
4 A. That are assigned weapons and all?
5 Q. Yeah.
6 A. There is an Administrative Regulation 307
7     that governs the use of those weapons.
8 Q. So there are written -- except as authorized
9     by the warden/division director, does that
10    imply Reg 307 that you're talking about?
11       MR. BIGGS: Object to the form.
12 Q. Or is that different? I'm trying to figure
13    out what does it mean, authorized by
14    warden/division directors?
15 A. I've got the authority to authorize an
16    employee to carry a weapon. In addition, 307
17    gives me parameters in which to authorize
18    weapons.
19 Q. Okay.
20 A. Who's allowed to carry what weapon, that type
21    of thing.
22 Q. And these written -- these authorizations
23    that you or the wardens are given parameters

Page 123

1 to allow, are these authorizations typically
2 in writing or are they verbal authorizations?
3 How do y'all typically exercise those
4 authorizations?
5 A. Well, some of it's by virtue of their
6    position. They're authorized certain weapons
7    because of the position they hold. So you
8    may not have a specific authorization to
9    carry a particular weapon. Others are
10   specific due to the special nature of a
11   weapon and that type of thing.
12 Q. With respect to the illustrations that I set
13   forth earlier involving employees from other
14   facilities, the Bullock County
15   Correctional --
16 A. Start again. I caught that leg cramp and
17   didn't hear a thing.
18 Q. I'm almost finished. I think I'm on the last
19   question. With respect to the illustrations
20   that I set forth earlier regarding employees
21   at Bullock County Correctional Facility,
22   Kilby or other correctional facilities within
23   the DOC, if there were authorizations for

Page 124

1 those individuals to have weapons, those
2 authorizations would be in the I&I files or
3 the warden office, correct? Are we
4 clarifying those authorizations?
5 A. I'm not -- I'm not familiar with the
6    incidents you're referring to. So I mean, if
7    you're just talking about in general terms,
8    an officer may be authorized to carry a
9    weapon because he's a transfer agent, because
10   he's a farm officer, because he's a dog
11   handler. As a warden, I'm assigned a weapon,
12   so you have people by virtue of their
13   position that are authorized to carry
14   weapons.
15 Q. And those individuals would not necessarily
16   have a written authorization, correct?
17 A. That's correct. They'd have a card that
18   authorizes them to carry certain calibers of
19   weapon but not necessarily a specific weapon.
20       MR. PITTERS: That's all I've got.
21       (The deposition concluded
22        at 4:22 p.m.)
23 * * * * * FURTHER DEPONENT SAITH NOT * * * * *

Page 125

1    REPORTER'S CERTIFICATE
2 STATE OF ALABAMA
3 MONTGOMERY COUNTY
4    I, Sherry L. Mack, Court Reporter and
5 Commissioner for the State of Alabama at Large,
6 hereby certify that on Tuesday, May 16, 2006, I
7 reported the deposition of TERRANCE G. McDONNELL,
8 who was first duly sworn or affirmed to speak the
9 truth in the matter of the foregoing cause, and
10 that pages 4 through 124 contain a true and
11 accurate transcription of the examination of said
12 witness by counsel for the parties set out
13 herein.
14    I further certify that I am neither of kin
15 nor of counsel to any of the parties to said
16 cause, nor in any manner interested in the
17 results thereof.
18    This 19th day of May, 2006.
19
20
21    SHERRY MACK, COURT REPORTER
      Commissioner For The State
22    of Alabama at Large
23    MY COMMISSION EXPIRES: 1/06/08

DEPOSITION OF TERRANCE G. MCDONNELL
FELICIA S. HENDRICKS v. TERRANCE MCDONNELL, ET AL.

May 16, 2006

33 (Page 126)

Page 126

1          SIGNATURE OF WITNESS
2      I, TERRANCE G. McDONNELL, hereby certify
3   that I have read the transcript of my deposition
4   consisting of pages 4 through 124, and except for
5   the corrections listed below, certify that it is
6   a true and correct transcription.
7
8      _____
       TERRANCE G. McDONNELL
9
10  SWORN TO AND SUBSCRIBED before me
    this _____ day of _____, 2006.
11
12  _____
    NOTARY PUBLIC
13
14      * * * * * * * * * * *
15  Page  Line  Correction and reason therefor
16
17
18
19
20
21
22
23

*State of Alabama*

# Alabama Department of Corrections

Kilby Correctional Facility
P.O.Box 150
Mt. Meigs, AL 36057

TERRANCE MCDONNELL
WARDEN III

334-215-6603
Fax-215-6606

February 18, 2005

**MEMORANDUM:**

**FROM:**    TERRANCE MCDONNELL, WARDEN

**TO:**    CO I FELICIA HENDRICKS

**SUBJECT:**    NOTICE OF PRE-DISMISSAL CONFERENCE

It was reported to me that on February 10, 2005, at approximately 10:06 PM Lt. Tchernavia Blackmon and Sgt. Kenneth Cash observed a disturbance in the Kilby parking lot involving you, CO I Latoya Nelson, and CO I Lilkenya Colbert. Voices were heard screaming and cursing while another officer was attempting to restrain you.

An investigation was conducted by Mr. Demus, I & I Investigator, which revealed the following:

You, CO I Hendricks, did admit to Mr. Demus that you did pull a knife on CO I Colbert, in the Kilby parking lot. You turned the knife into Mr. Demus on Monday, February 14, 2005, stating it was the knife you pulled on CO I Colbert on the night of 2-10-05. Also, you admitted to Investigator Demus that you bullied CO Nelson by brushing up against her with your chest while pushing her backwards (with your chest). Another officer had to restrain you from attacking/going after CO Colbert while you were struggling to get to CO Colbert. There were numerous witnesses to this incident in the parking lot regarding your involvement in pulling the knife and/or physical and verbal confrontation on CO Is Colbert and Latoya Nelson.

Your actions are in direct violation of Administrative Regulation 207: Standards of Conduct:

II. Policy: It is the policy of the ADOC that all employees maintain the highest level of behavior and efficiency, reflect the best image of public service, and uphold with integrity the public confidence entrusted in them.

V. A. 7. Observe all laws, rules and regulations.
9. Uphold, with integrity, the public's trust involved in their positions.
B. Each employee's conduct shall, at all times, be consistent with the maintenance of proper security and welfare of the institution ...



C. Employees shall not:
11.   Carry any weapon...on the grounds of any ADOC state property, except as authorized by the Warden/Division Director.

This type behavior can not be tolerated.  It creates a tremendous risk for the life and safety of other employees at this institution and to the orderly operations of Kilby.  Employees behaving in this manner can not work together to provide for a safe and secure work environment.  Due to the extreme seriousness of your infractions, the penalties for the above violations are reflected in AR 208:  III.A.3.a.b. and warrants (4)Dismissal.

(a)   Fighting, assault, physical violence or disruptive behavior.
(n)   Conduct that is disgraceful, on or off the job, that does adversely affect an employee's effectiveness on the job.
(s)   Possession or use of ...weapons... or other dangerous items, except on duty and in designated areas and as authorized in regulations and/or procedures.
(v)   Serious violations of other rules, procedures, laws, or reasonable conduct expectations.

A review of your file does not indicate any active disciplinary action.

In accordance with AR 208, I have scheduled a pre-dismissal conference in my office on _Wednesday, March 2, 2005, at 10:00 AM_.  This dismissal conference is for the purpose of allowing you to present information to me regarding the action under consideration; i.e., a chance for you to "tell your side of the story".   Our conference shall be informal.  You may present written statements of witnesses or any other information regarding these charges.  You may, at your own expense, have representation present at this conference, but only as an observer, not a participant.

You may voluntarily resign in lieu of dismissal.  However, it is highly probable that you will not be recommended for re-employment with the Department of Corrections.

cc:  file

_[signature]_ 2-18-05    9:13A

**Witness        Date        TIME**

_[signature]_ 2/18/05

Received                    Date



STATE OF ALABAMA

DEPARTMENT OF CORRECTIONS

Research, Monitoring, & Evaluation
Post Office Box 301501
Montgomery, Alabama 36130-1501

**Don Siegelman**
GOVERNOR

**Michael W. Haley**
COMMISSIONER

July 26, 2000

**ADMINISTRATIVE REGULATION**
**NUMBER**                    **208**

**OPR: PERSONNEL**

## POSITIVE (PROGRESSIVE) EMPLOYEE DISCIPLINE

### I.    POLICY

A.    All elements of the Department of Corrections shall implement this regulation for the administration of a positive, progressive employee discipline program in this department.

B.    Employee disciplinary action will occur within the principles of progressive discipline, which involves steps of discipline to be used to correct negative behavior or poor job performance.

C.    Offenses will be identified according to Groups with Group I denoting minor offenses, Group II denoting more severe offenses not resulting in an issue of significant consequences, Group III and Group IV denoting serious offenses resulting in significant consequences and Group IV which results in dismissal on the first offense.

### II.    GENERAL

A.    Progressive discipline is a form of positive discipline. It is a way for the supervisor to bring awareness to employees of their weaknesses in a job-related area. This allows an employee the opportunity to change the undesired behavior. The objective, then, of progressive discipline is a change in an employee's behavior toward the desired result.

B.    The word discipline is derived from a Latin word meaning "to teach". Therefore, the structure of DOC progressive discipline combines this teaching principle with certain basic steps. The basic steps involved in progressive discipline include:

1.    Inform employees of expectations. Supervisors must take reasonable actions to ensure that employees are informed of their responsibilities.

2.    When an employee is not meeting expectations/standards the supervisor at his/her discretion, in a positive, non-threatening manner, may inform the employee of


DEFENDANT'S
EXHIBIT
2

AR208-July 26, 2000

shortcomings, remind employee of expectations, and how to meet them or may by-pass this step and apply a group sanction.

3.  If the employee's behavior/work performance does not change/improve, the supervisor may decide that informal Supervisory Instruction (SI) is required, see Annex B. The supervisor should at that time inform the employee that continued substandard performance/behavior will result in the use of formal corrective action.

4.  If the substandard behavior/work performance continues, the supervisor must resort to formal discipline, beginning with a Warning, see Annex B. If an employee receives a Warning during an evaluation period, it must be noted on the employee's annual evaluation in the Work Habits Section and included in the Disciplinary Action Section. Warnings are not included in the disciplinary score on evaluations. Documentation should include the disciplinary step taken, the date of the action, and the reason/nature of unwanted behavior or performance.

