Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

FELICIA SUZETTE HENDRICKS,

    Plaintiff,

vs.          CASE NO. 2:05-CV-714-F

WARREN McDONNELL, et al.,

    Defendants.

    * * * * * * * * * *

    DEPOSITION OF FELICIA SUZETTE HENDRICKS, taken pursuant to stipulation and agreement before Dee Coker, Registered Professional Reporter and Commissioner for the State of Alabama at Large, in the Legal Offices of the Department of Corrections, 301 South Ripley Street, Criminal Justice Building, Montgomery, Alabama, on Wednesday, April 26, 2006, commencing at approximately 1:21 p.m.

    * * * * * * * * * *



PLAINTIFF'S EXHIBIT

DEPOSITION OF FELICIA S. HENDRICKS April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.
Case 2:05-cv-00714-WKW-CSC   Document 37-5   Filed 06/30/2006   Page 2 of 17

3 (Pages 6 to 9)

Page 6

1  pending question -- that is, if I ask you a
2  question, you can't break until you answer
3  the question.
4      The other rule is that this is Dee, and
5  she's a court reporter; and she's a great
6  court reporter, and she takes down everything
7  that is said. But that behooves you, when I
8  ask a question, to answer verbally,
9  articulate an answer either yes or no or
10 state your answer. You can't nod your head
11 or you can't go uh-huh or unh-unh because
12 it's real hard for her to type that down.
13     If I ask a question and you don't
14 understand it, you ask me to ask it again,
15 because -- and I will ask bad questions and
16 sometimes, they don't make sense. If you
17 have any hesitation at all about what I'm
18 asking, ask me to clarify it, because I don't
19 want you to answer a question and you're
20 assuming what I'm asking. So you make sure
21 what I ask first, okay?
22 A. (Nodding head.)
23 Q. You have to say yes.

Page 7

1  A. Yes, sir.
2  Q. I want you to get used to doing that because
3     this is a very awkward thing. I will be
4     asking you a series questions, and you have
5     to answer those questions.
6  A. Yes, sir.
7  Q. And you're under oath. You understand that?
8  A. Yes, sir.
9  Q. The first thing I want you to do is state
10    your full name for the record.
11 A. Felicia Suzette Hendricks.
12 Q. Would you spell that, please?
13 A. Felicia, F-E-L-I-C-I-A, Suzette,
14    S-U-Z-E-T-T-E, Hendricks, H-E-N-D-R-I-C-K-S.
15 Q. Okay. And what's your date of birth?
16 A. May the 19th, 1971.
17 Q. Okay. And where do you live?
18 A. I live -- presently I'm living now at 734
19    St. Martins Drive, Pike Road, Alabama 36064.
20 Q. And how long have you lived there?
21 A. I just moved there the end of December of
22    2005.
23 Q. Okay. And before you moved out to that

Page 8

1  address, where did you live?
2  A. I was living at 5113 Loblolly Pine Drive,
3     Montgomery, Alabama.
4  Q. All right. Do you also have a P.O. box?
5  A. Yes, sir.
6  Q. And what's your P.O. Box?
7  A. Post Office Box 251554, Montgomery, Alabama,
8     36125.
9  Q. How long have you had that P.O. box?
10 A. It's been years.
11 Q. Okay. Are you employed presently?
12 A. Yes, sir, I am.
13 Q. Where are you employed now?
14 A. At T&WA of Montgomery.
15 Q. And how long have you been employed there?
16 A. April the 1st of this year was a year.
17 Q. Okay. So you've been working for that
18    company since April of '05?
19 A. Yes, sir.
20 Q. Okay. And prior to that, where did you work?
21 A. I was working at Kilby Correctional Facility.
22 Q. Okay. You worked for the Department of
23    Corrections?

Page 9

1  A. Department of Corrections, yes, sir.
2  Q. When did you start working for the Department
3     of Corrections?
4  A. It was April 2000.
5  Q. Okay. And what was your position with the
6     Alabama Department of Corrections?
7  A. Correction Officer I.
8  Q. Okay. And how did it come about you getting
9     a job with the Alabama Department of
10    Corrections?
11 A. I applied with the State at Jim Folsom
12    Building downtown. And I received a letter
13    saying that I was a qualified candidate, and
14    I pursued on from there with the steps.
15 Q. Okay. Did you have any prior law enforcement
16    experience to that day?
17 A. No, sir.
18 Q. Okay. After you were hired in 2000 --
19 A. Yes, sir.
20 Q. -- did you attend an academy?
21 A. Yes, sir. In Selma, Alabama.
22 Q. Okay. When was that?
23 A. In April -- in April, 2000.

Page 10

1  Q. Okay. How long was the academy?
2  A. I think it was like eight, nine weeks.
3  Q. Okay.
4  A. If I'm not mistaken.
5  Q. Okay. And as part of your training, did you
6     receive instruction on the administrative
7     regulations with the Alabama Department of
8     Corrections?
9  A. Yes, sir.
10 Q. All right. And you also were instructed as a
11    corrections officer you have responsibility
12    to review and -- well, strike that.
13        As part of your responsibilities as a
14    corrections officer, you also learned that
15    you were to keep up to date on the
16    administrative regulations of the Alabama
17    Department of Corrections?
18 A. Yes, sir.
19 Q. Okay. When you graduated the academy, what
20    was your first assignment? What was your
21    first place that you worked?
22 A. At Kilby.
23 Q. Okay. Is it safe to say that you were a

Page 11

1     corrections officer with the Alabama
2     Department of Corrections at Kilby Prison
3     only?
4  A. Yes, sir. Because that was my first choice,
5     and I was approved for my first choice.
6  Q. Okay. So your entire employment with the
7     Department of Corrections would be at that
8     facility?
9  A. Yes, sir.
10 Q. Kilby facility. In the position of
11    Corrections Officer I?
12 A. Yes, sir.
13 Q. Okay. All right. Ultimately, you were
14    dismissed as a corrections officer, correct?
15 A. Yes, sir.
16 Q. Do you remember the exact day that you were
17    dismissed?
18 A. February the 11th, 2005.
19 Q. And how did you receive notice that you were
20    dismissed?
21 A. It was first a pre-dismissal; then dismissal
22    from Terrance -- Warden Terrance McDonnell.
23 Q. Did you receive a letter from the

Page 12

1     Commissioner -- then Commissioner Campbell?
2  A. Yes, sir.
3  Q. Okay. It's like he -- the letter -- and
4     we'll go over it in a minute. But the letter
5     basically says, in sum, that he approves the
6     recommendation of the Warden McDonnell of
7     your dismissal?
8  A. Yes, sir.
9  Q. And you got that letter?
10 A. Yes, sir.
11 Q. Okay. I show what's marked as Defendant's
12    Exhibit #1. That is a notice of this
13    deposition. Do you see that?
14 A. Yes, sir.
15 Q. Okay. Do you remember getting a copy of that
16    notice?
17 A. Yes, sir.
18 Q. Okay. Did you read it?
19 A. Yes, sir.
20 Q. Okay. In that notice of taking deposition,
21    it says that your deposition will be today at
22    one o'clock, does it not?
23 A. Yes, sir, it does.