5.  If the substandard performance continues to persist, the supervisor must move to the next appropriate level of progressive discipline. This is usually a Written Reprimand, see Annex C. Employees who receive a Written Reprimand during an evaluation period will have their annual evaluation score reduced by 7 points. A copy of the Written Reprimand must be forwarded to DOC Personnel along with the Annual Evaluation Form. A Warden/Division Head, or higher supervisor, in an employee's chain of supervision has the authority to impose a Written Reprimand. Employees should be advised that continued substandard performance will result in more severe disciplinary action.

6.  If the substandard performance continues, the supervisor must resort to suspension from duty without pay, see Annex E. Employees who receive a suspension during an evaluation period will have their annual evaluation score reduced by 17 points. A copy of the suspension letter should be forwarded to DOC Personnel along with the Annual Evaluation Form. Only the Commissioner through his original signature as the appointing authority is authorized to impose a suspension.

7.  Dismissal is the last step in progressive discipline. This step should be taken only when an employee has failed to correct performance/behavior using the previous disciplinary steps or when an employee violates a rule of such a nature as to require, dismissal, i.e. positive drug screen. It should be used when an employee either cannot or will not perform to meet job responsibilities. Recommendations for dismissal should be sent to DOC Personnel for review and will be forwarded to the Commissioner's office, see Annex I. Only the Commissioner through his original signature as the appointing authority is authorized to impose a dismissal.

8.  Supervisors should carefully review this regulation and become familiar with its contents in order to properly implement disciplinary action in a positive encouraging manner. Supervisory communication and discretion is essential in successfully executing this regulation. Employees should be educated regarding the steps involved in implementing a positive discipline program.

AR208-July 26, 2000

C.  Supervisors shall use the discipline system hand-in-hand with the performance appraisal system. These are the two most important management tools a supervisor possesses. Some supervisors try to use the appraisal system to discipline an employee. Their thought is that if an employee has an undesirable behavior, the best way to handle the situation is to threaten or actually give an employee a lower score on the performance appraisal. Appraisal is not the discipline tool. Performance appraisal is simply a mirror that should reflect what has occurred during the rating period. If discipline has occurred, behavior/performance warranting the corrective action must be documented on the appraisal form, and in some instances must be attached to the form. This would, obviously, lower the appraisal score, but only as a reflection of what has occurred during the preceding year. Positive discipline is the corrective tool to use when infractions occur in work habits or when a weakness exists in the performance of work responsibilities. A maximum of 17 points can be deducted for disciplinary actions per evaluation period.

D.  Guidelines for Corrective Actions:

1.  Set the example.

2.  Provide training when appropriate.

3.  Implement regulations consistently and objectively.

4.  Use progressive discipline when behavior/performance violates a rule, regulation, procedure, standard, etc.

5.  Eliminate the appearance of favoritism by fairly and equitably implementing rules and regulations.

6.  Misconduct should be thoroughly evaluated before corrective action is taken.

7.  Document employee's performance/behavior whether positive or negative in nature.

## III.  PROCEDURES

A.  Offenses.  Supervisors may use discretion in executing all disciplinary action. The severity of the offense and/or the number of offenses should determine the level/severity of disciplinary action in a stated period of time. The employee's work history, length of service and any disciplinary action within the past twelve months should be considered in determining the penalty. It is important for a supervisor to have adequate justification when a decision is made to offer a lesser or a more severe penalty. Offenses are grouped as follows.

1.  Group I

a.  Offenses of a minor nature that normally result in progressive disciplinary action.

b.    Corrective Action for Group I Offenses:

(1) Supervisory Instruction (SI) (Discretion)

(2) Warning (Will reflect on the employee's Performance Appraisal without a point penalty)

(a) Violations of safety rules which <u>do not</u> endanger life or property.

(b) Abuse or misuse of equipment, <u>not</u> causing damages.

(c) Conviction for a minor traffic offense while driving a State or public use vehicle.

(d) Unauthorized use of telephones, bulletin boards, or other State property.

(e) Participation in unauthorized activity of a minor nature at the work place and/or improper use of duty time.

(f) Deviation from policies, procedures, regulations, etc.

(g) Use of abusive or threatening language to other employees, inmates or the public.

(h) Failure to follow proper notification procedures when calling in, i.e., tardy, absences.

(i) Tardiness and unexcused absences. (See AR #220)

<u>Repeated abuse of any Group I offense may result in Group II corrective action.  Group I offenses shall remain active for one year from the date of corrective action.  An employee's work history, annual evaluations and any disciplinary action within the last twelve months should be evaluated in determining the penalty.</u>

2.    Group II

a.    Offenses that are more severe than Group I and not resulting in an issue of significant consequences.

b.    Corrective Action for Group II Offenses:

(1) Warning (Will reflect on the employee's Performance Appraisal without a point penalty)

(2) Written Reprimand (7 point deduction on employee's Performance Appraisal)

(a) Failure to perform job properly, <u>not resulting</u> in actual consequences.

AR208-July 26, 2000

(b) Failure to follow a supervisor's instructions; noncompliance with policies and procedures.

(c) Leaving assigned post and/or work station before the end of the shift/work day without permission from proper authority or proper relief and no serious consequences occur.

(d) Disagreeable behavior, including a lack of cooperation.

(e) Failure to immediately report to the proper authority (supervisor) the violation of any rule, practice, or policy that results in minor consequences.

(f) Violation of security regulations/procedures when the potential consequences are serious, but consequences do not actually occur.

(g) Inattention to the job.

(h) Taking into an institution any article, item, or property which is not specifically authorized by regulation, or without the approval of the Warden.

(i) Serious violations of other rules, procedures, laws, or reasonable conduct expectations.

(j) Tardiness and unexcused absences. (See AR # 220)

(k) Non-compliance with policies, procedures, regulations, etc.

Repeated abuse of any Group II Offense may result in Group III corrective action. Group II offenses shall remain active for one year from the date of corrective action. An employee's work history, annual evaluations and any disciplinary action within the last twelve months should be evaluated in determining the penalty.

3.     Group III

a.   Offenses that are serious and/or result in serious consequences.

b.   Corrective Action for Group III Offenses:

(1) Written Reprimand (7 point deduction on employee's Performance Appraisal)

(2) Suspension (5 to 15 days – 17 point deduction on employee's Performance Appraisal)

(3) Demotion

(4) Dismissal

(a) Fighting, assault, physical violence or disruptive behavior.

(b) Theft or unauthorized possession of DOC or another individual's property.

(c) Leaving assigned post and/or work station before the end of the shift/workday without permission from proper authority or proper relief, resulting in severe consequences.

(d) Tampering with a drug screen sample, or any similar action that may invalidate or falsify the test results.

(e) Sleeping or the appearance of sleeping on duty.

(f) Abuse or misuse of authority, including but not limited to departmental property and/or DOC identification cards/items.

(g) Harassment as defined in Administrative Regulation # 206.

(h) Discrimination in employment based upon race, religion, color, age, sex, national origin or disability. (See Administrative Regulation #206)

(i) Failure to immediately inform and provide a written report to the Commissioner, through COS II/Division Head or above, concerning any incident of arrest for any misdemeanor, DUI, or felony, except minor traffic violations, or when required to appear as a defendant in any criminal court.

(j) Abusive or excessive physical force in dealing with inmates.

(k) Refusal of a supervisor's instruction to remain on duty during a shortage of personnel situation and/or an emergency situation.

(l) Borrowing/receiving money, or other items from, or giving money/items to inmates or an inmate's family. Giving preferential treatment to an inmate(s), corresponding with an inmate, or an inmate's family, in any capacity that is not officially required and in the line of duty.

(m) Failure to report, or violation of safety/security rules that result in injury to persons, or significant damage to property.

(n) Conduct that is disgraceful, on or off the job, that does adversely affect an employee's effectiveness on the job.

(o) Refusal to submit to screening or under the influence of alcohol or other substances on the job which interferes with the discharge of assigned duties.

(p) Failure to meet and/or maintain APOSTC standards, when applicable.

(q) Gross negligence that allows an inmate(s) to escape.

(r) Refusal to submit to personal search, or search of personal property, or vehicle on institutional property, when required by proper authority.

(s) Possession or use of firearms, weapons, explosives, or other dangerous items, except on duty and in designated areas and as authorized in regulations and/or procedures.

(t) Lack of cooperation or refusal to give information or verbal/written statements in connection with employment, an investigation, or injury. Giving false information, altering an investigative or incident report, and/or intentionally omitting facts pertinent to the incident.

(u) Tardiness and unexcused absences. (See Administrative Regulation #220)

(v) Serious violations of other rules, procedures, laws, or reasonable conduct expectations.

Supervisors should use discretion in recommending any actions noted in Group III and suspension/demotion/dismissal should be recommended only in cases where previous disciplinary action has failed to correct behavior or when the infraction is so serious as to warrant suspension, demotion or dismissal for the first offense. Progressive discipline should be followed in applying disciplinary action. Group III offenses shall remain active for one year from the date of the corrective action. An employee's work history, annual evaluations and disciplinary actions within the last twelve months should be thoroughly reviewed before recommendations are submitted.

4.    Group IV

a.    Offenses that will result in Dismissal on the first offense.

(1) Possession of drugs or a positive drug screen.

(2) Deliberate breach of security resulting in escape, riot, etc.

(3) Conviction for a felony (Title 36, Section 36-21-46(a), <u>Code of Alabama, 1975</u>) that would disqualify an individual from employment in the classification in which employed or a conviction of a misdemeanor crime of domestic violence.

5.    Other Authorized Personnel Action(s)

a.     Job Abandonment

State Personnel Board Rule 670-x-19-.01(k) – consists of three (3) days of unexcused, unreported absence.

Procedure: An employee who abandons his/her job will not be allowed to return to work. The Warden/Division Head will send a letter, similar to Annex G, by certified mail (return receipt requested) to the employee. If no reply is received from the employee within seven (7) calendar days, the Warden/Division Head will notify the Department Personnel Director, who will prepare a Letter of Dismissal and forward it through channels for approval/signature by the Commissioner. The Warden/Division Head will forward substantiating documents to the DOC Personnel Director as soon as possible but no later than three (3) work days.