Page 13

1  Q. It also asks you to bring things with you.
2     Did you bring any of the things that are
3     outlined in that notice of deposition with
4     you?
5        Well, maybe we ought to do it this way.
6     Let me go through it one by one with you.
7     Look at number one. Do you have any written
8     or tape recorded notes, memorandum or other
9     documents in your possession or subject to
10    your control which supports the claims made
11    the basis of your lawsuit in this case?
12 A. Yes.
13 Q. What do you have?
14 A. Just some little notes that I jotted down on
15    my own.
16 Q. Some notes?
17 A. Uh-huh.
18 Q. Do you have them with you?
19 A. Yes.
20 Q. Okay. Could you bring them out and let us
21    take a look at them?
22    MR. PITTERS: You can't do that.
23         Objection to --

DEPOSITION OF FELICIA W. HENDRICKS
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

6 (Pages 18 to 21)

### Page 18

1  Q. Is that the dismissal letter signed by Donal
2     Campbell?
3  A. Yes, sir, the dismissal letter from
4     Mr. Campbell.
5  Q. Okay.
6  A. And I have another grievance form.
7  Q. It's your handwritten statement that you've
8     written?
9  A. And then I have some handwritten statements,
10    and I have a petition that was signed by some
11    officers and former employers -- employees,
12    excuse me. And I have another -- I have a
13    complaint form.
14 Q. Okay. What else do you have?
15 A. And this is the same thing that you have that
16    I have, which is the motion to amend for the
17    complaint of violation of equal protection of
18    the law.
19 Q. Okay. I see it.
20 A. I have that. And --
21 Q. Is that your personnel file that you have, a
22    copy of your personnel file? Is that the
23    complaint? I'm sorry. You're looking at the

### Page 19

1     actual -- the original complaint, right?
2  A. Yes.
3  Q. All right. I see that.
4  A. And I have the first original complaint.
5  Q. Okay.
6  A. And I have one of my employee's performance
7     appraisals that I brought with me.
8  Q. Okay. What date is on that performance
9     appraisal?
10 A. It was period covered from 11/01/2003 to
11    11/01/2004 and your raise effective for -- it
12    was January of 2005.
13 Q. Okay. Anything else you have?
14 A. No, sir. No more than I have Administration
15    Regulations Rule 208.
16 Q. What's the date of 208 there?
17 A. It was date of July 26, 2000.
18 Q. Okay.
19 A. And Administration Regulation 207. But
20    that's a -- it was dated like in '94. That's
21    the last one that I had received since I was
22    there. And Administration Regulation 220.
23    It's dated July 26, 2000.

### Page 20

1  Q. Okay. Anything else?
2  A. No, sir. That is it.
3  Q. Okay. What are you looking at? What are the
4     documents you're looking at right now? What
5     are those?
6  A. Those are the ones that I received from -- in
7     the United States District Court for the
8     Middle District of Alabama, Northern
9     Division.
10 Q. Is it documents or pleadings of this case
11    that was filed or orders by Judge Coody in
12    the case?
13 A. Yes, sir.
14 Q. Is that what those are?
15 A. From Judge Coody.
16 Q. Okay. What is that -- what is that one right
17    there? What's that?
18 A. And I have a -- it's a memoranda of
19    understanding the involvement of other
20    employees at DOC.
21 Q. Okay. Could I see that, please? Okay. I
22    won't mark this one. When Stephanie gets
23    here, I'll ask her to make a copy of it. But

### Page 21

1     what I'll do if you don't mind, I'll put a
2     little sticky on it. This will be marked
3     Defendant's Exhibit #15. And we'll refer to
4     it as that. Or I can take a break and we'll
5     make a copy of it real quick.
6        MR. PITTERS: Okay.
7        MR. BIGGS: Let me do that so I can go
8     ahead and mark it. We're off the
9     record for just a second.
10       (Off-the-record discussion)
11 Q. Ms. Hendricks, I show you what I have marked
12    as Defendant's Exhibit #15. And this is one
13    of the documents, other than the pleadings
14    and such you brought here today that you say
15    support your case. And it says, the first
16    paragraph, A memorandum of understandings
17    involving my employment at DOC, parenthesis,
18    see enclosures one through eleven for further
19    information. All DOC employees still remain
20    with DOC with no discrepancy. Who prepared
21    this?
22 A. I did.
23 Q. Okay. And why did you prepare this?

Page 22

1  A. Because it's incidents that happened
2     similarities to mine, but it wasn't any
3     actions taken as of for to where I received
4     the maximum action.
5  Q. Okay. When did you prepare this?
6  A. This was prepared during the -- when I --
7     when I had first went to court -- to the
8     hearing with Judge Coody and he told me that
9     I had -- he explained some of the laws to me,
10    and for me to get information that was
11    pertaining to my case, is that it was a
12    similarity to it. And that's when I dug and
13    found information as of to where I have known
14    of situations this had happened while I was
15    there and some that had happened before I
16    were -- became an officer.
17 Q. How did you -- when you say dug, how did you
18    do this? How did you prepare this -- gather
19    this information?
20 A. Well, it was some incident that I had already
21    knew and others that I -- I asked about.
22 Q. Okay. Which ones -- and these are numbered
23    one through eleven. Which ones did you

Page 23

1     already know about?
2        MR. PITTERS: Object to the form.
3        MR. BIGGS: What's the basis of your
4           objection?
5        MR. PITTERS: When you say already knew
6           about, I'm not sure exactly what
7           are you talking about. When you
8           say already knew about --
9        MR. BIGGS: Well, her testimony was
10          just now that some of these events
11          she knew about. The others she
12          had to gather and ask people. I
13          want to know which ones that she
14          knew about and not have to ask
15          people about.
16       MR. PITTERS: Which she knew about at
17          the time that she went to court
18          with Judge Coody or she knew about
19          it at the time she prepared the
20          document.
21       MR. BIGGS: At the time she prepared
22          the document.
23       MR. PITTERS: Okay.

Page 24

1  A. Eight.
2  Q. Okay. It's your testimony that eight of the
3     eleven --
4  A. Eight of the eleven that I already knew
5     about.
6  Q. Which ones of the eight? Just tell me which
7     numbers.
8  A. Number one, number four, number five, number
9     seven, eight, nine, ten, and eleven.
10 Q. Okay. All right. Let's go to number one.
11    And in this statement, it says: Lieutenant
12    Eddie Browning was arrested and charged with
13    stalking and sexual harassments in an event
14    that was highly televised. He was
15    immediately transferred to Staton
16    Correctional Facility. When was that?
17 A. I can't exactly remember the date, sir.
18 Q. Okay. Where was he arrested?
19 A. That, I really don't know where of that -- of
20    where he was arrested. I know that for
21    stalking and sexual harassment, and it was
22    televised on television.
23 Q. Where was the stalking or sexual harassment

Page 25

1     performed by Lieutenant Eddie Browning?
2  A. It was at an apartment complex here in
3     Montgomery, Alabama.
4  Q. Okay. Was there any weapons involved?
5  A. That, I -- I have no knowledge of.
6  Q. Okay. Is Lieutenant Browning, is he a --
7     what's his race?
8  A. His race? He's black.
9  Q. All right. Number four, Sergeant William
10    Miller was involved in a relationship with
11    CO-I Kenneth McMann's wife while both were
12    employed at the same institution which
13    eventually led to a dispute and a transfer.
14    What kind of dispute was that?
15 A. With Sergeant Miller and Officer Kenny McMann
16    had -- I think they had some words. And that
17    Officer McMann wife had worked up front. And
18    it was a little confrontation about that.
19    And --
20 Q. Well, tell me about that confrontation.
21 A. I really don't know the confrontation from
22    words for words.
23 Q. Were just words passed?