If a reply is received within seven (7) calendar days, the Warden/Division Head shall consider the information submitted and impose/recommend appropriate disciplinary action.

b.     Demotions

Demotions may occur with the approval of the appointing authority and State Personnel under the following circumstances. Wardens/Division Heads may recommend an employee be demoted after a thorough review of the employee's work history, annual evaluations and disciplinary actions.

(1) Employees may voluntarily request a demotion to a lower classification.

(2) Involuntary demotions may occur during a departmental layoff.

(3) The appointing authority may direct a demotion to a job classification more comparable to the employee's level of performance. In cases where demotions are directed, the appointing authority may use this action in lieu of dismissal or when its deemed necessary for the good of the Department.

c.     Action initiated

(1) A demotion action is initiated by a Warden/Division Head by preparing a written notice of the intent to recommend demotion (see sample letter – Annex H) to the employee. Concurrently, the Warden/Division Head will fax a copy of the letter to the Department's Personnel Director, who will schedule a hearing officer, and notify the Warden/Division Head of the time, date, and location by E-mail. The Warden/Division Head will inform the employee of this information by copy of E-mail.

(2) The written notice must state the charges in sufficient detail to permit the employee to prepare for the hearing.

    (a) A person designated under procedures approved by the Commissioner will conduct a hearing to receive information in support of and against the reasons for the demotion. This person will evaluate the information and make a recommendation to the Commissioner.

    (b) Employees may choose to be represented at their own expense, and may call witnesses who have direct knowledge of the actions/incidents upon which the charges are based. Employees may also present evidence during the hearing.

    (c) The employee may elect to waive a hearing (Annex I) and accept the action recommended by the Warden/Division Head, subject to approval by the Commissioner.

    (d) The Commissioner will consider the recommendation of the Warden/Division Head, information presented during the hearing and the findings of the hearing officer, as provided in the hearing officer's record of hearing, and approve the recommendation, approve lesser discipline, specify that no action is to be taken, or return the recommendation to the Warden/Division Head for another hearing. If the demotion stands, a copy will be sent to the State Personnel Department for final approval.

B.   <u>Corrective Action History</u>. Each Warden/Division Head will ensure that a Corrective Action History Record (Annex A) is maintained in the file of all employees who have received corrective action. This form is retained as one of the first items seen when opening the file. Supervisory personnel will review the Corrective Action History Record before deciding on the appropriate disciplinary action for any employee. Supervisors must remain alert to the advantages of progressive discipline and any developing trends (positive or negative) in the employee's behavior. Use the minimum action necessary to correct behavior and prevent recurrence of the infraction, within the published guidelines/schedules in this and other regulations.

C.   <u>Supervisory Instruction</u> is not disciplinary action. The immediate supervisor must record details regarding the incident/occurrence on DOC Form N008 (Annex B) and distribute as indicated on the form. This action will not be noted in the disciplinary action section on the employee's annual evaluation, nor under the work habits section.

D.   Warning

    1. The supervisor will conduct the warning in a private setting and without embarrassment to the employee. Another supervisor may attend as a witness, but **normally** a non-supervisory employee, or other person, should not attend.

    2. The supervisor will inform the employee of the specific offense and give the employee an opportunity to explain or respond.

AR208-July 26, 2000

3. The supervisor will record the basic facts of the discussion, reason for the Warning, and corrective action on DOC Form N008 (Annex B). This information will also be noted in the disciplinary action section on the employee's annual evaluation and under the work habits section.

4. Supervisors must inform the employees that they are imposing the first step of progressive discipline.

E. Written Reprimand

1. The Warden/Division Head will conduct the Reprimand in a private setting and without embarrassment to the employee. Another supervisor may attend as a witness, but normally a non-supervisory employee, or other person, should not attend.

2. The Warden/Division Head will inform the employee of the specific offense and give the employee an opportunity to explain or respond.

3. The Warden/Division Head will complete DOC Form N009 (Annex C to AR 208) to impose a Written Reprimand.

4. The Warden/Division Head will inform the employee that after receipt of the Written Reprimand the employee has five calendar days to submit a written reply/explanation.

5. After considering the employee's reply/explanation, the Warden/Division Head decides if the Written Reprimand will stand. The Warden/Division Head will inform the employee by indicating approval or denial on the employee's rebuttal statement. If the employee fails to submit a Written Rebuttal, within the allotted timeframe, the Written Reprimand will stand. The Warden/Division Head will forward a copy of all correspondence to the Department Personnel Director. If action is implemented, a copy of the Written Reprimand must accompany the employee's annual evaluation with a disciplinary score of 7 points deducted.

F. Suspension

1. Suspension is used only after warnings and reprimands have not been effective or when the gravity of the offense requires more stringent corrective action. A suspension puts an employee in an involuntary non-duty and non-pay status, and results in lost production to the Department, and a financial loss to the employee. During suspensions, an employee does not accrue annual leave, sick leave, longevity for retirement, law enforcement bonus, or service pins.

2. The maximum days an employee can be suspended is fifteen (15) days per infraction.

3. Prior to a suspension, a person designated under procedures approved by the Commissioner will conduct a hearing to receive information in support of and against the reasons for the suspension. The hearing shall be tape recorded. The

Warden/Division Head will retain the tape for two years for future reference. The hearing officer shall, within five work days, forward a record of hearing, similar to the example in Annex D, to the Department's Personnel Director, who will forward it to the Commissioner through the appropriate Deputy Commissioner.

4.   Action initiated.

  a.   A suspension action is initiated by a Warden/Division Head by preparing a written notice of the intent to recommend suspension (see sample letter – Annex E) to the employee. Concurrently, the Warden/Division Head will fax a copy of the letter to the Department Personnel Director, who will schedule a hearing officer, and notify the Warden/Division Head of the time, date, and location by E-mail. The Warden/Division Head will inform the employee of this information by copy of the E-mail.

  b.   The written notice must state the charges in sufficient detail to permit the employee to prepare for the hearing.

    (1) A person designated under procedures approved by the Commissioner will conduct a hearing to receive information in support of and against the reasons for the suspension. This person will evaluate the information and make a recommendation to the Commissioner.

    (2) Employees may choose to be represented at their own expense, and may call witnesses who have direct knowledge of the actions/incidents upon which the charges are based. Employees may also present evidence during the hearing.

    (3) The employee may elect to waive a hearing (Annex F) and accept the action recommended by the Warden/Division Head, subject to approval by the Commissioner. A suspension imposed through waiver, or otherwise, includes a stipulation that an employee will not be recommended for promotion until completion of one year of creditable service commencing after the period of suspension.

    (4) The Commissioner will consider the recommendation of the Warden/Division Head, information presented during the hearing and the findings of the hearing officer, as provided in the hearing officer's record of hearing, and approve the recommendation, approve lesser discipline, specify that no action is to be taken, or return the recommendation to the Warden/Division Head for another hearing. If the suspension stands, a copy of the suspension letter must accompany the employee's annual evaluation with a disciplinary score of 17 points deducted.

G.   Dismissal

  1.   In recent years, the U.S. Supreme Court has held that where the State provides full post-termination due process, a pre-termination hearing need not be elaborate. Adequate post-termination due process through a full, adversarial, post-termination evidentiary hearing is provided by the State Personnel Board.

2. The following procedures shall be followed with regard to the dismissal of an employee and the appropriate departmental official shall give the employee an advance written notice of his intent to recommend dismissal see Annex J. The written notice must:

    a. State the action proposed.

    b. State the charges in sufficient detail to enable employee to prepare a suitable response to be presented at the pre-dismissal conference.

    c. Specify which offenses were used in determining corrective action; also, specify which standards, policies, regulations or criteria were violated.

    d. State that a pre-dismissal conference will be held at least seven (7) days after employee's receipt of notice of intent to recommend dismissal. The purpose of this conference is to allow the employee to respond to the charges, explaining his/her side of alleged charges. Indicate that a reasonable extension may be granted if requested and justified by the employee.

    e. State that if dismissal is indicated, after the pre-dismissal conference, this recommendation will be made to the Commissioner.

    f. State that the employee may resign voluntarily in lieu of dismissal at any time prior to the pre-dismissal conference or during the conference, see Annex K.

3. At least seven (7) work days after delivery of notice of intent to recommend dismissal, the recommending official shall meet with the employee to hear the response/explanation. At the conclusion of the conference, a Pre-Dismissal Conference Form Memorandum (see Annex L) must be completed and signed by the employee and the person conducting the conference.

4. If, after the conference, the departmental official decides to continue the recommendation to dismiss, the official will forward the Notice of Intent to Recommend Dismissal and all supporting documentation, including Pre-Dismissal Conference Form Letter to the Department's Personnel Director. Documentation should include, but is not limited to, copies of SOPs and other directives violated (other than Administrative Regulations) statements, incident reports, and any other document(s) needed to support the charges. It should also include copies of all previous corrective actions.

5. If the departmental official determines that neither dismissal, suspension, nor demotion is indicated, the official may drop the action entirely or impose lesser discipline. If dropped, all correspondence referring to the action will be removed from employee's departmental and institutional personnel records file.

6. Where dismissal is recommended, the Commissioner may approve the dismissal, specify that no action is to be taken, or approve lesser discipline such as a

suspension in which case a hearing would be required.

7.  Employees may, at their own expense, have representation at the pre-dismissal conference, but only as an observer, not as a participant.

8.  The pre-dismissal conference outlined above is for the purpose of allowing employees to present information to the appropriate departmental official regarding disciplinary action under consideration; i.e., a chance for employees to "tell their side of the story." The discussion is informal. The employee is allowed to present written statements of witnesses or any other information with regard to the charges. With exception of representation, as specified above, attendance and participation by persons other than recommending officials and employee is at the discretion of the recommending official.

9.  Nothing in this regulation is intended to abrogate authority granted the Commissioner under Section 36-26-27, Code of Alabama, 1975, and 670-X-18-.02, Rules of the State Personnel Board.

10. Under the provisions of Rules of the State Personnel Board 670-X-18-.02, a permanent employee who has been dismissed may, within ten days after receiving written notice, appeal the dismissal by filing a written answer to the charges with the State Personnel Director, 64 North Union Street, Montgomery, AL 36130.