Case 2:05-cv-00714-WKW-CSC   Document 37-5   Filed 06/30/2006   Page 6 of 17

DEPOSITION OF FELICIA S. HENDRICKS                               April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

8 (Pages 26 to 29)

Page 26

1  A. Sir?
2  Q. Were words just passed, to your knowledge?
3  A. Yes.
4  Q. Okay. Was there any physical altercation
5     between the two individuals that you refer to
6     here?
7  A. That, I don't know for sure.
8  Q. Was there a weapon involved?
9  A. I can't say that I'm for sure about that
10    either.
11 Q. Okay. Number five, Sergeant Patricia Davis
12    and Johnnie Dumas were both involved in a
13    physical altercation that involved a weapon
14    at the Montgomery Work Center. Both Davis
15    and Dumas were involved in a love affair with
16    Warden Jeffery Williams. Both officers were
17    transferred to other institutions.
18       Let me go back to four -- I apologize to
19    you -- about Sergeant Miller. Where did that
20    occur?
21 A. It was while -- it was at Kilby Correctional
22    Facility.
23 Q. Okay. Kilby. Okay. And then go back to

Page 27

1     five. And, again, I apologize. How do you
2     know of this?
3  A. Because CO-I Johnnie Dumas was transferred to
4     Kilby Correctional Facility.
5  Q. Did you talk to Johnnie Dumas?
6  A. I've had some words with Ms. Johnnie Dumas.
7     And she really didn't get involved of the
8     incident because she said it would cause too
9     much chaos. But as of words of what I heard.
10 Q. Okay. So your summary of this, is it based
11    upon statements you received from Johnnie
12    Dumas or other sources?
13 A. Both.
14 Q. Okay. What are the other sources besides
15    Johnnie Dumas?
16 A. Other employees.
17 Q. Okay. What did they say?
18 A. I can't say word for word, but all I know was
19    a physical altercation over at the Montgomery
20    Work Center with Sergeant Davis and CO-I
21    Dumas in front of inmates at the Montgomery
22    Work Center.
23 Q. Okay. And who told you this?

Page 28

1  A. Other employees.
2  Q. Who are they?
3  A. Right now, I can't recall.
4  Q. Okay. And when did this happen?
5  A. I'm not sure of the date, sir.
6  Q. Is Patricia Davis a female?
7  A. Yes, sir.
8  Q. Is Johnnie Dumas a female?
9  A. Yes, sir.
10 Q. All right. And based on your conversations
11    with folks and Ms. Dumas, there was a
12    purported physical altercation. What
13    actually happened?
14 A. It was a physical altercation. They was
15    fighting.
16 Q. Okay. Well, what happened?
17 A. I don't know all the full details, sir.
18 Q. Okay. It says involved a radio as a weapon?
19 A. Yes, sir.
20 Q. How did that happen?
21 A. I heard the word that Mrs. Davis -- Sergeant
22    Davis had the radio.
23 Q. And she did what with it?

Page 29

1  A. I assume she had hit Ms. Johnnie Dumas.
2  Q. Okay. You assume that, but you don't know?
3  A. I assume she did. They was fighting.
4  Q. Okay. But other than summaries of what
5     you've talked to other folks about, what they
6     think happened, you have no personal
7     knowledge of what happened on this occasion?
8  A. No, sir, because it happened at the
9     Montgomery Work Center, sir.
10 Q. Okay. And you don't know where at Montgomery
11    Work Center this allegedly happened, do you?
12 A. No, sir, no more than I think it happened in
13    the office.
14 Q. Okay. Why do you say that?
15 A. Because that's where -- that's what I was
16    told.
17 Q. Okay. Someone told you it happened in the
18    office?
19 A. Yes.
20 Q. Okay. But this didn't happen at Kilby
21    Correctional Facility?
22 A. No, sir.
23 Q. Okay. Have you ever been to Montgomery Work

Page 30

1   Center?
2   A. Yes, sir.
3   Q. Okay. And what level of facility is
4      Montgomery Work Center; do you know?
5   A. I know, but I don't want to get it confused.
6   Q. Well, what do you know?
7   A. It's a work release -- work release.
8   Q. Work release center?
9   A. Uh-huh.
10  Q. What level of facility is Kilby?
11  A. Level four.
12  Q. Okay. Is that high or low?
13  A. Exceeding to the highest is -- number five is
14     the highest. It's in between.
15  Q. Okay. It's almost to the highest?
16  A. To the highest.
17  Q. Okay. Would it be a maximum?
18  A. Medium.
19  Q. Medium facility. But Kilby is not a work
20     release center, is it?
21  A. No, sir, it is not.
22  Q. All right. Anything else you know about
23     number five that you haven't told me?

Page 31

1   A. No, sir.
2   Q. Okay. What is the race of Sergeant Davis?
3   A. Black.
4   Q. What is the race of Johnnie Dumas?
5   A. Black.
6   Q. All right. Let's go to number seven. It
7      says CO-I Jerry Redic and CO-I William Scott
8      were involved in a physical, verbal
9      altercation in the seg unit at Kilby
10     Correctional Facility. Is that what that's
11     supposed to say?
12  A. Yes, sir.
13  Q. How do you know about that?
14  A. At the present time I was there at Kilby.
15  Q. Did you see it?
16  A. Yes. I was in West Dorm.
17  Q. Okay. And when did this happen?
18  A. I cannot recall the date, sir, when it
19     happened.
20  Q. What year? Do you know?
21  A. No, sir.
22  Q. Okay. Would it have been within the past
23     five years?

Page 32

1   A. Within the five years, yes, sir, in my
2      presence at Kilby.
3   Q. And what are the facts -- purported facts
4      surrounding this alleged physical/verbal
5      altercation?
6   A. It started about a fan between officer Redic
7      and CO-I William Scott. And they had words
8      about the fan. If I'm not mistaken -- I'm
9      not going to really say which one, but I know
10     one of them was assigned to segregation and
11     one of them was assigned to mental health.
12     And I think that Officer William Scott had
13     came to get the fan for mental health because
14     it was hot at that present time. And I think
15     the air had went out or something like that.
16     And Officer Redic -- Scott said that he
17     needed the fan down there because the
18     segregation unit -- it houses 25 on A block,
19     25 on B and 25 on C and 25 on D, which is a a
20     total of a hundred inmates, plus it was no
21     air circulating for the officers which was in
22     the office. And then they had words --
23     verbal words about who was going to get the

Page 33

1   fan and who wasn't. Then, from that forth,
2   it turned to a little tussle with him and
3   Officer Redic.
4   Q. What do you mean by a tussle?
5   A. To where they just locked up, and then they
6      was broken up.
7   Q. All right. Did you see this?
8   A. Yes, sir.
9   Q. Who else was present?
10  A. I can't recall no officer's names at this
11     present time, because I can't really remember
12     back that far of my surroundings.
13  Q. Was there a weapon involved?
14  A. No, sir.
15  Q. What's the race of Jerry Redic?
16  A. Black.
17  Q. What's the race of William Scott?
18  A. White.
19  Q. Number eight, CO-I Mary Holmes and CO-I Debra
20     Caldwell were involved in an altercation at
21     Montgomery Work Center. CO-I Holmes was
22     transferred to another institution after
23     CO-I Caldwell threatened to assault CO-I

Case 2:05-cv-00714-WKW-CSC    Document 37-5    Filed 06/30/2006    Page 8 of 17

DEPOSITION OF FELICIA S. HENDRICKS                     April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

10 (Pages 34 to 37)

Page 34

1  Holmes with a weapon, a hand-held radio.
2      Okay. How do you know about this?
3  A. From former -- other employees.
4  Q. Do you know what the purported altercation
5     was about?
6  A. No, sir, I don't.
7  Q. Okay. And you allege that CO-I Holmes was
8     transferred to another institution.
9  A. Yes.
10 Q. Is that what you heard?
11 A. Yes, sir, that's what I had heard. But I'm
12    not for sure which one.
13 Q. Okay. And you also heard an allegation that
14    CO-I Caldwell had threatened to assault CO-I
15    Holmes with a hand-held radio.
16 A. Yes. From my understanding from words that
17    was said, that she hit Ms. Holmes up side the
18    head, and Ms. Holmes was out for a few
19    minutes.
20 Q. Okay. Was this in the Montgomery Work Center
21    or outside or where?
22 A. I can't actually say, sir.
23 Q. Okay. And what's the race of Ms. Holmes?