H.  Probationary and Annual Performance Appraisals. (See Guidelines for Performance Appraisal, Annex M, Pages 1-16)

## IV. DISSEMINATION OF CONTENTS

Wardens, Directors, and Department Division Heads are responsible for the dissemination of the contents of this regulation to all employees. Post a copy on bulletin boards for access by all employees.

## V. REFERENCES

A.  Rules of the State Personnel Board, State of Alabama.

B.  Department of Corrections' Administrative Regulation 207, Standards of Conduct, Department of Corrections Employees.

C.  Department of Corrections' Administrative Regulation 213, Reporting and Resolution Procedures for Harassment, Sexual Harassment, Complaints, and Grievances.

D.  Department of Corrections' Administrative Regulation 227, Controlled Substances Testing for Employees of the Alabama Department of Corrections.

AR208-July 26, 2000

## VI.  SUPERSESSION

This regulation supersedes Administrative Regulation 208, dated September 1, 1998, and is effective July 26, 2000.



Michael W. Haley, Commissioner

## ANNEXES

ANNEX A      Corrective Action History Record
ANNEX B      Memo for the Record – WARNING/SUPERVISORY INSTRUCTION DOC Form N008
ANNEX C      DOC Written Reprimand – DOC Form N009
ANNEX D      Sample Record of Administrative Hearing
ANNEX E      Sample Notice of Pre-Suspension Hearing
ANNEX F      Sample Format for Waiving Due Process Disciplinary Hearing
ANNEX G      Sample Job Abandonment Letter
ANNEX H      Sample Notice of Intent to Recommend Demotion
ANNEX I      Sample Format for Waiving Demotion Hearing
ANNEX J      Sample Notice of Pre-Dismissal Conference
ANNEX K      Sample Format for Resignation from Employment
ANNEX L      Sample Pre-Dismissal Conference Memorandum
ANNEX M      Guidelines for Performance Appraisal

## SUMMARY OF CHANGES

Changes the number of days employees may be suspended during a calendar year, changes the duration of offenses, deletes repetition in offenses listed in Groups I, II, and III, and adds Group IV.

*State of Alabama*

# Alabama Department of Corrections

Kilby Correctional Facility
P.O.Box 150
Mt. Meigs, AL 36057

TERRANCE MCDONNELL
WARDEN III

334-215-6603
Fax-215-6606

**March 2, 2005**

**MEMORANDUM:**

**FROM:**   TERRANCE MCDONNELL, WARDEN

**TO:**   COMMISSIONER DONAL CAMPBELL

**THRU:**   DORA JACKSON, ADOC PER. DIRECTOR

**SUBJECT:**   PRE-DISMISSAL CONFERENCE
CO I FELECIA HENDRICKS

The Pre-Dismissal Conference was held in my office today.  Attached is the required summary of this meeting.

CO Hendricks did not present any new information at the hearing to change my decision to recommend her for dismissal. This incident of 2-10-05 involving Ms. Hendricks pulling a knife on another employee in Kilby's Parking Lot was investigated by I & I, Inv. Errick Demus.  Tape-recorded statements taken by Mr. Demus from the witnesses confirmed that CO Hendricks did pull a knife on another officer and bumped the other female in the chest pushing her backwards. If the other employee had pressed charges against CO Hendricks, she would be facing a felony. If the other officers witnessing this incident had not intervened this problem would have escalated resulting in serious injuries.

It is still my recommendation that CO Hendricks be dismissed from the ADOC.



KILBY CORRECTIONAL FACILITY
PRE-DISMISSAL CONFERENCE MEMORANDUM


TO:          DONAL CAMPBELL, COMMISSIONER

FROM:        TERRANCE MCDONNELL, WARDEN

SUBJECT:       CO I FELICIA HENDRICKS


On 2-18-05 the attached Notice of Intent to Recommend Dismissal was served on CO I Felicia Hendricks. On 3-2-05 at 10:08 AM, CO I Hendricks and I met in my office at Kilby. (Copy of Notice of Intent to Recommend Dismissal is attached.) CO Hendricks had no representative present as an observer.

**The employee responded to the Notice of Intent as follows:**

I request to remain as a Correctional Officer I and remain at Kilby. I bid for a shift at Kilby for 1 year 1-2-05 to 1-2-06. I have 2 daughters. I am not financially able to drive to another institution. I have a trailer. I will attend an Anger Management Class if deemed necessary.

I did pull a knife for my own defense on 2-10-05 in the parking lot. We both bumped chest to chest.



**In addition to her response the employee submitted the following documents (attached):**

CO Hendricks presented documents stapled together as her statement/defense for the incident which occurred on 2-10-05 in the Kilby Parking Lot at app. 10:06 PM. The documents stapled included were: Grievance Form for Step 3 signed by CO Hendricks dated 3-1-05; CO Hendricks 7 page statement; Signed statement from CO I Joey Craig; Unsigned statement from CO Roosevelt Pettaway; Unsigned 3 page statement with no notation as to who this was from other than CO Hendricks verbally stating it was from CO I Krammer Penn; A petition for CO Felicia Hendricks to remain with the Department of Corrections signed by 48 KCF and PHS employees; and a Grievance/Complaint Form for Step 1 signed and dated by CO Hendricks on 2-17-05.


_____  3-2-05          _____ 3/2/05
RECOMMENDING OFFICIAL    DATE             EMPLOYEE                DATE

**Pending resolution of this problem, the employee can be contacted at the following address and telephone number:**

*Felicia Hendricks*
*5113 Loblolly Pine Dr.*
*Montgomery, Al 36116*

DEFENDANT'S
EXHIBIT
4

GRIEVANCE FORM FOR STEP $\frac{3}{(1-3)}$

DATE OF GRIEVANCE (ACT): 03/01/05

CHECK IF ADA FILING: _____

FILE STEP 2: _____

FILE STEP 3: _____3_____

FILED STEP 1: _____

COMPLETED STEP 1: _____

COMPLETED STEP 2: _____

COMPLETED STEP 3: _____

NAME: Felicia Hendricks

SSN: 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

INSTITUTION: Kilby Correctional Facility

CLASSIFICATION: CO I

YEARS OF SERVICE W/DOC: 5

IN CLASSIFICATION: CO I

SUPERVISOR'S NAME: Warden Terrance McDonnell    SECT/SHIFT: 2nd

NATURE OF GRIEVANCE: Being considered for dismissal for making a defensive act facing down two female officers and a civilian female who made agressive moves toward Officer Felicia Hendricks. (See continuation for further details). Inclosures 1 thru 6

REMEDY SOUGHT

For my actions I deserve some form of discipline/guidance but not dismissal. I am willing to attend and complete anger management classes, if desired. I'm a single parent with two young girls to support and I need my job being a single parent and doing a professional job with D.O.C. I request appoaite actions to be taken against the other parties.

SIGNATURE OF GRIEVANT

DECISION AT STEP _____

_____

_____

_____

_____

SIGNATURE/TITLE/DATE

Annex B to AR 213

On February 10, 2005 at approximately 10:00pm. CO1 Felicia Hendricks wanted for CO1 Latoya Nelson to ask her (Nelson) about the rumors spreading inside the institution among officers, nursing staff and inmates. As CO1 Nelson approached her car, which both (Hendricks and Nelson) cars were parked side by side. CO1 Hendricks asked CO1 Nelson in a calmly manner "Do you have anything to say to me?" CO1 Nelson said "No" in a smarter tone. CO1 Hendricks said "Are you sure?" Then CO1 Hendricks said to Mrs. Nelson then "Why is you going around her telling people that I stole your money?" CO1 Nelson replied "You did." I (Hendricks) told Mrs. Nelson that I (Hendricks) don't have to steal from you, after all the times I let you borrow money. By that time our voices (Hendricks & Nelson) started getting louder. We both (Hendricks & Nelson) were in each other's face yelling and crying. Then CO1 Kammin Penn, Roaxelle Pettaway, Joey Craig and stated you'll need to

leave that mess alone. CO2 Michael Armstrong observed the incident from his car. CO2 Penn, Pettaway and Craig stated you'll need to leave. CO1 Nelson stated, "I'm not leaving and aint nobody jiving to fight, I need to talk to Ms. Hendricks and get this off my chest." CO2 Penn stated to CO1 Nelson, "I'll give you $100 dollars and you'll just leave with this mess." Then CO1 Nelson stated, "The money isn't the issue. Ms. Hendricks haven't spoke to me or said anything to me in two whole weeks and that's why I thought she had my money." I replied to Mrs. Nelson, "I don't have your money and why would I steal from you anyway. I don't have to steal. By that time Ms. Nelson said, "you'll leave me alone I just want to talk to Ms. Hendricks alone." Then after that Ms. Nelson asked me to get in her (Nelson) car and I did.

3 of 7

The arguing had ceased as CO1
Hendricks and Nelson was in
her car talking to each other. I
told Mrs. Nelson, I don't have
your money and why would I
steal from you anyway after all the
times I gave you money for gas
and whenever you asked me, I
gave it to you and I never
rounded you about paying me
back. Then Mrs. Nelson replied,
"Damn, its been two weeks and
you haven't spoke to me or said
a word to me." I told Mrs. Nelson
what do you expect for me to
say when you're going around
accusing me of stealing your
money. The right thing you could
have done was come to me
and ask me instead of accusing
me. CO1 Hendricks and Nelson
both apologized to each other. By
that time CO1 Lilianya Colbert, a
female friend and a child had
pulled up in front of CO1 Nelson's

car. In which, CO1 Colbert had left the parking lot, for home and returned back. CO1 Colbert got out of her (Colbert) car, and approached CO1 Nelson's driver door, opened it and stated to CO1 Nelson, "Are you alright?" CO1 Nelson replied, "I'm fine, I just want to talk to Ms. Hendricks. Then CO1 Colbert stated to CO1 Nelson, "You're my friend and I'm not leaving." I told CO1 Nelson that I'll see you later. As I (Hendricks) got out the passenger side of Nelson's car while CO1 Colbert was standing at the driver side, CO1 Colbert stated to CO1 Nelson, "I told you that Bitch aint shit." CO1 Hendricks replied to CO1 Colbert "this doesn't have anything to do with you." Then Colbert stated to Hendricks, "We (Colbert + Nelson) don't like you anyway." CO1 Hendricks replied, "Who cares because I don't like you either."