Page 35

1  A. Black.
2  Q. What's the race of Debra Caldwell?
3  A. Black.
4  Q. Number nine, CO-I William -- Willie Lawrence
5     was involved in a physical altercation with
6     his wife after his wife had an involvement
7     with a fellow employee at the sheriff's
8     department. The incident led to CO Lawrence
9     getting a domestic violence charge.
10     Where did this happen at, the physical
11    altercation?
12 A. Okay. On number nine, I strike that one,
13    because I'm not for sure that happened while
14    I was at Kilby -- during my present time at
15    Kilby.
16 Q. Okay. So you don't know if it happened on a
17    Department of Corrections facility, do you?
18 A. No, sir.
19 Q. Let's go to 10. CO-I Charles Caldwell
20    received a domestic violence charge after
21    assaulting his wife because of an affair that
22    CO-I Caldwell was having with Nurse Katie
23    Bailey, a former employee at DOC.

Page 36

1     Okay. Where did the domestic violence
2     charge occur?
3  A. I don't know, sir.
4  Q. Okay. Did you have information that that
5     occurred on or about a Department of
6     Corrections facility?
7  A. No, sir, I don't.
8  Q. Look at 11. CO-I Bernard McClain was
9     involved in an altercation with his
10    girlfriend, which led up to his arrest and
11    charged with domestic violence. You don't
12    know where that occurred, do you?
13 A. No, sir. Because CO-I Bernard McClain and
14    CO-I Charles Caldwell work first shift, and I
15    worked -- at that present time, I worked
16    second shift. So I don't know.
17 Q. But you don't know if the purported events of
18    10 and 11 occurred at Kilby or any other
19    Department of Corrections?
20 A. No, sir.
21 Q. All right. Let's go to two. Now, two,
22    three, and six are the ones that you had
23    people tell you about, correct?

Page 37

1  A. Yes, sir.
2  Q. Okay. Number two, purportedly, Lieutenant
3     Victor Napier had problems with his wife
4     where his wife came to the facility and
5     picked him up. Lieutenant Napier abandoned
6     his post. And he was the only one
7     supervising that day and left the facility
8     unsupervised. Who told you about this one?
9  A. It was an employee, sir.
10 Q. Well, who was it?
11 A. It was just former employees. I mean, I
12    don't really like to call no name, because I
13    don't want to put no one else's job in
14    jeopardy, sir.
15 Q. Well, unfortunately, this is a deposition and
16    you're under oath. And I ask questions; you
17    have to answer the questions unless your
18    attorney directs you not to answer those
19    questions.
20 A. Officer Thomas Parks.
21 Q. Thomas Harts?
22 A. Junior. P-A-R-K-S.
23 Q. And where does he work?

Case 2:05-cv-00714-WKW-CSC   Document 37-5   Filed 06/30/2006   Page 9 of 17

DEPOSITION OF FELICIA S. HENDRICKS                           April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

11 (Pages 38 to 41)

Page 38

1  A. Kilby Correctional Facility.
2  Q. And when did you talk to him?
3  A. It's been a while.
4  Q. Past three months?
5  A. Yeah, a little over three months.
6  Q. Okay. And how did it come about that you
7     spoke with Officer Parks?
8  A. I asked him what incidents that happened.
9  Q. And was this over the phone or in person?
10 A. Over the phone.
11 Q. Did you call him or did he call you?
12 A. I called him.
13 Q. And what did you tell him?
14 A. I asked him about some incidents that he knew
15    of that happened at Kilby.
16 Q. Was this before or after you were dismissed?
17 A. Way after.
18 Q. And did you call him at home?
19 A. Yes.
20 Q. Did you tell him that you were filing a
21    lawsuit?
22 A. Yes.
23 Q. Did you tell him you needed information?

Page 39

1  A. Yes, sir.
2  Q. Okay. What did he say?
3  A. He just only said that he only knew of a
4     couple of incidents, but it wasn't really
5     word for word of what happened and what --
6     how it went about.
7  Q. How long have you known Mr. Parks?
8  A. During the present time I was at Kilby.
9  Q. What shift does he work?
10 A. He was on second shift. Then he went to
11    first shift.
12 Q. Okay. And how would you describe your
13    relationship with Officer Parks?
14 A. It's not like a friendly, friendly basis. We
15    talk. It just -- it just a relationship. I
16    mean, it just a friendly relationship.
17 Q. How often do you talk to him?
18 A. I don't.
19 Q. Okay. Does he call you on occasion?
20 A. No, sir.
21 Q. Do you call him?
22 A. No, sir.
23 Q. Does he know about your dismissal?

Page 40

1  A. Yes, sir.
2  Q. Does he know about the facts surrounding your
3     dismissal?
4  A. As of facts of to --
5  Q. Well, did you tell him why you were
6     dismissed?
7  A. Yes, sir.
8  Q. You told him about the events in the parking
9     lot at Kilby?
10 A. Yes, sir.
11 Q. What did he tell you?
12 A. No more than he asked me what happened, and I
13    told him. And the only thing he said is it
14    just wasn't right. I received a maximum
15    disciplinary.
16 Q. You told Officer Parks about the events that
17    led to your dismissal, and he told you it's
18    not right?
19 A. Yes, sir.
20 Q. Is that your testimony?
21 A. Yes, sir.
22 Q. All right. So after talking to Officer
23    Parks, he informed you of the fact -- the

Page 41

1     purported facts that are outlined in number
2     two, correct?
3  A. Yes, sir.
4  Q. There was no physical altercation alleged in
5     number two, was there?
6  A. Not to my knowledge, sir. I don't know.
7  Q. There was no weapon used in number two,
8     correct?
9  A. Not to my knowledge.
10 Q. Okay. Basically, the purported allegations
11    are just Lieutenant Napier just left his
12    post, correct?
13 A. Yes, sir.
14 Q. All right. Let's go to number three. Did
15    you find out that information from Officer
16    Parks as well?
17 A. Yes, sir.
18 Q. Okay. And it says purportedly, Sergeant John
19    Crow assaulted his wife about a relationship
20    with an inmate. Nothing was done.
21    This is another event that was told to
22    you purportedly by Officer Parks, correct?
23 A. Yes, sir.