5 of 7

Then Colbert walks to her car,
pulled off her jacket, pulled her
shirt out and said calling
Hendricks all kinds of Bitches
and Hoe's, telling me to bring it
on. At that time Colbert
continued to walk back and
forth to her car yelling out
loudly. By that time her female
friend got out the car and
opened the back door, then that's
when I grabbed my pocket knife
from the inside of my drivers
door and pulled it out. By that
time CO1 Penn had grabbed
my hand and took it from me.
Then CO1 Colbert started yelling
"she's got a knife, Bitch you
got to use a knife. I replied
to CO1 Penn who was holding
me that, "That Bitch aint shit."
Then CO1 Penn pushed me in
my car and closed the door
and I CO1 Hendricks pulled off
and left, then CO1 Nelson

6 of 7

followed me (Hendricks).

On February 27, 2005 at
approximately 10:35 pm, COI Hendricks
called COI Nelson on her (Nelson)
cell phone and we talked. COI
Nelson said she was wondering
when I was going to call her.
I (Hendrick) to her that I
didn't know if you really
wanted to talk to me. COI
Nelson said "I'm not mad
at you and I told her I wasn't
mad at her either. Then we
talked about a few things
and then she said she didn't
think that things would have
gone this far. She (Nelson) said
that she heard that I (Hendricks)
could lose my job and she
(Nelson) didn't want that to
happen. Then I (Hendricks) asked
her do you have a problem
working with me and she (Nelson)

said "no." But she (Nelson) said that CO1 Colbert said "she (Colbert) didn't want me to lose my job either, but she (Colbert) can't work with me in fear of her (Colbert) life. I asked Mrs. Nelson could she write a statement and she did say "yes" she have no problem with that, and that she (Nelson) would get back with me the next morning, but she never did.

Felicia Hendricks

INCL: 2

On 2-10-05 at approx. 10:02 P.M. upon ending my tour of duty at Kilby Correctional Facility. As I CO Joey Craig was heading toward my car in the parking lot. CO Craig observed CO Felicia Hendrix and CO Latoya Nelson getting in CO Nelson's car. At approx. 10:03 P.M. as I CO Craig began to pull out of the parking lot. CO Tahenya Abbett pull up her car behind me and blocked my way out. I CO Craig then asked CO Abbett could she move her car for me please. CO Abbett then told somebody in her car to move it. They moved the car. I CO Craig began to exit the property and observed CO Abbett walk toward CO Nelson's car and open the driver side door. I CO Craig then drove off and did not witness anything else.

Joey Craig CO

INCL: 3

**DUTY POST LOG**

| DATE | PRINTED NAME AND RANK SIGNATURE | SHIFT (1, 2, 3, Adm, Etc.) | DUTY POST ASSIGNMENT |
|------|--------------------------------|----------------------------|----------------------|
| **ENTRY TIME** | | | |

On Thursday Feb. 10, 2005 at approx. 10:10 pm. I CO1 Roosevelt Pettaway, seen CO1 Lilkenya Calbert leaving the parking lot of Kilby Correction facility. She left state property and returned to the parking lot area. CO1 Lilkenya Calbert parked her car in front of CO1 Lataya Nelson car. As I was walking toward my vechile I observed CO1 L. Calbert walking toward the passenger side of ist L. Nelson car. As I enter my vechile to start it up, I observed 51 Tchenaria Blackman an 52 Kenneth Cash running toward the area where the girls were. As they were running 51 Tchenaria Blackman fell in the parking lot. 52 Kenneth Cash and I helped her up off the ground. I then got into my vechile and lefted.

INCL: 4

On February 10, 2005 at approximately 10:02 p.m. after leaving the institution and entering the parking lot. After walking to my car I observed COI Felicia Hendricks and COI Latoya Nelson arguing loudly. I immediately grabbed COI Hendricks by the arm and tried to place her in the car. COI Hendricks stated that she was not going anywhere until she gets straight with COI Nelson because she was not a thief. COI Nelson came behind COI Hendricks yelling you got my money because it was in the car and you and I were the only one's in the car. I told COI Nelson to get in her car and drive down the road and to get this settle down the road off of state property. I told them not to do this in front of everybody and that this shit is going to be all over the prison. Both stated that where not going anywhere until they got it straight. I told COI Nelson that if it was over a $1.00 I it

... about states that it wasn't about the money. After After arguing about 2 minutes COI Nelson and COI Hendrix got into COI Nelson's car. The loud arguing had ceased. COI Colbert who had left the institution had come back to the parking lot, parked her car in front of COI Nelson's car got out of her car and walked to the driver's side where COI Nelson was sitting yelling I'm not going to let you jump on my friend and we are not scaring you. COI Hendricks got out of the car and said this ain't got nothing to do with you Ms. Colbert COI Nelson jumped out of the car and told COI Colbert to go home. COI Colbert went back to her car and pulled off her jacket and pulled her shirt out and told COI Hendricks to bring it on. COI Colbert began to walk towards COI Hendricks. cusing COI Hendricks calling her Bitches and whores. I observed the female civilian in COI Colbert's car open the passenger door and get out and op the back passanger door of COI Colbert's car. COI Colbert continued to walk toward COI Hendricks. COI Nelson was standing next to the passanger's side of COI Hendricks car COI Hendricks then reached in the driver's side door g grabbed a pocket Knife. COI I then immediately grabbed the Knife from COI Hendricks and ... Knife back in ...

3 of 3

back into her ca.. CoI Colbert stated you see that the bitch had to get a knife for me. CoI Hendrut had pulled out of the parking lot. CoI Nelson had immediately followed CoI Hendricks. After the incident I had ran to assist Lt. Tchernavia Blackmon who had fallen. After checking on Lt. Blackmon I departed the parking lot.

# PETETION FOR COI FELICIA HENDRICKS TO REMAIN WITH THE DEPARTMENT OF CORRECTIONS

1. _[signature]_
2. Katie Bailey LPN
3. COI Calvin Banks
4. Charles Caldwell COI
5. Eric Richardson COI
6. _[signature]_ COI
7. Kevin Wallace COI
8. Lorraine Graves LPN
9. _[signature]_ COI
10. _[signature]_
11. _[signature]_
12. _[signature]_ COI
13. Latrika Henderson LPN
14. Daniel Rudolph COII
15. Roosevelt Pettaway
16. Cynthia M. Butler, LPN-I
17. _[signature]_ COI
18. _[signature]_ COI

21. Alfreda Dulaney LPN
22. John F. Richardson COX
23. Gary Winch COI
24. Leonard Cannon COI
25. Lenard Cannon COT
26. Tommy Riley Cpy
27. ___ COI
28. Robert Young COI
29. B. Clay, COT
30. ___
31. Ronald S. Gile COI
32. Alhircia Boswell RN
33. Mary Jarrett
34. Clarence Hall
35. Conja Jones
36. Leonard Moore
37. William ___
38. Yusuf A. Hasan
39. Nathaniel Brooks
40. ___
41. Antoine Turner

44. *[signature]*

45. *[signature]* Mr. Anthony J. Barber

46. Carolyn *[signature]*

47. *[signature]*

48. *[signature]* Vaughn, Gem

49. _____

50. _____

51. _____

52. _____

53. _____

54. _____

55. _____



**GRIVANCE/COMPLAINT FORM FOR STEP I** _____ **\*\***

PLEASE CIRCLE CAUSE OF COMPLAINT:

Race  Color  Sex  Religion  National Origin  Retaliation  Age  Disability
Other (specify) Information Clarification

DATE: February 17, 2005          NAME: Felicia Hendricks

SSN: 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                 CLASSIFICATION: Correctional Officer I

INSTITUTION: Kilby _____ Section/Shift: 2nd

SUPERVISOR'S NAME/POSITION: Tchernavia Blackmon, COSI/ Kenneth Cash, COII

DATE OF OCCURRENCE CAUSING THE COMPLAINT: February 10, 2005_____

NATURE OF COMPLAINT: On 2-10-05 at approximately 10:05 p.m., in the parking lot at Kilby Prison, Officer Felicia Hendricks was in discussion in Officer Latoya Nelson's vehicle on some money that was lost or disappeared. At approximately 10:14 p.m, I, Officer Hendricks was approached by Officer Lilkenya Colbert and a civilian who was driving her (Colbert) car which had left Kilby Institution and returned. Officer Colbert exited her (Colbert) car and approached Officer Nelson's car and starting making threathing remarks toward Officer Hendricks, who had left Officer Nelson's car for her (Hendricks) car persued by Officers Colbert, Nelson, and an unidentified female who was driving Officer Colbert's car. At approximately 10:15 p.m., Officer Hendricks felt/ threthened by the three individuals and took a small knife out of the driver door of Officer Hendricks' car to ward off the aggression of the three people mentioned above.

REMEDY SOUGHT: A thoroughly investigation of the events on 2-**00**-05, further information may be obtained from: Officers K. Penn, R. Pettaway, J. Craig, M. Anderson, M. Armstrong which will shed more light on this unusual occurance that may exonerate Officer Hendricks from the alleged allegations. Based on Administrative Regulation # 205, biding on shift institution and days off was elected for Kilby and Second Shift. Officer Hendricks wish to remain at Kilby based on being a single parent with two daughters and being established in the Montgomery area and having a trailer.

COPY OF STEP_____ AND \*\*                    *Felicia Hendricks* 2/17/05

DECISION ATTACHED                          EMPLOYEE SIGNATURE/DATE

DECISION AT STEP_____ *

_____

_____

                                    _____
                                    SIGNATURE/TITLE/DATE

\*\*ENTER APPROCIATE STEP NUMBER AND ATTACH COPY OF PREVIOUS STEP IF
PROCEEDING TO HIGHER STEP

ANNEX B

AR206 – February 22, 2000

INCL. 6

GRIVANCE (COMPLAINT FORM) FOR STEP I _____    **

PLEASE CIRCLE CAUSE OF COMPLAINT:

Race   Color   Sex   Religion   National Origin   Retaliation   Age   Disability
Other (specify) Information Clarification

DATE: February 17, 2005         NAME: Felicia Hendricks

SSN: 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                CLASSIFICATION: Correctional Officer I

INSTITUTION: Kilby _____ Section/Shift: 2nd

SUPERVISOR'S NAME/POSITION: Tchernavia Blackmon, COSI/ Kenneth Cash, COII

DATE OF OCCURRENCE CAUSING THE COMPLAINT: February 10, 2005_____

NATURE OF COMPLAINT: On 2-10-05 at approximately 10:05 p.m., in the parking lot at Kilby Prison,
Officer Felicia Hendricks was in discussion in Officer Latoya Nelson's vehicle on some money that was
lost or disappeared. At approximately 10:14 p.m., I, Officer Hendricks was approached by Officer Lilkenya
Colbert and a civilian who was driving her (Colbert) car which had left Kilby Institution and returned.
Officer Colbert exited her (Colbert) car and approached Officer Nelson's car and starting making
threathing remarks toward Officer Hendricks, who had left Officer Nelson's car for her (Hendricks) car
persued by Officers Colbert, Nelson, and an unidentified female who was driving Officer Colbert's car. At
approximately 10:15 p.m., Officer Hendricks felt/ threthened by the three individuals and took a small
knife out of the driver door of Officer Hendricks' car to ward off the aggression of the three people
mentioned above.