Case 2:05-cv-00714-WKW-CSC   Document 37-5   Filed 06/30/2006   Page 10 of 17

DEPOSITION OF FELICIA S. HENDRICKS                                April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

12 (Pages 42 to 45)

### Page 42

1  Q. And he's telling you that Sergeant Crow
2     assaulted his wife, allegedly, correct?
3  A. Yes, sir.
4  Q. Okay. Did he tell you where that assault
5     occurred?
6  A. No, sir.
7  Q. You've got no reason to believe that that
8     occurred at Kilby, do you?
9  A. I have no knowledge, sir, where it occurred.
10 Q. And you have no knowledge as to whether or
11    not a weapon was used, do you?
12 A. No, sir, I don't.
13 Q. Okay. And it says a relationship with an
14    inmate. Was this Sergeant Crow's
15    relationship with an inmate or a purported
16    relationship that Crow's wife had with an
17    inmate?
18 A. His wife.
19 Q. Okay. And number six, is that another
20    purported event that was told to you by
21    Officer Parks?
22 A. Yes, sir.
23 Q. And in number six, purportedly CO-I Jimmy

### Page 43

1     Glenn and CO-I Potterfield were involved in a
2     physical altercation where a knife was used
3     in the receiving unit at Kilby. The only
4     basis that you have for this allegation is
5     statements from Officer Parks, correct?
6  A. Yes, sir.
7  Q. The last page of Exhibit #15 is this a
8     narrative statement of yours?
9  A. Yes, sir.
10 Q. Okay. And it says what it says. But looking
11    at the second paragraph, it says, The
12    incident involving my dismissal, in my
13    opinion, was prejudiced and unfavorable due
14    to two of my fellow officers and an unknown
15    female later recognized as Selena Davis
16    approaching you -- approaching me -- in an
17    unfriendly manner which caused me to reach in
18    the door of my car where I was standing and
19    pick up a small pocket knife and made it
20    visible to them to distract or detour them
21    from approaching any further.
22       Is that your statement?
23 A. Yes, sir.

### Page 44

1  Q. Is that an accurate statement?
2  A. Yes, sir.
3  Q. Why did you put together this last page?
4  A. Because I just summed up of all the other
5     things that happened to my situation to where
6     I -- I said I was treated unfavorable because
7     of the calls that happened to where in my
8     discretion to where I was approached by an
9     aggressive officer and I -- I just -- I just
10    received the maximum disciplinary. And I
11    don't think that was right.
12 Q. All right. So you put this together in
13    response to someone other than your lawyer
14    directing you to do this or you did this on
15    your own?
16 A. I did this on my own.
17 Q. All right. We'll come back -- put this in --
18    Defendant's Exhibit #15 over here. We'll
19    come back to it. Go back to Defendant's
20    Exhibit #1. We're on number two now. Before
21    we get to number two, those are all the
22    documents that you've brought with you today
23    in response to number one of the notice to

### Page 45

1     take deposition, correct?
2  A. Yes, sir.
3  Q. Okay. Number two says all documents which
4     the plaintiff utilized to prepare for the
5     deposition testimony or to refresh your
6     recollection. Other than what you've
7     testified to already, are there any other
8     documents that falls in the category of
9     number two that you know about?
10 A. No, sir.
11 Q. Okay. Do you have copies of any medical
12    records that you intend on using in this
13    lawsuit?
14 A. No, sir.
15 Q. You've made no claim for any type of mental
16    anguish or any type of emotional distress in
17    this case, have you?
18 A. No, sir.
19 Q. Okay. Do you have any tape recordings of any
20    person, witness, that you intend on using in
21    this case?
22 A. No, sir.
23 Q. Okay. Number five, is there any paperwork

Case 2:05-cv-00714-WKW-CSC   Document 37-5   Filed 06/30/2006   Page 11 of 17
DEPOSITION OF FELICIA S. HENDRICKS                         April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

23 (Pages 86 to 89)

### Page 86

1  Q. Okay. Is it a form that you filled out in
2     hopes of countering the notice that you were
3     going to -- given a pre-dismissal conference?
4        MR. PITTERS: Object to the form.
5  Q. That's probably a good objection. I guess
6     what I'm trying to ask you is you already
7     have notice there's going to be a
8     pre-dismissal conference. I'm just trying to
9     understand why you would continually -- or
10    file a second grievance knowing that you've
11    already given notice that there's going to be
12    a pre-dismissal conference set up.
13 A. Well, at the time when I filed the first one,
14    I did not know it was going to be a
15    pre-dismissal. And this is the day -- this
16    was filed the day before the dismissal.
17 Q. I understand. But on February 18th, 2005,
18    you had a memo from the warden saying there's
19    a notice of pre-dismissal conference. You
20    didn't receive any response from the February
21    17th grievance. And then you filed this on
22    March 1st. I'm trying to understand why you
23    would do that.

### Page 87

1  A. I just filed the next step.
2  Q. Okay. The next step that you thought that
3     you ought to file regardless of whether or
4     not you received a memorandum from the warden
5     of a pre-dismissal conference?
6  A. Not regardless whether I received it. It
7     just that I didn't think I was going to be
8     dismissed for -- as of I had a
9     pre-dismissal. Then next I turned around and
10    I had a dismissal. Like I said, this was
11    filed the day before a dismissal.
12 Q. Are you telling me that on March 1st, 2005,
13    when you filed this, you had no idea you were
14    going to be dismissed?
15 A. No, sir, I didn't. A pre-dismissal. I had a
16    pre-dismissal -- recommended for a
17    pre-dismissal. But the next thing I know, I
18    was dismissed.
19 Q. Okay. Looking down at the remedy, it says,
20    For my actions, I deserve some form of
21    discipline guidance, but not dismissal. Are
22    those your words?
23 A. Correct.

### Page 88

1  Q. So you were aware that there was a
2     possibility you were going to be dismissed,
3     correct?
4  A. Well, what I told, it wasn't that I was going
5     to be dismissed from -- when I first went
6     back, I wasn't going to be dismissed. It was
7     just -- this is just a step that we go
8     through as a pre-dismissal of all that.
9  Q. Tell me what you mean by, For my actions, I
10    deserve some form of discipline.
11 A. Some form of discipline means I should have
12    got reprimanded or suspended for some days or
13    something due to other employees that have
14    the same similarities as of my situation.
15    They did not receive a dismissal at all, but
16    I did.
17 Q. Okay. So you agree with me that you did
18    something wrong on February 10th, 2005,
19    whereby you deserve some sort of discipline?
20       MR. PITTERS: Object to the form.
21 A. Can you repeat the question again, sir?
22 Q. Okay. I'm just using your words. You're
23    saying, For my actions, I deserve some form

### Page 89

1     of discipline. What actions are you talking
2     about whereby you deserve discipline?
3  A. To where I should have been punished but not
4     should have been -- for a dismissal.
5  Q. Would you agree with me that if you think on
6     March 1st, 2005 you need to be punished,
7     there is a reason why you should be punished?
8  A. There is a reason?
9  Q. Yes, ma'am.
10 A. I don't know.
11 Q. You don't know?
12 A. Unh-unh. I don't know.
13 Q. Are you saying that you should be punished
14    and you did nothing wrong?
15 A. No. I'm not saying I didn't do anything
16    wrong. I mean, I know what I did was wrong,
17    but to my discretion of what I did, it was
18    for my self defense.
19 Q. What did you do wrong?
20       MR. PITTERS: Object to the form.
21       Counsel, with all due respect,
22       could you let her finish answering
23       the question. I'm not sure.