REMEDY SOUGHT: A thoroughly investigation of the events on 2-**-05, further information may be
obtained from: Officers K. Penn, R. Pettaway, J. Craig, M. Anderson, M. Armstrong which will shed more
light on this unusual occurance that may exonerate Officer Hendricks from the alleged allegations. Based
on Administrative Regulation # 205, biding on shift institution and days off was elected for Kilby and
Second Shift. Officer Hendricks wish to remain at Kilby based on being a single parent with two daughters
and being established in the Montgomery area and having a trailer.

COPY OF STEP_____ AND **          *Felicia Hendricks* 3/17/05

DECISION ATTACHED                   EMPLOYEE SIGNATURE/DATE

DECISION AT STEP_____ *

_____

_____

_____

                    SIGNATURE/TITLE/DATE

**ENTER APPROCIATE STEP NUMBER AND ATTACH COPY OF PREVIOUS STEP IF
PROCEEDING TO HIGHER STEP

                    ANNEX B

                              AR206 – February 22, 2000


DEFENDANT'S EXHIBIT
5





*State of Alabama*
*Alabama Department of Corrections*

301 S. Ripley Street
P. O. Box 301501
Montgomery, AL 36130

**BOB RILEY**
GOVERNOR

**DONAL CAMPBELL**
COMMISSIONER

January 24, 2005

ADMINISTRATIVE REGULATION                    OPR: PERSONNEL
NUMBER                     213

### GRIEVANCES
**Alabama Department of Corrections Employees**

**I.**     **GENERAL**

This Alabama Department of Corrections (ADOC) Administrative Regulation (AR) establishes responsibilities, policies, and procedures for reporting and resolving employee grievances.

**II.**     **POLICY**

It is the policy of the ADOC to provide all employees open access to a timely grievance resolution process.

**III.**     **DEFINITION(S) AND ACRONYM(S)**

     A.     Departmental Grievance Officer:  An employee designated by the Commissioner to handle grievances.

     B.     Grievance:  For the purpose of this regulation is defined as any issue of dispute or conflict that an employee may have pertaining to the interpretation and/or application of:

         1.     ADOC regulations, procedures, or directives that affect an employee's compensation, evaluation, leave, discipline, duty assignment, work hours, and work conditions.

         2.     Rules of the State Personnel Board or the State Personnel Department's procedure manuals.

**IV.**     **RESPONSIBILITIES**

     A.     The Warden or Division Director is responsible for ensuring compliance with this regulation and educating employees under his/her supervision regarding proper grievance procedures.

     B.     The Departmental Grievance Officer and supervisors are responsible for investigating and resolving employee grievances and maintaining applicable records and reports.

AR 213 – January 24, 2005


DEFENDANT'S
EXHIBIT
6

C.   The employee is responsible for filing his/her grievance in a timely manner and in accordance with procedures outlined in this regulation.

## V.   **PROCEDURES**

A.   Employee grievances shall be handled informally at the lowest level of supervision, whenever possible.

B.   Complaints of harassment or discrimination shall be made in accordance with Administrative Regulation 206, Harassment and Discrimination Policy.

C.   Employee grievances shall be presented in writing on ADOC Form 213, Employee Grievance form, in accordance with the three-step process below:

1.   **Step One**:  A grievance shall be presented in writing on ADOC Form 213 within five (5) working days of the occurrence of the incident or of learning of the circumstances or conditions which gave rise to the grievance to the immediate supervisor. Extenuating circumstances, if applicable, may be considered should the grievance be presented after the required time period and the reason for late filing should be noted on ADOC Form 213.

   a.   The supervisor shall investigate the grievance and within five (5) working days, after it is presented, render a written response on ADOC Form 213.

   b.   A copy of the Step One grievance and response shall be provided to the Warden or Division Director.

2.   **Step Two**:  If a grievance at Step One is not resolved or a response is not given within the required time frame, the grievance may be presented to the Warden or Division Director.

   a.   The Step Two grievance shall be presented on ADOC Form 213 within five (5) working days of the supervisor's response or within five (5) days after the supervisor's response was due, whichever comes first. A copy of ADOC Form 213 filed at Step One shall be attached.

   b.   The Warden or Division Director shall conduct an investigation and meet with the employee to resolve the grievance.

   c.   Within seven (7) working days following the receipt of the Step Two grievance, the Warden or Division Director shall render a written response on ADOC Form 213.

3.   **Step Three**:  If a grievance is not resolved at Step Two or a response is not received within the required time frame, the grievance may be presented to the Commissioner through the Departmental Grievance Officer.

AR 213 – January 24, 2005

a.   The grievance shall be presented on the ADOC Form 213 for Step Three. Copies of the Step One and Two forms and responses, if any, shall be attached.

b.   The employee shall present the Step Three grievance to the Departmental Grievance Officer within five (5) working days following the deadline for the Warden or Division Director's response.

c.   Within seven (7) working days, the Departmental Grievance Officer shall investigate the grievance and meet with the employee in an attempt to resolve the grievance. If the grievant desires an attorney/representative to be present, the attorney/representative shall be limited to observer status only.

d.   The grievance hearing may be tape recorded by the Departmental Grievance Officer only.

e.   The investigation may include interviews, in person or by telephone, with any person(s) whom the Departmental Grievance Officer deems to have pertinent knowledge.

f.   The appearance of witnesses shall be at the discretion of the Departmental Grievance Officer. The employee filing the grievance shall be allowed to offer written statements of witnesses and any other valid information.

g.   The Departmental Grievance Officer may select an employee assigned to the Personnel Division to assist in resolving grievances at the departmental level.

h.   Within ten (10) working days following the investigation and/or meeting with the employee, the Departmental Grievance Officer shall render a response approved by the Commissioner. The resolution presented to the employee by the Departmental Grievance Officer shall be final.

## VI.   DISPOSITION

Any forms used will be disposed of and retained according to the Departmental Records Disposition Authority (RDA).

## VII.   FORMS

ADOC Form 213, Employee Grievance

## VIII.   SUPERCEDES

This regulation supercedes Administrative Regulation 213 dated October 4, 1996, as amended.

AR 213 – January 24, 2005

IX.    <u>PERFORMANCE</u>

This administrative regulation updates departmental policy and procedures pertaining to the reporting and resolution of employee grievances and is based on, but not limited to, the interpretation and application of the laws, regulations, and procedures as amended below:

A.    Title 1, the Code of Alabama, 1975

B.    Title 31, Code of Alabama, 1975

C.    Title 36, Code of Alabama, 1975

D.    Title 29, United States Code

E.    Title 38, United States Code

F.    Rules of the State Personnel Board

G.    State Personnel Department, Personnel Procedures Manual

H.    Family and Medical Leave Act of 1993, State Personnel Department Policy and Procedure

I.    State of Alabama Performance Appraisal Manual

J.    Alabama Department of Corrections' Administrative Regulations

K.    Alabama Department of Corrections' Standard Operating Procedures

Donal Campbell, Commissioner

AR 213 – January 24, 2005

# EMPLOYEE GRIEVANCE

Name _____     Date _____

Institution/Division _____     Job Classification _____

Supervisor's Name _____     Section/Shift _____

Nature of Complaint _____

_____

Remedy Sought _____

_____

_____
Signature of Complainant

If applicable, Reason for Late Filing of Grievance _____

_____

| DATE FILED | DATE COMPLETED |
|---|---|
| **Step 1:** | **Step 1:** |
| **Step 2:** | **Step 2:** |
| **Step 3:** | **Step 3:** |

Decision at Step: _____

_____

_____

_____

_____     _____     _____
Signature of Responder                 Date                 Title

**ADOC Form 213 – January 24, 2005**

AR 213 – January 24, 2005



**Bob Riley**
GOVERNOR



**Donal Campbell**
COMMISSIONER

# State of Alabama
# Alabama Department of Corrections

Research and Planning
P. O. Box 301501
Montgomery, AL 36130-1501

January 27, 2004

ADMINISTRATIVE REGULATION                    OPR: PERSONNEL
NUMBER                        206

## HARASSMENT AND DISCRIMINATION POLICY

### I.    GENERAL

This Alabama Department of Corrections (ADOC) Administrative Regulation
(AR) establishes departmental responsibilities, policies, and complaint procedures
for the fair and equitable treatment of all individuals.

### II.    POLICY

The ADOC:

A.  Strictly prohibits any form of harassment whether based on sex, race, color,
religion, national origin, age, sexual orientation, ancestry, or disability.

B.  Strictly prohibits any form of discrimination in hiring, promotion, discharge,
pay, fringe benefits, job training, classification, referral, and other aspects of
employment on the basis of sex, race, color, religion, national origin, age,
sexual orientation, ancestry, or disability.

C.  Shall swiftly investigate and seek resolution of any complaint made under this
regulation.

D.  Strictly prohibits any form of reprisal or retaliation against complainants
under this regulation.

### III.    DEFINITIONS AND ACRONYM(S)

A.    Harassment:  Any discriminatory and unwelcome conduct that is based on
an individual's race, color, religion, age, sex, national origin, sexual
orientation, ancestry, or disability.



DEFENDANT'S
EXHIBIT
7

B.    <u>Sexual Harassment</u>:  Any unwelcome conduct of a sexual nature, including advances, requests for favors, remarks, sounds, gestures, physical contact, and display or circulation of material, that is subjectively or objectively offensive.