DEPOSITION OF FELICIA S. HENDRICKS                                April 26, 2006
FELICIA HENDRICKS v. MARK McDONNELL, ET AL
Case 2:05-cv-00714-WKW-CSC   Document 37-5   Filed 06/30/2006   Page 12 of 17

17 (Pages 62 to 65)

Page 62

1    a knife in my car. As of that day, it was --
2    just happened to be in my car. But it was
3    not pulled to immediately as of to harm
4    somebody, but it's to ward off people from
5    coming to me as aggressive. And that was for
6    my defense.
7  Q. Okay. And are you saying that was why you
8    filed this lawsuit for denial of equal
9    protection?
10 A. Yes. Because I feel like I shouldn't have
11   lost my job for that.
12 Q. How were you denied due process?
13 A. As of to the grievances that I had filed --
14   two grievances that I -- a complaint and a
15   grievance that I had filed, it was not
16   answered.
17 Q. Are those grievances attached to your
18   complaint here?
19 A. Yes, sir, it is.
20 Q. All right. We'll get to those in a minute.
21   And you were denied due process because
22   someone didn't answer those grievances?
23 A. Yes, sir.

Page 63

1  Q. Who did you expect to answer those
2    grievances?
3  A. As of in the regulation that say you have to
4    file certain steps. And my first one was
5    filed to my supervisor. Then the next one I
6    filed to Warden McDonnell.
7  Q. Okay. What are you referring to? Is it in
8    State's -- Defendant's Exhibit #2 that you're
9    referring to? Let's go to the grievances.
10 A. On the very last page.
11 Q. Okay.
12 A. It was the complaint.
13 Q. All right. And what I'm looking at, it says
14   grievance, but it's G-R-I-V-A-N-C-E, slash,
15   complaint form. And it's got your signature
16   on it and it's got February 17th of '05.
17   Have I got the right document?
18 A. Yes, sir.
19 Q. Okay. When did you fill this out?
20 A. On February 17th, 2005.
21 Q. Okay. And why did you fill this out?
22 A. Because as of to that day when I was -- went
23   on mandatory leave, when I came into work

Page 64

1    that next day, I was pulled -- stopped up
2    front and I was told that the warden had
3    wanted to see me. And Officer Nelson and
4    Officer Colbert was at work and presently
5    working at the time while I was in a
6    conference with the warden on mandatory
7    leave -- to be placed on mandatory leave.
8  Q. Okay. This was at a meeting that you had
9    with Warden McDonnell?
10 A. Yes, sir, after the meeting I had with Warden
11   McDonnell.
12 Q. Okay. And you were placed on mandatory leave
13   after that day?
14 A. Yes, sir.
15 Q. And then, thereafter, you were placed on
16   mandatory leave, you felt that you needed to
17   file this grievance or complaint form?
18 A. Yes, sir.
19 Q. Okay. Did anyone direct you to do that?
20 A. I got the complaint form that I had got
21   from -- I had already had one and I had a
22   copy made of this same one from Kilby -- I
23   had a copy of one, and then I had a copy made

Page 65

1    from this one that I had already received
2    from Kilby of a complaints form.
3  Q. Okay. And tell us how you were denied due
4    process as a result of you filing this
5    particular grievance form and any results
6    thereafter.
7  A. Because I didn't receive any -- any response
8    from which it was filed to from Tchernavia
9    Blackmon, my lieutenant, and Kenneth Cash was
10   my sergeant. I didn't receive any response
11   from them.
12 Q. Did you expect a response after you had
13   already been placed on mandatory leave?
14 A. Well, yes.
15 Q. Okay. What kind of response did you expect
16   to receive?
17 A. Whatever they had -- I mean, had to say as of
18   dealing with the complaint I filed.
19 Q. Was this before or after the pre-dismissal
20   conference, this complaint? Well, I'll tell
21   you. I see a notice of pre-dismissal
22   conference from Warden McDonnell to you dated
23   February 18th, 2005. Do you recall that?

DEPOSITION OF FELICIA S. HENDRICKS                                April 26, 2006
FELICIA S. HENDRICKS V. JEFFREY MCDONNELL, ET AL
Case 2:05-cv-00714-WKW-CSC    Document 37-5    Filed 06/30/2006    Page 13 of 17

16 (Pages 58 to 61)

Page 58

1   thing as you going to your car, getting a
2   knife, opening a knife and attempting to use
3   it to assault another corrections officer in
4   the parking lot?
5       MR. PITTERS: Object to the form.
6   Q. Is that the same thing?
7       MR. PITTERS: Same objection.
8   Q. Answer if you can.
9   A. Okay. Can you ask the question again, sir?
10  Q. Did you get your answer from Mr. Pitters?
11  A. No, I didn't get my answer from Mr. Pitters.
12      I mean, it just -- how you asked the
13      question, it -- you throwing something in
14      there --
15  Q. All right. Well, what I'm getting at is you
16      filed this lawsuit, and you claim denial of
17      equal protection and due process. And on
18      page 3, you alleged that there's -- in your
19      argument for denial of equal protection and
20      due process, that male officers carry some
21      kind of pen or small knife and you, a female
22      kept a small pocket knife, which you're
23      telling me is in the car -- that somehow

Page 59

1   that's a denial of equal protection or due
2   process?
3       MR. PITTERS: Objection before she
4           answers that. Counsel, I will not
5           have you cut her off. She was
6           about to answer your question.
7           Before she answers what you just
8           represented on the record, I want
9           her to answer what she was
10          previously going to say before you
11          cut her off.
12      MR. BIGGS: Well, Mr. Pitters, that's
13          fine. I'll try to do better. But
14          I would ask you when I have a
15          question on the table, that that's
16          not the time to tell your
17          witness -- she's got to answer.
18          And if you want to take a break
19          and talk to her, you can. But if
20          there's a pending question, you
21          can't advise your client what to
22          say.
23      MR. PITTERS: I'm -- I don't want to

Page 60

1       take a break. I want her to tell
2       you what the -- what her answer
3       is.
4   MR. BIGGS: Okay.
5   Q. Do you have an answer? I didn't mean to cut
6   you off.
7   A. Yes, sir, I do. At that present time, sir, I
8       did have a pocket knife which was in my
9       possession as in my car, which was in the
10      parking lot. But as with other officers,
11      they have their knives in their possession
12      inside the institution. Yes, that is
13      different.
14      But the other thing is that I did have a
15      pocket knife and I pulled the pocket knife,
16      but I did not open the pocket knife.
17  Q. Okay. I'm going back to your complaint that
18      you filed in August of 2005. Was that the
19      basis then for your claims that you were
20      treated unfairly and were denied due process?
21      MR. PITTERS: Object to the form.
22      MR. BIGGS: What's your objection?
23      MR. PITTERS: I'm not sure what you

Page 61

1       mean by what was the basis -- or
2       was that the basis. What are you
3       referring to?
4   MR. BIGGS: I'm referring to the
5       lawsuit that she wrote herself and
6       she acted as her own attorney.
7   MR. PITTERS: What are you referring to
8       when you say was that the basis?
9       Was what the basis?
10  Q. Well, let me ask you this. In August of
11      2005, what was your argument that you were
12      denied equal protection and denied due
13      process?
14  A. Due to the fact that as of -- I just said
15      that the knife was in my car, due to the fact
16      of male officers have knives in their
17      possession inside the institution. At that
18      present the time when the knife was in my
19      car, that was for my protection outside in
20      the street wise, because I'm only a single
21      parent. It was not for me to have as -- I
22      came to work that day and forgot it was in my
23      car because I don't usually come to work with

Case 2:05-cv-00714-WKW-CSC    Document 37-5    Filed 06/30/2006    Page 14 of 17

DEPOSITION OF FELICIA S. HENDRICKS                                    April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