C.    <u>Verbal Harassment</u>:  Making statements which contain derogatory descriptions or stereotypes based on race, sex, color, national origin, age, sexual orientation, ancestry, or disability.

D.    <u>Physical Harassment</u>:  Pushing, shoving, touching, or other intentional acts committed in whole, or in part, because of the employee's race, sex, color, national origin, age, sexual orientation, ancestry, or disability; and the displaying of signs, pictures, cartoons, written statements or other materials that belittle or discriminate against any employee based on one's race, sex, color, national origin, age, sexual orientation, or disability.

E.    <u>Discrimination</u>:  Adverse treatment or consideration based on class or category rather than individual merit.

F.    <u>Individual</u>:  Employees, contractors, volunteers, vendors, customers, visitors, and other persons involved with the ADOC.

G.    <u>Reprisal/Retaliation</u>:  Any punishment, adverse consideration, or undeserved treatment as a result of filing a complaint.

H.    <u>Equal Employment Opportunity (EEO) Officer</u>:  An employee designated by the department to review, investigate, and resolve, complaints of harassment and discrimination.

## IV.    RESPONSIBILITIES

A.    Wardens and Divisional Directors are responsible for ensuring the implementation and adherence to this policy.

B.    ADOC employees and other affected individuals are responsible for reporting incidents of harassment and discrimination as prescribed in the procedures below.

C.    The Equal Employment Opportunity Officer will receive, review, investigate, and seek resolutions to complaints of harassment and discrimination.

## V.    PROCEDURES

A.    Each Warden and Division Director shall designate a supervisory level employee to serve in an EEO Officer capacity.

AR206 – January 27, 2004

B.   Any individual who believes he/she has been harassed or has witnessed harassment, or believes that adverse decisions concerning his/her employment were based on unlawful discrimination, shall:

1.   Promptly report the incident to the Institutional/Divisional EEO Officer or supervisor.

2.   In the event the alleged perpetrator is the Institutional/Divisional EEO Officer, the complainant shall report to the Departmental EEO Officer or the ADOC Personnel Division Director.

3.   Any allegations regarding the Departmental EEO Officer or the Personnel Division Director shall be reported to the Commissioner.

4.   If an individual feels that the Commissioner of the ADOC has subjected him/her to unlawful discrimination or harassment, he/she should report these allegations to the Director of the Alabama State Personnel Department.

C.   Under no circumstances shall an individual's complaint of harassment or discrimination be filed with or appealed to the alleged perpetrator.

D.   Reports of complaint, if possible, should be in writing, but may be oral.

E.   The filing and investigation of complaints shall consist of three (3) steps.

1.   **Step One**:  The complaint should be reported to the Institutional/Divisional EEO Officer or immediate supervisor in Writing outlining the problem.

   a.   Employees must use ADOC Form 206, Harassment and Discrimination Complaint Form.

   b.   The complaint must be submitted within five (5) working days of the occurrence of the incident causing the complaint. In addition to the complaint form, the employee may present written statements or affidavits from witnesses.

   c.   The Institutional/Divisional EEO Officer or the immediate supervisor must respond to the complaint within five (5) working days.

2.   **Step Two**:  If the employee is not satisfied with the Institutional/Divisional EEO Officer or immediate supervisor's response, he/she may, within five (5) working days, file an appeal to the Warden or Division Director.

AR206 – January 27, 2004

      a.    The Step two appeal must be made on ADOC Form 206. A copy of ADOC Form 206 filed at Step One should be attached.

      b.    The Warden or Division Director will, after investigating the complaint, respond to the employee's complaint within seven (7) working days.

3.    **Step Three:**  An employee who is not satisfied with the response at Step Two may appeal to the Departmental EEO Officer or the Personnel Division Director within five (5) working days after receiving the Step Two response.

      a.    The Step Three appeal must be filed an ADOC Form 206. A copy of ADOC Form 206 filed at Step One and Two should be attached.

      b.    The Departmental EEO Officer or the Personnel Division Director will, after review of the complaint, determine whether to meet with the employee to discuss the complaint or determine if further investigation is appropriate.

      c.    Following the meeting/investigation, the Departmental EEO Officer or the Personnel Division Director will submit his/her findings along with a recommendation for solution to the Commissioner within seven (7) working days.

F.    Any employee who desires to file a complaint of discrimination or harassment against an immediate or a higher level supervisor can by-pass Steps One and Two, and file the complaint at Step Three. When using this special complaint procedure, the employee must provide enough information to justify bypassing Steps One and Two.

G.    An applicant or employee, who is dissatisfied with the complaint resolution provided by the Commissioner, or has reason to believe that he/she has been discriminated against because of race, sex, color, gender, national origin, sexual orientation, or disability, within the work force, may appeal the Department's decision directly to the State Personnel Department Director.

H.    The employee or supervisor who receives an oral complaint of harassment or discrimination shall promptly document and forward it to the Institutional/Divisional EEO Officer, Warden, or Division Director.

I.    If the complaint is against the Institutional/Divisional EEO Officer, Warden, or Division Director, the receiving employee or supervisor shall

AR206 – January 27, 2004

forward the documentation to the Departmental EEO Officer or the Personnel Division Director.

## VI.   DISPOSITION

The disposition of forms prescribed by this regulation will be in accordance with the Department's Records Disposition Authority.

## VII.   FORMS

This regulation implements ADOC Form 206, Harassment and Discrimination Complaint Form.

## VIII.   SUPERCEDES

This Administrative Regulation supersedes Administrative Regulation 206 dated February 22, 2000, as amended.

## IX.   PERFORMANCE

This administrative regulation updates policy and procedures concerning harassment and discrimination of employees or otherwise affected individuals and is based on the laws below:

A.   Title VII of the Civil Rights Act of 1964, as amended.
B.   Age Discrimination in Employment Act of 1967, as amended.
C.   Rehabilitation Act of 1973, as amended.
D.   The Americans with Disabilities Act of 1990

ANNEXES:
ADOC Form 206

Donal Campbell, Commissioner

AR206 – January 27, 2004

## HARASSMENT AND DISCRIMINATION
### Complaint Form

Name _____     Date _____

Institution/Division_____     Job Classification_____

Supervisor's Name_____     Section/Shift_____

Nature of complaint_____

_____

_____

Remedy Sought_____

_____

_____

_____
Signature of Complainant

| | Date Filed | Date Completed |
|---|---|---|
| Step 1: | | Step 1: |
| Step 2: | | Step 2: |
| Step 3: | | Step 3: |

Decision at Step:_____

_____

_____

_____     _____     _____
Signature of Responder          Date               Title

**ADOC Form 206**
**Revision Date: January 2004**

AR206 – January 27, 2004

AR206 – January 27, 2004





### State of Alabama
### Alabama Department of Corrections

301 South Ripley Street
P. O. Box 301501
Montgomery, AL 36130

**BOB RILEY**
**GOVERNOR**

**DONAL CAMPBELL**
**COMMISSIONER**

March 4, 2005

Ms. Felicia S. Hendricks, CO I
Kilby Correctional Facility
Montgomery, AL 36057

Dear Ms. Hendricks:

On March 2, 2005 you appeared at a Pre-Dismissal Conference held
by Warden Terrance McDonnell to answer the following charges
against you:

1.  Employees shall observe all laws, rules and regulations.
    (Administrative Regulation 207, Section V, Paragraph A7)

2.  Employees shall uphold, with integrity, the public's trust
    involved in their positions. (Administrative Regulation
    207, Section V, Paragraph A9)

3.  Each employee's conduct shall, at all times, be consistent
    with the maintenance of proper security and welfare of the
    institution and of the inmates under his/her supervision.
    (Administrative Regulation 207, Section V, Paragraph B)

4.  Employees shall not carry any weapons, tear gas, ammunition,
    or blackjack into the institution or on the grounds of any
    ADOC state property, except as authorized by the
    Warden/Division Director. (Administrative Regulation 207,
    Section V, Paragraph C11)

In determining the appropriate disciplinary action for violations
of Administrative Regulation 207, I have also considered the
following offenses under Administrative Regulation 208:

1.  Fighting, assault, physical violence and disruptive
    behavior. (Administrative Regulation 208, Section III,
    Group III Offenses, Paragraph A.3.b.(4)(a))



**DEFENDANT'S
EXHIBIT
8**

Telephone (334) 353-3883          Fax (334) 353-3967

Page 2
Ms. Felicia S. Hendricks

2.   Conduct that is disgraceful, on or off the job, that does
     adversely affect employee's effectiveness on the job.
     (Administrative Regulation 208, Section III, Group III
     Offenses, Paragraph A.3.b.(4)(n))

3.   Possession or use of firearms, weapons, explosives, or
     other dangerous items, except on duty and in designated
     areas and as authorized in regulations and/or procedures.
     (Administrative Regulation 208, Section III, Group III
     Offenses, Paragraph A.3.b.(4)(s))

4.   Serious violations of other rules, procedures, laws, or
     reasonable conduct expectations. (Administrative
     Regulation 208, Section III, Group III Offenses, Paragraph
     A.3.b.(4)(v))

On or about February 10, 2005 it was reported that a disturbance
occurred in the parking lot of Kilby Correctional Facility that
involved you and two (2) other officers. Voices were heard
screaming and cursing while another officer was attempting to
restrain you.

An investigation on the above referenced incident revealed that
you pulled a knife on one (1) of the officers in the Kilby
parking lot. You admitted to one (1) of the department's
investigator that you did pull the knife on the officer and
turned the knife in to him. You further admitted that you
bullied the officer by brushing up against her with your chest
while pushing her backwards. There were numerous witnesses to
this incident regarding your involvement in pulling the knife
and/or physical and verbal confrontation on two (2) officers.

A review of your overall work record reveals no active or
previous disciplinary action.

Having reviewed the Warden's Notice of Intent to Recommend
Dismissal and associated documents, your overall work record, and
the defense you offered at the Pre-Dismissal Conference; I do
hereby order your dismissal, for the good of the service, to be
effective the close of business March 4, 2005.

I regret this action is necessary, but Alabama Department of
Corrections' employees are expected to maintain reasonable
standards of conduct. Your failure to meet these standards
cannot be condoned.