24 (Pages 90 to 93)

Page 90

1  Q. I'm sorry. Were you finished?
2  A. No, sir, I wasn't.
3  Q. Keep going. I'm sorry. I apologize. And
4     I'll ask you what you did wrong in a minute.
5  A. No. What I said was I know that what I did,
6     it was wrong. But two other employees, they
7     have done the similarity of things that they
8     have done, but no action wasn't taken or no
9     dismissal was not taken for those employees.
10    And, I mean, I -- I know -- like I said, I
11    know what I did was wrong, but -- I did pull
12    the pocket knife, but I didn't open the
13    pocket knife. But I used it as of to my
14    defense just to ward them off as just holding
15    it in my hand due to the aggressive one which
16    was Mrs. Colbert.
17 Q. Are you finished?
18 A. Uh-huh.
19    MR. PITTERS: Is that a yes?
20 A. Yes.
21 Q. What did you do wrong?
22    MR. PITTERS: I can put on the
23       record --

Page 91

1     MR. BIGGS: Counsel, there's a question
2        on the table.
3     MR. PITTERS: I can put on the
4        record -- I understand.
5     MR. BIGGS: And I would wish you would
6        respond to my question before you
7        take a break. If you want to take
8        a break, you can.
9     MR. PITTERS: I don't want to take a
10       break, Counselor. But she just --
11       immediately the record will
12       reflect once again to the
13       answer -- to the question that you
14       put to the witness. The witness
15       response was uh-huh. And I'm
16       trying to get the witness to
17       remember that she needs verbal
18       responses for clarity of the court
19       reporter's record. Uh-huh,
20       unh-unh is what we use in
21       colloquial. This is a formal
22       proceeding, and I want her to
23       remember to say yes or no so for

Page 92

1        clarity of the record.
2     MR. BIGGS: Thank you.
3     MR. PITTERS: Go ahead.
4  Q. There's a question on the table.
5  A. Okay. Repeat the question, sir.
6  Q. What did you do wrong?
7  A. I did pull a pocket knife, but I did not open
8     the pocket knife.
9  Q. Okay. Why is pulling the pocket knife wrong?
10 A. Why is it wrong?
11 Q. Yes, ma'am.
12 A. I'm kind of stuck right there, sir.
13 Q. Why are you stuck?
14 A. Because you -- you asking me why is it
15    wrong. I mean, as of to my defense, I don't
16    see it's wrong.
17 Q. Okay. Well, I'm getting -- to be frank with
18    you, you just testified a few seconds ago "I
19    know what I did was wrong." Now you're
20    saying it's not wrong?
21 A. Because I was on State property. It was
22    wrong for me to be on State property.
23 Q. With a knife?

Page 93

1  A. Yes. But me not knowing that at the time,
2     like I said, I don't usually carry no knife
3     on State property with me. At that present
4     time, it was just in my car.
5  Q. Okay. Are those the only actions of yours
6     whereby you say you deserve some form of
7     discipline or guidance?
8  A. My action was for what I did, I pulled -- I
9     did pull a pocket knife, but I did not open
10    it. And my discipline was for me to
11    receive -- not knowing that I was going to
12    receive a dismissal.
13 Q. Would you agree with me that you need to be
14    punished because you pulled a knife but
15    didn't open it?
16 A. Yes, because I was on State property, if
17    that's what you're saying.
18 Q. No, it's -- it's what you're saying, ma'am.
19    I'm trying to understand what you're saying.
20    You testified that what you did was wrong.
21    Now, I'm trying to understand in your mind
22    why you think what you did was wrong.
23 A. Because I pulled the pocket knife.

Case 2:05-cv-00714-WKW-CSC    Document 37-5    Filed 06/30/2006    Page 15 of 17

DEPOSITION OF FELICIA S. HENDRICKS                          April 26, 2006
FELICIA S. HENDRICKS v. WARREN MCDONNELL, ET AL.

25 (Pages 94 to 97)

Page 94

1  Q. Okay. So on that occasion on February 10th,
2     2005, you pulled a pocket knife and it was
3     wrong?
4  A. Yes.
5  Q. Why did you say in the second line for the
6     remedy sought, quote: I am willing to attend
7     and complete anger management?
8  A. Because I was told by some employees that if
9     I take an anger management class, it would
10    help me. But I don't see I need no anger
11    management class.
12 Q. Who told you you needed anger management?
13 A. Other former employees, because of the
14    situation of how it happened and how it
15    escalated.
16 Q. Who were those former employees?
17 A. I can't remember at this present time.
18    Because I mean, I talked to so many people at
19    that present time.
20 Q. Are you saying you don't have an anger
21    management problem?
22 A. No, sir.
23 Q. Okay. But you did put that down on this form

Page 95

1     that you were willing to do that?
2  A. But, yes, sir, I was willing to do that, yes,
3     sir.
4  Q. Even if you don't need it?
5  A. Even if I don't need it. I mean, that was
6     just to help, you know, protect myself for my
7     job.
8  Q. Okay. The next pages are several handwritten
9     pages. And it's signed Felicia Hendricks.
10    Is that your handwritten statement?
11 A. Yes, sir.
12 Q. Okay. Was this particular collection of
13    papers in your handwriting attached to the
14    grievance form that you filed on March 1st,
15    2005?
16 A. No, sir. This is what I wrote, because at
17    that present time, I was not asked to write a
18    statement at all.
19 Q. Okay. When you say at that present time,
20    what do you mean? What time are you talking
21    about you were not asked to write?
22 A. I was not asked at no time.
23 Q. To write a statement?

Page 96

1  A. No, sir. This was my own statement I wrote
2     and put it in with my grievance way after.
3  Q. Oh, okay. Okay. You put that with your
4     grievance?
5  A. It wasn't with -- I filed my grievance,
6     but this is with my grievance that I have
7     that's now as of to all the other grievance
8     and to --
9  Q. When did you write all that -- this
10    handwritten -- when did you write it?
11 A. This was written way after like the middle of
12    March.
13 Q. All right. And it's followed up by the
14    petition and some other statements that were
15    attached to your complaint, correct?
16 A. Yes, sir.
17 Q. Okay. I'm showing you what's Defendant's
18    Exhibit #3. Is that your amendment to your
19    original complaint?
20 A. Yes, sir.
21 Q. Okay. Are all your allegations in this
22    lawsuit contained in the original complaint
23    and in that amendment, Defendant's Exhibit

Page 97

1     #3?
2  A. Yes, sir.
3  Q. Okay. I don't want to ask you any questions
4     about that. You testified a little while ago
5     that, number one, you felt like there wasn't
6     an adequate investigation done, correct --
7  A. Yes.
8  Q. -- in this case. You also testified that you
9     never were allowed to give a written
10    statement, correct?
11 A. Yes.
12 Q. Okay. To your knowledge, there was an
13    investigation done by the I & I Division of
14    the Alabama Department of Corrections; is
15    that not correct?
16 A. Correct.
17 Q. Okay. Do you remember an investigator by the
18    name of Errick Demus?
19 A. Yes.
20 Q. Okay. Did he interview you?
21 A. Yes.
22 Q. And he interviewed you on -- well, shortly
23    after February 10th, 2005, correct?