Page 3
Ms. Felicia S. Hendricks

If you think your dismissal is unwarranted, you may appeal the dismissal to the State Personnel Department within ten (10) days by filing an answer to the charges made against you. Such request should be forwarded to the State Personnel Department, Personnel Director, Folsom Administrative Building, 300 Folsom Administrative Building, Montgomery, Alabama 36130-4100.

                                Sincerely,

                                Donal Campbell
                                Commissioner

DC:ne

CC:  Mr. Tommy Flowers, State Personnel Director
     Warden Terrance McDonnell, Kilby Correctional Facility
     Mrs. Dora Jackson, Departmental Personnel Director

DATE: 03-17-05

NAME: Hendricks   Felicia   Suzette   CLASSIFICATION: Correctional Officer I
         Last        First     Middle

INSTITUTION: Kilby                         SECTION/SHIFT: 2nd

YEARS WITH DEPARTMENT OF CORRECTIONS: 4 1/2   YEARS IN CLASSIFICATION: 4 1/2

SUPERVISOR'S NAME: Warden Terrance McDaniell   DATE OF ALLEGED INCIDENT OR MISAPPLICATION OF RULE OR REGULATION: 03-04-05

NATURE OF GRIEVANCE: Being singled out / dismissed for having a small pocket knife on state property: numerous of officers at Kilby have been found to have knives and other unauthorized items inside and on state property. Supervisors had informed the officers to take their weapons back to the cars and return to work. Names and events will be explained in person. (SEE CONTINUATION)

REMEDY SOUGHT: The same type of discipline be enforced against each officer the same way. Be advised this is the first time Officer Hendricks have had any form of discipline. See complaint form 1, 2 and 3 for further details. (SEE CONTINUATION)

DECISION RECEIVED AT STEP ONE: _____

_____

_____

_____

DECISION RECEIVED AT STEP TWO: _____

_____

_____

_____

                                    Felicia Hendricks        3/17/05
                                    SIGNATURE OF GRIEVANT

DECISION AT STEP THREE: _____

_____

_____

_____

_____

tabbies

DEFENDANT'S
EXHIBIT
9

                                    _____
                                    SIGNATURE/TITLE/DATE

ANNEX C to Department of Corrections' Administrative Regulation 213

                                                                21

§ 13A-6-20      CRIMINAL CODE      § 13A-6-20

Criminal liability for injury or death caused by operation of pleasure boat. 8 ALR4th 886.

Accused's right, in homicide case, to have jury instructed as to both unintentional shooting and self-defense. 15 ALR4th 983.

Validity and construction of statute defining homicide by conduct manifesting "depraved indifference." 25 ALR4th 311.

Criminal liability for death of another as result of accused's attempt to kill self or assist in another's suicide. 40 ALR4th 702.

Alcohol-related vehicular homicide: nature and elements of offense. 64 ALR4th 166.

## ARTICLE 2.

## ASSAULTS.

## § 13A-6-20. Assault in the first degree.

(a) A person commits the crime of assault in the first degree if:

(1) With intent to cause serious physical injury to another person, he causes serious physical injury to any person by means of a deadly weapon or a dangerous instrument; or

(2) With intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such an injury to any person; or

(3) Under circumstances manifesting extreme indifference to the value of human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to any person; or

(4) In the course of and in furtherance of the commission or attempted commission of arson in the first degree, burglary in the first or second degree, escape in the first degree, kidnapping in the first degree, rape in the first degree, robbery in any degree, sodomy in the first degree or any other felony clearly dangerous to human life, or of immediate flight therefrom, he causes a serious physical injury to another person; or

(5) While driving under the influence of alcohol or a controlled substance or any combination thereof in violation of Section 32-5A-191 he causes serious bodily injury to the person of another with a motor vehicle.

(b) Assault in the first degree is a Class B felony. (Acts 1977, No. 607, p. 812, § 2101; Acts 1987, No. 87-712, p. 1259.)

Cross references. — See Commentary following § 13A-6-22. As to culpable mental states, see § 13A-2-2. As to kidnapping in the first degree, see § 13A-6-43. As to rape in the first degree, see § 13A-6-61. As to sodomy in the first degree, see § 13A-6-63. As to burglary in the first and second degrees, see §§ 13A-7-5 and 13A-7-6. As to arson in the first degree, see § 13A-7-41. As to robbery, see §§ 13A-8-41 through 13A-8-43. As to escape in the first degree, see § 13A-10-31. As to committing offense when armed with pistol, see § 13A-11-71.

I. General Consideration.
II. Pleading and Practice.
III. Decisions Under Prior Law.
    A. In General.
    B. Deadly Weapon.
    C. Mayhem.

304


DEFENDANT'S EXHIBIT /0

*(Right column, partially cut off:)*

§ 13A-6-20

I. GENERA

"Intent to kill under §§ 13A-4- "intent to kill" is weapon and/or st which his intent State, 536 So. 2d

Meaning of " — "Substantial subdivision (9) of just any risk of d death was likely danger of death established. War Crim. App. 1991

The test of su whether the vic require that dea Ware v. State, 58 1991).

Fists as a de instrument, see (Ala. Crim. App

Fists may co dangerous instru circumstances an v. State, 555 So. modified on oth (Ala. 1991).

Defendant's ha the two and one considered a dea strument. Ray v Crim. App. 199

Assault in th Assault in the t injury rather t Foster v. State, 1991).

For case allo his opinion th serious injurie So. 2d 582 (Ala

In Alabama, offense of att statutory definit the attempt. Lee Crim. App. 198

Intent to ca was jury que evidence showe .25 rounds from the shooting sto a wooded area a heard, whether the victim serio tion for the jury 1238 (Ala. Crim

Criminal int ferred from cir

Case 2:05-cv-00714-WKW-CSC   Document 35-3   Filed 05/22/2006   Page 88 of 89

(1975), cert. denied, 295 Ala. 398, 325 So. 2d 546 (1976).

**Use of a fist is not the use of a weapon.** Cozart v. State, 42 Ala. App. 535, 171 So. 2d 77 (1964), cert. denied, 277 Ala. 698, 171 So. 2d 84 (1965).

#### C. Mayhem.

**Injury must have disfigured.** — The injury must have disfigured in such manner as to be apparent upon ordinary observation, as distinguished from a wounding which simply marred the member. State v. Abram, 10 Ala. 928 (1847); Green v. State, 151 Ala. 14, 44 So. 194 (1907).

**And must have been permanent.** — Former § 13-1-7 contemplated permanent injury, such as would constitute mayhem at common law. Temporary disabling of a member was not sufficient to constitute the offense. State v. Briley, 8 Port. 472 (1839).

**Intent must have existed.** — The essential ingredients of the offense denounced by former § 13-1-7, the necessary disfigurement of the person maimed being given, were that the act was done without authority of law and with evil intent and by design. Green v. State, 151 Ala. 14, 44 So. 194 (1907).

**Intent could be inferred.** — A specific intent to maim was generally held an essential ingredient of the offense of mayhem; but such intent could be inferred or presumed if the act was done deliberately and the disfigurement was reasonably to be apprehended as the natural and probable consequence of the act. Patterson v. State, 30 Ala. App. 135, 1 So. 2d 759 (1941).

**Self-defense might be available in justification.** — Self-defense might be available in justification of the act which otherwise would be mayhem providing, of course, the resistance was proportionate to the injury offered. Green v. State, 151 Ala. 14, 44 So. 194 (1907). (As to use of force in defense of a person, see § 13A-3-23.)

**Castration was a kind of mayhem.** Pritchett v. State, 40 Ala. App. 498, 117 So. 2d 345 (1959).

### § 13A-6-21. Assault in the second degree.

(a) A person commits the crime of assault in the second degree if the person does any of the following:

(1) With intent to cause serious physical injury to another person, he or she causes serious physical injury to any person.

(2) With intent to cause physical injury to another person, he or she causes physical injury to any person by means of a deadly weapon or a dangerous instrument.

(3) He or she recklessly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument.

(4) With intent to prevent a peace officer, as defined in Section 36-21-60, or emergency medical personnel or a firefighter from performing a lawful duty, he or she intends to cause serious physical injury and he or she causes serious physical injury to any person.

(5) With intent to cause serious physical injury to a teacher or to an employee of a public educational institution during or as a result of the performance of his or her duty, he or she causes physical injury to any person.

(6) For a purpose other than lawful medical or therapeutic treatment, he or she intentionally causes stupor, unconsciousness, or other physical or mental impairment or injury to another person by administering to him or her, without his or her consent, a drug, substance or preparation capable of producing the intended harm.

(b) Assault in the second degree is a Class C felony. (Acts 1977, No. 607, p. 812, § 2102; Acts 1994, 1st Ex. Sess., No. 94-794, § 1.)

officer. — Even if the defendants were work-
ing undercover on an investigation of another

Criminal Law, § 98.

## § 13A-3-23. Use of force in defense of a person.

(a) A person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for the purpose. A person may use deadly physical force if the actor reasonably believes that such other person is:

(1) Using or about to use unlawful deadly physical force; or

(2) Using or about to use physical force against an occupant of a dwelling while committing or attempting to commit a burglary of such dwelling; or

(3) Committing or about to commit a kidnapping in any degree, assault in the first or second degree, burglary in any degree, robbery in any degree, forcible rape or forcible sodomy.

(b) Notwithstanding the provisions of subsection (a), a person is not justified in using deadly physical force upon another person if it reasonably appears or he knows that he can avoid the necessity of using such force with complete safety:

(1) By retreating, except that the actor is not required to retreat:

a. If he is in his dwelling or at his place of work and was not the original aggressor; or

b. If he is a peace officer or a private person lawfully assisting a peace officer at his direction.

(2), (3) Repealed by Acts 1979, No. 79-599, p. 1060, § 1.

(c) Notwithstanding the provisions of subsection (a), a person is not justified in using physical force if:

(1) With intent to cause physical injury or death to another person, he provoked the use of unlawful physical force by such other person; or

(2) He was the initial aggressor, except that his use of physical force upon another person under the circumstances is justifiable if he withdraws from the encounter and effectively communicates to the other person his intent to do so, but the latter nevertheless continues or threatens the use of unlawful physical force; or

(3) The physical force involved was the product of a combat by agreement not specifically authorized by law. (Acts 1977, No. 607, p. 812, § 610; Acts 1979, No. 79-599, p. 1060, § 1.)

84