DEPOSITION OF FELICIA S. HENDRICKS April 26, 2006
FELICIA S. HENDRICKS v. MARK MCDONNELL, ET AL.
Case 2:05-cv-00714-WKW-CSC  Document 37-5  Filed 06/30/2006  Page 16 of 17

41 (Pages 158 to 161)

### Page 158

1  to you from Commissioner Campbell. The --
2  that would be Defendant's Exhibit #5 and
3  Defendant's Exhibit #10.
4  Okay. Now, you deny -- and your
5  representations a short while ago was that
6  you did not violate the regulations set forth
7  therein by the commissioner; is that correct?
8  A. Yes.
9  Q. Now, the actions or the course of events that
10 transpired on February 10th, 2005 occurred
11 after your hours of employment with the
12 Department of Corrections -- the Alabama
13 Department of Corrections had concluded; is
14 that correct?
15 A. Yes.
16 Q. Had you clocked out from your daily
17 employment with the Alabama Department of
18 Corrections when this -- the occurrence --
19 whatever happened out there with you and
20 Colbert and Nelson on October -- on February
21 10th, 2005?
22 A. Yes.
23 Q. Okay. Do you know if Colbert had clocked

### Page 159

1  out?
2  A. Yes.
3  Q. What about Nelson and Krammer Penn and all of
4  the folks that were there? Do you know if
5  everyone had -- their shift had ended and
6  y'all had terminated your employment that day
7  and were off the clock?
8  A. Yes.
9  Q. Okay. So what transpired on February 10th,
10 2005, that forms the basis of Mr. McDonnell's
11 recommendation to the Commissioner that you
12 be terminated and the Commissioner's
13 subsequent or -- subsequent action on
14 Mr. McDonnell's recommendation all occurred
15 after you -- well, let me back up.
16 Did not occur within the line and scope
17 of your employment with the Alabama
18 Department of Corrections; is that correct?
19    MR. BIGGS: Object to the form. She's
20        not qualified, and it's leading
21        your witness. There's no
22        predicate, and invades the mental
23        operations of folks that's not

### Page 160

1  her. That's my objection.
2  Q. Go ahead. Let me redo the question.
3  Apparently you don't recall it.
4  Were y'all off the clock, not working,
5  had concluded your shift and were on your way
6  home when all this happened?
7  A. Yes.
8  Q. And to that extent, did not occur within the
9  line and scope of your employment, correct?
10    MR. BIGGS: Object to the form. Not
11        qualified to give that answer.
12 Q. Is that correct?
13 A. Yes.
14 Q. Okay. Now, you did not fight, assault, or
15 engage in physical violence or disruptive
16 behavior during the hours of your employment
17 with the Alabama Department of Corrections on
18 February 10th, 2005, did you?
19    MR. BIGGS: Object to the form.
20 A. No.
21 Q. You did not possess or use a firearm,
22 weapons, explosives or other dangerous items
23 during the hours of your employment with the

### Page 161

1  Alabama Department of Corrections on February
2  10th, 2005, did you?
3  A. No.
4  Q. Now, number two on page 2 of the
5  commissioner's correspondence of May 4, 2005,
6  addressed conduct that is disgraceful on or
7  off the job that doesn't adversely affect
8  employees' effectiveness on the job. Did you
9  engage in any disgraceful conduct that
10 affected your effectiveness during the hours
11 of two to ten p.m. on February 10th, 2005?
12    MR. BIGGS: Object to the form.
13 A. No.
14 Q. How would you -- how would you describe your
15 effectiveness on the job with the Department
16 of Corrections on February 10, 2005 when you
17 worked for the Department of Corrections on
18 that day, between -- did you say you worked
19 between two to ten p.m. that day?
20 A. Yes, sir.
21 Q. How would you describe your effectiveness on
22 the job during those hours? Did anything
23 occur disgraceful or --

DEPOSITION OF FELICIA S. HENDRICKS                           April 26, 2006
FELICIA S. HENDRICKS V. WARDEN MCDONNELL, ET AL.
Case 2:05-cv-00714-WKW-CSC   Document 37-5   Filed 06/30/2006   Page 17 of 17

42 (Pages 162 to 165)

Page 162

1    MR. BIGGS: Which question you want her
2        to answer first? You've asked
3        numbers of questions.
4    MR. PITTERS: Strike all of that,
5        Ms. Court reporter.
6 Q. During the hours of two to ten p.m. on
7    October -- no, February 10, 2005, did you
8    engage in any disgraceful conduct that
9    adversely affected your -- or adversely
10   affected your performance on the job between
11   two to ten p.m. on February 10, 2005?
12   MR. BIGGS: Object to the form.
13 A. No.
14 Q. Were you written up during the hours of two
15   to ten p.m. on February 10, 2005?
16 A. No.
17 Q. Has Mr. McDonnell ever complained to you that
18   you engaged in any conduct between the hours
19   of two to ten p.m. on February 10, 2005
20   adversely reflecting your ability to perform
21   your job with the Department of Corrections?
22 A. No.
23 Q. All right. Now, Counsel asked you --

Page 163

1    opposing counsel asked you earlier about your
2    engaging in premeditation with respect to the
3    pocket knife that you had in your car in your
4    confrontation -- the confrontation you had
5    with -- is it Officer Colbert? Did you
6    previously had made up your mind before
7    February 10th of 2005 with respect to what
8    occurred in that parking lot, did you engage
9    in mental deliberations to use -- to get that
10   knife from your car and assaulted or engage
11   in any fight with Officer Colbert?
12   MR. BIGGS: Object to the form.
13 A. No.
14 Q. Now, Counsel asked you about the defendants
15   that you have named in this lawsuit. And he
16   asked you about warden -- now, Warden
17   McDonnell and the Department of Corrections,
18   are those -- that's who you named in your
19   original complaint; is that correct?
20 A. Yes.
21 Q. Okay. Now, when you named the Department of
22   Corrections, were you filing suit against the
23   Alabama -- the State of Alabama, Department

Page 164

1    of Corrections?
2 A. Yes.
3 Q. And indeed, in your complaint, you see where
4    you -- you have made reference to the Alabama
5    Department of Corrections, correct?
6 A. Yes.
7 Q. Okay. Now, who fired you?
8    MR. BIGGS: Objection to form.
9    MR. PITTERS: I'll rephrase the
10       question.
11 Q. Did you get a notice from the -- the
12   Defendant's Exhibit I think it's #10. Yeah.
13   Did you understand from that correspondence,
14   Defendant's Exhibit #10, March 4th, 2005, who
15   was that -- first of all, who was that
16   correspondence from?
17 A. Donal Campbell.
18 Q. Did you understand -- and what was that --
19   what did that -- what did you understand from
20   that correspondence from Commissioner
21   Campbell?
22 A. That I was going to be terminated, dismissed.
23 Q. Okay. And Donal Campbell -- I mentioned

Page 165

1    commissioner. You understood at the time
2    when you got this correspondence, that he was
3    the commissioner of the State of Alabama
4    Department of Corrections, correct?
5    COURT REPORTER:
6 A. Yes.
7 Q. Okay. And before this letter of termination,
8    you were placed on mandatory leave effective
9    February 11th, 2005; is that correct?
10 A. Yes.
11 Q. Let me show you -- okay. You're looking at
12   it. Tell me what's that document you're
13   looking at right now.
14 A. It's a memorandum to Felicia Hendricks,
15   correctional officer, from Donal Campbell,
16   Commissioner, subject: Mandatory leave
17   placement effective February 11th, 2005.
18 Q. Okay. Now, is that -- that document you just
19   read from, is that what you're referring to
20   when you told opposing counsel that --
21   MR. BIGGS: Objection to form. I'm
22       sorry. You're leading the
23       witness. Go ahead. I'm sorry. I